# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-CR-00327 |
| | ) | |
| [1] CHESTER GALLAGHER | ) | JUDGE TRAUGER |
| [2] HEATHER IDONI | ) | |
| [3] CALVIN ZASTROW | ) | |
| [4] COLEMAN BOYD | ) | |
| [5] CAROLINE DAVIS | ) | |
| [6] PAUL VAUGHN | ) | |
| [7] DENNIS GREEN | ) | |
| [8] EVA EDL | ) | |
| [9] EVA ZASTROW | ) | |
| [10 JAMES ZASTROW | ) | |
| [11 PAUL PLACE | ) | |

## REPLY OF DEFENDANTS
## IN SUPPORT OF THEIR MOTIONS TO DISMISS INDICTMENT
## AND SUPPORTING MEMORANDUM OF LAW

COME NOW the Defendants, Coleman Boyd, Caroline Davis, Eva Edl, Chester Gallagher, Dennis Green, Heather Idoni, Paul Place, Paul Vaughn, Calvin Zastrow, Eva Zastrow, and James Zastrow, by and through undersigned counsel, submitting this reply in support of the Defendants' motions to dismiss and in rebuttal to the Government's response memorandum; and in further support hereof would show to the Court the following:

1

<u>**MEMORANDUM OF LAW**</u>

**I.      Introduction**

Defendants in this case were not acting against health services for birth control or other activity that could be classified as "reproductive health services." They were demonstrating against abortion. The allegations of the Indictment make this very clear. The Government's Response would have this Court ignore the clear allegations of the Indictment, and reason as if *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 597 U.S. _____ (6/24/2022) had no effect on the FACE Act. These arguments crash against the language of the Indictment and controlling Supreme Court authority. In this Reply supplementing their motions, Defendants show that the Indictment is defective under two alternative analyses: one assuming a continued viability of the FACE Act after application of *Dobbs*, and the other based upon showing that the FACE Act is no longer valid after application of *Dobbs*.

**II.     Application of the *Dobbs* Decision**

      **A.      *Dobbs* changed the scope of the FACE Act.**

The Government's response argues that retroactive application of *Dobbs* is not relevant to this case because it would not shield Defendants from prosecution under the FACE Act, since the clinic offered reproductive health services other than abortion and the Defendants allegedly physically obstructed a patient's and an employee's right to access such other services. DE 264 at 8-9. Such argument ignores the allegations of the Indictment and the impact of the *Dobbs* decision on the scope of the FACE Act.

Supreme Court authority requires application of *Dobbs* to the facts of this case (which facts occurred before *Dobbs* was decided) and to the interpretation of the FACE Act. Before *Dobbs*, the FACE Act was analyzed by the Sixth Circuit, and other circuits, using the working

understanding that the terms "reproductive health services" used in the statute included abortion. At that time, abortion was protected by the Supreme Court's interpretation of the Constitution. After *Dobbs*, abortion is not protected under federal law and can be criminalized by the States. Under such laws, both State officers and private persons can certainly interfere with access to and the provision of "reproductive health services," if those terms are interpreted to include abortion. One effect of *Dobbs* is that the terms "reproductive health services" in the FACE Act can no longer include abortion (if the FACE Act has any continuing viability after *Dobbs*).[1]

The Indictment specifically alleges that the Defendants were "conspiring" to act and acting against *abortion*, not against any other reproductive health service. Indictment paragraphs making these specific allegations include:

¶ 1  Carafem Health Center ("Clinic") was a <u>provider of abortions</u> located in Mt. Juliet, in the Middle District of Tennessee.

¶ 9  Gallagher utilized social media to promote <u>anti-abortion events</u>.

¶ 19  Boyd asked Patient A if she was "Trying to come to <u>the abortion mill</u>?"

¶ 19  Boyd's child walked up to Patient A and asked her and her companion if they were "looking for <u>the abortion clinic</u>?"

¶ 19  Boyd told his livestream audience that Patient A was a "mom coming to kill her baby."

¶ 21  Gallagher stated that rescuers present there to "rescue families from this place of destruction."

¶ 27  Green explained to his Facebook livestream audience that he "hoped to stop as many murderous appointments as we can."

---

[1] It should be noted that "the termination of a pregnancy" is expressly included in the definition of "reproductive health services" in the FACE Act. 18 U.S.C. § 248(e)(5). If FACE has any continuing validity after *Dobbs*, this language would have to be considered inoperable, as the right protected when the statute was enacted is now, after *Dobbs*, not protected, and even criminalized in some States. Such treatment is not unlike other statutes that have never been repealed and remain on the books, even though the statute or some subpart thereof has been held to be unconstitutional.

Application of *Dobbs* to these Indictment allegations (taken as true at the motion to dismiss stage), shows Defendants were working together to act in ways that, after *Dobbs*, are *not* prohibited by FACE or any other federal law. The aim of their working together (alleged "conspiracy") was not against any right protected by federal law. Their purpose was not unlawful. Their conduct was not indictable under 18 U.S.C. § 241. The second result flowing from application of *Dobbs* is: if Defendants were acting to obstruct access to or provision of *abortions*, Defendants were not committing acts that are prohibited by the FACE Act, because, after *Dobbs*, the terms "reproductive health services" cannot include abortion services. And even if the FACE Act still includes abortion, application of the conspiracy against civil rights statute (18 U.S.C. § 241) to a "right" included in the FACE Act is still entirely invalid — given that the FACE Act was expressly predicated on the since-nullified "right" to abortion (as further discussed below).

