**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 3:22-cr-00327** |
| ) | **Judge Aleta A. Trauger** |
| **[1] CHESTER GALLAGHER** ) | |
| **[2] HEATHER IDONI** ) | |
| **[3] CALVIN ZASTROW** ) | |
| **[4] COLEMAN BOYD** ) | |
| **[5] CAROLINE DAVIS** ) | |
| **[6] PAUL VAUGHN** ) | |
| **[7] DENNIS GREEN** ) | |
| **[8] EVA EDL** ) | |
| **[9] EVA ZASTROW** ) | |
| **[10] JAMES ZASTROW** ) | |
| **[11] PAUL PLACE** ) | |

## MEMORANDUM

These eleven codefendants have filed a Joint Motion to Dismiss Indictment (Doc. No. 240) and an Amended Motion to Dismiss the Indictment (Doc. No. 245), to which the Government has filed a Response (Doc. No. 264), and the defendants have filed a Reply (Doc. No. 274). For the reasons set out herein, the motions will be denied.

## I. BACKGROUND

### A. The FACE Act and the Constitution

In 1994, Congress enacted the Freedom of Access to Clinic Entrances ("FACE") Act, which creates both civil and criminal liability for any person who, "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive

health services." 18 U.S.C. § 248(a)(1). It also extends similar protections to religious worship and prohibits vandalism of qualifying facilities. 18 U.S.C. § 248(a)(2)–(3).

The FACE Act does not draw distinctions between particular reproductive health services. 18 U.S.C. § 248(a)(1). To the contrary, it protects all "reproductive health services," which it expressly defines to include all "medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy," whether "provided in a hospital, clinic, physician's office, or other facility." 18 U.S.C. § 248(e)(5). As a practical matter, however, and as reflected in the legislative history, the FACE Act was, from its inception, particularly salient to the preexisting practice of individuals' interfering with access to medical facilities that provide procedures or treatments that result in the intentional termination of a pregnancy—that is to say, what are typically referred to as abortions.

Curtailing interference in the operation of lawful businesses is something governments do routinely. *See, e.g.*, *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 700 (Tenn. 2002) ("The theory of the tort of interference, it is said, is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others . . . .") (quoting *City of Rock Falls v. Chicago Title & Tr. Co.*, 300 N.E.2d 331, 333 (Ill. App. Ct. 1973)). Even routine forms of regulation, however, can raise constitutional concerns in the wrong context, and Congress recognized that such concerns could arise with the FACE Act, as it relates to individuals engaged in First Amendment-protected activities, such as public protests, that are intended to discourage, but not interfere with, the performance of reproductive health services. In an attempt to draw the line between lawful protest and actual injury, intimidation, or interference, the FACE Act instructs that it shall not be construed "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal

prohibition by the First Amendment to the Constitution."18 U.S.C. § 248(d)(1). It also defines "interference," "intimidation," and "obstruction" in ways that would exclude ordinary, First Amendment-protected protest. *See* 18 U.S.C. § 248(e).

Congress adopted the Act in express reliance on two parallel, but independent, authorizations of federal power: (1) "the affirmative power of Congress . . . under section 8 of article I of the Constitution . . . which includes, among other things, the 'Power . . . To regulate Commerce . . . among the several States'"; and (2) Congress's power "under section 5 of the fourteenth amendment to the Constitution, which grants Congress the 'power to enforce, by appropriate legislation, the provisions'" of that Amendment. FACE ACT OF 1994, PL 103–259, May 26, 1994, 108 Stat. 694 (quoting U.S. Const. art. I, § 8, cl. 3; U.S. Const. amend. XIV, § 5). The availability of the latter of those two sets of powers is, by definition, dependent on the assumption that access to reproductive health services is entitled to some degree of protection by the Fourteenth Amendment.

For most of the FACE Act's existence, that assumption reflected a straightforward reading of the Supreme Court's caselaw—including with regard to procedures for abortion. From the Court's 1973 issuance of its opinion in *Roe v. Wade*, 410 U.S. 113 (1973), until last year's *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), Supreme Court caselaw applying the Fourteenth Amendment of the Constitution unambiguously forbade states from banning abortion or restricting access to abortion in certain improper ways. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 876 (1992). That specific edict was part of a broader set of Supreme Court rulings recognizing a heightened level of constitutional protection of individuals' rights related to reproductive health generally. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 454

3

(1972) (access to contraception); *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (freedom from forced sterilization).

Those reproductive health-related constitutional protections, in turn, are part of a yet larger body of constitutional precedents recognizing protections from interference in certain areas of human life—particularly those related to parenting, the family, and the romantic and sexual relationships from which families frequently begin—that are so intimate and personal that they have generally been considered to be improper subjects of governmental regulation, in the absence of a particularly pressing need, accompanied by an effort to interfere no more than that need requires. *See, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (right to marry); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925) (right to "direct the upbringing and education of [one's] children"); *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 506 (1977) (right to form a household). None of those rights was founded on a specific constitutional provision setting it out by name, but the courts have recognized the protection due to those rights under the Fourteenth Amendment, based on the understanding that the existence of a personal, private sphere of life inures in our shared conception of a limited government.[1]

---

[1] "The Fourteenth Amendment of the United States Constitution protects individuals from the deprivation 'of life, liberty, or property, without due process of law.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1). That language "require[s] that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). The question of what procedures will be sufficient in any given instance—that is, "how much process is due"—depends on a number of factors, including, in particular, the nature of the right at issue. *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). The Supreme Court has held that a few rights, however, are so important, and so disfavored as subjects of government interference, that the Due Process Clause "'forbids the government to infringe [those] 'fundamental' liberty interests . . . , no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). This guarantee, which touches on an array of subject matters, *see Bell v. Wolfish*, 441 U.S. 520, 534 (1979) (collecting cases), is often discussed as involving "substantive due process." Some judges and litigants dislike the term "substantive due process," *see Dobbs*, 142 S. Ct. at 2301 (Thomas, J., concurring), but the terminology is of minimal importance compared to the principle.

