```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,      ) CRIMINAL ACTION NO.:
                                   ) 22-096-CKK
4           Plaintiff,             )
        vs.                        )
5                                  )
    JONATHAN DARNEL, JEAN MARSHALL, ) Washington, D.C.
6   JOAN BELL,                     ) September 12th, 2023
            Defendants.            ) 3:15 p.m.
7   _____) Afternoon Session

8

9                   TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Government:       Rebecca G. Ross, Esquire
                             United States Attorney's Office
13                           for the District of Columbia
                             610 D Street NW
14                           Washington, D.C. 20530

15                           Sanjay H. Patel, Esquire
                             Civil Rights Division
16                           950 Pennsylvania Avenue, NW
                             Washington, D.C. 20004
17
    For the Defendant
18  Jonathan Darnel:         Christopher M. Davis, Esquire
                             Davis & Davis
19                           1350 Connecticut Avenue, NW
                             Suite 202
20                           Washington, D.C. 20036

21  For the Defendant
    Jean Marshall:           John L. Machado, Esquire
22                           Law Office of John Machado
                             503 D Street, NW
23                           Suite 310
                             Washington, D.C. 20001

24

25
```

```
1    APPEARANCES: (Cont'd)

2

3    For the Defendant
     Joan Bell:                Pro se

4

5    Stand-by Counsel for      Stephen F. Brennwald, Esquire
     defendantJoan Bell:       Brennwald & Robertson, LLP

6                              922 Pennsylvania Avenue, SE
                               Washington, D.C. 20003

7

8

9

10   Reported by:             Christine T. Asif, RPR, FCRR
                              Official Court Reporter

11                            United States District Court
                              for the District of Columbia

12                            333 Contitution Avenue, NW
                              Washington, D.C., 20001

13                            (202) 354-3247

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand; transcript produced
25   by computer-aided transcription.
```

                              INDEX
Witness Name                                                      Page
    Direct Examination By Ms. Ross............................    4
    Cross-examination By Mr. Davis............................    6
Shampy Holler
    Direct Examination By Ms. Ross............................   10
    Cross-examination By Mr. Machado..........................   21
    Cross-examination By Mr. Davis............................   23
Caroline Davis
    Direct Examination By Mr. Patel...........................   27

1

2                        P R O C E E D I N G S

3              THE COURT:  Okay.  We're ready.

4              (Jury entered the courtroom.)

5              THE COURT:  All right.  We're ready to proceed and

6      continue with the direct of Special Agent Biscardi.

7              MS. ROSS:  Thank you, Your Honor.

8              Can we please publish -- this is Government's

9      Exhibit 4001A.

10                     DIRECT EXAMINATION (Cont'd)

11     BY MS. ROSS:

12     **Q.**  Agent Biscardi, can you just read this text message

13     please?

14     **A.**  Yeah.  "Once again, it can officially be posted on

15     Facebook around 9:05 to 10:00 a.m."  And that was sent on

16     October 20th, 2020, by Defendant Handy to Defendant

17     Geraghty.

18     **Q.**  How about just the next text message, please?

19     **A.**  Also on October 20th, Defendant Handy sends to Defendant

20     Geraghty, "We are all meeting up at 8:30."

21     **Q.**  Thank you.

22          And how many days in advance of the incident is this,

23     Agent Biscardi?

24     **A.**  That's two days.

25     **Q.**  Thank you.

1          MS. ROSS:  And can we please publish for the jury

2     what has been admitted as Government Exhibit 1017, please.

3     **Q.**  (BY MS. ROSS)  Agent Biscardi, we just looked at the text

4     message between Lauren Handy and Herb Geraghty that said, "It

5     can officially be posted on Facebook around 9:05 a.m. to

6     10:00 a.m."  Agent Biscardi, if you know, approximately when

7     did Defendant Darnel begin live streaming the blockade?

8     **A.**  Approximately 9:00 a.m.  Just after 9:00 in the morning on

9     Thursday, October 22nd, 2020.

10         MS. ROSS:  And can we please just have the front --

11    first image of this video.  Thank you.

12    **Q.**  (BY MS. ROSS)  Agent Biscardi, this is Government

13    Exhibit 1017.  Is this video the start of Defendant Darnel's

14    live stream?

15    **A.**  Yes, it is.

16    **Q.**  And do you recognize this location?

17    **A.**  I do.

18    **Q.**  Where is this?

19    **A.**  It is out in front of the sidewalk of 2112 F Street

20    Northwest, Washington, D.C.

21    **Q.**  Thank you.

22         MS. ROSS:  Can we please play this video.

23         (Video played.)

24         MS. ROSS:  Thank you.

25         No more questions, Your Honor.

```
 1              THE COURT:  All right.  You should take down the

 2    video.

 3              All right.  Mr. Davis.

 4              MR. DAVIS:  Couple questions.

 5                        CROSS-EXAMINATION

 6    BY MR. DAVIS:

 7    Q.  Good afternoon, Agent.

 8    A.  Afternoon, Counselor.

 9    Q.  How is it that you went to the Surgi-Clinic on

10    October 22nd of; 2020?

11    A.  I traveled there in my Bucar, my FBI vehicle.

12    Q.  You were not directly contacted by the clinic that day,

13    were you?

14    A.  I was contacted by an agent on my squad who was contacted

15    by a clinic employee.  That particular agent was out.  She was

16    on some sort of leave.  I forget exactly for what.  And so she

17    tried to put me in contact with the clinic.

18    Q.  And was this relationship with the clinic, was that as a

19    result of prior incidents that had occurred at Surgi-Clinic?

20    A.  Potentially in part.  I would also say it was due to

21    outreach that we as a field office do within our community as

22    a whole.

23    Q.  So you're telling us that that wasn't a direct result of

24    prior protest at Surgi-Clinic?

25              THE COURT:  What wasn't?  If you could be very
```

Case 3:22-cr-00327 Document 354-1 Filed 13/04/23 Page 6 of 106 PageID #: 2292
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    specific about what it is.

2    **Q.** (BY MR. DAVIS) So you're telling us that the relationship

3    that the FBI had with Surgi-Clinic was not due to prior

4    protests there?

5    **A.** That's not what I said, Counselor. I honestly -- I don't

6    know what the genesis of that relationship is. I do know we

7    do outreach to the Surgi-Clinic and other similar

8    organizations and have since continued to do so.

9    **Q.** Thank you.

10       I'm going to show you Government's Exhibit 305 and ask

11   you a question about that.

12              THE COURT: All right. I didn't hear what the

13   exhibit was. What was it?

14              MR. DAVIS: I would like to show you Government's

15   Exhibit 305, and I would like to ask you a question about

16   that.

17              THE COURT: Sure. 305, just 305?

18              MR. MACHADO: 3005.

19              THE COURT: Oh, okay.

20              MR. DAVIS: Madame clerk, if you could hook me up

21   here, that would be great.

22              THE CLERK: Your laptop?

23              MR. DAVIS: Yes.

24              THE COURT: 3005 has been admitted.

25              MR. DAVIS: Apologize for my slowness here.

Cross-examination - Biscardi

1          THE COURT:  If it's faster, do you want to ask the

2     government?  They might be able --

3          MR. DAVIS:  No, Your Honor, I just wanted to make it

4     a little bit bigger so it was visible.

5          THE COURT:  Okay.

6     **Q.**  (BY MR. DAVIS)  Now, Agent, I direct your attention to

7     Government's Exhibit 3005.  Do you recognize Caroline Davis in

8     this photograph?

9     **A.**  I do, yes.

10    **Q.**  And could you circle her for us, please?

11    **A.**  Sure.  (Indicating.)

12    **Q.**  And are you familiar with her due to your investigation?

13    **A.**  Yes, we are.

14    **Q.**  And actually, she's a witness for the prosecution;

15    correct?

16    **A.**  She is a government witness, that is correct.

17    **Q.**  So you've -- you've interviewed her?

18    **A.**  We have, yes.

19         MR. DAVIS:  I have no further questions.  Thank you,

20    Agent.

21         THE COURT:  Mr. Machado.

22         MR. MACHADO:  Actually, Your Honor, no questions.

23    Thank you.

24         THE COURT:  All right. Ms. Bell?

25         MS. BELL:  No questions.

1          THE COURT:  All right.  You can step down, sir.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Let's call your next witness.

4          MS. ROSS:  Your Honor, the next witness will be

5     Shampy Holler.

6          THE COURT:  All right.  Ms. Ross, do you know how to

7     get the circles off the video?

8          MS. ROSS:  Yes, Your Honor.

9          THE COURT:  While we're waiting around.  Thank you.

10         All right.  If you would step up over here, please,

11    to the witness box.  All right.  If you would step up, and we

12    need to swear you in.  We need to swear you in.

13         MS. HOLLER:  Okay.

14         THE COURT:  So if you raise your right hand.

15         THE CLERK:  Raise your right hand.

16         THE COURT:  Can you not hear her?  You can stand up.

17         Go ahead.  It's been a long day.

18                    SHAMPY HOLLER,

19    called as a witness, being first duly sworn, was examined and

20    testified as follows:

21         THE WITNESS:  I swear I say all the truth.

22         THE COURT:  All right.  You can go ahead and sit

23    down.

24         THE WITNESS:  Thank you.

25         THE COURT:  The chair moves up so you're closer to

1    the microphone.  And if you could speak --

2              MS. ROSS:  Hi, Ms. Holler, how are you?

3              THE WITNESS:  Good, thank you.

4              THE COURT:  Is it working?

5              Make sure you speak in a loud, clear voice.

6              THE WITNESS:  Okay.

7              THE COURT:  If you see somebody stand and say

8    they're objecting, if you have not started to answer, don't.

9    If you're in the middle of the answer, please stop and let me

10   hear what they're objecting about and then it will -- I'll let

11   you know if you can answer it.  Okay?

12             THE WITNESS:  Okay.

13             THE COURT:  Thank you.

14                          DIRECT EXAMINATION

15   BY MS. ROSS:

16   **Q.**  Ms. Holler, will you please just tell the jury your first

17   and last name?

18   **A.**  Hello, I'm Shampy Holler.

19   **Q.**  Ms. Holler, where did you live in 2020, generally?

20   **A.**  In Ohio.

21   **Q.**  Did you immigrate to the United States from India?

22   **A.**  Yup.

23   **Q.**  When?

24   **A.**  2017, June.

25   **Q.**  When you moved to the United States from India, did you

1    live in Ohio?

2    **A.**   Yes.

3    **Q.**   Were you married?

4    **A.**   Yes.

5    **Q.**   Are you currently married?

6    **A.**   Yes.

7    **Q.**   How long have you been married for?

8    **A.**   13 years, plus.

9    **Q.**   Where do you work, Ms. Holler?

10   **A.**   I'm homemaker.

11   **Q.**   Let me just talk about October 2020.  In October 2020, did

12   you come to Washington, D.C. from Ohio?

13   **A.**   Yes.

14   **Q.**   Did you come with your husband?

15   **A.**   Yes.

16   **Q.**   Were you pregnant at the time?

17   **A.**   Yes.

18   **Q.**   Why did you come to Washington, D.C. in October 2020?

19   **A.**   I had to terminate my pregnancy.

20   **Q.**   Did you want to have a child?

21   **A.**   Yes.

22   **Q.**   Was there something wrong with the pregnancy?

23   **A.**   Yes.

24   **Q.**   Do you know what was wrong?

25   **A.**   Yes.  Doctor said the child was not physically fully

1   developed.  There was some physical issue with that child.

2   **Q.**  When you first learned that there was something wrong with

3   your pregnancy, did you talk to a doctor?

4   **A.**  Yes.

5   **Q.**  And after the doctor told you that there was something

6   wrong with the pregnancy, did you talk to another doctor?

7   **A.**  Yes.

8   **Q.**  What did that second doctor tell you?

9   **A.**  The same thing.  It will be risky.

10  **Q.**  And after you talked to that second doctor, did you talk

11  to a third doctor?

12  **A.**  Yes.

13  **Q.**  And what did that third doctor tell you?

14  **A.**  The same thing, that was well said.

15  **Q.**  Ultimately, what did the doctors recommend that you do

16  with your pregnancy?

17  **A.**  They said the child is not physically developed.  And they

18  just listened the heart beat only.  No other body part was

19  seen at that time.  All three doctors said the same thing.

20  They said it's up to you if you want to continue.  Maybe the

21  child will not live after birth or if he were alive, he is not

22  physically fit.

23  **Q.**  Based on what the doctors told you --

24  **A.**  Yes.

25  **Q.**  -- what did you decide to do?

1   **A.** After all three doctors -- when the doctor said all these

2   thing, we decided to terminate that thing.

3   **Q.** Was that a difficult decision for you and your husband?

4   **A.** Yes, it was very difficult.

5   **Q.** Were you able to terminate the pregnancy in Ohio,

6   Ms. Holler?

7   **A.** No.

8   **Q.** Do you know why not?

9   **A.** Because of some laws, in that laws we are not allowed to

10   do in Ohio.

11   **Q.** Because you cannot terminate the pregnancy in Ohio, did

12   you make an appointment here in Washington, D.C.?

13   **A.** Yes.

14   **Q.** And was that in October of 2020?

15   **A.** Yes.

16   **Q.** Do you remember how many appointments you had to make?

17   **A.** Yes; three.

18   **Q.** Three. Does that mean you had to spend at least three

19   days here in Washington, D.C.?

20   **A.** Yes.

21   **Q.** Do you remember what the first appointment was for?

22   **A.** It was just only the form fillings and the primary

23   medicines only.

24   **Q.** When you went to the clinic on the first day, did you go

25   with your husband?

1  **A.**  Yes.

2  **Q.**  And did you have any trouble entering the clinic reception

3  area?

4  **A.**  No.

5  **Q.**  Did you have any trouble entering the treatment area?

6  **A.**  No.

7  **Q.**  Do you remember what the second appointment was for?

8  **A.**  Sorry?

9  **Q.**  Do you remember what the second appointment was for at the

10  clinic?

11  **A.**  Second appointment, during second appointment, there is no

12  issue -- there was not an issue.

13  **Q.**  Did you go to the clinic on the second day with your

14  husband as well?

15  **A.**  Yes.

16  **Q.**  Did you have any trouble entering the reception area?

17  **A.**  No.

18  **Q.**  Did you have any trouble entering the treatment area?

19  **A.**  No.

20  **Q.**  And did you have a third appointment?

21  **A.**  Yes.

22  **Q.**  On the third day, how were you feeling before you went to

23  the clinic?

24  **A.**  I was in pain.  There are so many people, we cannot enter

25  into the clinic because of them.

Case 3:22-cr-00327 Document 354-1 Filed 12/04/23 Page 14 of 106 PageID #: 01300
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    **Q.**  What kind of pain were you in, Ms. Holler?

2    **A.**  It was labor pain, huge pain.

3    **Q.**  On that third day, was your appointment scheduled for

4    first thing in the morning, around 9:00 a.m.?

5    **A.**  Yeah.

6    **Q.**  And when you got to the clinic on the third day, and you

7    were experiencing labor pain, did you have trouble accessing

8    the reception area?

9    **A.**  Yes.

10   **Q.**  Can you please just describe generally what happened?

11   **A.**  There was so many people.  They were stopping us to enter

12   into the clinic.  Some were stand and some were -- some were

13   down on their knee, and do something with -- but they just

14   said not to enter into the clinic, you are not -- it's not

15   good, don't enter.

16   **Q.**  And did you try to go into the reception area of the

17   clinic?

18   **A.**  Yes.

19   **Q.**  Were you able to get into the reception area?

20   **A.**  No.

21   **Q.**  Do you remember what anybody said to you when you tried to

22   get into the reception area of the clinic?

23   **A.**  No.  They just blocked gate.  They just blocked the

24   gate.

25   **Q.**  Do you remember what your husband was doing?

Case 3:22-cr-00327 Document 854-1 Filed 12/04/23 Page 15 of 106 PageID #: 13061
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

 1    **A.**  He was somehow made possible me to enter into the clinic

 2    because I was in pain.

 3    **Q.**  Did you have to lie down in the hallway?

 4    **A.**  Yes.

 5    **Q.**  Why did you have to do that?

 6    **A.**  I was in pain.  I was not able to stand at that time.

 7    **Q.**  While you were lying down in the hallway, what was your

 8    husband doing?

 9    **A.**  He was helping -- supporting me, but he was also trying me

10    to enter.

11    **Q.**  Ms. Holler, prior to your testimony here today, did you

12    have a chance to review video of the hallway of the clinic?

13        Prior to today, were you able to review what was on a

14    CD?

15    **A.**  Yes.

16    **Q.**  And was that video taken from the hallway of the clinic?

17    **A.**  Yes.

18            MS. ROSS:  Your Honor, permission to approach.

19            THE COURT:  Yes.

20    **Q.**  (BY MS. ROSS)  I'm going to hand you, Ms. Holler, what's

21    been marked as Government's Exhibit 1079B.

22    **A.**  Okay.

23    **Q.**  Ms. Holler, prior to today, did you watch the video that

24    was on that CD?

25    **A.**  Yes.

Direct Examination - Holler

1    **Q.**  And did you initial it?

2    **A.**  Yes.

3    **Q.**  And what you watched on that CD, did you see yourself?

4    **A.**  Yes.

5    **Q.**  Are you in that video?

6    **A.**  Yes.

7    **Q.**  And is that a true and accurate representation of what

8    happened to you on that day?

9    **A.**  Yes.

10   **Q.**  Did it appear to be altered in any way?

11   **A.**  No.

12          MS. ROSS:  Your Honor, the government moves to admit

13   and publish for the jury what's been marked as Government

14   Exhibit 1079B.

15          MR. MACHADO:  No objection.

16          THE COURT:  All right.  I don't see any objection,

17   so I'll admit 1079B, as in boy, without opposition.

18          MS. ROSS:  Thank you, Your Honor.  And can we please

19   publish it for the jury?

20   **Q.**  (BY MS. ROSS)  Ms. Holler, do you recognize the people on

21   the video screen?

22   **A.**  Yes.  Me and my husband.

23   **Q.**  Are you there in the maroon top?

24   **A.**  Yeah, I'm --

25   **Q.**  And is your husband behind you in the blue sweatshirt?

1   **A.**  Yes.

2   **Q.**  At this point, were you trying to get into the reception

3   area of the clinic?

4   **A.**  Yes.

5   **Q.**  Were you able to get in?

6   **A.**  No.

7   **Q.**  Why not?

8   **A.**  Because the people are not allowing me to enter.

9   **Q.**  Thank you.

10          MS. ROSS:  Can we continue playing, please.

11          (Video played.)

12   **Q.**  (BY MS. ROSS)  Ms. Holler, after you couldn't get into the

13   reception area of the clinic, did you try to get into the

14   clinic in a different way?

15   **A.**  Yes.

16   **Q.**  Looking at the video at this point, were you able to get

17   into the clinic through the different door?

18   **A.**  No.

19   **Q.**  Why not?

20   **A.**  That door was closed, the door that this is also the door

21   of that clinic.

22   **Q.**  Thank you.

23          MS. ROSS:  Can we continue playing.

24          (Video played.)

25   **Q.**  (BY MS. ROSS)  Ms. Holler, where are you in this video

1    right now?

2    **A.**  I just laid down over there, floor, on the floor.

3    **Q.**  Why did you fall to the floor, Ms. Holler?

4    **A.**  I was not able to stand properly.

5    **Q.**  Why not?

6    **A.**  It was heavy pain.

7            MR. MACHADO:  Your Honor --

8            THE COURT:  Excuse me, there seems to be some

9    objection.

10           MR. MACHADO:  Just objection, 403, Your Honor.

11           THE COURT:  I'm sorry?  I've already ruled on this,

12   I believe.

13           MR. MACHADO:  Okay.

14           THE COURT:  So your objection has already been

15   noted --

16           MR. MACHADO:  Yes, Your Honor.

17           THE COURT:  -- and preserved.  You don't need to do

18   it again.

19           MR. MACHADO:  Thank you.

20           THE COURT:  Go ahead.

21   **Q.**  (BY MS. ROSS)  Ms. Holler, why did you fall to the

22   floor?

23   **A.**  I was in pain.

24   **Q.**  What was your husband doing at this point?

25   **A.**  My husband is searching any way to make me enter into the

1   clinic somehow.

2   **Q.** At this point, was he able to find a way into the

3   clinic?

4   **A.** No.

5   **Q.** Thank you.

6          MS. ROSS: Can we continue playing.

7          (Video played.)

8   **Q.** (BY MS. ROSS) Ms. Holler, are you still on the ground at

9   this point?

10  **A.** Yes.

11  **Q.** Do you see the woman in the blue bandana touching you?

12  **A.** Yes.

13  **Q.** Do you know her?

14  **A.** No.

15  **Q.** Did you want her to touch you?

16  **A.** No.

17  **Q.** Do you remember anything that she was saying?

18  **A.** No. She was just saying, I think, "don't do this, don't

19  do this, this is not good," something like that.

20  **Q.** Thank you.

21          MS. ROSS: Can we please continue playing.

22          (Video played.)

23  **Q.** (BY MS. ROSS) Ms. Holler, did you see yourself try to get

24  up there?

25  **A.** Yeah. Somehow that door was little bit open. My husband

1    tried me to enter there, but I could not, again.

2    **Q.**  And, Ms. Holler, as you tried to get up, did you see the

3    woman try to push you back down?

4              MR. DAVIS:  Objection.

5    **A.**  Yes.

6              THE COURT:  Sustained.

7    **Q.**  (BY MS. ROSS)  Ms. Holler, do you remember what the woman

8    did as you tried to get up?

9    **A.**  Yeah -- no, I think she -- she was pushing me to down.

10   **Q.**  Thank you.

11             MS. ROSS:  Can we continue playing.

12             (Video played.)

13   **Q.**  (BY MS. ROSS)  Ms. Holler, the entire time that you are on

14   the ground in the hallway, were you experiencing pain?

15   **A.**  Yes.

16   **Q.**  Were you eventually able to get into the clinic that

17   day?