The "conspiracy" conclusion is further confirmed by the Supreme Court's holding in *Bray v. Alexandria Women Health Clinic*, 506 U.S. 263 (1993). Even before *Dobbs*, the federal right to abortion was not protected by federal law against a purely private conspiracy (i.e., one not involving state action by state officials). Where private-person defendants agreed to work together (or "conspired") to deprive other persons of abortions and the conduct of the alleged conspirators had an incidental effect upon a right that is federally protected against private conduct, the incidental effect did not bring the defendants within the purview of the federal conspiracy statute. *Id.* at 278. In the instant case, the Indictment alleges that the Defendants were engaged in a purely private conspiracy against abortion. Thus, even without *Dobbs*, the Section 241 charge against these Defendants is defective. Further, the Supreme Court has recognized that application of the § 241 conspiracy statute must be limited to violations of federal "*civil rights*"

4

that are "a direct traditional concern of the Federal Government," and must "not raise fundamental questions of federal-state relationships." *United States v. Price*, 383 U.S. 787, 806 (1966) (emphasis added); *see also id.* at 802 ("from [its] original enactment," § 241 "was intended to deal . . . with conspiracies to interfere with Federal rights"). That the instant Section 241 charges plainly disrupt the federal-state balance required by proper application of § 241 is all the clearer considering that abortion is a crime under Tennessee law, which of course flows from *Dobbs*.

Applying these controlling legal principles to the instant case compels the conclusion that since Defendants were acting solely to oppose abortion, not some generic "reproductive health service," such conduct was not aimed at a federally protected right and the Section 241 conspiracy charge should be dismissed. And even if Defendants' demonstrating against abortion had some incidental effect upon some other right that was protected (e.g., assuming arguendo that access to generic reproductive health services is such a right), such incidental effect does not bring Defendants within the purview of Section 241. Thus, if Defendants, while demonstrating against abortion, incidentally blocked or interfered with some person's attempt to access or provide some "reproductive health service" other than abortion, then the FACE Act (again assuming continued viability) cannot be applied to the demonstration in such a way as to violate the First Amendment free speech and free exercise rights of Defendants. If the FACE Act were applied in such way, the result would be an unconstitutional application of the statute, as discussed further below.

**B.** *Dobbs* **removed the basis for FACE Act validity under the Commerce Clause**.

But *Dobbs* did even more than change the scope of the FACE Act. *Dobbs* removed the foundational pillar upon which the circuit courts, specifically including the Sixth Circuit, relied to support a conclusion that the FACE Act was a valid exercise of Congress' Commerce Clause authority. Again, the Government's argument – that FACE "protects the broad category of 'reproductive health services," not simply abortion (DE 264 at 5, 7) – ignores this effect of *Dobbs*.

As demonstrated in the legislative history set forth in Defendants' brief (DE 245, 18-20), the foundation upon which FACE was erected was the so-called right to abortion. As decorative window dressing, Congress added "reproductive health services" to the abortion foundation. It made no legislative findings with respect to "reproductive health services" generally, it recited no incidents of violence or blockades directed at "reproductive health services" generally, and it made scant mention of "reproductive health services" generally throughout the enactment process and debates. Yet the Government now hangs virtually its entire argument defending the continued viability of FACE upon the slender thread of "reproductive health services." That thread cannot sustain the weight of the entire rationale for the FACE Act's constitutionality.

Similarly, for every federal circuit court that addressed the constitutional validity of FACE before *Dobbs*, abortion was the foundation of the analytical framework, just as it was for the Congressional findings upon which enactment was based. This is equally true of the cases cited by the Government. In the Sixth Circuit's *Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002), the court stated:

> we note that the presence of a national commercial market in *abortion-related services*, together with the effects on such market of the proscribed conduct, serves as a limiting principle circumscribing Congress's regulation of intrastate activity under the Act." . . .

6

*Id.* at 557 (emphasis added). And,

> *Morrison* also instructs us to consider any congressional findings that a particular activity burdens interstate commerce. . . . Both the Senate Judiciary Committee and the House Committee on Labor and Human Resources submitted extensive reports detailing that clinic blockades **and** violent *anti-abortion protests burdened interstate commerce*. . . .

*Id.* (emphasis added) (citations omitted). And,

> Finally, the fourth Morrison factor directs us to assess the link between the regulated activity and interstate commerce. . . . With respect to this first inquiry, the legislative record indicates that there is a *national market for abortion services*. . . .

*Id.* at 557-58 (emphasis added) (citations omitted). And,

> Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act disrupted the *national market for abortion-related services* and decreased the availability of such services. Considered along with the other Morrison factors, we hold that Congress validly enacted the Act pursuant to its Commerce Clause power.

*Id.* at 559 (emphasis added) (citations omitted).

This same basis was relied upon and the same rationale employed in *United States v. Gregg*, 226 F.3d 253, 262 (3rd Cir. 2000), from which *Norton* drew heavily.[2] *See also*, *U. S. v.*

---

[2] *Gregg* could not have been clearer as to the activity at which FACE was aimed: "Based on the testimony and evidence before it, Congress found that the clinic blockades, the threats against employees, and the other violent and obstructive activities prohibited by FACE have the single goal of eliminating *the practice of abortion* by closing *abortion* clinics." *Id*. at 264 (citing S.Rep. No. 103–117, at 11; H.R.Rep. No. 103–306, at 6, U.S.C.C.A.N., at 703) (emphasis added). In addition, Judge Weis authored a powerful dissent in *Gregg*. Persuaded that *Lopez* and *Morrison* had altered the landscape in Commerce Clause analysis, Judge Weis would have found FACE unconstitutional. "*Lopez* and *Morrison* mandate limits to the federalization of local crime under the aegis of the Commerce Clause." *Id*. at 268. Similarly, Judge Coffee dissented in the Seventh Circuit's ruling in *U.S. v. Wilson*. Judge Coffee would have found FACE unconstitutional because it does not regulate economic activity that substantially affects interstate commerce: "Title 18 U.S.C. § 248 does not regulate the business or commercial practices of abortion clinics. Rather, the Act criminalizes the *purely non-economic activity* (i.e., the civil disobedience) of anti-abortion protesters." 73 F.3d 675, 689 (emphasis added). If FACE failed the Commerce Clause analysis *before Dobbs*, how much more does it fail *after Dobbs*.