4

In *Dobbs*, the Supreme Court reversed *Roe* and its subsequent precedents applying and refining *Roe*, holding instead that abortion is not entitled to heightened protection under the Fourteenth Amendment. *Dobbs*, 142 S. Ct. at 2242. The Court, however, took extraordinary pains to stress that it was not disturbing other aspects of its caselaw, including its past recognition of constitutional protections for other rights arising out of the intimate sphere. The opinion of the Court emphasized that "[t]he abortion right is . . . critically different from any other right that this Court has held to fall within the Fourteenth Amendment's protection of 'liberty.'" *Id.* at 2243. The Court specifically confirmed that it was contrasting *Roe* with its own "past decisions involving matters such as intimate sexual relations, contraception, and marriage," which the opinion did not disturb. *Id.* Regarding pre-*Roe* precedents involving the right to access contraception, for example, the Court wrote:

> None of [those decisions] involved the critical moral question posed by abortion. They are therefore inapposite. They do not support the right to obtain an abortion, and by the same token, our conclusion that the Constitution does not confer such a right does not undermine them in any way.

*Id.* at 2258.

The Court also did not disturb the general rule that the Constitution protects certain unenumerated rights "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* at 2243 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Quite to the contrary, the Court reversed *Roe* pursuant to that very standard. *Id.* at 2260. Finally, the Court specifically wrote,

> [T]he Solicitor General suggests that overruling [*Roe* and *Casey*] would "threaten the Court's precedents holding that the Due Process Clause protects other rights." . . . . [T]o ensure that our decision is not misunderstood or mischaracterized, we emphasize that our decision concerns the constitutional right to abortion and no other right. Nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion.

5

*Id.* at 2277–78. The Court ultimately lamented that "[i]t is hard to see how [it] could be clearer," regarding the limited scope of the case's holding. *Id.* at 2281.

Concurring opinions by members of the *Dobbs* majority emphasized these points even further. Justice Thomas issued an opinion stating that, in his view, the Court should have gone further in rewriting the Supreme Court's caselaw. *Id.* at 2300–04 (Thomas, J., concurring). A complaint that something did not happen, however, is also confirmation that it did not. Justice Kavanaugh wrote separately to address "the future implications of [the] decision," and to emphasize that he interpreted the Court's holding to mean that "the Constitution is neutral on the issue of abortion." *Id.* at 2304–05 (Kavanaugh, J., concurring). Justice Kavanaugh stressed that, in his view and what he understood to be the view of the Court expressed in the majority opinion, "[o]verruling *Roe* . . . does *not* threaten or cast doubt on" the Court's body of "other precedents involving issues such as contraception and marriage." *Id.* at 2309 (collecting case) (emphasis in original).

Justice Kavanaugh also discussed another way in which the holding in *Dobbs* was limited. By narrowly eliminating protection for abortion under the Fourteenth Amendment, *Dobbs* did not change the fact that individuals seeking or providing abortions might be entitled to other constitutional protections, depending on the context. Justice Kavanaugh wrote:

> [A]s I see it, some of the other abortion-related legal questions raised by today's decision are not especially difficult as a constitutional matter. For example, may a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel. May a State retroactively impose liability or punishment for an abortion that occurred before today's decision takes effect? In my view, the answer is no based on the Due Process Clause or the Ex Post Facto Clause.

*Id.* at 2309 (citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)).

6

The distinctions that *Dobbs* drew between the constitutional right to abortion and other, seemingly similar constitutional guarantees were not merely relevant to the substantive question of what the Constitution protects, but also to the question of whether it would be proper to overrule those other precedents *even if* the Court concluded that those other holdings had also been erroneous for similar reasons. As the Court explained at length, its decision to overrule *Roe* and *Casey* was not based solely on the conclusion that those precedents were wrong—because, under the doctrine of *stare decisis*, bare disagreement, alone, is typically not a basis for overruling a precedent—but on the specific difficulties that the Court concluded had arisen over the course of several decades of enforcing the right to abortion. *Id.* at 2261, 2272. The Court stressed that its analysis had no effect on any precedent other than those specifically related to abortion, because, even aside from any substantive difference between the rights at issue, "[e]ach precedent is subject to its own *stare decisis* analysis, and the factors that [Supreme Court] doctrine instructs [the Court] to consider like reliance and workability are different for [those other] cases than for [the Court's] abortion jurisprudence." *Id.* at 2281. Ultimately, then, the Court overruled *Roe* not simply because the Court believed that it had been decided incorrectly, but also based on specific, contextual factors that the Court itself identified as unique to abortion rights.

The rescission of heightened constitutional protection for abortion poses obvious questions regarding the FACE Act's reliance on section 5 of the Fourteenth Amendment. There is no basis in *Dobbs*—just as there was no basis before *Dobbs*—for doubting the availability of section 5 with regard to legislation protecting the right to still-protected reproductive health services other than abortion, such as contraception. Nevertheless, because the powers of section 5 are limited to those matters addressed by the Fourteenth Amendment, it is fair to wonder whether those powers remain available with regard to abortion, in particular.

7

While the question of how section 5 applies to the FACE Act may be of some abstract or academic interest, however, it is of limited practical importance, given that section 5 is only one of two powers on which Congress relied in enacting the FACE Act, the other of which—the power to regulate interstate commerce—was not at issue in *Dobbs*. Congress's power to regulate interstate commerce is not dependent on whether any right at issue is entitled to heightened constitutional protection, but rather on whether the regulated activities are interstate in character or, if the activities are, in isolation, "purely local," whether they are "part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (quoting *Perez v. United States*, 402 U.S. 146, 153 (1971); citing *Wickard v. Filburn*, 317 U.S. 111, 128–29 (1942)). Congress's reliance on its commerce powers, therefore, was not based on any issue addressed by *Dobbs*, but on the fact that reproductive health services are part of the healthcare field, which is deeply bound up in interstate commerce and which is already heavily regulated by federal law, such as through federal oversight of pharmaceutical safety and federal safeguarding of the privacy of medical records. *See, e.g.*, *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1320 (D.C. Cir. 2014) (describing argument that medical product could not be regulated under the Commerce Clause as "simply impossible to square this argument with the last seventy years of Commerce Clause jurisprudence"); *Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Dep't Of Health & Hum. Servs.*, 224 F. Supp. 2d 1115, 1126 (S.D. Tex. 2002) ("Health care providers transmitting health information in electronic form in connection with health claims, referral authorizations, and health care payments, also engage in interstate commerce. The court concludes that HIPAA falls within Congress's Commerce Clause authority."), *aff'd*, 67 F. App'x 253 (5th Cir. 2003).