18   **A.**  Yeah.  But after long struggle, my husband found a way,

19   and the nurse somehow picked me into the room.

20             MS. ROSS:  Thank you.  No more questions.

21             THE COURT:  All right.  You can take the video down.

22             Cross.

23             MR. MACHADO:  Very briefly, Your Honor.

24                           CROSS-EXAMINATION

25   BY MR. MACHADO:

1    **Q.**  Good afternoon, ma'am.

2    **A.**  Good afternoon.

3    **Q.**  My client is this woman in the back.

4           THE COURT:  You need to speak into the microphone.

5    I can't hear you.

6           MR. MACHADO:  I'm sorry.

7    **Q.**  (BY MR. MACHADO)  My client is the woman in the back.  She

8    was the one with the blue bandana.

9    **A.**  Okay.

10   **Q.**  The one that was talking to you when you were on the

11   ground.

12   **A.**  I don't remember actually.

13   **Q.**  That's fine.  Do you recall talking --

14          THE COURT:  Can you speak up so we can have a

15   record?  Being gentle is nice, but we need a record.

16   **Q.**  (BY MR. MACHADO)  Do you recall being asked about whether

17   you had some seaweed or something called laminaria in you?

18       Do you know what that is?

19   **A.**  No.

20   **Q.**  Okay.  Do you recall her asking you about whether you were

21   feeling well or not?

22   **A.**  I don't remember.

23   **Q.**  Okay.  Do you -- so you can't remember one way or another

24   what she was saying to you?

25   **A.**  I just remember, "don't do this, this is not good."

Case 3:22-cr-00327  Document 854-1  Filed 12/04/23  Page 22 of 106  PageID #: 11308
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    **Q.**  Okay.

2    **A.**  Nothing else.

3    **Q.**  Okay.

4          MR. MACHADO:  All right.  I have nothing further.

5          THE COURT:  Mr. Davis.

6          MR. DAVIS:  I just have one question, Your Honor.

7                    CROSS-EXAMINATION

8    BY MR. DAVIS:

9    **Q.**  Ma'am, when the prosecutor asked you what the lady did

10   when you tried to get up, you said, "I think she pushed me."

11   Is it possible she was trying to assist you up?

12   **A.**  As I told you, I don't remember what was happen on that

13   day.  But when I watch that video, it seems like she was not

14   allowing me to enter into the room.

15         MR. DAVIS:  Okay.  Thank you.

16         THE COURT:  Ms. Bell?

17         MS. BELL:  No questions.

18         THE COURT:  All right.  Any redirect?

19         MS. ROSS:  No, Your Honor.  Thank you.

20         THE COURT:  All right.  You can step down.

21         THE WITNESS:  Okay.

22         THE COURT:  You're finished.

23         THE WITNESS:  Thank you.

24         THE COURT:  If we could take a quick break for a

25   minute, if she could wait one second.

1      We're going to take a quick break, if you could

2  just -- five minutes.

3          (Jury left the courtroom.)

4          THE COURT:  All right.  I want to make sure that

5  nobody follows her out or tries to speak to her, please.

6  Okay.  So I just want to make sure.

7          I want to check on one quick thing and I'll be right

8  back.  Don't leave.

9          (A recess was taken.)

10         THE COURT:  I truly meant a minute.  I asked people

11  to wait.  Okay.  If you're not going to wait, then I'll tell

12  you anyway without everybody being here.

13         The reason I took a break is I had indicated in my

14  ruling that I would give an instruction.  So I have an

15  instruction to give.  All right.  So is everybody back?  No.

16  I told you all a minute and I meant a minute.  All right.  I

17  wanted to make sure I had the right instruction to give, which

18  I had indicated when I ruled on your motions in limine.

19         Plus, Mr. Machado, you did not have to, you know,

20  renew your objection.  I had told you that when you do it, you

21  don't need to keep popping up to do it.  It does break up the

22  testimony.  I will say it does accomplish that purpose.

23         So bring the jury out.

24         No comment from you is probably best.

25         And I will read the instruction which I had said I

1  would do specifically for her, since the motion in limine

2  indicated that between the two, this one was considered the

3  more prejudicial or emotional.

4          MS. ROSS:  Your Honor, may the witness be excused?

5          THE COURT:  I'm sorry?

6          MS. ROSS:  May the witness be excused?

7          THE COURT:  Yes.  I just wanted to make sure I told

8  everybody not to do anything.

9          MS. ROSS:  Thank you.  We appreciate that, Your

10 Honor.

11         THE COURT:  Because we've had problems.

12         Do you have the next witness ready?

13         MR. PATEL:  Yes.

14         THE COURT:  Okay.  Is that going to be Ms. Davis?

15         MS. ROSS:  Yes.

16         THE COURT:  Okay.

17         (Jury entered the courtroom.)

18         THE COURT:  All right.  Turned out to be more than a

19 minute, but I wanted to give you an instruction.  I wanted to

20 make sure that I had done it correctly.  But it relates to

21 Ms. Holler's testimony.

22         So, members of the jury, you heard testimony from

23 Ms. Holler regarding the circumstances of her pregnancy and

24 why she sought to terminate her pregnancy on October 22nd,

25 2020.  You are to consider this testimony only for the purpose

Case 3:22-cr-00327 EXHIBIT A  DEFENSE MOTION IN LIMINE 1 06 PageID #:0196

1    of determining whether one or more of the defendants in this

2    case obstructed Ms. Holler in her alleged efforts to receive

3    abortion services that day and for no other purpose.  And

4    again, I'll remind you that this case is not about the

5    propriety of abortion or one form of abortion or another.

6          I would also remind you that when I instruct you to

7    consider evidence for a limited purpose, you may only consider

8    the evidence for that limited purpose.  So this is an

9    instruction relating to the circumstances of her pregnancy and

10    why she sought to terminate her pregnancy.

11          All right.  So we're ready to move on to the next

12    witness.  And you'll get these instructions with the final

13    ones as well.

14          MR. PATEL:  Your Honor, the government calls

15    Caroline Davis.  I'll go and get her.

16          THE COURT:  All right.  Ms. Davis, if you would step

17    up here, and we need to swear you in.

18          THE CLERK:  Raise your right hand.

19                    CAROLINE DAVIS,

20    called as a witness, being first duly sworn, was examined and

21    testified as follows:

22          THE WITNESS:  I do.

23          THE CLERK:  Please be seated.

24          THE COURT:  All right.  The chair moves up.  And you

25    need to speak into the microphone so we have a clear record.

1    I'd ask that you allow counsel to finish their question before

2    you start to answer, and they should wait for you to finish

3    your answer before they move on.  All right.  So you're not

4    speaking at the same time.  If you hear the word "objection"

5    or see them stand -- they're going to -- if you haven't

6    started to answer, don't.  If you're in the middle of the

7    answer, please stop, let me hear the objection and then I can

8    indicate whether you should answer it.  All right?

9              MR. PATEL:  May I proceed, Your Honor?

10             THE COURT:  Yes.

11                       DIRECT EXAMINATION

12   BY MR. PATEL:

13   Q.  Good afternoon, Ms. Davis.

14   A.  Good afternoon.

15   Q.  Can you introduce yourself to the jury, please?

16   A.  Yes.  My name is Caroline Davis.

17   Q.  Ms. Davis, how old are you?

18   A.  I'm 25 years old.

19   Q.  What state do you currently live in?

20   A.  Georgia.

21   Q.  Are you currently working?

22   A.  Yes.

23   Q.  What are you doing for a living?

24   A.  I work as a paralegal at a criminal defense law firm.

25   Q.  You mentioned that you currently live in Georgia.  Did you

```
1    ever -- were you born and raised in Georgia?
2    A.   I was born in Georgia, and I lived there until I was
3    around 11 or 12 years old.
4    Q.   And following when you turned 11 or 12, did you leave
5    Georgia and live in several different states?
6    A.   Yes.
7    Q.   Can you tell us the chronology of where you lived after
8    you first left Georgia through to when you returned to
9    Georgia?
10   A.   Yes.  So I was in Georgia until 11 or 12.  Then I moved to
11   Austin, Texas.  I was there until the day after I turned 18
12   and moved to Pensacola, Florida.  I went to a college there.
13   I briefly stayed in Atlanta for a little bit.  I briefly
14   stayed in Dallas.  But I ended up moving to Lapeer, Michigan.
15   I lived in Lapeer, Michigan for a bit.  I lived in Davison,
16   Michigan for a little bit, moved back to Lapeer, Michigan, and
17   then I moved down to Atlanta, Georgia, recently, only about
18   almost two years ago, it was May of 2021, to take care of my
19   grandfather, my late grandfather.
20   Q.   During what years did you live in Michigan?
21   A.   Let's see, I was in Michigan from the years of 2017 until
22   2021.
23   Q.   During the time you were living in Michigan, did you
24   become involved in the pro-life movement?
25   A.   Yes.
```

1   **Q.**  While you lived in Michigan, did you meet a woman named
2   Heather Idoni?
3   **A.**  Yes, I did.
4   **Q.**  When did you meet Ms. Idoni?
5   **A.**  I would have met Ms. Heather Idoni around probably April
6   or May of 2020.
7   **Q.**  And how did you meet her, just very generally?
8   **A.**  Out in front of an abortion clinic.
9   **Q.**  What were you doing in front of the abortion clinic?
10  **A.**  I was like protesting, offering help to moms.
11  **Q.**  You were protesting against abortion services?
12  **A.**  Yes.
13  **Q.**  What type of relationship did you develop with Ms. Idoni
14  after you met her?
15  **A.**  It was a very mother-daughter relationship.
16  **Q.**  How often would the two of you communicate?
17  **A.**  We almost communicated on a daily basis, constantly.  We
18  worked together out at the abortion clinics in Michigan.
19  **Q.**  Tell us about your involvement in the pro-life movement
20  during the time you lived in Michigan.
21  **A.**  It started out with me finding an abortion clinic closest
22  to me when I got passionate about the subject.  And when I was
23  going out there with all my free time away from my job, I met
24  some different individuals that got me hyped up about the
25  rescue movement.  And so then I started participating in those

Case 3:22-cr-00327 Document 354 Filed 12/04/23 Page 29 of 106 PageID #: 1905
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    as well.

2    Q.  When you got hyped up and involved in this rescue

3    movement, did you participate in any clinic blockades during

4    the time you lived in Michigan?

5    A.  Yes, I did.  I participated in two specifically in

6    Michigan and in Tennessee where I actively blocked the doors

7    of abortion clinics.

8    Q.  Were you charged in relationship to those -- your

9    participation in those blockades?

10   A.  Yes, I was.

11   Q.  We'll talk about that later, but before -- before we get

12   into your involvement in this case, you mentioned the word

13   "rescue."  What does that mean to you?

14   A.  The act of rescue to me is when a person -- I used to

15   believe that it meant to put yourself in between the victim

16   and the aggressor.  So with abortion, it was the idea of

17   blocking the ability for the aggressor to kill the baby, to

18   commit the abortion.

19   Q.  Is that a commonly -- or based upon your experience, your

20   knowledge, and the pro-life movement, was that a commonly used

21   term to refer to preventing women from obtaining or clinics

22   from providing abortion services?

23   A.  Yes.

24   Q.  Are you familiar with a clinic blockade that occurred here

25   in D.C. in October of 2020?

1    **A.**   Yes.

2    **Q.**   Was that at the Washington Surgi-Clinic?

3    **A.**   Yes.

4    **Q.**   Were you at the clinic on the day it was blockaded?

5    **A.**   Yes, I was.

6    **Q.**   How did you learn about the Washington Surgi-Clinic

7    event?

8    **A.**   Through Heather Idoni.

9    **Q.**   And how did Ms. Idoni learn about it?

10   **A.**   My understanding is she heard that Joan was going to be

11   participating in a rescue, and she wanted to be there because

12   she looked at Joan as one of her heroes.  Yeah.

13   **Q.**   Did you later learn who this Joan individual is?

14   **A.**   My understanding is that Joan had done many, many rescues

15   over the years.  And so she had apparently written a book

16   about it, and Heather was telling me about that and how she

17   was so excited to be with her.  That was my only knowledge of

18   who Joan was.  And I met Joan at the gathering the day before

19   the rescue in D.C.

20   **Q.**   Okay.  We'll talk about that meeting that you had with

21   Joan.  But when you first learned about this from Heather

22   Idoni, did she use a word in reference to what was going to

23   happen here in D.C.?

24   **A.**   She said that we were going to rescue.

25   **Q.**   Rescue?

Direct Examination - Davis

1    **A.**  Uh-huh.

2    **Q.**  And when you mentioned or you discussed what rescue means

3    a little earlier, I think I heard you use the word "interpose"

4    or "interposition"; is that right?

5    **A.**  Yes.

6    **Q.**  Can you describe what that means and its relationship to

7    the word "rescue" as it's used in the pro-life movement?

8    **A.**  Yes.  From my understanding, it's referred to as the

9    historical Christian Doctrine of Peaceful Interposition, where

10   Christians believe that it's their job to interpose themselves

11   for the innocent, the way that Jesus Christ interposed himself

12   for everyone else, or everyone.

13        So the concept is to put yourself in their place, to

14   receive the beating on their behalf, to -- you know, to become

15   a martyr for the babies.

16   **Q.**  So does the concept of interposition, as it's understood

17   in the term "rescue" by you, mean essentially to -- as an act

18   to prevent abortions from taking place?

19   **A.**  That is correct.

20   **Q.**  What is your understanding of the different types of

21   rescues that are available for those in the pro-life movement

22   who want to participate in such an event?

23   **A.**  Yeah, there's rescues that are legal, and then there's

24   rescues that are illegal.  So there's rescues that are when

25   you stand in the public easement and you call out, use your

1    voice.  And you open your mouth for the weak and the

2    destitute, to quote, you know, the Bible and what the pro-life

3    movement would hold to for Christians.

4        Then there's also red rose rescues, where people don't

5    want to risk committing the FACE Act, like breaking the FACE

6    Act, so they don't block the doors.  Usually they'll go inside

7    the clinic or just go into the parking lot of the abortion

8    clinic, so that as to not be charged with FACE.  And then

9    there's obviously the blockade rescue like the one that part

10   happened in D.C.

11   **Q.**  You just mentioned the word "FACE Act" or you referenced

12   the FACE Act.  What is your understanding of what that is?

13            THE COURT:  Mr. Patel, can you keep your voice up?

14   I know it's at the end of the day.

15            MR. PATEL:  I'm sorry, Judge.

16   **Q.**  (BY MR. PATEL)  Ms. Davis, what is your understanding of

17   the FACE Act is?

18   **A.**  The FACE Act from my understanding, is the Freedom to

19   Access Clinic Entrance Act, which was brought in by the

20   Clinton administration.  And it was brought about to try and

21   shut down the rescue movement back in the '80s and the '90s.

22   And basically it makes it a possible misdemeanor felony if you

23   block the doors or if you harm someone or anything like that,

24   hinder someone from getting an abortion.

25            MR. MACHADO:  Objection, legal conclusion, Your

1    Honor.

2              THE COURT:  This is what her understanding of it is.

3    It's -- obviously the Court will give you an instruction of

4    what the statute says.  So this is strictly what her

5    understanding is, not necessarily the way you're going to be

6    instructed.

7    **Q.**  (BY MR. PATEL)  Ms. Davis, do you understand -- is your

8    understanding of the FACE Act, is that it's a federal law?

9    **A.**  That is my understanding.

10   **Q.**  And it's a federal crime if you are charged with a FACE

11   Act offense?

12   **A.**  Yes.

13   **Q.**  Were you charged with FACE Act offenses for your

14   participation in those blockades that you mentioned earlier

15   from Detroit and Nashville?

16   **A.**  I was.

17   **Q.**  Or Tennessee?  I'm sorry.

18   **A.**  Yeah.

19   **Q.**  Okay.  What is your understanding of the interplay between

20   the FACE Act and rescues?

21   **A.**  Well, I was always told that if I did participate in a

22   rescue that included blockading, that there was a chance that

23   I could be charged with FACE.

24      So I was told that there was a possibility of going to

25   prison and that every time you did it, you were risking that,

Case 3:22-cr-00327 EXHIBIT A - DEFENSE MOTION IN LIMINE 1 Document 854-1 Filed 12/04/23 Page 34 of 106 PageID #: 01920

1    but that, you know, that it's your job as a Christian, you

2    don't -- you know, you'd rather go to jail than go to hell,

3    like that's the big quote, so you have to be a martyr.

4    **Q.**  So you talked about there being different types of

5    rescues.

6    **A.**  Uh-huh.

7    **Q.**  Can you explain what a traditional rescue is?

8    **A.**  My understanding of a traditional rescue is where you go

9    and put yourself in front of the doors of the abortion clinic,

10   and you try to sit there as peacefully as you can and ensure

11   that you are there as long as you can be to try and get the

12   clinic shut down for the day.

13   **Q.**  And is there a name for a type of rescue where that

14   involves locks and chains?

15   **A.**  Yeah, it's usually called a lock-and-block rescue.

16   **Q.**  And can you describe what with a little more detail what

17   your understanding of a lock-and-block rescue is?

18   **A.**  My understanding of a lock-and-block rescue is using

19   different techniques with different ways of securing yourself

20   to obstruct the entry of the clinic to keep yourself there as

21   long as possible.

22       So it's basically a time -- like a time killer, to try

23   and keep you there longer, keep the clinic shut down for

24   longer kind of thing.

25   **Q.**  And what's the point of trying to keep the clinic shut

1  down longer using locks and chains?

2  **A.**  Well, the longer that the clinic is shut down, the more

3  chance you have that abortions won't happen there that day.

4  **Q.**  Are there other tactics that are -- that you have used to

5  further delay or keep a clinic closed when you would

6  participate in a rescue?

7  **A.**  Me, specifically?

8  **Q.**  Yes.

9  **A.**  Specifically, I pretty much just sat down, sang, and

10  talked to women that came at the door, but I didn't ever

11  lock-and-block myself.  And I never went limp.  That's another

12  technique used to buy time.

13  **Q.**  What is your understanding of different techniques that

14  are used to buy more time?

15  **A.**  Could you -- like how do you mean my understanding of?

16  **Q.**  Why would -- why would a rescuer want to buy more time

17  before they're arrested?

18  **A.**  To try and get the clinic shut down for as long as

19  possible.  So if that means like talking to the police and

20  having an argument with them in hopes that, you know, the

21  police might change their minds and sit down with you, or

22  things like that.  Anything you can do to try and keep the

23  clinic shut down so that abortions won't happen for the day.

24  **Q.**  You mentioned something about going limp.  Did I hear you

25  correctly?  What is that and why would somebody do that?

1    **A.**  Yeah, it was talked about at the prep for this rescue in

2    D.C.  Going limp is a technique used by many to make it as

3    difficult as possible for the police officers to remove you

4    from in front of the door.  So that buys more time.  It takes

5    them longer to get you away, makes it harder.

6    **Q.**  Let's finish that thought.  And what does -- what is the

7    point of it taking the police a longer time to remove --

8    **A.**  Yeah --

9    **Q.**  -- a rescuer?

10   **A.**  Sorry.

11        Yeah, it's just to make sure that abortions don't happen

12   that day.

13   **Q.**  Did you have -- when you first learned about this rescue

14   that was going to take place in D.C. from Ms. Idoni, did you

15   have any conversations with her about the FACE Act?

16   **A.**  Yes.  We discussed the FACE Act, definitely the night

17   before the rescue, but I don't know if we discussed it

18   previous to that.  My memory's a little fuzzy on it.

19   **Q.**  Do you remember ever having discussions with Ms. Idoni

20   about the FACE Act before you came to D.C. --

21   **A.**  Yes.

22   **Q.**  -- to participate in the rescue?

23   **A.**  Yes.  We talk- --

24   **Q.**  Tell us about that.

25   **A.**  Well, back when Heather and I had participated in another

Case 3:22-cr-00327 Document 354 Filed 12/04/23 Page 37 of 106 PageID #: 1928
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    rescue in Michigan, we had to have long discussions about it,

2    about the FACE Act and what the penalties were.  And Heather

3    talked about how the Lord had delivered her from facing the

4    FACE Act, the FACE Act penalties before in previous rescues

5    that she participated in.

6    **Q.**  How did Ms. Idoni contact you first in connection with the

7    event that was going to take place here in D.C.?

8    **A.**  She contacted me on Facebook Messenger.

9    **Q.**  Do you remember what that message was?

10   **A.**  It was something along the lines of like there's going to

11   be a rescue in D.C.  And she told me that Eva Zastro was going

12   to be driving her car.  And she ended up doing that only part

13   of the time.  And I just kind of wanted to participate at the

14   time.

15   **Q.**  Who's Eva Zastro?

16   **A.**  Eva Zastro is -- she was one of my close friends who was

17   part of the rescue movement.  Her dad is the one who discipled

18   me in the culty rescue movement.  And she -- she actually went

19   with us to this D.C. rescue.

20   **Q.**  Eva and her dad are from Michigan?

21   **A.**  Yes.  But it was just Eva.  Her dad didn't go.

22   **Q.**  Was there anything else that you learned about this rescue

23   when Ms. Idoni first sent you that message?

24   **A.**  Well, I only knew that Joan was going to be rescuing, and

25   that it was happening in D.C.  I didn't have very many other

Case 3:22-cr-00327 Document 354-1 Filed 12/04/23 Page 39 of 106 PageID #: 3024
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    details.

2    **Q.**  Do you remember how -- how many days before the event in

3    D.C. that you received that message from Ms. Idoni?

4    **A.**  It would have been really close.  I don't remember the

5    exact amount of days, because I remember not having much time

6    to prepare to go on the trip.

7    **Q.**  So walk us through what happens between the time you get

8    that message from Ms. Idoni and before you get in the car with

9    her and Eva Zastro.

10   **A.**  Yes.  I reached out to my ex-husband and asked if he was

11   okay with me going.  I arranged it so -- for work to make sure

12   everything would work out with that.  And then I packed my

13   bags.