*Weslin*, 156 F.3d 292 (2d Cir. 1998); *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997) (relying on the analysis and authority of *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995)); *U. S. v. Bird*, 124 F.3d 667 (5th Cir. 1997); *Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996) ("The Senate Committee on Labor and Human Resources, which held hearings on *anti-abortion violence* and drafted the bill that ultimately became the Access Act, concluded that for several reasons *abortion clinics* do engage in interstate commerce; . . . .") (emphasis added); *U. S. v. Soderna*, 82 F.3d 1370 (7th Cir. 1996); *U. S. v. Dinwiddie*, 76 F.3d 913, 919 (8th Cir. 1996); *U. S. v. Wilson*, 73 F.3d 675, 680 (7th Cir. 1995); *Cheffer v. Reno*, 55 F.3d 1517, 1520 (11th Cir. 1995) (adopting the reasoning of *American Life League, Inc. v. Reno*, 47 F.3d 642, 647 (4th Cir. 1995)). *Norton* mentioned abortion no less than 30 times; *Gregg* mentioned it 63 times; *Weslin*, a short per curiam opinion, mentioned abortion 13 times. FACE always was about abortion, and abortion is the pillar upon which circuit courts based their holdings.

All these cases were decided before *Dobbs*, at a time when the controlling Supreme Court precedent held that abortion was protected by the Constitution. In such an environment, with the added fact that Congressional committees cited the protection of abortion as the reason for the FACE Act, it is not surprising that circuit courts relied on abortion as the basis for supporting the validity of the FACE Act under Congress' Commerce Clause authority. With such history, the FACE Act and the cases interpreting it cannot help but run headlong into the *Dobbs* decision. After *Dobbs*, FACE and the case law must be re-examined. The rationale of these cases upholding the constitutionality of FACE collapses without abortion.

The Government's Response argues that the FACE Act remains valid because it protects a broad category of "reproductive health services." (DE 264 at 7.) But the Government cites no authority for that proposition. Notably, the Government cites no court opinion that has evaluated

8

the validity of the FACE Act based upon such "broad category" providing the basis for Congress' authority. The two cases cited by the Government (*Norton v. Ashcroft*, and *Terry v. Reno*, 101 F.3d 1412 (D.C. Cir. 1996)) discussed interstate travel and purchases of supplies in interstate commerce in the context (and based upon the foundation) of *abortion* being the reproductive health service that (a) required the interstate travel, (b) required purchases of supplies in interstate commerce, and (c) was expressly specified by Congress as the purpose for adopting the FACE Act. *Norton*, 298 F.3d at 558; *Terry*, 101 F.3d at 1415-16. They do not stand for the proposition that the FACE Act remains valid without abortion as its primary (if not only) underpinning.

After *Dobbs*, in those States where abortion is now a crime, any ostensible national market for abortion services is an illegal enterprise. Abortion services can no longer serve as the commercial activity that justifies Congress' authority to regulate interstate commerce, since *Dobbs* returned the issue of abortion to the States. *See Dobbs*, 142 S. Ct. at 2279 ("[T]he authority to regulate abortion must be returned to the people and their elected representatives."). As such, every court decision that relied on abortion and abortion services as the foundation for Congress' authority to adopt the FACE Act must be re-examined in light of *Dobbs*. Such re-examination leads directly to an analysis of the application of *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000) to the FACE Act. Without abortion as the lynchpin for interstate commerce to support Congress' authority under the Commerce Clause, FACE is left with run-of-the-mill reproductive health services that were never the object of blockades or any nationwide campaign to shut them down. Such services have long been the subject of regulation by an individual State's health and medical authorities. And the fact that such services have an incidental effect on interstate commerce or the fact that

9

there is a national market for health care services is not sufficient to sweep such services within the ambit of Congress' Commerce Clause authority. [3]

### C. Without abortion as a federally protected right, the FACE Act fails the Commerce Clause analysis.

In *NFIB v. Sebelius*, 567 U.S. 519 (2012), the Supreme Court held that "Obamacare's" individual mandate exceeded Congress' power under the Commerce Clause. [4] In authoring the majority opinion Chief Justice Roberts reiterated certain basic principles of Congressional authority. "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." 567 U.S. at 533. "The Constitution's express conferral of some powers makes clear that it does not grant others. And the Federal Government 'can exercise only the powers granted to it.'" *Id.* at 534-35 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819)).

The Government here seems to forget these principles, essentially presuming its powers are plenary. They are not. To sustain legislation under Commerce Clause authority it is generally required that the law regulate commerce. *Id.* at 550 ("The power to regulate commerce presupposes the existence of commercial activity to be regulated.") Without the abortion

---

[3] Taken to its logical extreme, an argument can be made that virtually *any* noneconomic intrastate activity has an impact on interstate commerce. But the law does not (and cannot) go that far. In *Lopez* and *Morrison*, the Court, conscious of the potential of the "substantially affects" test to "obliterate the distinction between what is national and what is local," rejected the argument that Congress may regulate *noneconomic* activity based solely on the effect that it may have on interstate commerce through a remote chain of inferences. *Lopez*, *supra*, at 564–567; *Morrison*, *supra*, at 615–618. "[I]f we were to accept [such] arguments," the Court reasoned in *Lopez*, "we are hard pressed to posit any activity by an individual that Congress is without power to regulate." 514 U.S. at 564; Thus, although Congress's authority to regulate intrastate activity that substantially affects interstate commerce is broad, it does not permit the Court to "pile inference upon inference, *Lopez*, *supra*, at 567, in order to establish that noneconomic activity has a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 35-36 (2005) (Scalia, J., concurring in the judgment) (emphasis in original).