A law enacted pursuant to one sufficient power of Congress is just as valid as a law enacted pursuant to two. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561, 575 (2012) ("*NFIB*") (stating that,"[b]ecause the Commerce Clause does not support the [challenged policy], it is necessary to turn to the Government's second argument: that [it] may be upheld as within Congress's enumerated power to 'lay and collect Taxes,'" and upholding the policy on that basis) (quoting U.S. Const. art. I, § 8, cl. 1). Accordingly, no court has held that *Dobbs* did away with the FACE Act—either generally or with regard to abortion alone—and the Government has continued to pursue charges under the Act, including those arising out of actions taken prior to *Dobbs* in jurisdictions where, post-*Dobbs*, abortions have since been severely curtailed, if not eliminated.

It bears noting, at this point, that there is nothing remarkable about the fact that the Government would prosecute a crime against a business that, in the face of later regulatory changes, either changed its business model or ceased to operate. It is, for example, no defense to bank robbery charges that the bank in question later went out of business after trouble with regulators. The FACE Act protects access to reproductive health services based on their status *as health services*, not just because access to those services is, at least in many instances, a constitutional right. Accordingly, it is of no importance under the FACE Act *why* the reproductive health services at issue were available in the relevant jurisdiction at the time of the offense—whether due to the federal Constitution, a state constitution, or a state policy decision. If reproductive health services were available, access to them was protected from interference by FACE.

The defendants are eleven individuals who are alleged to have violated the FACE Act on March 10, 2021, in connection with the barricading of a clinic in Mt. Juliet, Tennessee that

provided "reproductive health services, including abortion." (Doc. No. 3 ¶ 1.). According to the Indictment, the defendants promoted their actions expressly as a "rescue," and spoken instructions that defendant Gallagher gave to the other defendants during the events confirmed an understanding that those members of the group who physically obstructed clinic entrances—which several did—would be arrested. (*Id.* ¶¶ 21–22.) Gallagher contemporaneously boasted over social media that the defendants' efforts had successfully "already turned away one couple" and that their intention was to "stop as many murderous appointments as we can." (*Id.* ¶ 27.)

The Indictment states two counts. Count 1, which is asserted only against the first seven defendants, is not a charge directly under the FACE Act, but rather 18 U.S.C. § 241, which makes it unlawful for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." 18 U.S.C. § 241. (*Id.* ¶¶ 5–27.) Count 2, which is asserted against all defendants, is a FACE Act charge based on the allegation that the defendants,

> aiding and abetting one another, did by force, threat of force, and physical obstruction, intentionally injure, intimidate, and interfere with, and attempt to injure, intimidate, and interfere with Patient A, Employee A, and the other employees of the Clinic, because Patient A was obtaining, and the Clinic was providing, reproductive health services.

(Doc. No. 3 ¶ 29.)

On March 8, 2023, the defendants filed two Joint Motions to Dismiss Indictment (Doc. Nos. 240, 242), followed the next day by an Amended Joint Motion to Dismiss Indictment (Doc. No. 245) that superseded one of the earlier motions (Doc. No. 242, which the court then denied as moot).[2] The defendants argue that (1) abortion can no longer, in the wake of *Dobbs*, be considered

---

[2] The purpose of the amendment was to remove one argument that attorneys for the defendants apparently ultimately decided, after consultation among co-counsel, to omit. (*See* Doc. No. 244 at 1.) The rescinded

10

a "reproductive health service" under the Act; (2) the Government has engaged in improper selective prosecution based on the defendants' views; (3) the FACE Act is an unconstitutional content-based regulation of speech; (4) the FACE Act violates the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment; (5) the conspiracy charge of Count 1 is improper for a number of reasons, including that "after *Dobbs*, there are no civil rights at issue" in the underlying events; and (6) "this [c]ourt lacks jurisdiction because, especially after the Supreme Court's decision in [*Dobbs*], FACE is an invalid exercise of Congress' Commerce Clause authority." (Doc. No. 240 at 12; Doc. No. 245 at 2.)

## II. LEGAL STANDARD

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure, which states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b). The Sixth Circuit guides district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976). A defense raised in a motion to dismiss indictment is "capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* at 664 (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)). On a motion to dismiss indictment, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *United States v. Campbell*, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. Apr. 6, 2006) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)).

---

argument was that the court should dismiss the charges against the defendants on the ground that "[p]reborn human beings are persons entitled to the same inalienable and constitutional rights as post-birth human beings," which, according to the defendants, should make it impermissible for the Government to prosecute FACE Act violations related to abortion. (Doc. No. 242 at 47.)

### III. ANALYSIS

**A. Definition of "Reproductive Health Services"**

The defendants argue that, despite the fact that the FACE Act contains a statutory definition of "reproductive health services" that expressly and unambiguously includes abortion, "now, under *Dobbs*, the term[] 'reproductive health services' may not be interpreted as including abortion." (Doc. No. 240 at 12; *see also id.* at 13 (asserting that "'reproductive health services' may no longer be interpreted as protecting abortion".) This argument, taken on its face, is entirely without merit. When Congress adopted the FACE Act, it was free to define "reproductive health services" in the manner it chose, and, as the defendants themselves acknowledge, it included abortion. (See Doc. No. 274 at 3 n.1.) *Dobbs*, which was not about the FACE Act or any other federal statute, neither affected that definition nor gave this court the power to rewrite it.