14       And the morning of -- the morning the day before the

15   rescue, I met with Heather and Eva Zastro at a parking lot,

16   like a meet parking lot where you can leave your car there, in

17   Michigan.  And then we drove.  I got into their car and --

18   into Heather's car, and we drove to D.C. from there.

19   **Q.**  Do you remember how many days before the event in D.C.

20   that was?

21   **A.**  So, the day that we met at that park, park-and-drive.

22   **Q.**  Right.

23   **A.**  That was the day before the rescue, the morning of the day

24   before.

25   **Q.**  So did you, Eva Zastro, and Heather Idoni drive to D.C.

1    from Michigan?

2    **A.**  Yes.

3    **Q.**  Could you tell us about the conversations that you all had

4    in the car as you were driving down here?

5    **A.**  Well, I specifically remember Heather talking about Joan.

6    And I remember her talking about her book.  And I remember

7    there was some dispute once we got closer to the location

8    about what was about to happen.  I just felt like I didn't

9    have a lot of information.

10       And so -- but Heather just kept saying, oh, the Lord will

11   lead us, the Holy Spirit will lead us.  And so that's all I

12   remember from the trip.

13   **Q.**  How long was the car drive from Michigan to D.C.?

14   **A.**  Well, we left early in the morning, and we got there

15   around -- I think it was 5:00 or 6:00 p.m.  It was the early

16   evening.  And we were at that house for what felt like a long

17   time before other rescuers started showing up.

18   **Q.**  So you drove straight to some home here in the D.C.

19   area?

20   **A.**  Yes.  It was a pastor's house.  I don't know who the

21   pastor was.  I had never been there before, never met him.

22   **Q.**  Who knew where to come here in D.C.?

23   **A.**  Heather had all the information.  Me and Eva felt very out

24   of the loop.  I remember like we talked about it, like feeling

25   very uncomfortable and not really sure what was going on.

1    **Q.**  Did Heather give you any indication where she was getting

2    her information from or how she knew where to go or where to

3    go?

4    **A.**  I saw that she had the information on her cell phone, but

5    I didn't know where she was getting it from.

6    **Q.**  During the drive down, did Heather Idoni indicate what she

7    was planning on doing in terms of her participation in this

8    rescue?

9    **A.**  Well, she had indicated she wanted to be right next to

10   Joan, and that like she just was so excited about that.  But

11   there wasn't a whole lot of other indications that I

12   remember.

13   **Q.**  And during the drive down, had you made a decision about

14   what you were planning on doing?

15   **A.**  During the drive down, I had not made a decision fully.  I

16   remember being very sure that I wasn't going to do it once I

17   kind of saw the whole group together.  I didn't really know

18   what I was getting myself into.  And I was kind of trying to

19   just follow Eva Zastro's -- like whatever she did, I was

20   doing.  I was just kind of following her, because I felt like,

21   oh, this girl's got it figured out, like I'll just emulate

22   her.

23        And her dad didn't want her to do it, because there was

24   Catholics involved, and so I tried to emulate that too, like,

25   oh, like there's Catholics involved, and it's an eclectic

1   group and, okay, so I'm not going to do it.

2   **Q.** Why did that matter?

3   **A.** It's a really culty thing. Like for some reason a lot of

4   Protestants, and in the group that I was a part of, what I

5   used to believe is that Catholics aren't real Christians, but

6   I don't believe that anymore.

7   **Q.** What do you believe now?

8   **A.** I believe that God sent his son for the whole world and

9   that -- I do believe that. I don't know. I'm nervous to get

10  too into religious stuff, but...

11  **Q.** Okay. So eventually you arrived here in D.C. with Eva

12  Zastro and Heather Idoni?

13  **A.** Yes.

14  **Q.** You indicated you went to a pastor's home?

15  **A.** Yes. I didn't know his name, but it was a pastor and his

16  wife.

17  **Q.** Do you remember what time you arrived in D.C.?

18  **A.** I think it was 5:00 or 6:00 p.m. It was like early

19  evening. And I remember we got there way before everyone

20  else, and it felt super uncomfortable, like the whole -- it

21  was like they were still getting ready for the event, and we

22  just kind of like barged in on them. That's how it felt.

23  **Q.** So this was the night before the actual event or the

24  rescue that was taking place the next day; right?

25  **A.** Yes, this was the night before the rescue.

Case 3:22-cr-00327 Document 854-1 Filed 12/04/23 Page 42 of 106 PageID #: 10928
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1   **Q.**  When you arrived at that home here in the D.C. area, what
2   was your understanding what was going to happen at this
3   home?
4   **A.**  Well, my understanding was that like once we were walking
5   towards the house, Heather said that there was going to be a
6   bunch of people arriving and that these were going to be some
7   of the rescuers and maybe some extra people too that might not
8   participate.  And so we went in there, and she said we'll just
9   fellowship for a while till everyone shows up.
10  **Q.**  And do you know what was going to be discussed at this
11  home?
12  **A.**  I understood it was going to be prep for the rescue.
13  **Q.**  Okay.  Eventually, did other people arrive at the home?
14  **A.**  Yes.
15  **Q.**  All right.  And was there a meeting that was had about
16  what was going to take place the next day?
17  **A.**  There was.
18  **Q.**  I'd like to show you what's been marked as Government
19  Exhibit 2015.
20          MR. PATEL:  Your Honor, it's already been admitted
21  into evidence.  With your permission, can we publish it to the
22  jury and the witness?
23          THE COURT:  All right.  Go ahead.
24          MR. PATEL:  Confirming the jury can see this on
25  their screen?  Okay.

Case 3:22-cr-00327 Document 854-1 Filed 12/04/23 Page 43 of 106 PageID #: 10329
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    **Q.**  (BY MR. PATEL)  Ms. Davis, do you see Government

2    Exhibit 2015?

3    **A.**  Yes, I do.

4    **Q.**  Do you recognize a person on that first page?

5    **A.**  Yes, that's Jonathan Darnel.

6    **Q.**  Do you see him in court today?

7    **A.**  Yes, I do.

8    **Q.**  Can you point at him and describe something he's wearing,

9    please?

10   **A.**  Yes.  Jonathan Darnel is wearing a purple shirt, and he's

11   wearing a black suit jacket.  He has glasses on.  He has brown

12   hair.  He has some facial hear.

13            MR. PATEL:  Your Honor, will the record reflect an

14   in-court identification of Defendant Darnel?

15            THE COURT:  All right.  So let the record reflect

16   that she has identified Mr. Darnel.

17   **Q.**  (BY MR. PATEL)  Ms. Davis, was Mr. Darnel at this meeting

18   that night before the rescue in D.C. the following day?

19   **A.**  Yes, he was.

20            MR. PATEL:  We can go to the second page.

21   **Q.**  (BY MR. PATEL)  Do you recognize this person on page 2?

22   **A.**  Yes, that's Lauren Handy.

23   **Q.**  Was she at this meeting?

24   **A.**  She was.  She led the meeting.  And it seemed like

25   Jonathan Darnel also was leading to some extent.

1    **Q.**  Had you met Lauren Handy or Jonathan Darnel before you
2    arrived here in D.C.?
3    **A.**  No, that was my first time meeting them.
4    **Q.**  Okay.
5           MR. PATEL:  Next page, please.
6    **Q.**  (BY MR. PATEL)  Do you recognize this guy?
7    **A.**  I do recognize him.
8    **Q.**  Do you know his name?
9    **A.**  I do not know his name.
10   **Q.**  Was he at the meeting?
11   **A.**  Yes, he was.
12   **Q.**  Was there anything interesting that he said or was
13   discussed about him?
14   **A.**  There was.  Many of the individuals felt uncomfortable
15   with him rescuing, because he was a new convert, like a new
16   Catholic.  And people were worried that either he would do
17   what I'm doing right now, or that he would become violent if
18   people were violent to him.
19   **Q.**  When you say "what I'm doing right now," what do you mean
20   by that?
21   **A.**  That he would take the stand and testify or take a deal or
22   something like that.
23   **Q.**  Who were some of the people at this meeting who had
24   concerns about this individual?
25   **A.**  Well, Heather Idoni was the person that I was hearing most

1    of the concerns from.

2    **Q.**  Was there anybody else that raised some concerns that you

3    might have even been sitting next to in this meeting?

4    **A.**  Yeah, actually in that photograph, if my memory serves me

5    correctly, those women were some of the women that seemed to

6    be discussing whether or not it was a good idea for him to

7    participate.

8    **Q.**  When you say "those women," you mean the women to the --

9    **A.**  Left.

10   **Q.**  -- left of him in that photograph?

11            MR. MACHADO:  Objection, speculation.

12            THE COURT:  What's -- speculation about what?

13            MR. MACHADO:  She thinks, she's not sure.

14            THE COURT:  Not sure about what?  The question was,

15   "When you say 'those women,' you mean what?"  She answered,

16   "Actually in that photograph, if my memory serves me

17   correctly, were some of the women that seemed to be discussing

18   whether or not."  So it's not clear to me what you're

19   objecting to.

20            MR. MACHADO:  I'll withdraw.

21   **Q.**  (BY MR. PATEL)  Do you remember what the -- the women in

22   this photograph who were seated next to this man, do you

23   remember what concerns they had at this meeting that they

24   raised?

25   **A.**  Yes, the concerns were whether or not he would become

EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    violent or whether or not he would take a plea deal down the

2    road if something went wrong and he couldn't handle the

3    pressure.  Like they weren't discussing it in those terms, but

4    like that's what they meant.

5    **Q.**  I'm going to draw a circle around one individual.  Do you

6    see that yellow circle I drew on the screen?  It's to the

7    person to the immediate left of the man depicted in this

8    picture?

9    **A.**  I do.

10   **Q.**  There's a red circle around his picture, and I drew a

11   yellow circle on the screen.  Do you see that?

12   **A.**  I do.

13   **Q.**  Was that lady at the meeting?

14   **A.**  I don't know.  I'm not a hundred percent sure.  She looks

15   like the one that was sitting right next to her on the other

16   side.

17       Joan Bell is the one I specifically remember.  And there

18   was multiple older women that all had the same kind of look to

19   them.  Joan Bell's the one that I remember specifically.

20   Her -- I can't be a hundred percent sure.  I don't know her

21   name.  It's one of those things, but...

22   **Q.**  I'm drawing another circle around a woman to the far left

23   in that photograph wearing a red shirt and a black mask.  Do

24   you recognize that person?

25   **A.**  That looks like Joan Bell.

Case 3:22-cr-00327 Document 854 Filed 12/04/23 Page 47 of 106 PageID #: 10133
EXHIBIT A  DEFENSE MOTION IN LIMINE 1

Direct Examination - Davis

1    **Q.**  Okay.  I could have just waited until we got to page 3

2    because here's that person with the red circle around their

3    face.  That's the woman seated to the immediate left of the

4    man from the previous page; right?

5    **A.**  Yes.

6    **Q.**  You indicated you don't remember if she was at the

7    meeting?

8    **A.**  I just -- I just don't know her.  She's not sticking in my

9    memory, unfortunately.

10   **Q.**  Do you remember her from the event at the clinic the

11   following day?

12   **A.**  I do.

13   **Q.**  What do you remember seeing her doing at the clinic the

14   next day?

15   **A.**  Exactly what she's doing in that photo, whenever I looked

16   into the -- into the abortion clinic and I saw her.

17   **Q.**  What did you see her doing?

18   **A.**  That, where she's sitting in the chair --

19   **Q.**  Well, let's --

20   **A.**  -- at the rescue.

21   **Q.**  I need you to use -- I want you to --

22          THE COURT:  You're talking over each other.

23          MR. PATEL:  I apologize, Judge.

24   **Q.**  (BY MR. PATEL)  I want you to rely on your memory and tell

25   the jury what you remember seeing her doing in the clinic that

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327 Document 854-1 Filed 12/04/23 In Page 40 of 106 Page ID #:10384
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    day, on October 22nd at the Washington Surgi-Clinic.

2    **A.**  Yes, I remember seeing her sitting in a chair, blocking

3    the entrance to the back of the abortion clinic.

4             MR. PATEL:  If we can turn to the next page.

5    **Q.**  (BY MR. PATEL)  Do you recognize the individual on this

6    page?

7    **A.**  I do recognize her.

8    **Q.**  On the day of the event, she was wearing a blue bandana;

9    is that correct?

10   **A.**  She was.

11   **Q.**  Do you remember seeing her at the meeting the night

12   before?

13   **A.**  If my memory serves me correctly, I do.

14   **Q.**  What specifically do you remember about her from the

15   meeting the night before?

16   **A.**  Sitting in a chair.

17   **Q.**  Do you remember her saying anything?

18   **A.**  I don't remember.

19   **Q.**  Do you remember if she was one of the individuals who

20   voiced a concern about the recent convert who was on the

21   second or third page of this exhibit that you saw?

22   **A.**  I don't remember if she was specifically one of the

23   individuals that did.

24   **Q.**  Okay.  Do you remember seeing her at the clinic the

25   following day?

1    **A.**  Yes.

2    **Q.**  What do you remember seeing her doing?

3    **A.**  I remember her walking around at one point, upstairs.  And

4    that was -- I also remember her before the rescue happened.

5    So there was a meetup before the rescue happened very close to

6    the abortion clinic, and I remember her being there as well.

7    **Q.**  Okay.  Move to the next page.  Do you recognize this

8    individual?

9    **A.**  I do.

10   **Q.**  Do you know his name?

11   **A.**  I do now, but during the time of the rescue, I didn't know

12   his name.

13   **Q.**  Today, what do you know his name as?

14   **A.**  John Hinshaw, I believe.

15   **Q.**  Was he at the meeting the night before?

16   **A.**  He -- I wouldn't be able to tell you for sure.  I get him

17   confused with another one of the defendants.

18   **Q.**  He was at the clinic the following day; correct?

19   **A.**  He was.

20   **Q.**  What did you see him doing at the clinic?

21   **A.**  I saw him sitting in a chair, blockading the doors to the

22   back of the clinic as well.

23   **Q.**  And who is this person?

24   **A.**  That's Heather Idoni.

25   **Q.**  She's the one you drove down from Michigan with?

1    **A.**   Yes.

2    **Q.**   She was obviously at the meeting?

3    **A.**   She was.

4    **Q.**   Do you remember what she did the following day at the

5    clinic?

6    **A.**   Yeah, she blocked the door to the -- I believe it was the

7    abortion doctor's entrance into the clinic.

8    **Q.**   Would that be the staff entrance?

9    **A.**   Yes.

10   **Q.**   Where is that located?

11   **A.**   Outside the clinic in the hallway.  So the abortion clinic

12   was in a big medical facility like with multiple different

13   offices for different things.  And so it was on the fourth

14   floor.  And as soon as you come out of the elevators, the

15   clinic staff entrance was right in front of that.  And then

16   you go to the left and then there was the abortion clinic

17   entrance.  And so she was on the outside of where everybody

18   else was, that was blocking the doors to the abortion clinic.

19   She was blocking, yeah, the staff clinic entrance.

20   **Q.**   Do you recognize this individual?

21   **A.**   I do.

22   **Q.**   Do you know his name?

23   **A.**   His name is William Goodwin.

24   **Q.**   Was he at the meeting the night before?

25   **A.**   I don't remember him being at the meeting the night

```
 1    before, but I remember him being at the host home that we
 2    stayed at.
 3    Q.  That same evening?
 4    A.  That same evening.
 5    Q.  And then how about the following day?
 6    A.  Yes, he was there the following day.
 7    Q.  What did you see him doing at the clinic the following
 8    day?
 9    A.  Well, at the time I would get him confused with John, but
10    I saw him up in the hallway standing next to Heather Idoni.
11    Q.  And what was he doing while he was standing next to
12    Ms. Idoni?
13    A.  He was blocking the doors to the staff clinic entrance.
14    Q.  Thank you.
15          MR. PATEL:  Next page.
16    Q.  (BY MR. PATEL)  Do you recognize this person?
17    A.  That's Joan.
18    Q.  Is that the same person Heather Idoni spoke about before
19    and as you were driving down to D.C.?
20    A.  Yes.
21    Q.  Do you -- do you know her first and last name, or do you
22    just know her as Joan?
23    A.  I've heard her whole name said so many times, and I feel
24    like it's Joan Bell Ark or something, but I can never remember
25    so I just refer to her as Joan.
```

1    **Q.**  She was at the meeting the night before?

2    **A.**  Yes, she was.

3    **Q.**  She was at the clinic the following day participating in

4    the rescue?

5    **A.**  Yes, she was.

6    **Q.**  Do you see her in court today?

7    **A.**  Yes, I do.

8    **Q.**  Can you point at her and describe something she's wearing,

9    please?

10   **A.**  Yes, she has bangs cut across, she's wearing a

11   pinkish-colored shirt with a collar, and there's buttons, and

12   her mask is hanging on the side of her face.

13              MR. PATEL:  Your Honor, will the record reflect an

14   in-court identification of Defendant Bell.

15              THE COURT:  I'm assuming there's no objection to her

16   identification?

17              MS. BELL:  No objection.

18              THE COURT:  All right.  Let the record reflect that

19   she's identified Joan Bell.

20              MR. PATEL:  And move to the next page.

21   **Q.**  (BY MR. PATEL)  Here's the last page of this exhibit.  Do

22   you recognize this individual?

23   **A.**  I do.  That's Herb.

24   **Q.**  Do you remember seeing Herb the night before at the

25   meeting at the pastor's house?

1    **A.**  Yes, I do.

2    **Q.**  And he was there at the clinic the following day?

3    **A.**  He was.

4    **Q.**  All right.

5            MR. PATEL:  We can take the exhibit down, please.

6    **Q.**  (BY MR. PATEL)  Now, besides the individuals that you

7    identified being at the meeting in this exhibit that you just

8    saw, was there anybody else you remember at this meeting?

9    **A.**  Anyone else that I remember at the meeting, well, off the

10   top of my head, I don't know.

11   **Q.**  Were there more people at this meeting than just these

12   individuals?

13   **A.**  Oh, yes, there was a lot of people.  I'm sorry.

14   **Q.**  Generally, tell us about what happened at the meeting.

15   What was the point of it?

16   **A.**  The entire point of the meeting was to give everybody a

17   rundown of what -- what is rescue and what the plan was, what

18   the possible consequences could be, should you participate in

19   a rescue, things like that.

20   **Q.**  Who led the meeting?

21   **A.**  It was mostly Lauren Handy, but Jonathan Darnel also

22   seemed to be leading a little bit as well.  He gave leadership

23   vibes.

24   **Q.**  So let's first talk about what Jonathan Darnel talked

25   about at this meeting.

Case 3:22-cr-00327 Document 354 Filed 12/04/23 Page 54 of 106 PageID #: 01840
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    **A.**   Yeah.

2    **Q.**   What was it -- what was it about what he said that gave

3    you leadership vibes?

4    **A.**   Well, he came around -- he put a piece of paper in my hand

5    and just said that everyone now is participating in the rescue

6    needed to put their email on it.  And I remember being like,

7    well, if I'm not going to participate but just in case,

8    because he said anything goes down, if anything gets crazy or

9    emergency information needs to go out, he would send the

10   email.  So I was like, well, I want to be on that list just in

11   case, so I put my email on it.  Eva Zastro put her email on

12   it.  And it went around, I remember that.

13   **Q.**   Was there any discussion about risking arrest --

14   **A.**   Yes.

15   **Q.**   -- for participating in this rescue?

16   **A.**   Yes, there was.

17   **Q.**   Tell us about that.

18   **A.**   So once we got to the point of understanding what the

19   consequences could be, there was basically a discussion about

20   whether or not you wanted to go to jail or not go to jail.  So

21   if you were willing to go to jail, it's called risking arrest,

22   in their terms, and the understanding was that you are risking

23   the potential of being charged with trespassing, or FACE

24   essentially.  And so --

25   **Q.**   You say -- I'm sorry, when you say "FACE," you mean that

1    federal law you talked about earlier?

2    **A.**  Yes, the FACE Act.

3    **Q.**  What would someone have to do -- based upon what was

4    discussed at that meeting, what would someone have to do if

5    they would be risking arrest?

6    **A.**  Blocking the entrance one way or another to the abortion

7    clinic.

8    **Q.**  What was your understanding of the reason why Mr. Darnel

9    handed out that piece of paper for people to write their names

10   on, or their email address?

11   **A.**  My understanding was that if there was going to be a

12   situation of any kind or an emergency, like something happened

13   that was unexpected, that he would be able to keep everybody

14   in the loop.  That's what I thought at least.

15   **Q.**  Okay.  What were some of the other things that were

16   discussed?  Let's talk about Lauren Handy.  What did she talk

17   about?

18   **A.**  Yeah, so she initially talked about what rescue is, why

19   rescue is done.  And then she talked about the FACE Act.  So

20   she talked about when it came into being and what the

21   potential downfall could be if you were charged with it.  They

22   talked about how rare it had been in the past to be charged

23   with FACE.  And most likely you would just be trespassed.

24   They talked about if you participated in the blockading, you

25   most likely would be arrested and you would go to jail that

Case 3:22-cr-00327 Document 854 Filed 12/04/23 Page 56 of 106 PageID #: 10342
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    day.  Things like that.

2        They talked about using like the lock-and-block.  Lauren

3    basically said that if like the Spirit leads you to do that,

4    then so be it.  If not, you know, that's okay too.  Same with

5    going limp.  There was like discussion in the group at the

6    house meeting about those two things.

7    **Q.**  What did -- what was the discussion about in terms of

8    rescue, was there a -- sorry, let me rephrase the question.

9        Was there any conversation about what actually -- what a

10   rescue actually is?

11   **A.**  Yes.

12   **Q.**  Tell us about that.

13   **A.**  Lauren specifically just said that with rescue, it is

14   their understanding of interposition, so interposing yourself

15   in harm's way for the babies.  So basically all based off the

16   Bible is what it seemed like to me.  Like Bible verses.

17   **Q.**  And then as she explained the concept of rescue, was it

18   woven into blocking the doors at the clinic the next day?