[4] The Court nevertheless upheld the individual mandate under Congress' taxing powers.

component, the FACE Act fails the most elementary Commerce Clause analysis. Defendants' expressive conduct was not by any means economic activity.

*NFIB v. Sebelius* made plain the insufficiency of an interstate "market" alone to support plenary federal regulation under the Commerce Clause of any form of non-economic intrastate conduct. Indeed, the rationale advanced by the Government here is nearly identical to that found wanting in *NFIB v. Sebelius* -- that in the aggregate, an individual's decision to not purchase health insurance had a substantial effect on the national market for healthcare was insufficient to sweep it within the ambit of Commerce Clause authority. *See* 567 U.S. at 551-57. Likewise, without the abortion component, it is insufficient here to sustain Congressional authority to enact FACE.

Another distinguishing feature of the FACE Act is that it does not purport to regulate the economic activity of reproductive health services. The FACE Act regulates only the *non-economic activity of interfering with access to or provision of* reproductive health services. But significantly, "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature*." *U. S. v. Morrison*, 529 U.S. 598, 613 (2000) (quoting *Lopez*, 514 U.S. at 559-60) (emphasis added). Singing hymns, praying, and ministering in one-on-one conversations is emphatically not "economic in nature." Ergo, the FACE Act cannot be sustained as a valid exercise of Commerce Clause authority, especially not without abortion.[5]

---

[5]  Although it is true that including abortion in the analysis does not change the fact that Defendants' peaceful pro-life activity was noneconomic, it does remove the "abortion-distortion" factor and crystallize the glaring defects in the FACE Act. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 785 (1994) (Scalia, J., concurring) ("no legal rule or doctrine [bearing any link to abortion] is safe from ad hoc nullification") (citations omitted); *SisterSong Women of Color Reprod. Just. Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022) ("Because we take the Supreme Court at its word, we must treat parties in cases concerning

As mentioned, the Sixth Circuit in *Norton v. Ashcroft* expressly acknowledged that it was abortion that undergirded the FACE Act: "Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act *disrupted the national market for abortion-related services* and decreased the availability of such services." 298 F.3d at 558 (emphasis added). It was upon this basis that the Sixth Circuit, recognizing that the FACE Act did not regulate economic activity, reasoned that non-economic "activity with an effect that is economic in nature" could be swept under the authority of the Commerce Clause, because that effect "disrupted the national market for *abortion*" and "intimidated a number of physicians from offering *abortion services*." *Id.* at 262 (emphasis added). But that rationale is irreconcilable with the Supreme Court's admonition that it has upheld "Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Morrison*, *supra*, 529 U.S. at 613.

Now, after *Dobbs*, the *Norton* court's analysis no longer has any foundation. Non-economic "activity with an effect that . . . disrupts the national market for abortion" is no longer a basis for Commerce Clause authority. The non-economic activity of disrupting "reproductive health services" is not an adequate basis for Commerce Clause authority simply because there is a national market for health care. *NFIB v. Sebelius*, 567 U.S. at 551-57. And to sweep that non-economic activity into Commerce Clause authority is to do what *United States v. Lopez* and *United States v. Morrison* said had never been done. FACE is unconstitutional after *Dobbs*.

---

abortion the same as parties in any other context. *See Dobbs*, 142 S. Ct. at 2275–76. And to the extent that this Court has distorted legal standards because of abortion, we can no longer engage in those abortion distortions in the light of a Supreme Court decision instructing us to cease doing so.") (citations omitted); *Memphis Ctr. for Reprod. Health v. Slatery*, 14 F.4th 409, 437 (6th Cir.), *reh'g en banc granted, opinion vacated*, 18 F.4th 550 (6th Cir. 2021) (Thapar, J., concurring in judgment in part and dissenting in part) ("There are rules for most cases, and then there are rules for abortion cases.").

**III.    The Indictment Violates First Amendment Rights by Unconstitutional Application of Sections 241 and 248.**

The Government argues that the FACE Act is content neutral, and its application in this case does not violate Defendants' First Amendment rights. (DE 264 at 913). Here again, the Government ignores the application of *Dobbs*.

Supreme Court case law has repeatedly held that a content neutral statute can be enforced and applied in such a way that it infringes First Amendment rights. A content-neutral statute that prohibits interference with police officers can be unconstitutionally applied, see, e.g., *Houston v. Hill*, 482 U.S. 451 (1987), as can a disorderly conduct statute, see, e.g., *Brown v. Louisiana*, 383 U.S. 131 (1966), and an anti-loitering ordinance, see, e.g., *Shuttleworth v. Birmingham*, 382 U.S. 87 (1965).

In the instant case, when *Dobbs* is applied to the FACE Act (here assumed to have continuing viability) the terms "reproductive health services" cannot be interpreted so as to include abortion services. Then, as discussed above, *Bray v. Alexandria Women Health Clinic* is directly on point, making it clear that 18 U.S.C. § 241 may not be applied so as to sweep within its ambit the coordinating actions ("conspiring") of individuals to pursue First Amendment protected activities, even where such activities have the incidental effect of interfering with another's exercise of a federally protected right. Accordingly, even if Defendants' expressive activities had the incidental effect of interfering with some person's access to some reproductive health services (other than abortion), then Defendants' actions are protected by the First Amendment and may not be punished as a crime by application of an otherwise content-neutral FACE Act that would punish their protected activity as a crime.