As a statutory interpretation argument, the defendants' position would be frivolous. The Act says what it says, and nothing about its scope was changed by any even remotely reasonable reading of *Dobbs*. As best as the court can tell, the defendants are actually arguing, not that the FACE Act says something that it plainly does not say, but that the defendants should have been permitted to disrupt access to any Tennessee-based clinic that provided abortion services on the ground that abortion was not *really* legal in Tennessee in 2021—because abortion would have, but for *Roe*, been illegal under preexisting statutes. There are a number of problems with this argument, but none is greater than the fact that the defendants are wrong about what the law was at the time of their alleged offenses.

The Supreme Court was clear, in *Dobbs*, that it was making a change in binding Supreme Court precedent, not interpreting a past rule. Until *Dobbs*, *Roe* was the law, and abortion was legal in Tennessee, not because *Roe* was correct in some academic sense or would never be overruled,

but because the prohibition of abortion was inconsistent with a binding precedent of the Supreme Court, issued in the exercise of its Article III "judicial power," U.S. Const. art. III, § 1, and entitled to the preemptive force afforded the Constitution under the Supremacy Clause, U.S. Const. art. VI, cl. 2. Moreover, as the Government points out—and the defendants concede (Doc. No. 240 at 6)—any retroactive prosecution of an individual for engaging in an action that was, at the time, protected by *Roe* would be a clear violation of the Ex Post Fact Clause, because insufficient notice would have been provided of the practice's criminality. *See* U.S. Const., art I, § 10, cl. 1. The reason that the healthcare providers and patients at issue in this case believed that abortion was legal in Tennessee in 2021 was that it was.

It is, moreover, not clear to the court that this argument would be particularly persuasive, even *if* abortion had been (secretly, unenforceably) illegal in Tennessee in 2021. For one thing, the facility in question has not been alleged to provide only abortions, and it appears that it did, in fact, provide other services that would have been just as disrupted by the defendants' conduct. Even if it did not provide those services, though, and even if abortion really had been somehow abstractly "illegal" in Tennessee at the time, the court is aware of no reason why the government would be forbidden from policing vigilantism against the performance of even those "illegal" abortions. It is entirely permissible for the law to prohibit a particular practice, while also forbidding people from invading the liberty or property of others because they have decided to take it upon themselves, as private actors, to do the government's enforcement work for it. A person cannot, for example, vandalize or trespass on a healthcare facility because the facility is engaging in malpractice or overcharging Medicare. Why would the performance of abortions—even unlawful ones—be any different?

In any event, such issues are beside the point, because (1) abortion was, both as a matter of law and of objective reality, permitted in Tennessee prior to *Dobbs* and (2) the FACE Act contains an express and unambiguous definition of "reproductive health services" that covers all such services, and any argument to the contrary is wholly without merit.

## B. Selective/Discriminatory Prosecution

"Under Article II [of the Constitution], the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *United States v. Texas*, No. 22-58, 2023 WL 4139000, at *5 (U.S. June 23, 2023). (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021)). Although the discretion afforded to prosecutors is not limitless, "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the government's] discretion." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Such discretion plays a particularly striking and important role in the federal criminal justice system, because, in most areas of the criminal law, the primary responsibilities of policing and prosecution are performed at the state level. Federal prosecutors therefore can—and, in light of resource constraints, must—pick and choose which cases to bring. *See, e.g., United States v. Agilar*, 779 F.2d 123, 125 (2d Cir. 1985) (describing prosecutorial decision to "convert garden-variety state law drug offenses into federal offenses"). All of this can seem unfair to criminal defendants, and it is easy to see their reasons, and hard to fault them, for their visceral reactions. The Supreme Court has been clear, however, that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). The power of the courts to

14

disturb the Government's decision to pursue one defendant more aggressively than another is therefore markedly limited. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).

Nevertheless, prosecutorial discretion is not entirely unfettered by the Constitution. For example, it is well-established that a government may not use its discretion to enforce laws against members of one race or nationality and not others. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886). More broadly, the Supreme Court has recognized that, while the "presumption of regularity" is strong, a defendant may obtain dismissal of charges if he can demonstrate, through "clear evidence," that his prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 608; *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926)). The courts have been clear, however, that "discrimination," in this context, does not merely mean choosing to treat one person more harshly than another. The distinction made by the prosecutor must be improper under "ordinary equal protection standards." *Id.* (quoting *Wayte*, 470 U.S. at 608).

There is no direct evidence that these prosecutors acted for any impermissible purpose, so the defendants have tried to assemble a circumstantial case. The defendants argue that the Department of Justice has engaged in impermissible selective enforcement because the Government has, in their view, not brought enough prosecutions under the FACE Act against individuals who have interfered in the operation of "crisis pregnancy centers" that are intended to provide reproductive health-related services and counseling from an anti-abortion perspective. The defendants also note that FACE Act prosecutions appear to have increased around the time of *Dobbs*—a fact that may not surprise a person who has actually seen the volatile environment that has developed around abortion in that period, but which the defendants argue proves that the

Government's prosecution is some kind of revenge for the success that opponents of abortion had at the Supreme Court.

In support of the defendants' argument regarding crisis pregnancy centers, the defendants rely primarily on citations to overtly ideological websites making claims about a supposed epidemic of crime—mostly vandalism—against churches and crisis pregnancy centers by supporters of the right to access abortion. None of these citations is evidence, but, even if they were, they would not support the defendants' claims, even under relatively aggressive readings of equal protection principles, because the defendants have not established that the Government is either making improper distinctions or doing so for improper reasons, both of which the defendants would need to show in order to prevail.

For example, the sources that the defendants suggest provide proof that the Department of Justice is refusing to protect crisis pregnancy centers consist in significant part of accounts of after-hours vandalism—including many cases in which, at least according to the cited reports, no particular culprit had yet been identified. This is a stark contrast to the direct physical obstruction, targeted at actual patients and employees, performed by these defendants in open view of witnesses during ordinary business hours. Indeed, as the Government points out, the defendants have not identified a single known and identified abortion-supporting FACE violator who has escaped prosecution, despite having engaged in the same kind of acts that these defendants have been accused of performing. The simple fact that some people who support access to abortion have violated the Act in some way without facing charges—even if true—does not establish that the Government improperly favored those individuals over these. *Cf. United States v. Hedaithy*, 392 F.3d 580, 608 (3d Cir. 2004) (holding that journalistic accounts of unprosecuted violations of a law did not establish that the unprosecuted violators were similarly situated).