19   **A.**  Yes.  And just because like they -- they were saying like

20   if you know a time and place where someone's going to be

21   killed, then you're going to show up and, you know, defend

22   them.

23           MR. PATEL:  Your Honor, with your permission, I'd

24   like to publish Government Exhibit 1009, which has been

25   admitted into evidence.

Case 3:22-cr-00327 Document 354-1 Filed 12/04/23 Page 57 of 106 PageID #:01848

EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1           THE COURT:  All right.

2           MR. PATEL:  Just want to --

3           Is there a -- why don't you pull it up.

4           Just want to confirm the jury can see this before we

5      play?  Okay.

6           (Video played.)

7      **Q.**  (BY MR. PATEL)  Did you see that individual that just kind

8      of walked by behind the police officer and the woman in

9      black?

10     **A.**  Yes, that's Jonathan Darnel and Lauren Handy.

11     **Q.**  Describe what Lauren Handy is wearing.

12     **A.**  Lauren Handy is wearing a head scarf, it looks like and

13     she's got a hood and she's wearing black.

14          (Video played.)

15     **Q.**  (BY MR. PATEL)  I'm going to draw a circle around -- we've

16     paused it at the time stamp of 9:13:02 on this exhibit.  I

17     just drew a circle around somebody we can see the back of

18     their head.  Do you know who that is?

19     **A.**  Yeah, that's me.

20     **Q.**  Okay.  Do you know what -- approximately what moment in

21     time this was where you were captured on this officer's

22     body-worn camera video?

23     **A.**  Yeah, that was like right as the rescue was beginning.  It

24     was the very beginning of the whole event.

25          (Video played.)

1    **Q.**   (BY MR. PATEL)   Did you hear Ms. Handy explain what a

2    rescue is in this video?

3    **A.**   Yes.

4    **Q.**   Was that consistent with what she was explaining at the

5    meeting the night before?

6    **A.**   Yeah, she was getting a lot of points across at the

7    meeting, but yes, she did say that.

8    **Q.**   So based upon what she says in this video and what she

9    said at the meeting, was it your understanding that the plan

10   was to block access to the clinic?

11   **A.**   Absolutely.

12   **Q.**   And to prevent patients from obtaining abortion care?

13   **A.**   Yes.

14   **Q.**   And the clinic from not being able to provide abortion

15   care?

16   **A.**   Yes.

17          MR. PATEL:   If we can take the exhibit down.

18   **Q.**   (BY MR. PATEL)   Was there any discussion about the cost of

19   rescue?

20   **A.**   Yes.

21   **Q.**   What does that mean and what is it?

22   **A.**   Well, the cost of rescue, my understanding is that when

23   you participate in a rescue, there's a high cost, meaning you

24   could have to go to jail for a long time or you could have to

25   pay a high penalty, just like Jesus paid a high penalty on the

1    cross for sin.  So it's this like martyrdom thing, where you

2    understand you're definitely going to end up going to jail at

3    some point or things like that if you do this.  You are

4    breaking the law; therefore, you will pay the price.

5    **Q.**  You also mentioned that there's some discussion about

6    lock-and-block?

7    **A.**  Yes.

8    **Q.**  Tell us about that, please.

9    **A.**  Well, the discussion at the meeting the night before

10   seemed to just be that if you are going to lock-and-block,

11   that was your decision.  So if you wanted to use extra chains

12   to try and buy time to stay in front of the doors longer, that

13   was a Holy Spirit led decision kind of thing.

14   **Q.**  Was there any talk about the point of delaying arrest or

15   trying to prolong the blockade for as long as possible?

16             MR. MACHADO:  Objection.  Leading.

17             THE COURT:  Sustained.

18   **Q.**  (BY MR. PATEL)  Was there any discussion -- what, if

19   anything, was discussed about prolonging the event?

20   **A.**  Yeah, it -- well, my understanding was simply that with --

21   when it comes to prolonging the event, it was try to engage

22   police officers if you're given that opportunity.  And there

23   were certain individual who were specifically going to do

24   that.  And that generally buys time at a rescue, from my

25   understanding.  As well as the lock-and-block option or the

1   going limp option.

2       And I'm not sure if there was any others.  Oh, actually

3   there is one more technique I'm familiar with.  If you have

4   more people, and in the rescue movement they're now calling

5   them blowfish, which is individuals who are not willing to

6   risk arrest, but want to look like they're going to risk

7   arrest, because then the police are looking at it like, oh,

8   it's more paperwork, it's more of a process to have them taken

9   away and taken to jail.  But then those individuals actually

10  leave the vicinity once the second or third warning is given

11  that they're going to arrest.

12  **Q.**  Was there any conversation about these warnings being

13  given --

14  **A.**  Yes.

15  **Q.**  -- prior to arrest?  I'm sorry.

16  **A.**  Yes.  The understanding was that there would be an

17  individual who would go around, if you were in the hallways or

18  in the elevators, at some point someone would tell you, hey,

19  the police are giving an arrest, they're giving out warnings

20  for the arrest, you need to get out of the building.

21      So if you weren't going to risk arrest, and you heard the

22  police giving out a second or third warning, you should get

23  out of the building.  That was the understanding.

24  **Q.**  Did either of -- did either Lauren Handy or Mr. Darnel ask

25  for people to volunteer to block the doors?

Case 3:22-cr-00327 Document 854 Filed 12/04/23 Page 61 of 106 PageID #: 10347

EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1   **A.**  Well, they asked who is going to.

2           MR. DAVIS:  Objection, Your Honor, as to "they."

3   **Q.**  (BY MR. PATEL)  Who specifically?

4           MR. PATEL:  I'm sorry, Your Honor, I'll let you rule

5   first.

6           THE COURT:  I think he's correct, you need to be

7   more specific.

8   **Q.**  (BY MR. PATEL)  Who specifically talked about that?

9   **A.**  So at the meeting, I just remember -- it was either Lauren

10  Handy or Jonathan Darnel.  I'm not sure.  I don't remember

11  which one.  But someone got up and said who -- raise your hand

12  if you're going to risk arrest.  And that was at the meeting

13  the night before.

14  **Q.**  Do you remember if anybody raised their hands?

15  **A.**  Yeah, all the people that we've seen in the photos so far

16  raised their hands that were at that meeting.

17  **Q.**  So all the people you remember at the meeting who were in

18  that Government Exhibit 2015 that I showed you earlier with

19  photos, they all raised their hands?

20  **A.**  Yes.

21  **Q.**  When it came to discussing individuals volunteering and

22  risking arrest, was there any talk about the FACE Act?

23  **A.**  Yes.

24  **Q.**  Can you tell us about that?

25  **A.**  So Lauren Handy explained what the FACE Act was and --

1    from my memory, what it was, how it came into being and what

2    it would mean if you were found guilty of committing the FACE

3    Act.

4    **Q.**  Did anyone at the meeting volunteer to use locks and

5    chains?

6    **A.**  Yes.

7    **Q.**  Can you tell us who it was and just tell us about kind of

8    how that conversation involved?

9              MR. MACHADO:  Objection.

10             THE COURT:  Keep your voice up.

11             MR. MACHADO:  Objection.  Compound.

12             THE COURT:  I don't know whether it's compound.

13    It's locks and chains.  You mean in terms of separating locks

14    and chains?  Is that what you're asking?

15             MR. MACHADO:  He said who it was and then he asked

16    about what -- a description of it.

17             THE COURT:  All right.  You can break it down in

18    terms of who it is that had -- who volunteered to do this.

19    **Q.**  (BY MR. PATEL)  Do you -- do you remember who it was that

20    volunteered to use locks and chains?

21    **A.**  I do not specifically remember who.

22    **Q.**  Do you remember what the conversation was about

23    volunteering to use locks and chains?

24    **A.**  I remember hearing the conversation about it.  I even

25    remember the general vicinity of the room that I heard the

Case 3:22-cr-00327 Document 354 Filed 12/04/23 Page 63 of 106 PageID #: 10349
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    conversation take place, but I don't remember the individuals

2    that said what they said, because I didn't really know them at

3    the time.  This was my first time meeting almost all of

4    them.

5    **Q.**  How focused were you on the things that were being

6    discussed at this meeting?

7    **A.**  I was pretty spaced out, actually, only because I knew I

8    pretty much -- I almost was a hundred percent sure I wasn't

9    going to be participating in the blockading.  And so I just

10   didn't feel like the necessity to really pay attention.  And I

11   have ADHD, so I'm pretty, you know...

12   **Q.**  Do you remember if anybody talked about the clinic

13   layout?

14   **A.**  Yes.  That would have definitely taken place more so the

15   next day --

16   **Q.**  Okay.

17   **A.**  -- at the meeting before we went over to the clinic.  I

18   remember them talking about that more in depth, just because

19   of my part that I played.

20   **Q.**  How about a fake appointment being made?

21   **A.**  Yes.  My understanding was that a fake appointment was

22   going to be made to get the door opened so everybody could go

23   inside.

24   **Q.**  Who was the one that talked about this fake appointment?

25   **A.**  Lauren Handy, from my memory.

 1   **Q.**  Do you remember what she said was the reason for making
 2   that fake appointment?
 3   **A.**  To get the door opened so people could go inside.  So
 4   someone would open the door thinking they had the appointment
 5   and then they would rush them.
 6   **Q.**  Well, are there any other reasons why there would -- that
 7   people in -- whether it's in the pro-life movement or these --
 8   this group that had assembled for this D.C. event, why they
 9   would make fake appointments, other than just accessing the
10   clinic?
11   **A.**  Yeah --
12            THE COURT:  You made a very confusing question.  You
13   need to shorten it.
14            MR. PATEL:  Yup.  Yes, Your Honor.
15   **Q.**  (BY MR. PATEL)  Are there any other reasons why a fake
16   appointment would be made?
17   **A.**  Yes.
18            MR. MACHADO:  Your Honor, just objection to the
19   form.  Is he talking about her experience or what was said at
20   the meeting?
21            THE COURT:  If you want, in terms of which -- how
22   you're focusing on it, Mr. Patel, in terms of the meeting, how
23   she considered it, just put it in the correct context.
24            MR. PATEL:  Yes, Your Honor.
25   **Q.**  (BY MR. PATEL)  Initially, based upon your experience, are

1      there other reasons why people in the pro-life movement would

2      make a fake appointment?

3      **A.**   Yes.  My understanding is when you make fake appointments,

4      you're booking up time slots and guaranteeing that an abortion

5      will not happen at that time.

6      **Q.**  Was that your understanding another reason why a fake

7      appointment was made by Ms. Handy for the event that was going

8      to take place the following day?

9      **A.**   That was my understanding.

10                  THE COURT:  Keep your voice up, Mr. Patel.

11                  MR. PATEL:  I'm sorry, Your Honor.

12                  If I can have just one moment, Judge.

13                  THE COURT:  Sure.

14     **Q.**  (BY MR. PATEL)  At this meeting, was there any

15     conversation about the importance of having people both inside

16     and outside of the clinic?

17     **A.**   There was, yes.

18     **Q.**  Can you tell us about that, please?

19     **A.**   When we were discussing it, we just kind of -- I remember

20     Lauren just saying it's important that we have people outside

21     counseling the moms, and in the hallways kind of monitoring

22     the situation as well as people blocking the doors.

23     **Q.**  Were there -- at this meeting, did it seem as though there

24     were defined roles for people to play at the event the next

25     day?

1    **A.**  There definitely were defined roles, yes.

2    **Q.**  When were those roles kind of assigned to people, was it

3    that day or the meeting before the walk over to the clinic?

4    **A.**  I remember my role being assigned to me the day of when we

5    were out front.  We were outside, a couple -- I felt like we

6    were a couple blocks away from the abortion clinic.

7    **Q.**  So why don't you -- let's fast-forward, let's jump forward

8    to the next day.  Was there a time that was agreed upon where

9    everybody was going to meet up before the clinic blockade was

10   going to take place?

11   **A.**  There was.  I don't remember the exact time.  But it was

12   early in the morning, and it was before the abortion clinic

13   opened.  So --

14   **Q.**  Was there an agreed-upon location where everybody would

15   meet?

16   **A.**  Yes.  It was a couple blocks away from -- like it was

17   walking distance from the abortion clinic.

18   **Q.**  How far was it from where you had stayed the night

19   before?

20   **A.**  I do not remember the distance, but it was a drive.

21   **Q.**  Well, where you stayed, you mentioned earlier there was a

22   host house?

23   **A.**  There was.

24   **Q.**  Was -- who else stayed at the host house?

25   **A.**  So I remember William Goodwin stayed at the host house,

1    Heather Idoni.  I remember Joan was at the host home, if my

2    memory serves me right.  Eva, Zastro, me.  Jonathan Darnel did

3    not stay there.  Lauren Handy did not stay there.  Herb

4    Geraghty, I think is how you say his name, he did not stay

5    there either.  But everybody else, from my memory, was

6    there.

7    **Q.**  And then did everybody depart that host home the next day

8    to meet up at the agreed-upon location?

9    **A.**  Yes.

10   **Q.**  And do you remember what time it was that everyone was

11   supposed to meet?

12   **A.**  I don't remember the exact time.  It was just early in the

13   morning, before the clinic opened.

14   **Q.**  Tell us about what happened at the meetup --

15   **A.**  Yes.

16   **Q.**  -- the next morning.

17   **A.**  Sorry.

18        Yes, we were just kind of given instructions, last-minute

19   instructions.  We were reminded of a few things.  I remember

20   the block -- the lock-and-block materials were in a bag.  And

21   they kind of talked about that.  The people who were going to

22   use them.

23        It was a lot of private discussions and then some basic

24   overview, a reminder, and then like a run-through, just basic

25   last-minute prep of what was going to happen.

1   **Q.**  So talk -- tell us about the run-through.

2   **A.**  Man --

3           MR. MACHADO:  Objection to the form.  Just vague.

4           THE COURT:  I'm not sure.  She indicated that they

5   had a run-through.  He simply has asked her to describe what

6   it is.

7           MR. MACHADO:  Okay.

8           THE COURT:  Go ahead and answer.

9   **A.**  So the run-through would have been going over -- it was

10  going over like where things were -- the layout of the clinic,

11  and then who was going to be where.  So I remember being told

12  to be -- that I could be in the elevators, just going up and

13  down.

14      And I mostly focused in on my part.  But my understanding

15  was the rescuers were going to go over first and then everyone

16  else would follow suit after that.

17  **Q.**  (BY MR. PATEL)  What was your job?

18  **A.**  To be in the elevators.

19  **Q.**  And did you have any specific duties when you were in the

20  elevator?

21  **A.**  Right, yeah.  In the elevators, I was supposed to talk to

22  anyone who pressed on the fourth floor, indicating that they

23  were going to the abortion clinic.  So if it looked like it

24  was a mom, potentially, or a patient, I was supposed to, you

25  know, try and talk them out of it, offer them help and loudly

1  tell them my beliefs.

2  **Q.** Do you know what Joan Bell's job was or what she had

3  volunteered to do?

4  **A.** I knew she was going to rescue before I got there, just

5  from Heather Idoni.

6  **Q.** Do you know what Lauren Handy's job was during this

7  event?

8  **A.** Well, from what I saw, she was the organizer. I had

9  noticed that she talked to the police a lot. But I didn't

10 personally see her blocking doors, but -- yeah, she seemed

11 like the one that was running the show.

12 **Q.** And how about Jonathan Darnel?

13 **A.** He also seemed like a co-show runner, from my

14 perspective.

15 **Q.** So once this run-through occurred, what happened next?

16 **A.** So after that, the rescuers went over, and we kind of just

17 trickled like over to the clinic. It kind of felt like a

18 slow -- from my perspective, it felt kind of slow moving, like

19 wasn't sure exactly what was happening. But once I got over

20 there, I know I was outside for a little bit, and eventually I

21 assumed my position in the elevator.

22 **Q.** So were there groups of people that went over kind of in

23 waves after the meeting -- the meeting occurred, I guess at

24 the meetup location before the clinic opened?

25         MR. MACHADO: Objection. Leading.

1    THE COURT:  It's in between.  I think you also have
2    added a bunch of different things in here.  You need to make
3    it a shorter question.
4    **Q.**  (BY MR. PATEL)  Were there -- were there groups of people
5    that went over to the clinic at different times?
6    **A.**  That's what it looked like to me, like a trickle of
7    people.
8    **Q.**  Who were -- what was the first group?  What was their job
9    when they went over?
10   **A.**  My understanding was the first group was going to be the
11   person with the appointment and the rescuers.
12   **Q.**  Do you remember what group you were in?
13   **A.**  I felt like I was at the very last, like I was -- the
14   people that weren't going to be blockading, so the sidewalk
15   counselor group.
16   **Q.**  Before the groups disbanded, did anybody take a picture?
17   **A.**  Yes.  We had a group photo in the meetup location a couple
18   blocks from the abortion clinic when we were -- that morning,
19   before the rescue took place.
20   **Q.**  I'd like to show you what's been marked as Government
21   Exhibit 3005.
22       MR. PATEL:  Your Honor, with your permission, it's
23   been admitted, I'd like to publish it.
24       THE COURT:  Yes.  Go ahead.
25   **Q.**  (BY MR. PATEL)  Is this the group photograph that was

1    taken --

2            MR. PATEL:  I just want to confirm the jury can see

3    this?  Okay.

4    **Q.**  (BY MR. PATEL)  Is this the group photograph that was

5    taken before the group started to walk over to the clinic?

6    **A.**  Yes.

7    **Q.**  You're in this photograph?

8    **A.**  Yes.  I'm in the back in the orange skirt.

9    **Q.**  Can you just draw a circle around your face?

10   **A.**  Sure.  (Indicating.)

11   **Q.**  All right.  And one other question --

12           MR. PATEL:  We can take this exhibit down.

13   **Q.**  (BY MR. PATEL)  One other question I want to ask you

14   before we talk about what actually happened over at the

15   clinic.  Did somebody bring the locks and chains to this

16   location where everyone met up before the walk over?

17   **A.**  I saw the locks and chains in the possession of one of the

18   ladies that was in the photo.  But I can't remember her name.

19   But I could point her out.

20           MR. PATEL:  If we can put the exhibit back up,

21   please.

22   **A.**  It's the lady in the sunglasses.  You want me to draw a

23   circle?

24   **Q.**  (BY MR. PATEL)  You can draw a circle around her.

25   **A.**  (Indicating.)

1  **Q.** So she's the one who brought the locks and chains to this
2  location?
3  **A.** I saw them in her possession in a bag. Whether or not she
4  brought them there, not sure.
5  **Q.** Do you know who took them over to the clinic when the
6  first group went over?
7  **A.** I'm not sure.
8       MR. PATEL: You can take the exhibit down.
9  **Q.** (BY MR. PATEL) Tell us about what happened when you got
10  to the clinic.
11  **A.** When I got to the clinic, I know I was outside for a
12  little bit, and eventually I was told it was okay to go
13  inside. So I remember walking in. And I was kind of hanging
14  around out around Joan's -- I think they're her children. And
15  eventually I hopped into -- I hopped into the elevator. And I
16  kind of stayed there for a while, went up and down with
17  different individuals, police officers, things like that.
18       THE COURT: We probably should stop at some point.
19  It's about 10 of. I just want you to figure out where you
20  want to stop in your questioning.
21       MR. PATEL: This is probably a logical time to stop,
22  Your Honor.
23       THE COURT: All right. Then let me excuse you for
24  this evening. And we'll try very hard to promptly start
25  tomorrow at 9:00. I'm going to stop at 11:00 o'clock in terms

1    of I have a -- I realize that you get the extra time, but it

2    does make the trial longer.  I'm the chair of the District of

3    Columbia Commission on Judicial Disabilities and Tenure, which

4    does appoint- -- re-appointments of the local courts and

5    complaints.  And they have monthly meetings, and it's very

6    hard to get all these people to move the meeting.  So it's

7    done on a specific day each -- and it's the second Tuesday.

8    So I'm sorry that although you get to do what you want for the

9    day, it does make the trial longer.  But it is something that

10   I need to do.

11       So tomorrow we'll start at 9:00.  We'll finish at 11:00.

12   And then we'll see where we are at that point in terms of the

13   next day.  But the next day will be a full day.

14       Why don't you wait a second.

15           (Jury left the courtroom.)

16           THE COURT:  All right.  Let me excuse you at this

17   time.  Make sure you don't talk to anybody else.  I want to

18   make sure nobody talks to her or goes near her, okay, or

19   you're going to be in trouble with me.  No --

20           MR. PATEL:  Your Honor, with your --

21           THE COURT:  Excuse me.

22           No contact.

23           MR. PATEL:  With your permission, we'd like to have

24   some limited contact with the witness because she's scheduled

25   to travel back home today, but we need to make arrangements.

1          THE COURT:  I don't have any problem with discussing
2     travel arrangements, but not through testimony.
3          MR. PATEL:  Thank you.
4          THE COURT:  All right.  Do we have anything coming
5     up, anything that you think is going -- you're going to be
6     sending me or any motions in limine or anything else, just so
7     I have some notice?
8          Defense counsel, anything from you all?
9          MR. MACHADO:  No, Your Honor.
10         THE COURT:  Okay.  So we have -- we finish with her,
11    and then we have one other witness.
12         MR. PATEL:  Yes.
13         THE COURT:  And then presumably at that point -- I
14    don't know where we'll -- obviously it's not going to get all
15    of that done tomorrow.  And then the next day.  And I assume
16    on Thursday we will be discussing, you know, what's going to
17    happen with the defense case.  But we can discuss it a little
18    bit --
19         MR. BRENNWALD:  Your Honor, I think what -- I think
20    what all of us were thinking, or maybe it's just me, is that
21    if we finish the evidence tomorrow, we can probably -- we
22    might have time to discuss jury instructions, or may not.  I
23    know that you've already given instructions in the last trial,
24    so I'm guessing they won't change.
25         Anyway, I think we're thinking that we can go to

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327-DCLC-JEM Document 854-1 Filed 12/04/23 Page 75 of 106 PageID #: 10661
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

1    closings on Thursday and instructions and go from there.