13

## IV.   The United States has engaged in Selective Prosecution and Viewpoint Discrimination.

The Government would have this Court create new standards for the Defendants to meet in order to show selective prosecution. For example, the Government argues that Defendants have failed to identify any pro-choice individual responsible for an un-prosecuted incident or to explain how there is sufficient evidence to prove beyond a reasonable doubt that the unidentified person violated § 248(a)(1). (DE 264 at 18). Nowhere does the law require Defendants to present evidence sufficient to prove "beyond a reasonable doubt" that an unprosecuted person is guilty.

For the purpose of satisfying the discriminatory-effect prong, "some evidence" means "a credible showing" that "similarly situated individuals . . . were not prosecuted." *United States v. Thorpe*, 471 F.3d 652, 657 (6th Cir. 2006) (quoting *United States v. Armstrong*, 517 U.S. 456, 465, 470 (1996)). The Sixth Circuit's holding in *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998) is instructive in this regard. In *Jones*, the court reversed the district court's order denying discovery to Jones, an African-American man, on his selective-prosecution claim. The court reasoned that in addition to the flagrant and uncontroverted evidence of discriminatory intent, Jones had also satisfied the "some evidence" standard as to discriminatory effect by introducing evidence that "law enforcement referred only him and his co-defendant for a federal prosecution that involved crack cocaine, and failed to refer for federal prosecution eight non-African-Americans who were arrested and prosecuted for crack cocaine." *Jones*, 159 F.3d at 978. Neither the small sample size nor the fact that Jones's codefendant was Caucasian prevented the appellate court from remanding Jones's case to the district court to compel discovery. *United States v. Thorpe*, 471 F.3d at 658.

The defendants' burden is to adduce "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent."

*Armstrong*, 517 U.S. at 468. And an equal protection violation may be established by inferences drawn from indirect evidence, valid relevant statistical evidence, or other circumstantial evidence. *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019). "The goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination." *U. S. v. Aguilar*, 883 F.2d 662, 706 (9th Cir.1989), *cert. denied*, 498 U.S. 1046 (1991). There is no magic formula for determining who is similarly situated; the inquiry is one of common sense. *Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th Cir. 2001). "The similarly situated group is the control group." *Aguilar*, 883 F.2d at 706. Statistical evidence may be used to prove discriminatory effect. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002). "Raw statistics" alone are not enough to prove discriminatory effect *unless* they account for similarly situated individuals of other groups who were not investigated. *U. S. v. Bass*, 536 U.S. 862, 863 (2002). Courts have held that [t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *U. S. v. Whitfield*, 29 F.Supp.3d 503, 514-515 (E.D. Pa. 2014). When statistical evidence is used to show a discriminatory effect, that evidence should include: (1) reliable demographic information; (2) some manner of determining whether the data reflects similarly situated individuals; and (3) information about the actual rate of occurrence of the suspected crime across relevant groups. *U. S. v. Alabi*, 597 Fed. App'x 991, 997 (10th Cir. 2015).

The second requirement that a defendant must prove to prevail on a selective enforcement claim is that the law enforcement officers in his case "decided to enforce the law against him on the basis of an impermissible ground such as race." *Lacey v. Maricopa County*, 693 F.3d 896, 922 (9th Cir. 2012). To satisfy the discriminatory purpose prong, a defendant need only show that "discriminatory intent was a motivating factor in the decision to enforce the

criminal law against the defendant." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). Discriminatory intent does not have to be the sole motivating purpose, such intent must have been only "a motivating factor in the decision . . . ." *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003). "'[D]iscriminatory purpose' . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).

In the instant case, Defendants present evidence of discriminatory intent that is strong and flagrant. No lesser figure than the Department of Justice's Assistant Attorney General for Civil Rights, Kristen Clarke, who oversees the DOJ investigations into violations of the FACE Act, has openly expressed her support for abortion, and has called pro-life pregnancy centers "fake clinics." The Government claims that Defendants "fail to present any evidence to support their claim" about Ms. Clarke. (DE 264 at 19.) But in fact, Ms. Clarke has provided evidence (presented by the Defendants) by her openly expressed intent, and that intent produced the effect one would expect. Under Clarke's oversight, the DOJ used the FACE Act to charge more than 20 pro-life individuals in 2022. Compared to the prosecution of pro-abortion persons who attacked pro-life groups, the DOJ did not charge one in 2022, despite repeated violations being committed by pro-abortion activists. When these statistics are viewed in light of Kristen Clark's public statements of bias, the evidence is clear and the case for selective prosecution and viewpoint discrimination is compelling. To this should be added the fact that the Department of Justice did not bring charges against these Defendants until after *Dobbs* was decided. The Department's prosecution of these defendants so many months after the incident-at-issue was a response by the

DOJ to the *Dobbs* decision, a decision the DOJ officials have stated publicly they disagree with. This is additional evidence of intent.

The Government's own statements and reports corroborate the statistical evidence that shows the Department of Justice's discriminatory intent and purpose, and then the discriminatory effect on the Defendants' for exercising their First Amendment rights to oppose abortion. The one-sided nature of the federal government's position could hardly be clearer. It would be a rare case where a defendant would have stronger evidence of a governmental intent to discriminate against one side in a political debate. Nevertheless, such evidence has recently come to light. When the Government finally undertook to prosecute one pro-abortion activist, it showed astonishing leniency, quite foreign to its practice and pattern in the prosecution of pro-life activists like Defendants.