As the defendants concede, FACE Act prosecutions are markedly rare—with only 26 individuals facing such charges in 2022. (Doc. No. 245 at 14.) According to Department of Justice statistics for the 2022 fiscal year, that is 26 people out of nearly 130,000 individual criminal prosecutions in United States district courts.[3] By definition, then, the Department of Justice uses this power sparingly. The defendants apparently feel that the network of activists of which they are a part has been prioritized, and maybe it has. But it is the law of the land that "[o]ur Nation's historical understanding of ordered liberty does not prevent the people's elected representatives from deciding how abortion should be regulated," *Dobbs*, 142 S. Ct. at 2257, and that includes whether the Department of Justice, led by an Attorney General selected by the elected President and confirmed by the elected Senate, wishes to dedicate resources toward protecting clinics that provide abortions, which it has chosen to do.

Finally, although the defendants complain that the Department of Justice has been enforcing FACE more aggressively since *Dobbs*, there is nothing wrong with that, even if it is true. If the defendants had adduced evidence that this alleged increase in prosecutions *was* simply driven by spite or revenge, that might raise constitutional concerns. The sources they cite, however, merely suggest, at most, that the Department of Justice changed its reproductive health-related priorities after *Dobbs*, in reaction to the fact that *Dobbs* profoundly changed the legal, social, and practical environment surrounding the provision of those services. There is nothing nefarious about concluding, for example, that the shuttering of numerous reproductive health facilities since *Dobbs* gave rise to a heightened need to protect the facilities that remain. Nor is there anything wrong with acknowledging the incredibly charged environment surrounding abortion since *Dobbs* was

---

[3] Executive Office for United States Attorneys, U.S. Dept. of Justice, Annual Statistical Report Fiscal Year 2022 at 4 (Table 1), available at https://www.justice.gov/media/1279221/dl?inline.

17

decided and redirecting federal resources toward addressing that volatile environment before it becomes even worse.

## C. Freedom of Speech

The defendants present various arguments that the FACE Act is inconsistent with the Free Speech Clause of the First Amendment, because it burdens their right to protest. As the court has already noted, however, Congress specifically drafted the Act to avoid infringing on the rights of protestors or others who wish to speak out peacefully on the topic of abortion. The fact that Congress tried to make a law constitutional does not, of course, mean that it succeeded. In this instance, however, court after court has held that Congress did enough. The FACE Act has repeatedly been held to be consistent with the First Amendment, including by the Sixth Circuit. *See Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002) ("[W]e are satisfied that the Act easily passes muster . . . ."); *see also, e.g.*, *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000) ("[W]e join the decisions of the courts of appeals that FACE does not regulate speech and expression protected by the First Amendment."); *United States v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1998) ("FACE . . . leaves anti-abortion protestors and all other persons wishing to exercise free speech rights under the First Amendment at liberty to hold signs, pass out handbills, speak conversationally, and so forth, anywhere and anytime they choose. FACE is therefore valid . . . ."); *United States v. Wilson*, 154 F.3d 658, 664 (7th Cir. 1998) ("Because FACE furthers the significant government interest of protecting women who are in need of reproductive health services, is not aimed at expression, and is narrowly tailored in that it only prohibits the use of force, threat of force, and physical obstruction and leaves open sufficient alternative means to express an anti-abortion message such as picketing in a non-violent, nonobstructive manner, it survives constitutional scrutiny."); *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997) ("[W]e agree

18

with every other circuit court that has addressed the issue and hold that the Act is not unconstitutionally overbroad.").

The defendants nevertheless argue that all of these conclusions should be ignored and that this court should disregard existing Sixth Circuit precedent. (*See* Doc. No. 245 at 26 (describing the Sixth Circuit's conclusion as "incorrect").) As a basis for such a step, they point to no Sixth Circuit or Supreme Court case addressing FACE or its constitutionality. Rather, they rely only on general changes to First Amendment law, particularly rulings that have refined the manner in which courts distinguish between content-based and content-neutral regulations of speech. The FACE Act though, according to the Sixth Circuit, "does not directly apply to speech, but rather prohibits three types of conduct—use of force, threat of force, and physical obstruction—which are not protected by the First Amendment." *Norton*, 298 F.3d at 552.

Insofar as the Act does incidentally touch on speech, moreover, it makes no content-based distinction. *See id.* The FACE Act is not only neutral as between interference by supporters and opponents of abortion, but neutral on the question of whether a perpetrator's moral position on reproductive healthcare was even part of his motivation at all. All that matters is that the defendant "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services"—for any reason, including entirely personal, apolitical ones.[4] 18 U.S.C. § 248(a)(1).

---

[4] For example, an abuser who used violent threats or force to prevent his significant other from obtaining an abortion would violate the FACE Act, even if his only motive was the chance to use a pregnancy as a tool of interpersonal control, and he had no opinions about the general morality of the services at issue.

The FACE Act does draw a central distinction between what it covers and what it does not, but it is not a distinction between different types of speech or opinion. It is a distinction between different types of *healthcare*. Congress concluded that reproductive healthcare facilities needed this kind of protection more than other healthcare facilities, and, if the defendants wonder why, they need look no further than their own briefing regarding crisis pregnancy centers and their own social media boasts about disrupting attempts to receive or perform abortions. Congress was well within its right to conclude that reproductive health facilities require more protection from interference than allergists' offices. That distinction is not based, in any way, on the content of any speech or opinion, but on the fact that reproductive healthcare is routinely targeted for economic disruption in a way that other types of healthcare are not.