2              THE COURT:  Well, I guess the question is that I

3    thought at least Ms. Marshall had a witness, no?

4              MR. MACHADO:  Your Honor, she has decided not to

5    call the witness.

6              THE COURT:  Okay.  I realize that things can change.

7              I will make an inquiry at some point.  I won't have

8    time tomorrow because we'll want to get -- use all of the

9    testimony.  But I will make an inquiry of each of them just to

10   make sure they're making their own voluntary decisions about

11   whether they want to testify or not.

12             As of today, from counsel, and from Ms. Bell, are

13   people thinking of testifying or not, just for planning

14   purposes?

15             MR. BRENNWALD:  Not for Ms. Bell.

16             MR. MACHADO:  At this point, Ms. Marshall is not

17   going to be testifying.

18             THE COURT:  All right.

19             MR. DAVIS:  At this point, no.

20             THE COURT:  Okay.  We have, I believe, sent you the

21   jury instructions.  We'll go over them to make sure --

22   probably tomorrow afternoon while I'm gone, to make sure all

23   of the additional things that we've -- there's been the one

24   about the motion in limine with Ms. Holler, make sure that

25   some other things go in.

1          We will add -- which we ultimately did because of a

2     question from a juror in the last trial, we will add it to the

3     discussion of definitions.  So we'll add that if we haven't

4     already.

5          (Discussion off the record.)

6          THE COURT:  Okay.  But have we sent them the full --

7     the whole thing again?

8          Okay.  So you've got them from the last trial, which

9     is probably most of it.  I'll take a look.  We've had a couple

10    things that have been stricken, just to make sure everything

11    is correct.  And if you think of something that's not in there

12    that you think needs to be put in because of this trial,

13    please let me know.  And we have a note as to what we were

14    going to add.  So you should have all of that.

15         So there's only a couple things that we've thought

16    that we needed to add.  That one definition, which I think

17    needs to be -- excuse me, needs to be put in this last jury

18    instruction.  So I can't think of anything else off the top of

19    my head, but I'll look.  But we'll go -- we'll have a

20    discussion about them just to make sure.  You know, you're all

21    certainly allowed to raise any issue.

22         MR. BRENNWALD:  Aside from if the defense doesn't

23    put on a case at all, is there any reason not to go to

24    closings on Thursday?

25         THE COURT:  If we get everything done tomorrow, yes,

1    I don't -- my recollection of her -- of Ms. Davis's testimony

2    is there's some more to come.  And then I don't know what

3    you're going to do about cross.  And then you -- the last

4    witness is the other clinic employee.  If we can get it all

5    done.  I really do have to stop at 11:00 though, to get over

6    there.

7              MR. PATEL:  Judge, if I was to forecast, we won't --

8    we won't be done by 11:00 o'clock tomorrow.  I just wanted to

9    confirm we would be sitting for two hours tomorrow.  And in

10   terms of planning, if I -- if Ms. Davis is off the stand by

11   10:00, 10:30, you would -- you want us to have our next

12   witness ready to go.

13             THE COURT:  I would -- we should move.  I mean, I

14   think the jury is just as happy to move this along and have

15   the case finish shorter.

16             MR. PATEL:  Yes, Judge.

17             THE COURT:  So I would have -- I would have her

18   ready.

19             MR. PATEL:  Okay.

20             THE COURT:  We'll know better tomorrow.  I try and

21   do -- you know, we have to have some discussion of the jury

22   instructions.  So I would just ask if you want to look through

23   them to see if there's something you wish to specifically add

24   or, you know, raise.  Although I think I -- we had originally,

25   you know, discussed most of the objections that had been made

1   originally, because they were sent out to all of you, not just

2   to the first trial group.  So unless there's something

3   additional that we haven't discussed, the discussion of the

4   jury instructions should be pretty quick.

5           I try and do jury -- closings all at -- you know, on

6   one time so we're not having part one day and the rest of it

7   the next day, if we can help it.  Okay.  We'll see where we

8   are.

9           MR. BRENNWALD:  All right.  Thank you.

10          THE COURT:  All right.  Parties are excused.

11          (A recess was taken from 4:59 to 5:05 p.m.)

12          THE COURT:  All right.  Do we have the rest of the

13  people?  They're bringing a Marshal up, so let me wait till

14  that, because they need to hear.  They need to do something.

15  Unfortunately, we have a lot of trials going at this time.

16  And part of it -- I don't know, other criminal trials.  So

17  we're sort of low on Marshals.  For the first trial we did add

18  some additional court security people because we were having

19  so much trouble.  But for this one we've had slightly fewer

20  problems, although not totally.  So they didn't -- you know,

21  they didn't send somebody up.  Because we'd had somebody

22  outside the door so we wouldn't have as much trouble in terms

23  of when people left.  But we can wait a second.

24          I'm sorry to make you wait.  I do want to hear it

25  with the Marshal is present, because we have had discussions

1    with them in terms of what needed to be done, so I'd prefer to

2    have -- rather than having them hear things secondhand, I'd

3    rather they heard it firsthand.

4              But do you have to be someplace else?

5              MR. BRENNWALD:  Your Honor, if you don't mind, I'm

6    tired of sitting.

7              THE COURT:  No, that's fine.  No problem.

8              All right.  We've had a problem in terms of one of

9    the witnesses, if you could come up to the podium for a second

10   and identify yourself, who you are.

11             AGENT BISCARDI:  Good afternoon, Your Honor.  My

12   name's Special Agent Mike Biscardi with the FBI.  I was

13   testifying in this case as well as being one of the case

14   agents on the matter in question.

15             THE COURT:  Okay.  So I understand there was an

16   incident?

17             THE WITNESS:  Yes, Your Honor.  So I was scheduling

18   transport for -- to get Ms. Davis back to her hotel.  And when

19   I was coming back into the courtroom, one of the members of

20   the gallery, as I was halfway through the door -- I apologize,

21   I didn't get a great look at her -- but basically she said,

22   you testified against some very good people.  And then

23   something along the lines of the effect, they would have

24   defended you, to which point I kind of just brushed it off as,

25   you know, that's fine, whatever, kept it moving.

1      But given kind of the climate and things that other

2  witnesses have experienced in this case and the prior case, I

3  just want to bring it to the Court's attention and get it on

4  the record, given your concerns you've previously expressed as

5  well.

6      THE COURT:  All right.  So where did it happen,

7  outside or on your way in?

8      THE WITNESS:  Right as I was walking into the outer

9  door of the courtroom, Your Honor.

10      THE COURT:  So did the person come from the gallery

11  or were they already outside?

12      THE WITNESS:  They were already -- this was a few

13  minutes after you had adjourned for the day, Your Honor.  So I

14  was coming back from the witness rooms, and there was a large

15  congregation of people that were in the gallery, you know, I

16  think intermixed with some of the defendants, possibly some of

17  the counsel.

18      And so I just kind of say "excuse me" to get around

19  them so I can hang a left to get through that outer door into

20  the courtroom, because I wanted to meet with counsel before I

21  left for the day with the witness.  And so that's when it

22  occurred, as I was kind of already turned and walking in as

23  the door was open.

24      THE COURT:  Can you identify the person?

25      THE WITNESS:  It would be a little bit hard for me.

1    It was one of the older Caucasian females that's been in the
2    gallery this whole time.
3            THE COURT:  Okay.  If you saw her again, would you
4    be able to recognize her?
5            THE WITNESS:  It would be tough, because I heard the
6    voice.  I didn't fully see, there was a crowd of people, and I
7    was already kind of turned.  I'm not sure if they're willing
8    to identify themselves, but again I just wanted to bring it to
9    your attention with the issues we've been having with
10   witnesses.
11           THE COURT:  All right.  Thank you.
12           We need more people -- we need a CSO or something up
13   here.  I'm not going to have this keep happening.  And, you
14   know, he's from the FBI, but we've had to wait for the
15   witnesses and make sure that I say something to them to make
16   sure nobody says anything.  We had three incidents for the
17   last trial.  I realize you all are short, but somebody's got
18   to hang out, be around the back there or something.  We always
19   have somebody in here.
20           MR. ESPINAL:  Good afternoon, Your Honor.  This is
21   Judicial Security Inspector Angel Espinal.  I was told that a
22   female district security officer, I believe, was here earlier?
23           THE COURT:  We've had somebody inside the Court, so
24   within the courtroom.  It's worked, more or less.
25           MR. ESPINAL:  I understand.

1    THE COURT:  So we haven't had an incident where

2    somebody has said something like last time, as the witness was

3    leaving.  We've managed to not have that happened.  But we did

4    have, evidently right outside -- if you could -- we had a CSO

5    at the last one, sort of hanging out outside there, outside

6    the door, so people -- you know, whoever went out got outside

7    the thing, didn't wind up having somebody say something to

8    them.  But we had something earlier.  I'm trying to remember

9    what it was.

10    Ms. Ross, you brought it to my attention.

11    MR. ESPINAL:  Judge, we definitely can add

12    additional personnel to the courtroom.

13    THE COURT:  Yeah, the courtroom seems to be working

14    better than it did, partly because I don't -- I tell people

15    not to leave until the witness gets out, and they've been

16    surrounded, like three people that goes out with -- especially

17    the lay witnesses, because they've been the problem the last

18    time.  But if somebody could sort of from time to time float

19    in.  And I realize you've got, in the back outside, because

20    that's evidently on his way in, is when it happened.  You

21    know, just from time to time to check.

22    MR. ESPINAL:  I understand, Your Honor.

23    THE COURT:  I appreciate it.  As I said, I realize

24    that you all are very tight with all of the cases we've got.

25    But if they would float in and out, I think people see them

```
 1    and they recognize them as security people, so they're less

 2    likely to do something.

 3              MR. ESPINAL:  Yes, Your Honor.  I agree.

 4              THE COURT:  Thank you.

 5              All right.  Was there something -- we had something

 6    earlier, though, I thought.

 7              MS. ROSS:  Yes, Your Honor, there was the incident

 8    with Ms. Jones as she left the courtroom.

 9              THE COURT:  Okay.  Excuse me, Mr. -- Marshal

10    Espinal.

11              If we could get him back.  I just wanted to bring

12    the one other thing we've had in this trial.

13              MS. ROSS:  And, Your Honor, that actually isn't the

14    only thing, either.  Mr. Patel and I also have had comments

15    said too.  As members of the Court, we didn't necessarily feel

16    it was pertinent to bring to your attention, but there have

17    been multiple incidences outside the courtroom.  So I think it

18    would be nice to have additional security out there as well.

19              THE COURT:  Okay.  And Ms. Jones was one of the

20    laypeople who -- and where was she -- where did they --

21              MS. ROSS:  That's right, Your Honor, Ms. Jones was

22    the first witness who testified.  She was leaving the

23    courtroom and was right outside of the door is my

24    understanding, but that was somebody who actually followed her

25    out.
```

```
 1              THE COURT:  Right.

 2              MS. ROSS:  Out the doors.

 3              THE COURT:  And got a picture of her?

 4              MS. ROSS:  -- but either way.  Exactly.

 5              THE COURT:  All right.  So if we could have -- you

 6      know, in the courtroom seems to be in better shape than it

 7      was.  We seem to have no incidents within here that I know of.

 8      But outside, if we could have a CSO float out from time to

 9      time, it would be helpful.  I realize you don't know when I

10      take breaks, which makes it more difficult.

11              MR. ESPINAL:  Yes, Your Honor, we can accommodate

12      the Court.

13              THE COURT:  Thank you very much.

14              All right.  I would suggest, to the extent any of

15      you as defendants have any influence over people who have come

16      to support you, kindly say something to them.  This is not the

17      way to act.  Okay.  People should be able to testify and say

18      things without anything.  I'm not blaming you in any way,

19      okay.  But if you -- you know, if there are people here in

20      support, do encourage them not to do anything, okay.  It's

21      just -- it's not an appropriate way of, you know, conducting

22      business in judicial business in terms of doing things, to try

23      to talk to witnesses or to create -- everybody's doing their

24      job in terms of whether it's the agent or whether it's the

25      attorneys, and, you know, the witnesses come and they testify.
```

1    It's hard to get people to come and testify.  You know, let's

2    not make this any worse.  Particularly, since we've got a

3    third trial.  We've already had problems with the first one.

4    So I would just ask -- you know, at some point I'm going to

5    start issuing show causes for contempt.

6              All right.  Parties are excused.

7              MS. ROSS:  Thank you, Your Honor.

8              (The proceedings were concluded at 5:16 p.m.)

9

10             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

11

                      _____/s/_____
12                       Christine T. Asif
                         Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

EXHIBIT A - DEFENSE MOTION IN LIMINE 1

< Dates >.
October 2020
  11:11,
  11:18.
October 22nd
  6:10, 49:1.
October 22nd,
  2020 5:9,
  25:24.
.
.
< 1 >.
10 73:19.
1009 57:24.
1017 5:2,
  5:13.
1079B 16:21,
  17:14,
  17:17.
10:00 4:15,
  5:6, 78:11.
10:30 78:11.
11 28:3, 28:4,
  28:10.
11:00 73:25,
  74:11, 78:5,
  78:8.
12 28:3, 28:4,
  28:10.
12th 1:11.
13 11:8.
1350 1:37.
18 28:11.
.
.
< 2 >.
2 44:21.
20001 1:46,
  2:24.
20003 2:12.
20004 1:32.
20036 1:39.
2015 43:19,
  44:2,
  62:18.
2017 10:24,
  28:21.
202 1:38,
  2:25.
2020 4:16,

6:10, 10:19,
  13:14, 29:6,
  30:25.
2021 28:18,
  28:22.
2023 1:11.
20530 1:27.
20th 4:16,
  4:19.
2112 5:19.
22-096-CKK
  1:6.
25 27:18.
.
.
< 3 >.
3 48:1.
3005 7:18,
  7:24, 8:7,
  71:21.
305 7:10, 7:15,
  7:17.
310 1:45.
333 2:23.
354-3247
  2:25.
3:15 1:12.
.
.
< 4 >.
4001A 4:9.
403 19:10.
4:59 79:11.
.
.
< 5 >.
503 1:44.
5:00 40:15,
  42:18.
5:05 79:11.
5:16 86:8.
.
.
< 6 >.
610 1:26.
6:00 40:15,
  42:18.
.
.
< 8 >.

80s 33:21.
8:30 4:20.
.
< 9 >.
90s 33:21.
922 2:11.
950 1:31.
9:00 5:8, 15:4,
  73:25,
  74:11.
9:05 4:15,
  5:5.
9:13:02
  58:16.
_____/s/___
_____
86:14.
.
.
< A >.
a.m. 4:15, 5:5,
  5:6, 5:8,
  15:4.
ability
  30:17.
able 8:2, 13:5,
  15:19, 16:6,
  16:13, 18:5,
  18:16, 19:4,
  20:2, 21:16,
  50:16, 56:13,
  59:14, 82:4,
  85:17.
abortion 26:3,
  26:5, 29:8,
  29:9, 29:11,
  29:18, 29:21,
  30:7, 30:16,
  30:18, 30:22,
  33:7, 33:24,
  35:9, 48:16,
  49:3, 50:6,
  51:7, 51:11,
  51:16, 51:18,
  56:6, 59:12,
  59:14, 66:4,
  67:6, 67:12,
  67:17, 69:23,
  71:18.

abortions
  32:18, 36:3,
  36:23,
  37:11.
above-entitled
  86:12.
Absolutely
  59:11.
Access 33:19,
  59:10.
accessing 15:7,
  65:9.
accommodate
  85:11.
accomplish
  24:22.
accurate
  17:7.
across 53:10,
  59:6.
Act 30:14,
  32:17, 33:5,
  33:6, 33:11,
  33:12, 33:17,
  33:18, 33:19,
  34:8, 34:11,
  34:13, 34:20,
  37:15, 37:16,
  37:20, 38:2,
  38:4, 56:2,
  56:19, 62:22,
  62:25, 63:3,
  85:17.
ACTION 1:5.
actively
  30:6.
actual 42:23.
Actually 8:14,
  8:22, 22:12,
  38:18, 46:4,
  46:16, 57:9,
  57:10, 61:2,
  61:9, 64:7,
  72:14, 84:13,
  84:24.
add 77:1, 77:2,
  77:3, 77:14,
  77:16, 78:23,
  79:17,
  83:11.

added 71:2.
additional 76:23, 79:3, 79:18, 83:12, 84:18.
address 56:10.
ADHD 64:11.
adjourned 81:13.
administration 33:20.
admit 17:12, 17:17.
admitted 5:2, 7:24, 43:20, 57:25, 71:23.
advance 4:22.
Afternoon 1:13, 6:7, 6:8, 22:1, 22:2, 27:13, 27:14, 76:22, 80:11, 82:20.
Agent 4:6, 4:12, 4:23, 5:3, 5:6, 5:12, 6:7, 6:14, 6:15, 8:6, 8:20, 80:11, 80:12, 85:24.
agents 80:14.
aggressor 30:16, 30:17.
ago 28:18.
agree 84:3.
agreed 67:8.
agreed-upon 67:14, 68:8.
ahead 9:17, 9:22, 19:20, 43:23, 69:8, 71:24.
alive 12:21.
alleged 26:2.
allow 27:1.

allowed 13:9, 77:21.
allowing 18:8, 23:14.
almost 28:18, 29:17, 64:3, 64:8.
already 19:11, 19:14, 43:20, 75:23, 77:4, 81:11, 81:12, 81:22, 82:7, 86:3.
altered 17:10.
Although 74:8, 78:24, 79:20.
AMERICA 1:5.
amount 39:5.
Angel 82:21.
answer 10:8, 10:9, 10:11, 27:2, 27:3, 27:6, 27:7, 27:8, 69:8.
answered 46:15.
anybody 15:21, 46:2, 54:8, 62:14, 64:12, 71:16, 74:17.
Anyway 24:12, 75:25.
Apologize 7:25, 48:23, 80:20.
apparently 31:15.
appear 17:10.
APPEARANCES 1:21, 2:1.
appoint- 74:4.
appointment 13:12, 13:21, 14:7, 14:9, 14:11, 14:20, 15:3, 64:20,

64:21, 64:24, 65:2, 65:4, 65:16, 66:2, 66:7, 71:11.
appointments 13:16, 65:9, 66:3.
appreciate 25:9, 83:23.
approach 16:18.
appropriate 85:21.
Approximately 5:6, 5:8, 58:20.
April 29:5.
area 14:3, 14:5, 14:16, 14:18, 15:8, 15:16, 15:19, 15:22, 18:3, 18:13, 40:19, 43:1.
argument 36:20.
Ark 52:24.
around 4:15, 5:5, 9:9, 15:4, 28:3, 29:5, 40:15, 47:5, 47:10, 47:22, 48:2, 50:3, 55:4, 55:12, 58:15, 58:17, 61:17, 72:9, 72:24, 73:14, 81:18, 82:18.
arranged 39:11.
arrangements 74:25, 75:2.
arrest 55:13, 55:21, 56:5, 60:14, 61:6, 61:7, 61:11,

61:15, 61:19, 61:20, 61:21, 62:12, 62:22.
arrested 36:17, 56:25.
arrive 43:13.
arrived 42:11, 42:17, 43:1, 45:2.
arriving 43:6.
Aside 77:22.
Asif 2:19, 86:10, 86:15.
assembled 65:8.
assigned 67:2, 67:4.
assist 23:11.
assume 75:15.
assumed 70:21.
assuming 53:15.
Atlanta 28:13, 28:17.
attention 8:6, 64:10, 81:3, 82:9, 83:10, 84:16.
Attorney 1:24.
attorneys 85:25.
Austin 28:11.
available 32:21.
Avenue 1:31, 1:37, 2:11, 2:23.
away 29:23, 37:5, 61:9, 67:6, 67:16.
.
.
< B >.
babies 32:15,

added 71:2.
additional 76:23, 79:3, 79:18, 83:12, 84:18.
address 56:10.
ADHD 64:11.
adjourned 81:13.
administration 33:20.
admit 17:12, 17:17.
admitted 5:2, 7:24, 43:20, 57:25, 71:23.
advance 4:22.
Afternoon 1:13, 6:7, 6:8, 22:1, 22:2, 27:13, 27:14, 76:22, 80:11, 82:20.
Agent 4:6, 4:12, 4:23, 5:3, 5:6, 5:12, 6:7, 6:14, 6:15, 8:6, 8:20, 80:11, 80:12, 85:24.
agents 80:14.
aggressor 30:16, 30:17.
ago 28:18.
agree 84:3.
agreed 67:8.
agreed-upon 67:14, 68:8.
ahead 9:17, 9:22, 19:20, 43:23, 69:8, 71:24.
alive 12:21.
alleged 26:2.
allow 27:1.

allowed 13:9, 77:21.
allowing 18:8, 23:14.
almost 28:18, 29:17, 64:3, 64:8.
already 19:11, 19:14, 43:20, 75:23, 77:4, 81:11, 81:12, 81:22, 82:7, 86:3.
altered 17:10.
Although 74:8, 78:24, 79:20.
AMERICA 1:5.
amount 39:5.
Angel 82:21.
answer 10:8, 10:9, 10:11, 27:2, 27:3, 27:6, 27:7, 27:8, 69:8.
answered 46:15.
anybody 15:21, 46:2, 54:8, 62:14, 64:12, 71:16, 74:17.
Anyway 24:12, 75:25.
Apologize 7:25, 48:23, 80:20.
apparently 31:15.
appear 17:10.
APPEARANCES 1:21, 2:1.
appoint- 74:4.
appointment 13:12, 13:21, 14:7, 14:9, 14:11, 14:20, 15:3, 64:20,