In Bellevue, Washington, a pro-abortion activist who defaced a Catholic church with profane graffiti, smashed two glass doors, assaulted an employee, and then attacked the police cruiser when confronted by the police, was arrested on June 28, 2022, only four days after the *Dobbs* decision was released. Amanda Zhou, "Police arrest Bellevue resident suspected in hate crime after church vandalism," Seattle Times June 29, 2022, https://www.seattletimes.com/seattle-news/law-justice/police-arrest-bellevue-man-suspected-in-hate-crime-after-church-vandalism/. Despite the perpetrator admitting to his criminal conduct and the fact that the attack on the church was captured on videotape, the DOJ *failed to charge him with a FACE violation* and then *recommended no jail time*.[6] Joe Schoffstall, "Biden DOJ recommends no jail time for trans vandal of Catholic church: 'F--- Catholics'," Fox News April 12, 2023, https://www.foxnews.com/politics/biden-doj-recommends-no-jail-time-for-trans-

---

[6] Instead, the DOJ charged him with a misdemeanor, destruction of religious property. *Id*.

vandal-of-catholic-church-f-catholics. Thus, violent pro-abortion activists are treated with kid gloves while peaceful pro-life activists are given no quarter, prosecuted to the nth degree, and subjected to FBI SWAT teams when being arrested.

The Government argues that Defendants have not presented clear evidence of discriminatory purpose or effect. (Doc. 264 at 17-19). "The defendants present no actual evidence showing that the Department of Justice has elected not to prosecute pro-choice individuals similarly situated to the defendants." *Id.* at 17. If this is not clear evidence of discriminatory purpose and effect, then those terms have lost all meaning.

## V.    The FACE Act is not content-neutral.

The Government recites that the reviewing courts of appeals have upheld FACE against constitutional challenges thus far. (DE 264 at 10). But once again, the Government ignores the fact that recent Supreme Court decisions have reset the content-based analysis, and no court has revisited that issue since. The Government concedes, as it must, that expressive conduct – which the Defendants were engaged in -- is "a First Amendment activity." *Id.* In addition, the Government cannot gainsay the plain language of the Act, which on its face limits its reach to only obstruction that is undertaken *because* that individual is "obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). A truly content neutral statute would not include a "because" clause. Were the law's sole object to guarantee access to "reproductive health services," the motive for impeding such access would be immaterial. After all, obstruction of access for other reasons imposes an equal burden upon the alleged interstate commerce of the facility, yet it is left wholly unregulated under FACE.

"[T]he notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994)

(ordinance allowing numerous exceptions to ban on residential signs unconstitutional); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425-26 (1993) (removal of commercial newsracks to promote safety and aesthetics violated First Amendment because noncommercial newsracks posing identical problems remained unregulated). FACE does not in fact serve its purported purpose of protecting interstate commerce; it allows burdens on that alleged interest, only not those imposed by pro-lifers. It is underinclusive.

The Government further argues that *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), and *McCullen v. Coakley*, 573 U.S. 464 (2014) "confirm" that *Norton* was correctly decided. (DE 264 at 11-12.) The Government is mistaken. *Norton* relied in its content neutrality analysis on *U.S. v. Weslin*, 156 F.3d 292 (2d Cir. 1998). But *Weslin* was incorrect right from the start, asserting that "[b]oth by its language and its application, FACE seeks to govern all people who obstruct the provision of reproductive health services." *Id*. at 296. As shown above, this statement is flatly contradicted by the plain language of the statute. Inclusion of the "because of" clause is fatal to the content neutrality of FACE. In their opening brief, Defendants pointed to the recent Sixth Circuit case of *Wagner v. City of Garfield Heights*, 675 F. App'x 599 (6th Cir. 2017), where the court amended its ways when reviewing an ordinance requiring law enforcement to examine the content of the message, finding such a requirement "determinative," not merely "indicative" of whether the restriction was content based. *Id*. at 604 (Doc. 245 at 27). Tellingly, the Government fails to mention *Garfield Heights*. In short, FACE is content based under *Reed* and *McCullen*, and therefore subject to strict scrutiny, which it cannot survive. It is therefore facially unconstitutional.[7]

---

[7] The Government attempts to parse the language in § 248 such that the intent requirement falls outside the ambit of *Reed*. DE 264 at 12. The Government fails, however, because the plain language of the statute makes a violation dependent on anti-abortion (or, euphemistically,

**VI.    The FACE Act violates the Religious Freedom Restoration Act.**

Responding to Defendants' challenge to FACE under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"), the Government cites *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995), claiming it dealt with an "almost identical argument" to that raised by these Defendants. DE 264 at 13-14. This is untrue. In fact, *Cheffer* was a purely facial challenge to FACE, and as the court noted, appellants there did not argue "that the Access Act 'substantially burdens' their religious practice." 55 F.3d at 1522. By contrast, Defendants here bring both a facial and an as-applied challenge and have clearly asserted – and shown – that the Government's charging Defendants with violating FACE for conduct that was nothing more than peacefully ministering outside an abortion clinic is an application of FACE that substantially burdens Defendants' religious exercise. It cannot be overlooked that the Government has charged Defendants who did not position themselves near the entrances to the facility, and included the conspiracy charges against persons who also did not position themselves near the entrances. By design and effect, this case is calculated to inflict the harshest punishment conceivable upon even those who dare to join in singing hymns or praying in the vicinity of an abortion facility. The Government's true purpose of punishing pro-life ideology has been exposed.

Additionally, *Cheffer* relied heavily on the Fourth Circuit's opinion in *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995) ("*ALL*"). *ALL* was also a pure facial challenge. *Id*. at 645. The *ALL* court began its First Amendment analysis by considering whether the Act is

---

"reproductive health services") motivation – one seeking such services may be obstructed without violating FACE so long as the obstructor does not do so "**because** that person is or has been . . . obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added). Again, Defendants provided unrebutted examples in their opening brief. (Doc. 245 at 25).

content neutral. *Id.* at 648-49. But the Fourth Circuit, like every other circuit reviewing FACE, erred in utilizing the now-debunked standard articulated in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). *Id.* at 649 (citing *Ward*). It wrote that "a statute regulating expressive conduct is neutral if it is justified without reference to the content of the violator's message or point of view." *Id.* (citing *Ward*, 491 U.S. at 791, and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 761-62 (1994)). "Congress's purpose is the main consideration." *ALL*, 47 F.3d at 649.