Nor is the FACE Act being applied in an unconstitutional manner to these particular defendants based on their viewpoints or participation in First Amendment-protected activities, as would be required for a so-called "vindictive prosecution" defense. "To show vindictive prosecution, a petitioner must show '(1) an exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right.'" *Davison v. United States*, No. 21-4170, 2022 WL 17572211, at *3 (6th Cir. June 7, 2022) (quoting *United States v. Meda*, 812 F.3d 502, 510 (6th Cir. 2015)). Because there is no actual evidence of any such improper motive, the defendants engage in a sleight of hand, whereby they have treated any statement by the Department of Justice indicating a desire to safeguard access to abortion as evidence of a desire to punish these defendants for *Dobbs*. The defendants, though, are not the center of the moral or political universe. A desire to safeguard access to abortion is a desire to safeguard access to abortion—not an affront directed at them. More importantly, safeguarding access to abortion is, particularly under *Dobbs*,

20

an entirely appropriate thing for legislatures and executives to do, if that is the course they choose. Indeed, it is harder to imagine a more fulsome endorsement of the elected branches' power to set abortion policy than *Dobbs*.

These defendants have been charged pursuant to an ordinary exercise of prosecutorial discretion, in the furtherance of objectives that are entirely constitutionally permissible— particularly in light of *Dobbs*. Once one does away with the defendants' mistaken assumption that all government efforts to protect access to abortion are illegitimate, there is no meaningful evidence that the defendants are being targeted based on their First Amendment-protected views or utterances. Rather, it appears that, if the allegations in the indictment are true, the defendants' undeniably First Amendment-protected views on abortion happen to have led them to commit some decidedly non-First Amendment-protected crimes that invaded interests that Congress and the Department of Justice have chosen, in the valid exercise of their powers, to protect.

The court stresses that none of this prevents any defendant from seeking, at trial, to demonstrate that he or she did not do anything, on or in the lead up to March 10, 2021, other than engage in constitutionally protected speech that does not fall into any of the narrow categories of action prohibited by the FACE Act.

## D. Free Exercise/RFRA

The defendants argue next that the FACE Act violates the Free Exercise Clause of the First Amendment and/or the Religious Freedom Restoration Act ("RFRA"). The FACE Act does contain provisions bearing on the exercise of individuals' religion freedom, in that it extends the protection that it provides to reproductive health services to religious exercise and worship as well. *See* 18 U.S.C. § 248(a)(2)–(3). The defendants, however, have not been charged pursuant to those aspects of FACE, but rather its reproductive health provisions, which draw no distinctions between

21

religious and secular actions or motivations. The defendants argue that those provisions nevertheless infringe on their freedom of religion because the subjective motivations for their (and many other FACE Act violators') offenses included moral objections to abortion that are religious in character.

"The Free Exercise Clause of the First Amendment to the United States Constitution provides that 'Congress shall make no law . . . prohibiting the free exercise [of religion].'" *Maye v. Klee*, 915 F.3d 1076, 1083 (6th Cir. 2019) (quoting U.S. Const. amend. I). "In any free exercise claim, the first question is whether 'the belief or practice asserted is religious in the [plaintiff's] own scheme of things' and is 'sincerely held.'" *Id.* (quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987)). If the individual asserting a violation makes this threshold showing, then the court "appl[ies] the test set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987), to determine whether [the alleged] restriction is invalid." *Arauz v. Bell*, 307 F. App'x 923, 928 (6th Cir. 2009). The Supreme Court has held that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 859 (2015) (citing *Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 878–882 (1990)).

The boundaries of the Free Exercise Clause are a topic of much disagreement. *See, e.g.*, *Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868, 1882 (2021). The defendants' argument, however, goes to something much more fundamental. Although the defendants go to great lengths to make this issue more complicated than it is, they ultimately ask a straightforward question: Does the Free Exercise Clause grant individuals who are acting out of religious motivations freedom to commit actions that otherwise would be crimes against the person or property of others through physical invasion, intimidation, or threat? The answer is similarly straightforward: No, it does not.

22

Just as one's religious beliefs do not give one the right to bomb a café, they do not give one the right to barricade the entrance to a private facility against the wishes of the facility's operators. *See Reynolds v. United States*, 98 U.S. 145, 167 (1878) ("[W]hen the offence consists of a positive act which is knowingly done, it would be dangerous to hold that the offender might escape punishment because he religiously believed the law which he had broken ought never to have been made. No case, we believe, can be found that has gone so far.").

The reproductive health provisions of the FACE Act are generally applicable laws with no religious component. Undoubtedly, some people prosecuted under the FACE Act appear to have acted out of religious motivations. That, though, is not a defense to criminal prosecution, and our system of government could not function if it were. The defendants seem to imagine themselves unique in the fact that their crimes were committed for religious reasons, but there is no reason to think that that is the case. Religion and morality are closely intertwined for many people, not simply ones who happen to hold religious commitments hostile to abortion. A person might sell drugs because he feels that God imposes on him a moral obligation to provide for his family to the maximum extent possible. A person might physically abuse his wife and children because he believes that God grants him that right as a patriarch. A person might vandalize a slaughterhouse because he believes that God demands better treatment of the animals killed within or set fire to a munitions factory out of his religious opposition to war. Yet the defendants suggest that they, unlike those other hypothetical defendants, should be free to commit crimes based on their beliefs. The Constitution, though, does not play favorites among religious beliefs, and an even-handed application of the defendants' proposed rule would eviscerate the criminal justice system altogether. It is little surprise, then, that the Clause has not been read to embrace such an approach.

RFRA does not require a different result. That Act states that the federal "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)– (b). As with the defendants' First Amendment arguments, the question of how that rule applies to the FACE Act is not new. Numerous courts have considered it and have concluded that the FACE Act is compatible with RFRA. *See, e.g., Cheffer v. Reno*, 55 F.3d 1517, 1522 (11th Cir. 1995) ("[W]e hold that the Act survives appellants' challenge under the RFRA . . . ."); *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 656 (4th Cir. 1995) ("We conclude that the Access Act serves sufficiently compelling government interests by the least restrictive means available. It therefore does not violate RFRA."); *United States v. Weslin*, 964 F. Supp. 83, 88 (W.D.N.Y. 1997), aff'd, 156 F.3d 292 (2d Cir. 1998) ("As explained in connection with defendant's free-speech claim, the Act is narrowly drawn, prohibiting only the use or threat of force, and physical obstruction, the sources of the nationwide problem that Congress sought to remedy."), *aff'd*, 156 F.3d 292 (2d Cir. 1998); *United States v. Dinwiddie*, 885 F. Supp. 1286, 1289 (W.D. Mo. 1995), *aff'd and remanded*, 76 F.3d 913 (8th Cir. 1996); *United States v. Brock*, 863 F. Supp. 851, 866-67 (E.D. Wis. 1994) ("FACE does not violate RFRA."), *aff'd sub nom. United States v. Soderna*, 82 F.3d 1370 (7th Cir. 1996).