64:21, 64:24, 65:2, 65:4, 65:16, 66:2, 66:7, 71:11.
appointments 13:16, 65:9, 66:3.
appreciate 25:9, 83:23.
approach 16:18.
appropriate 85:21.
Approximately 5:6, 5:8, 58:20.
April 29:5.
area 14:3, 14:5, 14:16, 14:18, 15:8, 15:16, 15:19, 15:22, 18:3, 18:13, 40:19, 43:1.
argument 36:20.
Ark 52:24.
around 4:15, 5:5, 9:9, 15:4, 28:3, 29:5, 40:15, 47:5, 47:10, 47:22, 48:2, 50:3, 55:4, 55:12, 58:15, 58:17, 61:17, 72:9, 72:24, 73:14, 81:18, 82:18.
arranged 39:11.
arrangements 74:25, 75:2.
arrest 55:13, 55:21, 56:5, 60:14, 61:6, 61:7, 61:11,

61:15, 61:19, 61:20, 61:21, 62:12, 62:22.
arrested 36:17, 56:25.
arrive 43:13.
arrived 42:11, 42:17, 43:1, 45:2.
arriving 43:6.
Aside 77:22.
Asif 2:19, 86:10, 86:15.
assembled 65:8.
assigned 67:2, 67:4.
assist 23:11.
assume 75:15.
assumed 70:21.
assuming 53:15.
Atlanta 28:13, 28:17.
attention 8:6, 64:10, 81:3, 82:9, 83:10, 84:16.
Attorney 1:24.
attorneys 85:25.
Austin 28:11.
available 32:21.
Avenue 1:31, 1:37, 2:11, 2:23.
away 29:23, 37:5, 61:9, 67:6, 67:16.
.
.
< B >.
babies 32:15,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327  Document 854  Filed 12/04/23  Page 88 of 106 PageID #: 10594
EXHIBIT A - DEFENSE MOTION IN LIMINE 1

57:15.
baby 30:17.
back 21:3,
    22:3, 22:7,
    24:8, 24:15,
    28:16, 33:21,
    37:25, 49:3,
    50:22, 58:17,
    72:8, 72:20,
    74:25, 80:18,
    80:19, 81:14,
    82:18, 83:19,
    84:11.
bag 68:20,
    73:3.
bags 39:13.
bandana 20:11,
    22:8, 49:8.
bangs 53:10.
barged 42:22.
Based 12:23,
    30:19, 56:3,
    57:15, 59:8,
    65:25.
basic 68:23,
    68:24.
basically
    33:22, 35:22,
    55:19, 57:3,
    57:15,
    80:21.
basis 29:17.
beat 12:18.
beating
    32:14.
become 28:24,
    32:14, 45:17,
    46:25.
begin 5:7.
beginning
    58:23,
    58:24.
behalf 32:14.
behind 17:25,
    58:8.
beliefs 70:1.
believe 19:12,
    30:15, 32:10,
    42:5, 42:6,
    42:7, 42:8,

42:9, 50:14,
    51:6, 76:20,
    82:22.
Bell 1:11, 2:6,
    2:10, 8:24,
    23:16, 47:17,
    47:19, 47:25,
    52:24, 53:14,
    53:19, 70:2,
    76:12,
    76:15.
besides 54:6.
best 24:24.
better 78:20,
    83:14,
    85:6.
Bible 33:2,
    57:16.
big 35:3,
    51:12.
bigger 8:4.
birth 12:21.
Biscardi 4:6,
    4:12, 4:23,
    5:3, 5:6,
    5:12, 80:11,
    80:12.
bit 8:4, 20:25,
    28:13, 28:15,
    28:16, 54:22,
    70:20, 73:12,
    75:18,
    81:25.
black 44:11,
    47:23, 58:9,
    58:13.
blaming
    85:18.
block 33:6,
    33:23, 59:10,
    61:25,
    68:20.
blockade 5:7,
    30:24, 33:9,
    60:15,
    67:9.
blockaded
    31:4.
blockades 30:3,
    30:9,

34:14.
blockading
    34:22, 50:21,
    56:24, 64:9,
    71:14.
blocked 15:23,
    30:6, 51:6.
Blocking 30:17,
    49:2, 51:18,
    51:19, 52:13,
    56:6, 57:18,
    66:22,
    70:10.
blocks 67:6,
    67:16,
    71:18.
blowfish
    61:5.
blue 17:25,
    20:11, 22:8,
    49:8.
body 12:18.
body-worn
    58:22.
book 31:15,
    40:6.
booking 66:4.
born 28:1,
    28:2.
box 9:11.
boy 17:17.
break 23:24,
    24:1, 24:13,
    24:21,
    63:17.
breaking 33:5,
    60:4.
breaks 85:10.
Brennwald 2:9,
    2:10.
briefly 21:23,
    28:13.
bring 24:23,
    72:15, 81:3,
    82:8, 84:11,
    84:16.
bringing
    79:13.
brought 33:19,
    33:20, 73:1,

73:4,
    83:10.
brown 44:11.
brushed
    80:24.
Bucar 6:11.
building 61:20,
    61:23.
bunch 43:6,
    71:2.
business
    85:22.
buttons
    53:11.
buy 36:12,
    36:14, 36:16,
    60:12.
buys 37:4,
    60:24.
.
.
< C >.
call 9:3,
    32:25,
    76:5.
called 9:19,
    22:17, 26:20,
    35:15,
    55:21.
calling 61:4.
calls 26:14.
camera 58:22.
captured
    58:21.
car 38:12,
    39:8, 39:16,
    39:17, 39:18,
    40:4,
    40:13.
care 28:18,
    59:12,
    59:15.
Caroline 8:7,
    26:15, 26:19,
    27:16.
case 26:2,
    26:4, 30:12,
    55:7, 55:11,
    75:17, 77:23,
    78:15, 80:13,

81:2.
cases 83:24.
Catholic
45:16.
Catholics
41:24, 41:25,
42:5.
Caucasian
82:1.
causes 86:5.
CD 16:14,
16:24,
17:3.
cell 41:4.
certain
60:23.
certainly
77:21.
certify
86:10.
chains 35:14,
36:1, 60:11,
63:5, 63:13,
63:14, 63:20,
63:23, 72:15,
72:17,
73:1.
chair 9:25,
26:24, 48:18,
49:2, 49:16,
50:21,
74:2.
chance 16:12,
34:22,
36:3.
change 36:21,
75:24,
76:6.
charged 30:8,
33:8, 34:10,
34:13, 34:23,
55:23, 56:21,
56:22.
check 24:7,
83:21.
child 11:20,
11:25, 12:1,
12:17,
12:21.
children

73:14.
Christ 32:11.
Christian 32:9,
35:1.
Christians
32:10, 33:3,
42:5.
Christine 2:19,
86:10,
86:15.
Christopher M.
Davis 1:35.
chronology
28:7.
circle 8:10,
47:5, 47:6,
47:10, 47:11,
47:22, 48:2,
58:15, 58:17,
72:9, 72:23,
72:24.
circles 9:7.
circumstances
25:23,
26:9.
Civil 1:30.
clear 10:5,
26:25,
46:18.
CLERK 7:20,
7:22.
client 22:3,
22:7.
climate 81:1.
clinics 29:18,
30:7,
30:21.
Clinton
33:20.
close 38:16,
39:4, 50:5.
closed 18:20,
36:5.
closer 9:25,
40:7.
closest
29:21.
closings 76:1,
77:24,
79:5.

co-show
70:13.
collar 53:11.
COLLEEN
KOLLAR-KOTELL
Y 1:18.
college
28:12.
COLUMBIA 1:2.
Columbia 1:25,
2:22, 74:3.
comes 60:21.
coming 75:4,
80:19,
81:14.
comment
24:24.
comments
84:14.
Commission
74:3.
commit 30:18.
committing
33:5, 63:2.
commonly 30:19,
30:20.
communicate
29:16.
communicated
29:17.
community
6:21.
complaints
74:5.
Compound 63:11,
63:12.
computer-aided
2:49.
concept 32:13,
32:16,
57:17.
concern
49:20.
concerns 45:24,
46:1, 46:2,
46:23, 46:25,
81:4.
concluded
86:8.
conclusion

33:25.
conducting
85:21.
confirm 58:4,
72:2, 78:9.
Confirming
43:24.
confused 50:17,
52:9.
confusing
65:12.
congregation
81:15.
Connecticut
1:37.
connection
38:6.
consequences
54:18,
55:19.
consider 25:25,
26:7.
considered
25:2,
65:23.
consistent
59:4.
constantly
29:17.
Cont'd 2:1,
4:10.
contact 6:17,
38:6, 74:22,
74:24.
contacted 6:12,
6:14, 38:8.
contempt
86:5.
context
65:23.
continue 4:6,
12:20, 18:10,
18:23, 20:6,
20:21,
21:11.
continued
7:8.
Contitution
2:23.
conversation

57:9, 61:12, 63:8, 63:22, 63:24, 64:1, 66:15.
conversations 37:15, 40:3.
convert 45:15, 49:20.
correct 8:15, 8:16, 32:19, 49:9, 50:18, 62:6, 65:23, 77:11, 86:11.
correctly 25:20, 36:25, 46:5, 46:17, 49:13.
cost 59:18, 59:22, 59:23.
Counsel 2:9, 27:1, 75:8, 76:12, 81:17, 81:20.
counseling 66:21.
Counselor 6:8, 7:5, 71:15.
Couple 6:4, 67:5, 67:6, 67:16, 71:17, 77:9, 77:15.
courtroom 80:19, 81:9, 81:20, 82:24, 83:12, 83:13, 84:8, 84:17, 84:23, 85:6.
courtroom. 4:4, 24:3, 25:17, 74:15.
courts 74:4.
crazy 55:8.
create 85:23.
crime 34:10.
CRIMINAL 1:5,

27:24, 79:16.
Cross 21:22, 60:1, 78:3.
CROSS-EXAMINATION 6:5, 21:24, 23:7.
crowd 82:6.
CSO 82:12, 83:4, 85:8.
culty 38:18, 42:3.
currently 11:5, 27:19, 27:21, 27:25.
cut 53:10.
.
.
< D >.
dad 38:17, 38:20, 38:21, 41:23.
daily 29:17.
Dallas 28:14.
Darnel 1:35, 5:7, 5:13, 44:5, 44:10, 44:14, 44:16, 44:17, 44:25, 45:1, 54:21, 54:24, 56:8, 58:10, 61:24, 62:10, 68:2, 70:12.
Davis 1:36, 6:3, 7:25, 8:7, 23:5, 23:15, 25:14, 26:15, 26:16, 26:19, 27:13, 27:16, 27:17, 33:16, 34:7, 44:1, 44:17, 78:1, 78:10, 80:18.
Davison 28:15.
days 4:22, 4:24, 13:19,

39:2, 39:5, 39:19.
deal 45:21, 47:1.
decide 12:25.
decided 13:2, 76:4.
decision 13:3, 41:13, 41:15, 60:11, 60:13.
decisions 76:10.
defend 57:21.
Defendant 1:34, 1:41, 2:5, 4:16, 4:19, 5:7, 5:13, 44:14, 53:14.
defendantjoan 2:10.
Defendants 1:12, 26:1, 50:17, 81:16, 85:15.
defended 80:24.
Defense 27:24, 75:8, 75:17, 77:22.
defined 66:24, 67:1.
definitely 37:16, 60:2, 64:14, 67:1, 83:11.
definition 77:16.
definitions 77:3.
delay 36:5.
delaying 60:14.
delivered 38:3.
depart 68:7.
depicted 47:7.
depth 64:18.

Describe 15:10, 32:6, 35:16, 44:8, 53:8, 58:11, 69:5.
description 63:16.
destitute 33:2.
detail 35:16.
details 39:1.
determining 26:1.
Detroit 34:15.
develop 29:13.
developed 12:1, 12:17.
different 18:14, 18:17, 28:5, 29:24, 32:20, 35:4, 35:19, 36:13, 51:12, 51:13, 71:2, 71:5, 73:17.
difficult 13:3, 13:4, 37:3, 85:10.
DIRECT 4:6, 4:10, 6:23, 8:6, 10:14, 27:11.
directly 6:12.
Disabilities 74:3.
disbanded 71:16.
discipled 38:17.
discuss 75:17, 75:22.
discussed 32:2, 37:16, 37:17, 43:10, 45:13, 56:4, 56:16, 60:19, 64:6, 78:25,

79:3.
discussing
46:6, 46:17,
47:3, 62:21,
66:19, 75:1,
75:16.
Discussion
55:13, 55:19,
57:5, 57:7,
59:18, 60:5,
60:9, 60:18,
77:3, 77:5,
77:20, 78:21,
79:3.
discussions
37:19, 38:1,
68:23,
79:25.
dispute 40:7.
distance 67:17,
67:20.
District 1:1,
1:2, 1:19,
1:25, 2:21,
2:22, 74:2,
82:22.
Division
1:30.
Doctor 11:25,
12:3, 12:5,
12:6, 12:8,
12:10, 12:11,
12:13, 13:1,
51:7.
doctors 12:15,
12:19, 12:23,
13:1.
Doctrine
32:9.
doing 15:25,
16:8, 19:24,
27:23, 29:9,
38:12, 41:7,
41:14, 41:20,
45:17, 45:19,
48:13, 48:15,
48:17, 48:25,
50:2, 50:20,
52:7, 52:11,
85:22,

85:23.
done 25:20,
31:14, 56:19,
74:7, 75:15,
77:25, 78:5,
78:8, 80:1.
door 18:17,
18:20, 20:25,
36:10, 37:4,
51:6, 64:22,
65:3, 65:4,
79:22, 80:20,
81:9, 81:19,
81:23, 83:6,
84:23.
doors 30:6,
33:6, 33:23,
35:9, 50:21,
51:18, 52:13,
57:18, 60:12,
61:25, 66:22,
70:10,
85:2.
downfall
56:21.
draw 47:5,
58:15, 72:9,
72:22,
72:24.
drawing
47:22.
drew 47:6,
47:10,
58:17.
drive 39:25,
40:13, 41:6,
41:13, 41:15,
67:20.
driving 38:12,
40:4,
52:19.
drove 39:17,
39:18, 40:18,
50:25.
due 6:20, 7:3,
8:12.
duly 9:19,
26:20.
During 14:11,
28:20, 28:23,

29:20, 30:3,
41:6, 41:13,
41:15, 50:11,
70:6.
duties 69:19.
.
.
< E >.
earlier 32:3,
34:14, 56:1,
62:18, 67:21,
82:22, 83:8,
84:6.
early 40:14,
40:15, 42:18,
67:12,
68:12.
easement
32:25.
eclectic
41:25.
effect 80:23.
efforts 26:2.
either 45:16,
61:24, 62:9,
68:5, 84:14,
85:4.
elevator 69:20,
70:21,
73:15.
elevators
51:14, 61:18,
69:12, 69:18,
69:21.
email 55:6,
55:10, 55:11,
56:10.
emergency 55:9,
56:12.
emotional
25:3.
employee 6:15,
78:4.
emulate 41:21,
41:24.
encourage
85:20.
end 33:14,
60:2.
ended 28:14,

38:12.
engage 60:21.
ensure 35:10.
enter 14:24,
15:11, 15:14,
15:15, 16:1,
16:10, 18:8,
19:25, 21:1,
23:14.
entered 4:4,
25:17.
entering 14:2,
14:5, 14:16,
14:18.
entire 21:13,
54:16.
Entrance 33:19,
49:3, 51:7,
51:8, 51:15,
51:17, 51:19,
52:13,
56:6.
entry 35:20.
especially
83:16.
Espinal 82:20,
82:21, 82:25,
84:3, 84:9.
Esquire 1:23,
1:29, 1:35,
1:42, 2:9.
essentially
32:17,
55:24.
Eva 38:11,
38:15, 38:16,
38:20, 38:21,
39:9, 39:15,
39:25, 40:23,
41:19, 42:11,
55:11,
68:2.
evening 40:16,
42:19, 52:3,
52:4,
73:12.
event 31:7,
32:22, 38:7,
39:2, 39:19,
42:21, 42:23,

48:10, 49:8,
58:24, 60:19,
60:21, 65:8,
66:7, 66:24,
70:7.
Eventually
21:16, 42:11,
43:13, 70:20,
73:12,
73:15.
everybody
24:12, 24:15,
25:8, 51:17,
54:16, 56:13,
64:22, 67:9,
67:14, 68:5,
68:7,
85:23.
everyone 32:12,
42:19, 43:9,
55:5, 68:10,
69:15,
72:16.
everything
39:12, 77:10,
77:25.
evidence 26:7,
26:8, 43:21,
57:25,
75:21.
evidently 83:4,
83:20.
ex-husband
39:10.
exact 39:5,
67:11,
68:12.
Exactly 6:16,
48:15, 70:19,
85:4.
EXAMINATION
4:10, 10:14,
27:11.
examined 9:19,
26:20.
excited 31:17,
41:10.
Excuse 19:8,
73:23, 74:16,
74:21, 77:17,

81:18,
84:9.
excused 25:4,
25:6, 79:10,
86:6.
Exhibit 4:9,
5:2, 5:13,
7:10, 7:13,
7:15, 8:7,
16:21, 17:14,
43:19, 44:2,
49:21, 53:21,
54:5, 54:7,
57:24, 58:16,
59:17, 62:18,
71:21, 72:12,
72:20,
73:8.
experience
30:19, 65:19,
65:25.
experienced
81:2.
experiencing
15:7,
21:14.
explain 35:7,
59:1.
explained
57:17,
62:25.
explaining
59:4.
expressed
81:4.
extent 44:25,
85:14.
extra 43:7,
60:11,
74:1.
.
.
< F >.
F. 2:9.
FACE 33:5,
33:8, 33:11,
33:12, 33:17,
33:18, 34:8,
34:10, 34:13,
34:20, 34:23,

37:15, 37:16,
37:20, 38:2,
38:4, 48:3,
53:12, 55:23,
55:25, 56:2,
56:19, 56:23,
62:22, 62:25,
63:2, 72:9.
Facebook 4:15,
5:5, 38:8.
facial 44:12.
facility
51:12.
facing 38:3.
fake 64:20,
64:21, 64:24,
65:2, 65:9,
65:15, 66:2,
66:3, 66:6.
fall 19:3,
19:21.
familiar 8:12,
30:24,
61:3.
far 47:22,
62:15,
67:18.
fast-forward
67:7.
faster 8:1.
FBI 6:11, 7:3,
80:12,
82:14.
FCRR 2:19,
86:10.
federal 34:8,
34:10,
56:1.
feel 52:23,
64:10,
84:15.
feeling 14:22,
22:21,
40:24.
fellowship
43:9.
felony 33:22.
felt 40:8,
40:16, 40:23,
41:20, 42:20,

42:22, 45:14,
67:5, 70:17,
70:18,
71:13.
female 82:22.
females 82:1.
few 68:19,
81:12.
fewer 79:19.
field 6:21.
figure 73:19.
figured
41:21.
fillings
13:22.
final 26:12.
find 20:2.
finding
29:21.
fine 22:13,
80:7,
80:25.
finish 27:1,
27:2, 37:6,
74:11, 75:10,
75:21,
78:15.
finished
23:22.
firm 27:24.
first 5:11,
9:19, 10:16,
12:2, 13:21,
13:24, 15:4,
26:20, 28:8,
31:21, 37:13,
38:6, 38:23,
44:4, 45:3,
52:21, 54:24,
62:5, 64:3,
69:15, 71:8,
71:10, 73:6,
79:2, 79:17,
84:22,
86:3.
firsthand
80:3.
fit 12:22.
five 24:2.
float 83:18,

83:25,
85:8.
floor 19:2,
19:3, 19:22,
51:14,
69:22.
Florida
28:12.
focused 64:5,
69:14.
focusing
65:22.
follow 41:19,
69:16.
followed
84:24.
following 28:4,
41:20, 44:18,
48:11, 49:25,
50:18, 51:4,
52:5, 52:6,
52:7, 53:3,
54:2, 66:8.
follows 9:20,
24:5,
26:21.
forecast
78:7.
foregoing
86:11.
forget 6:16.
form 13:22,
26:5, 65:19,
69:3.
forward 67:7.
found 21:18,
63:2.
fourth 51:13,
69:22.
free 29:23.
Freedom
33:18.
friends
38:16.
front 5:10,
5:19, 29:8,
29:9, 35:9,
37:4, 51:15,
60:12,
67:5.

full 74:13,
77:6.
fully 11:25,
41:15,
82:6.
fuzzy 37:18.
.
.
< G >.
G. 1:23.
gallery 80:20,
81:10, 81:15,
82:2.
gate 15:23,
15:24.
gathering
31:18.
gave 54:22,
55:2.
general
63:25.
Generally
10:19, 15:10,
29:7, 54:14,
60:24.
genesis 7:6.
gentle 22:15.
Georgia 27:20,
27:25, 28:1,
28:2, 28:5,
28:8, 28:9,
28:10,
28:17.
Geraghty 4:17,
4:20, 5:4,
68:4.
gets 55:8,
83:15.
getting 33:24,
41:1, 41:5,
41:18, 42:21,
59:6.
girl 41:21.
give 24:14,
24:15, 24:17,
25:19, 34:3,
41:1,
54:16.
given 60:22,
61:10, 61:13,

68:18, 75:23,
81:1, 81:4.
giving 61:19,
61:22.
glasses
44:11.
God 42:8.
good. 22:25.
Goodwin 51:23,
67:25.
Government
1:23, 4:8,
5:2, 5:12,
7:10, 7:14,
8:2, 8:7,
8:16, 16:21,
17:12, 17:13,
26:14, 43:18,
44:1, 57:24,
62:18,
71:20.
grandfather
28:19.
great 7:21,
80:21.
ground 20:8,
21:14,
22:11.
group 41:17,
42:1, 42:4,
57:5, 65:8,
71:8, 71:10,
71:12, 71:15,
71:17, 71:25,
72:4, 72:5,
73:6, 79:2.
groups 70:22,
71:4,
71:16.
guaranteeing
66:4.
guess 70:23,
76:2.
guessing
75:24.
guilty 63:2.
guy 45:6.
.
.
< H >.