It was precisely this analytical approach that *Reed v. Town of Gilbert* denounced. In *Reed*, the Supreme Court reversed, 9-0, a Ninth Circuit opinion applying the *Ward* analysis and finding the ordinance at issue content neutral. The Ninth Circuit found the sign ordinance content neutral "because the Town 'did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed.'" *Reed*, 576 U.S. 155, 162-63 ((quoting court of appeals decision, 707 F.3d 1057, 1071-72 (9th Cir. 2013)). The High Court counseled that the Ninth Circuit's analysis "skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face." 576 U.S. at 165. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* (internal quotation marks and citation omitted).

The Court further instructed: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64. The Fourth Circuit in *ALL* "skipped the crucial first step" in the content neutrality analysis, as did the Eleventh Circuit in *Cheffer* and the Sixth Circuit in *Norton.* Because FACE is content based by defining

regulated (expressive) conduct "by its function or purpose," i.e., "because of" the person's obtaining or providing reproductive health services, the courts of appeal erred by subjecting FACE to intermediate scrutiny rather than strict scrutiny.

*Cheffer* held that FACE did not substantially burden the plaintiffs because they had failed to allege that their religion required them to engage in sit-ins, so it did not even reach the least restrictive means analysis. 55 F.3d 1517, 1522-23. The *ALL* court, on the other hand, correctly found that the plaintiffs there, like Defendants here, adequately pled and demonstrated that FACE substantially burdened their religion. The Fourth Circuit then undertook a compelling interest and least restrictive means analysis, but did so in a woefully inadequate, conclusory fashion. With respect to the compelling interest prong, it stated:

> First, we believe the Access Act serves sufficiently compelling governmental interests. After all, the Act protects public health by promoting unobstructed access to reproductive health facilities. It also protects public safety by proscribing all violent, threatening or obstructive conduct specifically aimed at patients and providers of reproductive health services.

47 F.3d 642, 656. This subjective assessment is couched in broad terms, which is insufficient under RFRA. "RFRA . . . contemplates a 'more focused' inquiry" and requires a higher degree of specificity. *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 726 (2014). These broad formulations are inadequate.

Even more troubling, however, was the Fourth Circuit's analysis of the least restrictive means: "Second, we believe the Access Act is sufficiently narrow. The Act's prohibitions are directed only to those actions Congress found to be a national problem, specifically force, threat of force and physical obstruction. The Act does not sweep within its prohibitions activity unrelated to the serious trouble Congress sought to address." 47 F.3d 642, 656. As already shown, FACE leaves unregulated the exact same obstructive conduct when it is undertaken for a

different purpose. Indeed, FACE appears to prohibit expressive conduct like sit-ins, but to leave unregulated non-expressive obstructive conduct, thereby treating First Amended protected speech *worse* than pure conduct. Consequently, FACE is not the least restrictive means to achieve any legitimate governmental interest, and the Act is unconstitutional.

## VIII. The FACE Act violates the Free Exercise Clause.

FACE violates the Free Exercise Clause as applied here for many of the same reasons that it violates RFRA – it has been used by the Government as a weapon against peaceful nonviolent pro-life Christians who minister outside abortion facilities while violent pro-abortion activists are basically allowed to roam free and vandalize churches and pregnancy resource centers at will. The Government argues that FACE is a neutral law of general applicability (DE 264 at 15) despite the glaring evidence of its refusal to investigate and prosecute pro-abortion violence while leaving no stone unturned in seeking out peaceful pro-lifers to prosecute zealously. That the Government has now at long last chosen to bring charges against one group of pro-abortion activists, after having been exposed for its utter lack of prosecutions, hardly vitiates the claim of weaponization of FACE against pro-life activists motivated by their religious beliefs.

The Government claims that the indisputable fact that vastly more pro-lifers are being prosecuted than pro-abortion activists "is irrelevant." Doc. 264 at 16. It then asserts with a straight face that "'[a] group cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group.'" *Id.* (citing *U.S. v. Soderna*, 82 F.3d at 1376). Indeed. But that is Defendants' point: the unrefuted evidence shows that the pro-abortion group *has* and *continues to* violate FACE more frequently than the pro-life group, *and the Government has effectively granted it immunity from prosecution*. This refusal to prosecute

violent pro-abortion activists is a violation of Defendants' Free Exercise rights, as well as an affront to the very core of equality under the law.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully moves this Court for an order dismissing the Indictment and all charges in this case.

Respectfully submitted,

**/s/ *Steve C. Thornton***
Steve C. Thornton, Esq. (MSB #9216)
P.O. Box 16465
Jackson, MS 39236
(601) 982-0313
mail@lawlives.com
Attorney for Defendant Coleman Boyd

**/s/ *G. Kerry Haymaker (by permission)***
G. KERRY HAYMAKER
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
haymaker@tennesseedefense.com
Attorney for Defendant Coleman Boyd

**/s/ *Stephen M. Crampton (by permission)***
STEPHEN M. CRAMPTON
Thomas More Society
P.O. Box 4506
Tupelo, MS  38803
662-255-9439
scrampton@thomasmoresociety.org
Attorney for Defendant Paul Vaughn

**/s/ Jodie A. Bell. (by permission)**
JODIE A. BELL
Tn.Sup.Ct.No. 18336
214 Second Avenue North, Suite 208
Nashville, TN  37201
(615)244-1110/ (615) 956-4977
(615) 928-1901 (facsimile)
Attorney for Chester Gallagher