This court joins those courts in finding no conflict between the two Acts. For one thing, it is highly questionable whether the FACE Act actually burdens the exercise of religion in any meaningful way, because it does not restrict any person's power to express his support or opposition to abortion on religious grounds, as long as the person does not engage in the kinds of

24

threats or invasions of person or property that are routinely considered unlawful. *See Cheffer*, 55 F.3d at 1522 ("The Access Act leaves ample avenues open for appellants to express their deeply-held belief so long as this expression does not involve physical force, threats of such force, or physical obstruction."). Even if the Act did burden religious exercise, however, the government has a compelling interest in protecting the free and voluntary seeking of reproductive healthcare, including abortion.

The defendants suggest that no such compelling interest can exist after *Dobbs*, but the Supreme Court has never held that a "compelling interest" depends upon something being considered a fundamental right. They are different constitutional concepts, performing different jurisprudential functions. There is, for example, no constitutionally "fundamental right" not to be a victim of violent crime. *Cf. Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (noting the lack of a constitutionally cognizable interest in "contest[ing] the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution"). Any suggestion that there is no compelling government interest in protecting individuals from violence, however, is nonsense. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (internal quotation omitted)) (collecting cases).

Regardless of what the Fourteenth Amendment says about heightened constitutional protection against government interference, there is no reason to doubt that there is a compelling government interest in protecting reproductive health decisions from private interference. Indeed, the defendants' long list of supposed interference in the business of crisis pregnancy centers would, if presented through actual evidence, seem to prove that fact. The defendants have spent pages and pages suggesting that reproductive health facilities are being aggressively terrorized by criminal

activists; they cannot, in the same breath, argue that there is no "'actual problem' in need of solving" simply because the reproductive health facility at issue in this instance was of a type that they dislike. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000))

A prohibition on physical and threat-based interference in obtaining or providing reproductive health services is, moreover, narrowly tailored to that problem. *See Am. Life League*, 47 F.3d at 656 ("The Act's prohibitions are directed only to those actions Congress found to be a national problem, specifically force, threat of force and physical obstruction. The Act does not sweep within its prohibitions activity unrelated to the serious trouble Congress sought to address."). The defendants have not identified any alternative mechanism that would be less invasive, and it is hard to see how one could exist. The FACE Act criminalizes the clear, compelling problem that Congress identified and nothing else. It therefore faces no obstacle from RFRA.

**E. Conspiracy Against Federal Rights**

The federal "conspiracy against rights" statute makes it unlawful for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." 18 U.S.C. § 241. Prior to *Dobbs*, such a charge could be brought pursuant to a conspiracy to improperly interfere in the exercise of the constitutional right to abortion. Such an approach is still presumably viable with regard to the federal right to access other forms of reproductive health services protected by the Constitution, such as contraception. The defendants argue, however, that § 241 can no longer be applied to them, because the only right with which

they sought to interfere was the right to abortion, which is no longer protected under the Constitution.

As the Government points out, however, § 241 does not require that the right in question be *constitutional*, only that it be *federal*. FACE is, of course, a federal statute, and the Government argues that the court should construe it as granting a federal right to freedom from certain types of interference in the access and/or provision of reproductive health services, including abortion. That reading is entirely persuasive. The question of when a federal statute should be construed as creating an individual "right" is one that has been raised and litigated frequently (particularly in the 42 U.S.C. § 1983 context), and the Supreme Court has held that, when considering such questions, a court should look to "whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries.'" *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 143 S. Ct. 1444 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 285–86 (2002)). The FACE Act plainly does so. For one thing, it creates a civil cause of action. *See* 18 U.S.C. § 248(c). Moreover, it defines the ways that an individual can violate the Act in reference to the interests of specific individuals. "Interference," under the Act, for example, "means to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(1). "Intimidation" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." 18 U.S.C. § 248(e)(3). This focus on the individual supports the conclusion that the FACE Act is a right-conferring statute.

The defendants nevertheless complain that no reproductive health-related right conferred by the FACE Act is sufficiently "specific" to fall within the scope of § 241, as the Supreme Court has held that such a right must be. *See United States v. Kozminski*, 487 U.S. 931, 941 (1988). The prohibitions of the FACE Act, however, involve well-defined concepts that courts routinely

interpret and apply in the criminal context. The Act's focus on restriction of a "person's freedom of movement," 18 U.S.C. § 248(e)(2), is of a piece with, to pick an example, Tennessee's false imprisonment statute and its focus on "interfer[ing] substantially with [a person's] liberty," Tenn. Code Ann. § 39-13-302(a). The FACE Act's protection from "plac[ing] a person in reasonable apprehension of bodily harm to him- or herself or to another" can stand easily alongside the Tennessee assault statute's prohibition of "caus[ing] another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). Although few legal terms are entirely free of ambiguity, none of these concepts has been considered impermissibly vague when the people being prosecuted are ordinary residents of Tennessee. They do not become vague simply because the FACE Act happens to implicate these defendants.

Finally, the defendants argue that applying § 241 in this situation "conflicts with both the spirit and the letter of" the FACE Act, as "Congress could not have been clearer in its intention that first offense violations of FACE be charged as misdemeanors." (Doc. No. 245 at 48.) But a § 241 conspiracy charge based on a conspiracy to violate FACE Act rights is not the same thing as a charge under the FACE Act. The defendants' argument is not so much one based on any statutory language—which it is not—but on the fact that it simply seems, to them, unfair to consider it a felony to conspire to commit some misdemeanors. Whatever the moral persuasiveness of that thought, the defendants are asking this court to second-guess both the legislative decisions of Congress and the charging decisions of the Executive in a way that this court has no power to do. Nor can the defendants defeat those separation-of-powers concerns by recasting this argument as one involving disproportionate punishment, because there is no caselaw supporting such a holding regarding the punishments available under § 241. The conspiracy against rights charges, therefore, have been sufficiently stated.