H. 1:29.
hair 44:12.
halfway
80:20.
hallway 16:3,
16:7, 16:12,
16:16, 21:14,
51:11,
52:10.
hallways 61:17,
66:21.
hand 9:14,
9:15, 16:20,
26:18, 55:4,
62:11.
handed 56:9.
handle 47:2.
hands 62:14,
62:16,
62:19.
Handy 4:16,
4:19, 5:4,
44:22, 45:1,
54:21, 56:16,
58:10, 58:11,
58:12, 59:1,
61:24, 62:10,
62:25, 64:25,
66:7, 68:3,
70:6.
hang 81:19,
82:18.
hanging 53:12,
73:13,
83:5.
happen 23:12,
31:23, 36:3,
36:23, 37:11,
40:8, 43:2,
66:5, 68:25,
75:17,
81:6.
happened 15:10,
17:8, 33:10,
50:4, 50:5,
54:14, 56:12,
68:14, 70:15,
72:14, 73:9,
83:3,
83:20.

happening
38:25, 70:19,
82:13.
happens 39:7.
happy 78:14.
hard 73:24,
74:6, 81:25,
86:1.
harder 37:5.
harm 33:23,
57:15.
head 54:10,
58:12, 58:18,
77:19.
hear 7:12,
9:16, 10:10,
22:5, 27:4,
27:7, 36:24,
44:12, 59:1,
79:14, 79:24,
80:2.
heard 25:22,
31:10, 32:3,
52:23, 61:21,
63:25, 80:3,
82:5.
hearing 45:25,
63:24.
heart 12:18.
Heather 29:2,
29:5, 31:8,
31:16, 31:21,
37:25, 38:2,
39:15, 39:18,
39:25, 40:5,
40:10, 40:23,
41:1, 41:6,
42:12, 43:5,
45:25, 50:24,
52:10, 52:18,
68:1, 70:5.
heavy 19:6.
hell 35:2.
Hello 10:18.
help 29:10,
69:25,
79:7.
helpful 85:9.
helping 16:9.
Herb 5:4,

53:23, 53:24,
68:3.
hereby 86:10.
heroes 31:12.
high 59:23,
59:25.
hinder 33:24.
Hinshaw
50:14.
historical
32:9.
hold 33:3.
Holler 9:5,
9:13, 9:18,
10:2, 10:16,
10:18, 10:19,
11:9, 13:6,
15:1, 16:11,
16:20, 16:23,
17:20, 18:12,
18:25, 19:3,
19:21, 20:8,
20:23, 21:2,
21:7, 21:13,
25:21, 25:23,
26:2,
76:24.
Holy 40:11,
60:13.
home 40:18,
42:14, 43:1,
43:3, 43:11,
43:13, 52:1,
68:1, 68:7,
74:25.
homemaker
11:10.
honestly 7:5.
HONORABLE
1:18.
hood 58:13.
hook 7:20.
hopes 36:20.
hopped 73:15.
host 52:1,
67:22, 67:24,
67:25, 68:1,
68:7.
hotel 80:18.
hours 78:9.

house 40:16,
40:20, 43:5,
53:25, 57:6,
67:22, 67:24,
67:25.
huge 15:2.
hundred 47:14,
47:20,
64:8.
husband 11:14,
13:3, 13:25,
14:14, 15:25,
16:8, 17:22,
17:25, 19:24,
19:25, 20:25,
21:18.
hyped 29:24,
30:2.
.
.
< I >.
idea 30:16,
46:6.
identification
44:14, 53:14,
53:16.
identified
44:16, 53:19,
54:7.
identify 80:10,
81:24,
82:8.
Idoni 29:2,
29:4, 29:5,
29:13, 31:8,
31:9, 31:22,
37:14, 37:19,
38:6, 38:23,
39:3, 39:8,
39:25, 41:6,
42:12, 45:25,
50:24, 52:10,
52:12, 52:18,
68:1, 70:5.
illegal
32:24.
image 5:11.
immediate 47:7,
48:3.
immigrate

10:21.
importance
66:15.
important
66:20.
in-court 44:14,
53:14.
in. 9:12, 38:5,
73:13, 76:25,
83:19.
incidences
84:17.
incident 4:22,
80:16, 83:1,
84:7.
incidents 6:19,
82:16,
85:7.
included
34:22.
India 10:21,
10:25.
indicate 27:8,
41:6.
indicated
24:13, 24:18,
25:2, 41:9,
42:14, 48:6,
69:4.
indicating
69:22.
Indicating.
8:11, 72:10,
72:25.
indication
41:1.
indications
41:11.
individual
31:13, 45:24,
47:5, 49:5,
50:8, 51:20,
53:22, 58:7,
60:23,
61:17.
individuals
29:24, 45:14,
49:19, 49:23,
54:6, 54:12,
61:5, 61:9,

62:21, 64:1,
73:17.
influence
85:15.
information
40:9, 40:23,
41:2, 41:4,
55:9.
initial 17:1.
Initially
56:18,
65:25.
innocent
32:11.
inquiry 76:7,
76:9.
inside 33:6,
64:23, 65:3,
66:15, 73:13,
82:23.
Inspector
82:21.
instruct
26:6.
instructed
34:6.
instruction
24:14, 24:15,
24:17, 24:25,
25:19, 26:9,
34:3,
77:18.
instructions
26:12, 68:18,
68:19, 75:22,
75:23, 76:1,
76:21, 78:22,
79:4.
interesting
45:12.
intermixed
81:16.
interplay
34:19.
interpose 32:3,
32:10.
interposed
32:11.
interposing
57:14.

Interposition
32:4, 32:9,
32:16,
57:14.
interviewed
8:17.
introduce
27:15.
investigation
8:12.
involved 28:24,
30:2, 41:24,
41:25,
63:8.
involvement
29:19,
30:12.
involves
35:14.
issue 12:1,
14:12,
77:21.
issues 82:9.
issuing 86:5.
.
.
< J >.
jacket 44:11.
jail 35:2,
55:20, 55:21,
56:25, 59:24,
60:2, 61:9.
Jean 1:10,
1:42.
Jesus 32:11,
59:25.
Joan 1:11, 2:6,
31:10, 31:12,
31:13, 31:14,
31:18, 31:21,
38:24, 40:5,
41:10, 47:17,
47:19, 47:25,
52:17, 52:22,
52:24, 52:25,
53:19, 68:1,
70:2,
73:14.
job 29:23,
32:10, 35:1,

69:17, 70:2,
70:6, 71:8,
85:24.
John 1:42,
1:43, 50:14,
52:9.
Jonathan 1:35,
44:5, 44:10,
44:25, 45:1,
54:21, 54:24,
58:10, 62:10,
68:2,
70:12.
JONATHAN DARNEL
1:10.
Jones 84:8,
84:19,
84:21.
Judge 1:19,
33:15, 48:23,
66:12, 78:7,
78:16,
83:11.
Judicial 74:3,
82:21,
85:22.
jump 67:7.
June 10:24.
juror 77:2.
Jury 4:4, 5:1,
10:16, 17:13,
17:19, 24:3,
24:23, 25:17,
25:22, 27:15,
43:22, 43:24,
48:25, 58:4,
72:2, 74:15,
75:22, 76:21,
77:17, 78:14,
78:21, 79:4,
79:5.
JURY TRIAL
1:17.
.
.
< K >.
Keep 24:21,
33:13, 35:20,
35:23, 35:25,
36:5, 36:22,

56:13, 63:10,
66:10,
82:13.
kept 40:10,
80:25.
kill 30:17.
killed 57:21.
killer 35:22.
kind 15:1,
35:24, 38:13,
41:17, 41:18,
41:20, 42:22,
47:18, 56:12,
58:7, 60:13,
63:7, 66:19,
66:21, 67:2,
68:18, 68:21,
70:16, 70:17,
70:18, 70:22,
73:13, 73:16,
80:24, 81:1,
81:18, 81:22,
82:7.
kindly 85:16.
knee 15:13.
knowledge
30:20,
31:17.
.
.
< L >.
L. 1:42.
labor 15:2,
15:7.
ladies 72:18.
lady 23:9,
47:13,
72:22.
laid 19:2.
laminaria
22:17.
Lapeer 28:14,
28:15,
28:16.
laptop 7:22.
large 81:14.
last 10:17,
52:21, 53:21,
71:13, 75:23,
77:2, 77:8,

77:17, 78:3,
82:17, 83:2,
83:5,
83:17.
last-minute
68:18,
68:25.
late 28:19.
later 30:11,
31:13.
Lauren 5:4,
44:22, 45:1,
54:21, 56:16,
57:2, 57:13,
58:10, 58:11,
58:12, 61:24,
62:9, 62:25,
64:25, 66:20,
68:3, 70:6.
Law 1:43,
27:24, 34:8,
56:1, 60:4.
laws 13:9.
lay 83:17.
layout 64:13,
69:10.
laypeople
84:20.
lead 40:11.
leadership
54:22,
55:3.
Leading 44:25,
54:22, 60:16,
70:25.
leads 57:3.
learn 31:6,
31:9,
31:13.
learned 12:2,
31:21, 37:13,
38:22.
least 13:18,
56:14,
76:3.
leave 6:16,
24:8, 28:4,
39:16, 61:10,
83:15.
leaving 83:3,

84:22.
led 44:24,
54:20,
60:13.
Left 24:3,
28:8, 40:14,
46:9, 46:10,
47:7, 47:22,
48:3, 51:16,
74:15, 79:23,
81:19, 81:21,
84:8.
legal 32:23,
33:25.
less 82:24,
84:1.
lie 16:3.
likely 56:23,
56:25,
84:2.
limine 24:18,
25:1, 75:6,
76:24.
limited 26:7,
26:8,
74:24.
limp 36:11,
36:24, 37:2,
57:5, 61:1.
lines 38:10,
80:23.
list 55:10.
listened
12:18.
little 8:4,
20:25, 28:13,
28:16, 32:3,
35:16, 37:18,
54:22, 70:20,
73:12, 75:17,
81:25.
live 5:7, 5:14,
10:19, 11:1,
12:21, 27:19,
27:25, 28:5,
28:20.
lived 28:2,
28:7, 28:15,
29:1, 29:20,
30:4.

living 27:23,
28:23.
LLP 2:10.
local 74:4.
located
51:10.
location 5:16,
40:7, 67:14,
68:8, 70:24,
71:17, 72:16,
73:2.
lock-and-block
35:15, 35:17,
35:18, 36:11,
57:2, 60:6,
60:10, 60:25,
68:20.
locks 35:14,
36:1, 63:4,
63:13, 63:20,
63:23, 72:15,
72:17,
73:1.
logical
73:21.
long 9:17,
11:7, 21:18,
35:11, 35:21,
36:18, 38:1,
40:13, 40:16,
59:24,
60:15.
longer 35:23,
35:24, 36:1,
36:2, 37:5,
37:7, 60:12,
74:2, 74:9.
look 47:18,
61:6, 77:9,
77:19, 78:22,
80:21.
looked 5:3,
31:12, 48:15,
69:23,
71:6.
Looking 18:16,
61:7.
looks 47:14,
47:25,
58:12.

loop 40:24,
56:14.
Lord 38:3,
40:10.
lot 33:7,
39:15, 39:16,
40:9, 41:11,
42:3, 54:13,
59:6, 68:23,
70:9,
79:15.
loud 10:5.
loudly 69:25.
low 79:17.
lying 16:7.
.
.
< M >.
Ma'am 22:1,
23:9.
Machado 1:42,
1:43, 8:21,
22:6,
24:19.
machine 2:48.
Madame 7:20.
Man 46:22,
47:7, 48:4,
69:2.
managed 83:3.
marked 16:21,
17:13, 43:18,
71:20.
maroon 17:23.
married 11:3,
11:5, 11:7.
Marshal 79:13,
79:25,
84:9.
Marshall 1:10,
1:42, 76:3,
76:16.
Marshals
79:17.
martyr 32:15,
35:3.
martyrdom
60:1.
mask 47:23,
53:12.

materials 68:20.
matter 42:2, 80:14, 86:12.
me. 23:10.
mean 13:18, 30:13, 32:17, 36:15, 45:19, 46:8, 46:15, 55:25, 59:21, 63:2, 63:13, 78:13.
meaning 59:23.
means 32:2, 32:6, 36:19.
meant 24:10, 24:16, 30:15, 47:4.
medical 51:12.
medicines 13:23.
meet 29:1, 29:4, 29:7, 39:16, 67:9, 67:15, 68:8, 68:11, 81:20.
meetings 74:5.
meetup 50:5, 68:14, 70:24, 71:17.
members 25:22, 80:19, 84:15.
memory 37:18, 46:4, 46:16, 48:9, 48:24, 49:13, 63:1, 64:25, 68:2, 68:5.
mentioned 27:25, 30:12, 32:2, 33:11, 34:14, 36:24, 60:5,

67:21.
message 4:12, 4:18, 5:4, 38:9, 38:23, 39:3, 39:8.
Messenger 38:8.
met 29:5, 29:14, 29:23, 31:18, 39:15, 39:21, 40:21, 45:1, 72:16.
Michigan 28:14, 28:15, 28:16, 28:20, 28:21, 28:23, 29:1, 29:18, 29:20, 30:4, 30:6, 38:1, 38:20, 39:17, 40:1, 40:13, 50:25.
microphone 10:1, 22:4, 26:25.
middle 10:9, 27:6.
Mike 80:12.
mind 80:5.
minds 36:21.
minute 23:25, 24:10, 24:16, 25:19.
minutes 24:2, 81:13.
misdemeanor 33:22.
mom 69:24.
moment 58:20, 66:12.
moms 29:10, 66:21.
monitoring 66:21.
monthly 74:5.
morning 5:8, 15:4, 39:14, 39:23, 40:14, 67:12, 68:13,

68:16, 71:18.
mostly 54:21, 69:14.
mother-daughter 29:15.
motion 25:1, 76:24.
motions 24:18, 75:6.
mouth 33:1.
Move 26:11, 27:3, 50:7, 53:20, 74:6, 78:13, 78:14.
moved 10:25, 28:10, 28:12, 28:16, 28:17.
movement 28:24, 29:19, 29:25, 30:3, 30:20, 32:7, 32:21, 33:3, 33:21, 38:17, 38:18, 61:4, 65:7, 66:1.
moves 9:25, 17:12, 26:24.
moving 28:14, 70:18, 80:25.
MR. BRENNWALD 75:19, 76:15, 77:22, 79:9, 80:5.
MR. DAVIS 6:4, 6:6, 7:2, 7:14, 7:20, 7:23, 8:3, 8:6, 8:19, 21:4, 23:6, 23:8, 62:2, 76:19.
MR. ESPINAL 83:11, 83:22, 85:11.
MR. MACHADO

7:18, 8:22, 17:15, 19:7, 19:10, 19:13, 19:16, 19:19, 21:23, 21:25, 22:7, 22:16, 23:4, 33:25, 46:11, 46:13, 46:20, 60:16, 63:9, 63:11, 63:15, 65:18, 69:3, 69:7, 70:25, 75:9, 76:4, 76:16.
MS. BELL 8:25, 23:17, 53:17.
MS. ROSS 4:7, 5:24, 9:4, 9:8, 10:2, 10:15, 16:18, 16:20, 17:12, 17:18, 17:20, 18:12, 18:25, 19:21, 20:8, 20:23, 21:7, 21:13, 21:20, 23:19, 25:4, 25:6, 25:9, 25:15, 84:7, 84:13, 84:21, 85:2, 85:4, 86:7.
multiple 47:18, 51:12, 84:17.
myself 36:11, 41:18.
.
.
< N >.
name 10:17, 27:16, 35:13, 42:15, 45:8, 45:9, 47:21, 50:10, 50:12, 50:13, 51:22, 51:23, 52:21, 52:23, 68:4,

72:18,
80:12.
named 29:1.
names 56:9.
Nashville
  34:15.
near 74:18.
necessarily
  34:5,
  84:15.
necessity
  64:10.
need 9:12,
  19:17, 22:4,
  22:15, 24:21,
  26:17, 26:25,
  48:21, 61:20,
  62:6, 65:13,
  71:2, 74:10,
  74:25, 79:14,
  82:12.
needed 55:6,
  77:16,
  80:1.
needs 55:9,
  77:12,
  77:17.
nervous 42:9.
new 45:15.
Next 4:18, 9:3,
  9:4, 25:12,
  26:11, 41:9,
  42:24, 43:16,
  45:5, 46:3,
  46:22, 47:15,
  48:14, 49:4,
  50:7, 52:10,
  52:11, 52:15,
  53:20, 57:18,
  64:15, 66:24,
  67:8, 68:7,
  68:16, 70:15,
  74:13, 75:15,
  78:11,
  79:7.
nice 22:15,
  84:18.
night 37:16,
  42:23, 42:25,
  44:18, 49:11,

49:15, 50:15,
  51:24, 51:25,
  53:1, 53:24,
  59:5, 60:9,
  62:13,
  67:18.
No. 1:5, 15:23,
  20:18,
  24:15.
nobody 24:5,
  74:18,
  82:16.
Northwest
  5:20.
not. 46:18.
note 77:13.
noted 19:15.
Nothing 23:2,
  23:4.
notice 75:7.
noticed 70:9.
nurse 21:19.
NW 1:26, 1:31,
  1:37, 1:44,
  2:23.
.
.
< O >.
o'clock 73:25,
  78:8.
objecting 10:8,
  10:10,
  46:19.
Objection
  17:15, 17:16,
  19:9, 19:10,
  19:14, 21:4,
  24:20, 27:4,
  27:7, 33:25,
  46:11, 53:15,
  53:17, 60:16,
  62:2, 63:9,
  63:11, 65:18,
  69:3,
  70:25.
objections
  78:25.
obstruct
  35:20.
obstructed

26:2.
obtaining
  30:21,
  59:12.
obviously 33:9,
  34:3, 51:2,
  75:14.
occurred 6:19,
  30:24, 70:15,
  70:23,
  81:22.
October 4:16,
  4:19, 13:14,
  30:25.
offense
  34:11.
offenses
  34:13.
offer 69:25.
offering
  29:10.
Office 1:24,
  1:43, 6:21.
officer 58:8,
  58:21,
  82:22.
officers 37:3,
  60:22,
  73:17.
offices
  51:13.
Official 2:20,
  86:16.
officially
  4:14, 5:5.
often 29:16.
Ohio 10:20,
  11:1, 11:12,
  13:5, 13:10,
  13:11.
old 27:17,
  27:18,
  28:3.
older 47:18,
  82:1.
Once 4:14,
  40:7, 41:16,
  43:4, 55:18,
  61:10, 70:15,
  70:19.

ones 26:13.
open 20:25,
  33:1, 65:4,
  81:23.
opened 64:22,
  65:3, 67:13,
  68:13,
  70:24.
opportunity
  60:22.
opposition
  17:17.
option 60:25,
  61:1.
orange 72:8.
organizations
  7:8.
organizer
  70:8.
originally
  78:24,
  79:1.
others 61:2.
outer 81:8,
  81:19.
outreach 6:21,
  7:7.
Outside 51:11,
  51:17, 66:16,
  66:20, 67:5,
  70:20, 73:11,
  79:22, 81:7,
  81:11, 83:4,
  83:5, 83:6,
  83:19, 84:17,
  84:23,
  85:8.
overview
  68:24.
own 76:10.
.
.
< P >.
p.m. 1:12,
  40:15, 42:18,
  79:11,
  86:8.
packed 39:12.
page 44:4,
  44:20, 44:21,

45:5, 48:1,
48:4, 49:4,
49:6, 49:21,
50:7, 52:15,
53:20,
53:21.
paid 59:25.
pain 14:24,
15:1, 15:2,
15:7, 16:2,
16:6, 19:6,
19:23,
21:14.
paper 55:4,
56:9.
paperwork
61:8.
paralegal
27:24.
park 39:21.
park-and-drive
39:21.
parking 33:7,
39:15,
39:16.
part 6:20,
12:18, 33:9,
38:12, 38:17,
42:4, 64:19,
69:14, 79:6,
79:16.
participate
30:3, 32:22,
34:21, 36:6,
37:22, 38:13,
43:8, 46:7,
54:18, 55:7,
59:23.
participated
30:5, 37:25,
38:5,
56:24.
participating
29:25, 31:11,
53:3, 55:5,
55:15,
64:9.
participation
30:9, 34:14,
41:7.

particular
6:15.
Particularly
86:2.
Parties 79:10,
86:6.
partly 83:14.
passionate
29:22.
past 56:22.
pastor 40:20,
40:21, 42:14,
42:15,
53:25.
patient
69:24.
patients
59:12.
paused 58:16.
pay 59:25,
60:4,
64:10.
Peaceful
32:9.
peacefully
35:10.
penalties 38:2,
38:4.
penalty
59:25.
Pennsylvania
1:31, 2:11.
Pensacola
28:12.
percent 47:14,
47:20,
64:8.
permission
16:18, 43:21,
57:23, 71:22,
74:23.
person 30:14,
44:4, 44:21,
45:25, 47:7,
47:24, 48:2,
50:23, 52:16,
52:18, 71:11,
81:10,
81:24.
personally

70:10.
personnel
83:12.
perspective
70:14,
70:18.
pertinent
84:16.
phone 41:4.
photo 48:15,
71:17,
72:18.
photograph 8:8,
46:4, 46:10,
46:16, 46:22,
47:23, 71:25,
72:4, 72:7.
photos 62:15,
62:19.
physical
12:1.
physically
11:25, 12:17,
12:22.
picked 21:19.
picture 47:8,
47:10, 71:16,
85:3.
piece 55:4,
56:9.
pinkish-colored
53:11.
place 32:13,
32:18, 37:14,
38:7, 42:24,
43:16, 57:20,
64:1, 64:14,
66:8, 67:10,
71:19.
Plaintiff
1:7.
plan 54:17,
59:9.
planning 41:7,
41:14, 76:13,
78:10.
play 5:22,
58:5,
66:24.
played 64:19.

played. 5:23,
18:11, 18:24,
20:7, 20:22,
21:12, 58:6,
58:14,
58:25.
playing 18:10,
18:23, 20:6,
20:21,
21:11.
plea 47:1.
Please 4:8,
4:13, 4:18,
5:1, 5:2,
5:10, 5:22,
8:10, 9:10,
10:9, 10:16,
15:10, 17:18,
18:10, 20:21,
24:5, 26:23,
27:7, 27:15,
44:9, 45:5,
53:9, 54:5,
60:8, 66:18,
72:21,
77:13.
Plus 11:8,
24:19.
podium 80:9.
point 18:2,
18:16, 19:24,
20:2, 20:9,
35:25, 37:7,
44:8, 50:3,
53:8, 54:15,
54:16, 55:18,
60:3, 60:14,
61:18, 72:19,
73:18, 74:12,
75:13, 76:7,
76:16, 76:19,
80:24,
86:4.
points 59:6.
police 36:19,
36:21, 37:3,
37:7, 58:8,
60:22, 61:7,
61:19, 61:22,
70:9,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327-HLT Document 554 Filed 12/04/23 Page 100 of 106 Page ID #871
EXHIBIT A - DEFENSE MOTION IN LIMINE 9
1386

73:17.
popping
  24:21.
position
  70:21.
possession
  72:17,
  73:3.
possibility
  34:24.
possible 16:1,
  23:11, 33:22,
  35:21, 36:19,
  37:3, 54:18,
  60:15.
possibly
  81:16.
posted 4:14,
  5:5.
potential
  55:23,
  56:21.
Potentially
  6:20,
  69:24.
prefer 80:1.
pregnancy
  11:19, 11:22,
  12:3, 12:6,
  12:16, 13:5,
  13:11, 25:23,
  25:24, 26:9,
  26:10.
pregnant
  11:16.
prejudicial
  25:3.
prep 37:1,
  43:12,
  68:25.
prepare 39:6.
present
  79:25.
preserved
  19:17.
pressed
  69:22.
pressure
  47:3.
presumably

75:13.
pretty 36:9,
  64:7, 64:8,
  64:11,
  79:4.
prevent 32:18,
  59:12.
preventing
  30:21.
previous 37:18,
  38:4, 48:4.
previously
  81:4.
price 60:4.
primary
  13:22.
Prior 6:19,
  6:24, 7:3,
  16:11, 16:13,
  16:23, 61:15,
  81:2.
prison 34:25.
private
  68:23.
Pro 2:6.
pro-life 28:24,
  29:19, 30:20,
  32:7, 32:21,
  33:2, 65:7,
  66:1.
probably 24:24,
  29:5, 73:18,
  73:21, 75:21,
  76:22,
  77:9.
problem 75:1,
  80:7, 80:8,
  83:17.
problems 25:11,
  79:20,
  86:3.
proceed 4:5,
  27:9.
Proceedings
  2:48, 86:8,
  86:12.
process 61:8.
produced
  2:48.
prolong

60:15.
prolonging
  60:19,
  60:21.
promptly
  73:24.
properly
  19:4.
propriety
  26:5.
prosecution
  8:14.
prosecutor
  23:9.
protest 6:24.
Protestants
  42:4.
protesting
  29:10,
  29:11.
protests 7:4.
provide
  59:14.
providing
  30:22.
public 32:25.
publish 4:8,
  5:1, 17:13,
  17:19, 43:21,
  57:24,
  71:23.
pull 58:3.
purple 44:10.
purpose 24:22,
  25:25, 26:3,
  26:7, 26:8.
purposes
  76:14.
push 21:3.
pushed 23:10.
pushing 21:9.
put 6:17,
  30:15, 32:13,
  35:9, 55:4,
  55:6, 55:11,
  65:23, 72:20,
  77:12, 77:17,
  77:23.
.
.

< Q >.
question 7:11,
  7:15, 23:6,
  27:1, 46:14,
  57:8, 65:12,
  71:3, 72:11,
  72:13, 76:2,
  77:2,
  80:14.
questioning
  73:20.
questions 5:25,
  6:4, 8:19,
  8:22, 8:25,
  21:20,
  23:17.
quick 23:24,
  24:1, 24:7,
  79:4.
quote 33:2,
  35:3.
.
.
< R >.
Raise 9:14,
  9:15, 26:18,
  62:11, 77:21,
  78:24.
raised 28:1,
  46:2, 46:24,
  62:14, 62:16,
  62:19.
rare 56:22.
rather 35:2,
  80:2, 80:3.
re-appointments
  74:4.
reached
  39:10.
read 4:12,
  24:25.
ready 4:3, 4:5,
  25:12, 26:11,
  42:21, 78:12,
  78:18.
real 42:5.
realize 74:1,
  76:6, 82:17,
  83:19, 83:23,
  85:9.

really 39:4,
  40:25, 41:17,
  42:3, 64:2,
  64:10,
  78:5.
reason 24:13,
  42:3, 56:8,
  65:1, 66:6,
  77:23.
reasons 65:6,
  65:15,
  66:1.
Rebecca 1:23.
recall 22:13,
  22:16,
  22:20.
receive 26:2,
  32:14.
received
  39:3.
recent 49:20.
recently
  28:17.
reception 14:2,
  14:16, 15:8,
  15:16, 15:19,
  15:22, 18:2,
  18:13.
recess 24:9,
  79:11.
recognize 5:16,
  8:7, 17:20,
  44:4, 44:21,
  45:6, 45:7,
  47:24, 49:5,
  49:7, 50:7,
  51:20, 52:16,
  53:22, 82:4,
  84:1.
recollection
  78:1.
recommend
  12:15.
record 22:15,
  26:25, 44:13,
  44:15, 53:13,
  53:18, 81:4,
  86:12.
record. 77:5.
recorded

2:48.
red 33:4,
  47:10, 47:23,
  48:2.
redirect
  23:18.
refer 30:21,
  52:25.
reference
  31:22.
referenced
  33:11.
referred
  32:8.
reflect 44:13,
  44:15, 53:13,
  53:18.
regarding
  25:23.
relates
  25:20.
relating
  26:9.
relationship
  6:18, 7:2,
  7:6, 29:13,
  29:15, 30:8,
  32:6.
religious
  42:10.
rely 48:24.
remind 26:4,
  26:6.
reminded
  68:19.
reminder
  68:24.
remove 37:3,
  37:7.
renew 24:20.
rephrase
  57:8.
Reported
  2:19.
Reporter 2:20,
  86:16.
representation
  17:7.
rescue.
  30:13.

rescuer 36:16,
  37:9.
rescuers 40:17,
  43:7, 69:15,
  70:16,
  71:11.
rescues 31:14,
  32:21, 32:23,
  32:24, 33:4,
  34:20, 35:5,
  38:4.
rescuing 38:24,
  45:15.
rest 79:6,
  79:12.
result 6:19,
  6:23.
returned
  28:8.
review 16:12,
  16:13.
Rights 1:30.
risk 33:5,
  61:6, 61:21,
  62:12.
risking 34:25,
  55:13, 55:21,
  55:22, 56:5,
  62:22.
risky 12:9.
road 47:2.
Robertson
  2:10.
role 67:4.
roles 66:24,
  67:1, 67:2.
room 21:19,
  23:14,
  63:25.
rooms 81:14.
rose 33:4.
Ross 1:23,
  4:11, 5:1,
  5:3, 5:10,
  5:12, 5:22,
  9:6, 18:10,
  18:23, 20:6,
  20:21, 21:11,
  83:10.
RPR 2:19,

86:10.
rule 62:4.
ruled 19:11,
  24:18.
ruling 24:14.
run-through
  68:24, 69:1,
  69:5, 69:9,
  70:15.
rundown
  54:17.
runner 70:13.
running
  70:11.
rush 65:5.
.
.
< S >.
sang 36:9.
Sanjay 1:29.
sat 36:9.
saw 41:4,
  41:17, 48:16,
  49:21, 50:21,
  52:10, 54:8,
  70:8, 72:17,
  73:3, 82:3.
saying 20:17,
  20:18, 22:24,
  40:10, 49:17,
  57:19,
  66:20.
says 34:4,
  59:8,
  82:16.
scarf 58:12.
scheduled 15:3,
  74:24.
scheduling
  80:17.
screen 17:21,
  43:25, 47:6,
  47:11.
SE 2:6, 2:11.
searching
  19:25.
seated 26:23,
  46:22,
  48:3.
seaweed

22:17.
Second 12:8,
 12:10, 14:7,
 14:9, 14:11,
 14:13, 23:25,
 44:20, 49:21,
 61:10, 61:22,
 74:7, 74:14,
 79:23,
 80:9.
secondhand
 80:2.
securing
 35:19.
Security 79:18,
 82:21, 82:22,
 84:1,
 84:18.
seeing 48:13,
 48:25, 49:2,
 49:11, 49:24,
 50:2,
 53:24.
seem 66:23,
 85:7.
seemed 44:24,
 46:5, 46:17,
 54:22, 57:16,
 60:10, 70:10,
 70:13.
seems 19:8,
 23:13, 83:13,
 85:6.
seen 12:19,
 62:15.
send 55:9,
 79:21.
sending 75:6.
sends 4:19.
sent 4:15,
 38:23, 42:8,
 76:20, 77:6,
 79:1.
separating
 63:13.
September
 1:11.
serves 46:4,
 46:16, 49:13,
 68:2.

services 26:3,
 29:11,
 30:22.
Session 1:13.
several 28:5.
Shampy 9:5,
 9:18,
 10:18.
shape 85:6.
shirt 44:10,
 47:23,
 53:11.
short 82:17.
shorten
 65:13.
shorter 71:3,
 78:15.
shorthand
 2:48.
show 7:10,
 7:14, 43:18,
 57:21, 70:11,
 71:20,
 86:5.
showed 62:18.
showing
 40:17.
shows 43:9.
shut 33:21,
 35:12, 35:23,
 35:25, 36:2,
 36:18,
 36:23.
side 47:16,
 53:12.
sidewalk 5:19,
 71:14.
similar 7:7.
simply 60:20,
 69:5.
sin 60:1.
sir 9:1.
sit 9:22,
 35:10,
 36:21.
Sitting 46:3,
 47:15, 48:18,
 49:2, 49:16,
 50:21, 78:9,
 80:6.

situation
 56:12,
 66:22.
skirt 72:8.
slightly
 79:19.
slots 66:4.
slow 70:18.
slowness
 7:25.
somebody 10:7,
 36:25, 58:17,
 72:15, 79:21,
 82:17, 82:19,
 82:23, 83:2,
 83:7, 83:18,
 84:24.
Somehow 16:1,
 20:1, 20:25,
 21:19.
someone 33:23,
 33:24, 56:3,
 56:4, 57:20,
 61:18, 62:11,
 65:4.
someplace
 80:4.
son 42:8.
soon 51:14.
Sorry 14:8,
 19:11, 22:6,
 25:5, 33:15,
 34:17, 37:10,
 54:13, 55:25,
 57:8, 61:15,
 62:4, 66:11,
 68:17, 74:8,
 79:24.
sort 6:16,
 79:17, 83:5,
 83:18.
sought 25:24,
 26:10.
spaced 64:7.
speaking
 27:4.
Special 4:6,
 80:12.
specific 7:1,
 62:7, 69:19,

74:7.
Specifically
 25:1, 30:5,
 36:7, 36:9,
 40:5, 47:17,
 47:19, 49:14,
 49:22, 57:13,
 60:23, 62:3,
 62:8, 63:21,
 78:23.
speculation
 46:11,
 46:12.
spend 13:18.
Spirit 40:11,
 57:3,
 60:13.
spoke 52:18.
squad 6:14.
staff 51:8,
 51:15, 51:19,
 52:13.
stamp 58:16.
stand 9:16,
 10:7, 15:12,
 16:6, 19:4,
 27:5, 32:25,
 45:21,
 78:10.
Stand-by 2:9.
standing 52:10,
 52:11.
start 5:13,
 27:2, 73:24,
 74:11,
 86:5.
started 10:8,
 27:6, 29:21,
 29:25, 40:17,
 72:5.
state 27:19.
States 1:1,
 1:5, 1:19,
 1:24, 2:21,
 10:21, 10:25,
 28:5.
statute 34:4.
stay 60:12,
 68:3, 68:4.
stayed 28:13,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327-HDM Document 554 ENSE MOTION IN LIMINE 3 of 406 Page ID #: 874
EXHIBIT A - DEFENSE MOTION IN LIMINE
1389

28:14, 52:2,
67:18, 67:21,
67:24, 67:25,
73:16.
stenographic
86:11.
step 9:1, 9:10,
9:11, 23:20,
26:16.
Stephen 2:9.
sticking
48:8.
stop 10:9,
27:7, 73:18,
73:20, 73:21,
73:25,
78:5.
stopping
15:11.
straight
40:18.
stream 5:14.
streaming
5:7.
Street 1:26,
1:44, 5:19.
stricken
77:10.
strictly
34:4.
struggle
21:18.
stuff 42:10.
subject
29:22.
suggest
85:14.
suit 44:11,
69:16.
Suite 1:38,
1:45.
sunglasses
72:22.
super 42:20.
support 85:16,
85:20.
supporting
16:9.
supposed 68:11,
69:21,

69:24.
Surgi-clinic
6:9, 6:19,
6:24, 7:3,
7:7, 31:2,
31:6, 49:1.
surrounded
83:16.
Sustained 21:6,
60:17.
swear 9:12,
9:21,
26:17.
sweatshirt
17:25.
sworn 9:19,
26:20.
.
.
< T >.
T. 2:19,
86:15.
tactics 36:4.
taken. 24:9.
talk- 37:23.
talked 12:10,
35:4, 36:10,
37:1, 38:3,
40:24, 54:24,
56:1, 56:18,
56:19, 56:20,
56:22, 56:24,
57:2, 62:8,
64:12, 64:24,
68:21,
70:9.
talks 74:18.
technique
36:12, 37:2,
61:3.
techniques
35:19,
36:13.
Tennessee 30:6,
34:17.
Tenure 74:3.
term 30:21,
32:17.
terminate
11:19, 13:2,

13:5, 13:11,
25:24,
26:10.
terms 41:7,
47:3, 55:22,
57:7, 63:13,
63:18, 65:21,
65:22, 73:25,
74:12, 78:10,
79:22, 80:1,
80:8, 85:22,
85:24.
testified 9:20,
26:21, 80:22,
84:22.
testify 45:21,
76:11, 85:17,
85:25,
86:1.
testifying
76:13, 76:17,
80:13.
testimony
16:11, 24:22,
25:21, 25:22,
25:25, 75:2,
76:9, 78:1.
Texas 28:11.
text 4:12,
4:18, 5:3.
THE CLERK 9:15,
26:18,
26:23.
THE WITNESS
9:2, 9:24,
10:3, 10:6,
10:12, 23:21,
23:23, 80:17,
81:8, 81:12,
81:25,
82:5.
themselves
32:10,
82:8.
they'll 33:6.
they've 83:15,
83:17.
they. 62:2.
thinking 65:4,
75:20, 75:25,

76:13.
thinks 46:13.
third 12:11,
12:13, 14:20,
14:22, 15:3,
15:6, 49:21,
61:10, 61:22,
86:3.
though 66:23,
78:5, 84:6.
Three 12:19,
13:1, 13:17,
13:18, 82:16,
83:16.
Thursday 5:9,
75:16, 76:1,
77:24.
tight 83:24.
till 43:9,
79:13.
tired 80:6.
Today 16:11,
16:13, 16:23,
44:6, 50:13,
53:6, 74:25,
76:12.
together 29:18,
41:17.
tomorrow 73:25,
74:11, 75:15,
75:21, 76:8,
76:22, 77:25,
78:8, 78:9,
78:20.
took 24:13,
71:19,
73:5.
top 17:23,
54:10,
77:18.
totally
79:20.
touch 20:15.
touching
20:11.
tough 82:5.
towards 43:5.
traditional
35:7, 35:8.
TRANSCRIPT

1:17, 2:48,
86:11.
transcription
2:49.
transport
80:18.
travel 74:25,
75:2.
traveled
6:11.
treatment 14:5,
14:18.
trespassed
56:23.
trespassing
55:23.
trial 74:2,
74:9, 75:23,
77:2, 77:8,
77:12, 79:2,
79:17, 82:17,
84:12,
86:3.
trials 79:15,
79:16.
trickle 71:6.
trickled
70:17.
tried 6:17,
15:21, 21:1,
21:2, 21:8,
23:10,
41:24.
tries 24:5.
trip 39:6,
40:12.
trouble 14:2,
14:5, 14:16,
14:18, 15:7,
74:19, 79:19,
79:22.
true 17:7.
truly 24:10.
truth 9:21.
try 15:16,
18:13, 20:23,
21:3, 33:20,
35:10, 35:11,
35:22, 36:18,
36:22, 60:12,

60:21, 69:25,
73:24, 78:20,
79:5,
85:22.
trying 16:9,
18:2, 23:11,
35:25, 41:18,
60:15,
83:8.
Tuesday 74:7.
turn 49:4.
Turned 25:18,
28:4, 28:11,
81:22,
82:7.
two 4:24, 25:2,
28:18, 29:16,
30:5, 57:6,
78:9.
type 29:13,
35:13.
types 32:20,
35:4.
.
.
< U >.
Ultimately
12:15,
77:1.
uncomfortable
40:25, 42:20,
45:14.
understand
34:7, 60:2,
80:15, 82:25,
83:22.
understood
32:16,
43:12.
unexpected
56:13.
Unfortunately
48:9,
79:15.
United 1:1,
1:5, 1:19,
1:24, 2:21,
10:21,
10:25.
unless 79:2.

until 28:2,
28:10, 28:11,
28:21, 48:1,
83:15.
upstairs
50:3.
using 35:18,
36:1, 57:2.
.
.
< V >.
vague 69:3.
vehicle 6:11.
verses 57:16.
vibes 54:23,
55:3.
vicinity 61:10,
63:25.
victim 30:15.
Video 5:11,
5:13, 5:22,
5:23, 6:2,
9:7, 16:12,
16:16, 16:23,
17:5, 17:21,
18:11, 18:16,
18:24, 18:25,
20:7, 20:22,
21:12, 21:21,
23:13, 58:6,
58:14, 58:22,
58:25, 59:2,
59:8.
violent 45:17,
45:18,
47:1.
visible 8:4.
voice 10:5,
33:1, 33:13,
63:10, 66:10,
82:6.
voiced 49:20.
voluntary
76:10.
volunteer
61:25,
63:4.
volunteered
63:18, 63:20,
70:3.

volunteering
62:21,
63:23.
vs 1:8.
.
.
< W >.
wait 23:25,
24:11, 27:2,
74:14, 79:13,
79:23, 79:24,
82:14.
waited 48:1.
waiting 9:9.
walk 39:7,
67:3, 72:5,
72:16.
walked 58:8.
walking 43:4,
50:3, 67:17,
73:13, 81:8,
81:22.
wanted 8:3,
24:17, 25:7,
25:19, 31:11,
38:13, 41:9,
55:20, 60:11,
78:8, 81:20,
82:8,
84:11.
warning 61:10,
61:22.
warnings 61:12,
61:19.
Washington
1:10, 1:27,
1:32, 1:39,
1:46, 2:12,
2:24, 5:20,
11:12, 11:18,
13:12, 13:19,
31:2, 31:6,
49:1.
watch 16:23,
23:13.
watched 17:3.
waves 70:23.
ways 35:19.
weak 33:1.
wearing 44:8,

44:10, 44:11, 47:23, 49:8, 53:8, 53:10, 58:11, 58:12, 58:13.
whatever 41:19, 80:25.
whenever 48:15.
Whether 22:16, 22:20, 26:1, 27:8, 46:6, 46:18, 46:25, 47:1, 55:20, 63:12, 65:7, 73:3, 76:11, 85:24.
whoever 83:6.
whole 6:22, 41:11, 41:17, 42:8, 42:20, 52:23, 58:24, 77:7, 82:2.
wife 42:16.
will 9:4, 10:10, 10:16, 12:9, 12:21, 24:22, 24:25, 34:3, 40:10, 40:11, 44:13, 53:13, 60:4, 66:5, 74:13, 75:16, 76:7, 76:9, 77:1, 77:2.
William 51:23, 67:25.
willing 55:21, 61:5, 82:7.
wind 83:7.
wish 78:23.
withdraw 46:20.
within 6:21, 82:24, 85:7.
without 17:17, 24:12, 85:18.
WITNESS 8:14,

8:16, 9:3, 9:4, 9:11, 9:19, 9:21, 25:4, 25:6, 25:12, 26:12, 26:20, 26:22, 43:22, 74:24, 75:11, 76:3, 76:5, 78:4, 78:12, 81:14, 81:21, 83:2, 83:15, 84:22.
witnesses 80:9, 81:2, 82:10, 82:15, 83:17, 85:23, 85:25.
woman 20:11, 21:3, 21:7, 22:3, 22:7, 29:1, 47:22, 48:3, 58:8.
women 30:21, 36:10, 46:5, 46:8, 46:15, 46:17, 46:21, 47:18.
word 27:4, 30:12, 31:22, 32:3, 32:7, 33:11.
work 11:9, 27:24, 39:11, 39:12.
worked 29:18, 82:24.
working 10:4, 27:21, 83:13.
world 42:8.
worried 45:16.
worse 86:2.
woven 57:18.
write 56:9.
written 31:15.
.
.

< Y >.
years 11:8, 27:18, 28:3, 28:18, 28:20, 28:21, 31:15.
yellow 47:6, 47:11.
yourself 17:3, 20:23, 27:15, 30:15, 32:13, 35:9, 35:19, 35:20, 57:14, 80:10.
Yup 10:22, 65:14.
.
.
< Z >.
Zastro 38:11, 38:15, 38:16, 39:9, 39:15, 39:25, 41:19, 42:12, 55:11, 68:2.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Case 3:22-cr-00327-HSO Document 354 Filed 12/04/23 Page 106 of 106 PageID #877
EXHIBIT A - DEFENSE MOTION IN LIMINE
1392