24

**/s/ *Robert Lynn Parris (by permission)*
ROBERT L. PARRIS, ATTORNEY AT LAW
200 Jefferson Avenue, Suite 1500
Memphis, TN 38103
(615) 490-8026
rlp@robertparrisattorney.com
Attorney for Defendant Calvin Zastrow


**/s/ *Heather G. Parker (by permission)*
HEATHER G. PARKER
Evans Bulloch Parker PLLC
302 North Spring Street
PO Box 398
Murfreesboro, TN 37133-0398
(615) 896-4154
heatherparker@bfhelaw.com
Attorney for Defendant Caroline Davis


**/s/ *Manuel B. Russ (by permission)*
MANUEL B. RUSS
340 21st Avenue North
Nashville, TN 37203
(615) 329-1919
russben@gmail.com
Attorney for Defendant Dennis Green


***William Conway***
WILLIAM J. CONWAY
214 Second Avenue North, Suite 208
Nashville, TN  37201
(615) 250-5363
wjconway@gmail.com
Attorney for Heather Idoni


**/s/ *David R. Heroux, P.C. (by permission)*
DAVID R. HEROUX, P.C.
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
heroux@tennesseedefense.com
Attorney for Defendant Eva Ed

25

**/s/ *David L. Cooper (by permission)*__
DAVID L. COOPER
Law Office of David L. Cooper, P.C.
208 Third Avenue, N Suite 300
Nashville, TN 37201
(615) 256-1008
dcooper@cooperlawfirm.com
Attorney for Defendant Eva Zastrow

**_Rayburn McGowan, Jr._**
RAYBURN McGOWAN, Jr.
8005 Church Street East, Suite 219
Brentwood, TN 37207
(615) 244-7070
mcgowanrayburnjr@bellsouth.net
Attorney for Defendant James Zastrow

**/s/ *Leonard E. Lucas, III (by permission)*__
LEONARD E. LUCAS, III
The Law Firm of Leonard Earl Lucas
315 Deadrick St, Suite 1550
Nashville, TN 37238
(301) 204-6498
leonard.lucas@lellawfirm.com
Attorney for Defendant Paul Place

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing Motion to Continue was filed

electronically and served on the following by the EF/CME electronic filing system:

**JODIE A. BELL**
214 Second Avenue North, Suite 208
Nashville, TN 37201
(615)244-1110/ (615) 956-4977
(615) 928-1901 (facsimile)
Attorney for Chester Gallagher

**WILLIAM J. CONWAY**
William J. Conway, Esq. P.C.
214 Second Avenue North, Suite 208
Nashville, TN 37201
(615) 260-5364
wjconway@gmail.com
Attorney for Defendant Heather Idoni

**ROBERT LYNN PARRIS**
Robert L. Parris, Attorney at Law
200 Jefferson Avenue, Suite 1500
Memphis, TN 38103
(615) 490-8026
rlp@robertparrisattorney.com
Attorney for Defendant Calvin Zastrow

**G. KERRY HAYMAKER**
Haymaker & Heroux, P.C.
545 Mainstream Drive. Suite 420
Nashville, TN 37228
(615) 250-0050
haymaker@tennesseedefense.com
Attorney for Defendant Coleman Boyd

**HEATHER G. PARKER**
Evans Bulloch Parker PLLC
302 North Spring Street
PO Box 398
Murfreesboro, TN 37133-0398
(615) 896-4154
heatherparker@bfhelaw.com
Attorney for Defendant Caroline Davis

**LARRY LAMONT CRAIN**
5214 Maryland Way, Suite 402
Brentwood, TN 37207
(615) 376-2600
larry@crainlaw.legal
Attorney for Defendant Paul Vaughn

**STEPHEN M. CRAMPTON**
Thomas More Society
P.O. Box 4506
Tupelo, MS 38803
662-255-9439
scrampton@thomasmoresociety.org
Attorney for Defendant Paul Vaughn

**MANUEL B. RUSS**
340 21st Avenue North
Nashville, TN 37203
(615) 329-1919
russben@gmail.com
Attorney for Defendant Dennis Green

**DAVID R. HEROUX, P.C.**
Haymaker & Heroux, P.C.
545 Mainstream Drive, Suite 420
Nashville, TN 37228
(615) 250-0050
heroux@tennesseedefense.com
Attorney for Defendant Eva Edl

**DAVID L. COOPER**
Law Office of David L. Cooper, P.C.
208 Third Avenue, N Suite 300
Nashville, TN 37201
(615) 256-1008
dcooper@cooperlawfirm.com
Attorney for Defendant Eva Zastrow

**RAYBURN McGOWAN, Jr.**
8005 Church Street East, Suite 219
Brentwood, TN 37207
(615) 244-7070
mcgowanrayburnjr@bellsouth.net
Attorney for Defendant James Zastrow

**LEONARD E. LUCAS, III**
The Law Firm of Leonard Earl Lucas
315 Deadrick St, Suite 1550
Nashville, TN 37238
(301) 204-6498
leonard.lucas@lellawfirm.com
Attorney for Defendant Paul Place

27

SANJAY PATEL
Department of Justice
150 M Street NE
Washington, DC 20002
(202) 598-1018
Sanjay.patel@usdoj.gov
Representing **USA** (*Plaintiff*)

AMANDA J. KLOPF
U.S. Attorney's Office (Nashville)
719 Church Street, Suite 3300
Nashville, TN 37203
(615) 736-5151
amanda.klopf@usdoj.gov
Representing **USA** (*Plaintiff*)

NIKHIL A. RAMNANEY
Department of Justice
150 M Street NE
Washington, DC 20002
(202) 598-1018
nikhil.ramnaney@usdoj.gov
Representing **USA** (*Plaintiff*)

This the  28th  day of April 2023.

/s/ Steve C. Thornton
STEVE C. THORNTON