28

**F. Commerce Clause**

Finally, the court turns to the defendants' most novel argument: that *Dobbs* somehow renders the FACE Act an impermissible exercise of Congress's Commerce Clause powers. The Sixth Circuit, like many other courts, has already held that the FACE Act was a permissible use of Congress's power, under the Constitution, to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. *See Norton*, 298 F.3d at 556, 559 (collecting cases demonstrating that "[a]ll eight circuits to address the issue have held that Congress validly enacted the Act pursuant to its Commerce Clause authority"). *Dobbs*, on its face, included no holding related to the Commerce Clause and nothing that could possibly be read fairly as overruling the Sixth Circuit's existing conclusion on the application of that provision to FACE. Nevertheless, the defendants argue that this court should ignore both existing precedent and the Supreme Court's description of its limited holding in *Dobbs*, in favor of a holding that there is now effectively a carveout from the ordinary commerce powers, reflecting the assumption that "protection of access to abortion and 'abortion-related services' is no longer a proper concern in federal law." (Doc. 245 at 37.) *Dobbs* said no such thing, of course, and, in fact, significant portions of *Dobbs* were dedicated to the dual admonitions that (1) *Dobbs* should be read narrowly and (2) the elected branches of government are free to make abortion policy as they choose. The defendants, nevertheless, have raised this argument, so the court must address it.

The fact that the Commerce Clause permits the regulation of interstate industries, such as the healthcare field, has been established for many decades. The Supreme Court has had the opportunity to reverse that approach, and it has expressly declined to do so. *See Raich*, 545 U.S.

at 17. Any holding that the federal government could not regulate healthcare would, at this point, amount to a wildly disruptive rebalancing of state-federal responsibilities in a field that not only accounts for a sizable chunk of the American economy, but which is charged, at any given moment, with life-and-death responsibilities in our society. The argument that *Dobbs*—a case that was not about the Commerce Clause in any way—dictated such a change, either generally or with regard to abortion alone, is without merit. What did the holding and essential reasoning of *Dobbs* change about Commerce Clause jurisprudence? Nothing. What did the holding and essential reasoning of *Dobbs* change about the interstate nature of the reproductive health field? Nothing. Those issues were not even remotely raised by the case, which involved a state statute. [5]

How, then, could the defendants conclude that the FACE Act's "substantial relation to interstate commerce has now been completely removed by *Dobbs*"? (Doc. No. 245 at 39.) As far as the court can tell, the defendants seem to have read *Dobbs* not as reversing *Roe*, but as enacting a kind of Anti-*Roe*—a rule whereby abortion is specially *dis*favored by the Constitution, including provisions of the Constitution that provide no textual, conceptual, or historical basis for such a distinction. It would be one thing if Congress's power to regulate the healthcare industry under the Commerce Clause was still an open question; then, the defendants could argue that federal regulation of abortion could be thrown out along with everything else. Given that such regulation

---

[5] The defendants' arguments that peaceful protest is noneconomic are similarly unavailing, because they are not being prosecuted for protesting, but for directly interfering in the activities of a facility engaged in unambiguously economic activity. *See Norton*, 298 F.3d at 557 ("Both the Senate Judiciary Committee and the House Committee on Labor and Human Resources submitted extensive reports detailing that clinic blockades and violent anti-abortion protests burdened interstate commerce."). The same flaw dooms the defendants' reliance on the Supreme Court's holding, in *NFIB. v. Sebelius*, 567 U.S. at 558, that wholly abstaining from participation in an interstate market is not economic activity. The FACE Act does not prohibit any individual from abstaining from the market for reproductive health services. Rather, it prohibits individuals from affirmatively interfering in the plainly economic reproductive health-related activities and transactions of others. As the Supreme Court acknowledged in *NFIB*, the Constitution grants Congress the power to regulate the activities of "those who by some preexisting activity bring themselves within the sphere of" Commerce Clause regulation. *Id.* at 560.

is squarely permitted, however, the idea that the Commerce Clause would treat abortion differently from any other health service is nonsensical. The performance of abortions is no less inherently economic or bound up with interstate markets than those other services. Nevertheless, the defendants urge the court to conclude, effectively, that there is one Commerce Clause for abortion and another Commerce Clause for everything else. If anything, *Dobbs* means the opposite of what the defendants suggest, because *Dobbs* was an unambiguous *increase* in governments' power to intervene in choices regarding abortion, not a reduction. The Supreme Court was abundantly clear that its intention in *Dobbs* was to "return the issue of abortion to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2243.

For all the defendants' misdirected focus on *Dobbs*, there really are serious constitutional issues implicated by this case—both in terms of the First Amendment and the ordinary constitutional protections afforded to all criminal defendants. The Government has an absolute burden to establish, beyond a reasonable doubt, that each individual defendant is criminally responsible for one or another of the narrow set of acts that Congress used its power, consistently with the First Amendment, to criminalize under the FACE Act. By all accounts, some of the things that these defendants did—singing, preaching, and speaking their views, for example—were expression protected by the First Amendment. That does not immunize the defendants from prosecution for any unprotected actions they performed, but it does highlight the importance of the Government's hewing closely to the lines Congress and the Constitution have set. The Government will have to prove its case, individually for each of the eleven defendants, against the strong presumption of innocence that the Constitution affords all those who face criminal prosecution. The defendants, in other words, may well have good arguments to make in their own

defense. Their arguments about *Dobbs*, the Commerce Clause, and the meaning of "reproductive health services," however, do not fall into that category.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Joint Motion to Dismiss Indictment (Doc. No. 240) and an Amended Motion to Dismiss the Indictment (Doc. No. 245) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge