

**User Name:** Jodie Bell

**Date and Time:** Thursday, November 30, 2023 11:46:00AM CST

**Job Number:** 211604551

## Document (1)

1. *United States v. Helbrans, 2021 U.S. Dist. LEXIS 196720*

   **Client/Matter:** -None-

   **Search Terms:** "United States v. Helbrans

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

# *United States v. Helbrans*

United States District Court for the Southern District of New York

October 12, 2021, Decided; October 12, 2021, Filed

S2 19-CR-497 (NSR) (01) (02)

**Reporter**
2021 U.S. Dist. LEXIS 196720 *; 2021 WL 4778525

UNITED STATES OF AMERICA -v- NACHMAN HELBRANS and MAYER ROSNER, Defendants.

**Prior History:** *United States v. Helbrans*, 2021 U.S. *Dist. LEXIS 17549 (S.D.N.Y., Jan. 29, 2021)*

## Core Terms

Minors, marriage, kidnapping, motions, Defendants', conspiracy, co-conspirator, religious, pro se, custody, declarant, family court, motion in limine, sexual activity, Indictment, courts, standby counsel, married, parental kidnapping, parental rights, transported, exhibits, Co-Defendants, allegations, abduction, consented, introduce, pre-trial, leaders, admits

**Counsel: [*1]** For Nachman Helbrans, Defendant (7:19-cr-00497-NSR-1): Bruce D. Koffsky, LEAD ATTORNEY, Koffsky & Felsen, LLC, Stamford, CT; Peter Joel Schaffer, Peter J. Schaeffer, Attorney At Law, Bronx, NY.

For USA (7:19-cr-00497-NSR-1, 7:19-cr-00497-NSR-2), Plaintiff: James Alan Ligtenberg, LEAD ATTORNEY, Jamie Ellen Bagliebter, U.S. Attorney's Office, SDNY (St Andw's), New York, NY; Samuel S Adelsberg, LEAD ATTORNEY, United States Attorney's Office, SDNY, New York, NY.

For Mayer Rosner, Defendant (7:19-cr-00497-NSR-2): Susanne Brody, LEAD ATTORNEY, Federal Defenders of New York Inc. (White Plains), White Plains, NY; Martin Samuel Cohen, Federal Defenders of New York Inc. (NYC), New York, NY.

**Judges:** HON. NELSON S. ROMÁN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** NELSON S. ROMÁN

## Opinion

OPINION & ORDER

Nelson S. Román, United States District Judge:

This case involves the removal of two minors ("the Minors") from their Mother in New York, by members of Lev Tahor, an "ultra-orthodox Hasidic Jewish community currently in Guatemala,"[1] of which the Mother and the Minors were previously a part. Defendants Nachman Helbrans ("Helbrans") (01) and Mayer Rosner ("Rosner")[2] (02) (collectively, "Defendants" or "the Defense") are members of Lev **[*2]** Tahor charged in a six-count superseding indictment for their involvement in the removal of the Minors with (1) conspiracy to transport a minor with intent to engage in criminal sexual activity, in violation of *18 U.S.C. §§ 2423(a)*, *(e)*; (2) conspiracy to travel with intent to engage in illicit sexual conduct, in violation of *18 U.S.C. § 2423(b)* and *(e)*; (3) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses the secure area of an airport, in violation of *18 U.S.C. § 371*; and (4) two counts of international parental kidnapping, in violation of *18 U.S.C. § 1204*, in connection with a December 2018 kidnapping. (Superseding Indictment ("S2"), ECF No. 229.)[3] Helbrans is also charged with an additional count

---

[1] The quoted description is taken from Defendant Helbrans's draft affidavit, which the Defendants filed as an exhibit to their motions *in limine*. (Ex. A. to Defs. MIL "Helbrans Draft Aff." (ECF No. 355-1).)

[2] Mayer Rosner's son, Jacob Rosner, and brother Aron Rosner are Co-Defendants in this case. Any reference to "Rosner" in this opinion is to Mayer Rosner. Any reference to Jacob or Aron includes their first names or first initials.

[3] On September 28, 2021, while the motions *in limine* were pending before the Court, a gran jury returned another superseding indictment (S3) (ECF No. 358.) S3 is substantively similar to S2—no charges against any Defendants are changed—except that it removes reference to

of international parental kidnapping in violation of *18 U.S.C. § 1204* in connection with a March 2019 attempted kidnapping.[4] Defendants' requests to represent themselves *pro se* were granted by this Court following in-person hearings in February 2021. (ECF Nos. 183 and 194.) A trial of Helbrans and Rosner is scheduled to commence on October 18, 2021.

The Government has moved *in limine*: (1) for the admission at trial of (A) testimony regarding instances of uncharged criminal **[*3]** conduct, wrongs, or bad acts in connection with the rules within the Lev Tahor community; (B) statements by co-conspirators in furtherance of the conspiracy which are admissible pursuant to *Rule 801(d)(2)(E)* and/or statements against the declarants' penal interest under *Rule 804(b)(3)*; and (C) certain business records on the basis of written declarations pursuant to *Rule 803(6)* and *902(11)*; and (2) to preclude the defense from raising irrelevant arguments at trial including: (A) historic persecution of Lev Tahor by the United States and Israel, (B) discriminatory prosecution based on their religious views, (C) that because the marriage between Minor-1 and J. Rosner was predicated on their religious beliefs, it cannot form the basis for a criminal charge; (D) that their conduct must be excused because the Minors consented to traveling with the Defendants out of the country and Minor-1 consented to have sex with an adult; and (E) the family court order giving the Mother custody of the Minors was fraudulently obtained. ("Gov't MIL" (ECF No. 352).)

Defendants[5] have also moved *in limine*, and appear to seek (1) an order from the Court prohibiting the Government's use of the terms (A) "kidnapping" or "abduction" to describe the Defendants' **[*4]** actions because the Government admits the Minors were not removed by force, (B) "victims" to describe the Minors, or (C) "cult" or otherwise characterize Lev Tahor as a religious community in which leaders "control" the minds of the members of group or otherwise coerce them to practice their religion in a certain way. ("Defs. MIL" (ECF Nos. 353 and 355) and "Defs. Opp'n" (ECF No. 371).) Broadly construed, Defendants papers and the exhibits attached thereto also suggest that Defendants intend to assert the following defenses at trial (1) they are not guilty of kidnapping and kidnapping conspiracy because (A) as the Government admits, no force was used against the Minors; (B) Defendants were rescuing the Minors from abuse, and therefore "unlawful" exercise of parental rights by the Mother; and (C) the Family Court order was improper and has no legal effect; and as to (2) Minor-1 consented to marry, be transported, and engage in sexual activity with Jacob Rosner, and any sexual relations between them were within their religious marriage, and therefore the sex trafficking charges do not hold water.[6] (*Id.*)

The Court addresses the issues in turn.

## BACKGROUND

### I. The Government's Allegations [*5] [7]

---

[a] Guatemalan Statute and clarifies the allegations against Matityau Moshe Malka. Because Helbrans and Rosner have not yet been arraigned on S3, this Opinion and Order cites to S2; however, the rulings would apply with equal force had the Defendants already been arraigned on S3 and, accordingly, the Court has included parallel citations.

[4] The superseding indictments also charge A. Rosner (03), Jacob Rosner (04), Matityau Moshe Malka (05), Yakov Weingarten (06), Shmiel Weingarten (07), Yoil Weingarten (08), and Mordechay Malka (09). The Court has set trial dates for Jacob Rosner and Mordechay Malka to commence in May 2022 and for A. Rosner and Matityau Moshe Malka to commence in June 2022. The Weingartens have not appeared before this Court; the Court understands that the Weingartens are currently in custody in Guatemala awaiting extradition to the United States in connection with this matter. (*See* Ex. J to Defendants' Motions *in Limine*, hereinafter "Weingarten Affidavit" (ECF No. 355-21).)

[5] Mayer Rosner filed the motion (ECF Nos. 353 and 355),

which Nachman Helbrans requested to join (ECF No. 354). By order dated September 27, 2021, the Court granted Helbrans's request to join Rosner's motion. (ECF No. 356.) One set of opposition papers was filed by standby counsel for Rosner, but signed by both Defendants. (ECF No. 371.) Helbrans's standby counsel filed a letter requesting to join the opposition filed by Rosner (ECF No.

[6] Insofar as they also seek additional bail review or renew their motion to disqualify the Court (*e.g.* Defs. MIL at 21 (disagreeing with the Court's denial of Defendants' motion to disqualify), Defs. Oppn at these issues were addressed by the Court during an in-person status conference on September 13, 2021 and Defendants have not adduced any new information that would lead the Court to disturb its prior denials.

[7] The Court recites the Government's allegations, including those contained in charging instruments such as the various indictments, because charging instruments are intended "to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United*

## A. Lev Tahor and the "Marriage" of Minor-1

The Defendants are members of Lev Tahor, a Jewish religious community of about 250 members founded in the 1980s by the father of Defendant Helbrans ("the late Rabbi Helbrans"). (S2 ¶¶ 2,3; S3 ¶¶ 2, 3.) Defendant Helbrans took over as the community's leader after his father passed away in 2016 or 2017. (S2 ¶ 3; S3 ¶ 3.) Regardless of their age, all brides in the Lev Tahor community are required to have sex with their husbands on predetermined intervals and new brides and grooms are instructed by community leaders on when and how to have sex before they are married. (S2 ¶ 7; S3 ¶ 7.)

In or about 2017, Helbrans arranged to have Minor-1, his then-twelve-year-old niece, engaged to be religiously "married" to J. Rosner, who was eighteen years old at the time. (S2 ¶ 6; S3 ¶ 6.) Minor-1 and J. Rosner were religiously "married" the following year when she was thirteen and he was nineteen. (S2 ¶ 6; S3 ¶ 6.) They were never legally married. (S2 ¶ 6; S3 ¶ 6.) They immediately began a sexual relationship with the goal of procreation. (S2 ¶ 6; S3 ¶ 6.)

## B. Mother and Minors Relocate to United States

In or around early November 2018, the Mother and her six children, **[*6]** including the Minors, left Lev Tahor and relocated to the United States. (S2 ¶ 8; S3 ¶ 8.)

On or about November 14, 2018, the Kings County Family Court in Brooklyn, New York (the "Family Court") granted the Mother temporary sole custody of her six children, including the Minors, and enjoined the children's father, Aaron Teller ("Teller"), a leader in the Lev Tahor community not named as a defendant in this case, from having any communication with the children. (S2 ¶ 8; S3 ¶ 8.) The orders of the Family Court are

_States v. Dupre, 462 F.3d 131, 140 (2d Cir. 2006)._ The Court has no opinion on the truth of the facts alleged. Rather, the Court provides this background because it is the Government's burden to adduce evidence at trial from which the jury can conclude beyond a reasonable doubt that the Defendants are guilty of each and every element of each and every crime charged. While the Government must prove each and every element charged, the Defendants bear no burden of proof. The purpose of this background, and this opinion more broadly, is to attempt to focus the issues for trial, including the evidence and defenses that will be offered, so as to minimize interruptions of the trial due to legal discussions that must take place outside of the presence of the jury.

collectively referred to as "the Family Court Order."

## C. December 2018

After the Mother and her children left Guatemala, the Defendants and others devised a plan to return the Minors, then fourteen and twelve years old, to Lev Tahor. (S2 ¶ 9; S3 ¶ 9.) At approximately 3:00 A.M. on or about December 8, 2018, Helbrans, Mordechay Malka, J. Rosner, and others removed the Minors from a home in Woodridge, New York. (S2 ¶ 10; S3 ¶ 10.) They, along with others, took the Minors to a hotel where they were provided with new clothes before they were driven to Scranton International Airport in Pennsylvania. Helbrans and the Minors, dressed in secular clothing, and using passports bearing the **[*7]** names of two of Helbrans's children proceeded through airport security in Scranton, flew to Washington, D.C., then to Texas, and then took a bus across the border to Mexico. (S2 ¶ 11; S3 ¶ 11.) Other Defendants, including Mordechay Malka and J. Rosner, took separate routes out of the country to Mexico. (S2 ¶ 12; S3 ¶ 12.) Once in Mexico, Helbrans and others transported the Minors to several hotels and residences with assistance from Lev Tahor members in the United States, Mexico, and Guatemala. At various times, Helbrans and the Minors were met by Rosner, J. Rosner, Matityau Moshe Malka, and others. (_Id._)

On or about December 18, 2018, Mexican law enforcement raided a house in San Miguel Tlaixpan, Mexico, and detained Helbrans, Rosner, J. Rosner, and Matityau Moshe Malka, among other individuals. On December 26, 2018, officials from Mexico's immigration authority, Instituto Nacional de Migración ("INM"), informed the FBI that INM had elected to deport Helbrans, Rosner, J. Rosner, and Matityau Moshe Malka—all of whom were and are U.S. citizens—from Mexico and deliver them into the custody of the FBI. On December 27, 2018, two INM officials accompanied Helbrans, Rosner, J. Rosner, and **[*8]** Matityau Moshe Malka on a commercial flight from Mexico City to New York. The FBI arrested Helbrans, Rosner, and J. Rosner upon their arrival at John F. Kennedy International Airport (Minute Entries dated December 27, 2018), pursuant to a Complaint alleging that Helbrans, Rosner, and J. Rosner conspired to kidnap two victims. (Dkt No. 18 MJ 10939, ECF No. 1.) The Complaint charged Helbrans, Rosner, and J. Rosner with violating _18 U.S.C. §§ 1201_ and _2_. (_Id._).

On or about December 27, 2018, the Minors were

recovered at a hotel in Mexico. (S2 ¶ 13; S3 ¶ 13.) At the time, the Minors were accompanied by Shmiel and Yoil Weingarten (*id.*).[8]

In and around December 2018, the entire Lev Tahor community was seeking asylum in Iran. (S2 ¶ 14; S3 ¶ 14.)

### D. March 2019

In or about March 2019, approximately three months after the Minors were recovered in Mexico, Helbrans, Yakov Weingarten, Matityau Moshe Malka, and others, attempted to remove Minor-1 a second time. (S2 ¶ 15; S3 ¶ 15.) On March 26, 2019, a Complaint was filed charging Matityau Moshe Malka with conspiracy to kidnap and conspiracy to obstruct justice in violation of *18 U.S.C. §§ 1201*, *1512*, and *2*. (Dkt No. 19 MJ 3011, ECF No. 1.) Matityau Moshe Malka was arrested the same day. **[*9]** (Minute Entry dated March 26, 2019.)

### E. The 2019 Indictments

On July 8, 2019, the Government sought and obtained a four-count Indictment charging (1) all Defendants with conspiracy (i) to commit international parental kidnapping, (ii) to unlawfully use a means of identification, and (iii) to enter by false pretenses the secure area of an airport, in violation of *18 U.S.C. § 371*; (2) all Defendants (except Mordechay Malka) with two counts of international parental kidnapping (one for each Minor in the December Kidnapping), in violation of *18 U.S.C. § 1204*; and (3) Helbrans, Matityau Moshe Malka, and Yakov Weingarten with another count of international parental kidnapping (for the March 2019 attempted kidnapping of Minor-1), in violation of *18 U.S.C. § 1204*. The Government charged Mordechay Malka and Yoil, Shmiel, and Yakov Weingarten, in a separate sealed superseding indictment containing the same counts and allegations, S1 19 Cr. 497 (ECF No. 52), because, at the time, these four Defendants were at-large. None of the indictments charge any of the Defendants with violating *18 U.S.C. § 1201*.

### F. Hague Convention Proceedings

On May 29, 2019, Teller, the father, filed a petition in the United States District Court for the Eastern District of New York ("the **[*10]** Hague Court"), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), seeking the expedited return of his six children to Guatemala. *Teller v. Helbrans*, 19 Civ. 3172 (SJB) (E.D.N.Y.) (the "Hague Case") at ECF No. 1. On October 22, 2019, the Hague Court denied Teller's petition with prejudice, holding that Teller had "engaged in a pattern and practice of misconduct and paid little attention to and disregarded the obligations attendant to a litigant in a federal civil proceeding," noting that Teller had "repeatedly told [the court] that he [had] no intention of appearing for any trial," and that "[f]rom the start, Teller has resisted discovery, failed to attend any proceeding, and clearly never intended to appear in the United States." (Hague Case, ECF No. 110.)

On December 9, 2019, Teller filed a notice of appeal. (Dkt. No. 19-4063 (2d Cir.) at ECF No. 1.) On February 7, 2020, the Second Circuit dismissed the appeal because Teller failed to file a required form. (*Id.* at ECF No. 21).

### G. March 2021

In or about March 2021, CC-1, a member of Lev Tahor, approached the Minors in New York and attempted to remove them again. (S2 ¶ 16; S3 **[*11]** ¶ 16.) At the time, CC-1 possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Minors. By late March 2021, CC-1 had returned to Guatemala. (*Id.*)

## II. **Defendants' Allegations**[9]

Defendants allege that the Mother was always "difficult" and often yelled at and beat her children.

---

[8] Shmiel and Yoil Weingarten returned to Guatemala but have since been detained in conjunction with this case and are awaiting extradition from Guatemala to the United States. (*See* Weingarten Affidavit.)

[9] The Court has surmised the following factual allegations in sum and substance from Defendants' voluminous submissions, including the draft affidavits appended to Defendants' motion papers. These submissions quote heavily from transcribed recordings of phone calls. Defendants are not required to put on a case; however, some background on their factual allegations is necessary to the Court's preliminary evidentiary rulings.

## A. The Mother Causes Tension Within Lev Tahor

Defendants allege that Minor-1 insisted on marrying Jacob Rosner after Minor-1 had significant tensions with her Mother, and both of her parents consented to the union. The Mother helped to set up the marital home for Minor-1 and Jacob Rosner. At some point, Minor-2 moved into the home of Minor-1 and Jacob Rosner after having disagreements with his Mother. At some point, Minor-1 stopped speaking to or interacting with her Mother due to the ongoing and increasing strain her Mother was causing in the community.

The Mother had significant disagreements with Teller and community leadership, including Helbrans, and threatened to leave the community. One of the fiercest disputes involved the expulsion of a group of Latino converts from Lev Tahor. The Rabbinic Court, which Teller leads, **[*12]** expelled the Latino converts because it determined that they had enabled drug production and trafficking within the community and brought non-kosher foods into the community. The Mother opposed the expulsion.

Teller and Helbrans pleaded with the Mother not to leave. When she refused, they proposed that the Mother could leave either to lead the Latino converts in Guatemala City or go to Canada—with the three youngest children while leaving behind the three oldest children, including the Minors. The Mother refused.

## B. The Mother's Abductions

Before dawn on October 12, 2018, the Mother disappeared to Guatemala City with two of her children and the passports of all six children. While there, the Mother called Teller and told him that she was planning to go to the United States with all six children. Teller again pleaded with the Mother to have the custody issues resolved by the Guatemalan or rabbinic courts.

At approximately 3 A.M. on October 14, 2018, the Mother returned to Lev Tahor with approximately twenty vigilantes to remove the remaining children from Lev Tahor by force. The vigilantes allegedly included some of the Latino converts as well as wealthy "activists" from New York whose **[*13]** community, Kasho, had a longstanding rivalry with Lev Tahor. In the course of the incident, Teller was violently beaten with a metal rod. Minors 1 and 2 resisted the vigilantes by kicking and screaming. More community members were drawn to the commotion to protect the Teller children. The Mother was only able to leave that night with one additional child.

Following the Mother's violent kidnapping attempt, on October 28, 2018, Teller took the three children that remained with him, including the Minors, to Mexico. The same day, the Mother filed a missing children claim with Guatemalan authorities falsely claiming that her children had gone missing on October 4, 2018. She allegedly portrayed herself as a foreign tourist concealed operative details that would have debunked her report including Teller's custody of the children or the family's residency status in Guatemala. Guatemalan authorities activated an amber alert for the allegedly missing children. Guatemalan authorities appeared the next day at the Lev Tahor compound to follow up on the report of missing young Canadian tourists. Teller and his children were not there, and unnamed Lev Tahor community members explained to the authorities **[*14]** that Teller and the three children were neither present nor missing.

On October 31, 2018, the Mother reappeared at the Lev Tahor compound with an attorney, local police, and a judge, and met with Helbrans. Helbrans related that Teller and the three children were in Texas. Helbrans tried again to get the Mother to participate in custody proceedings in Guatemalan or rabbinic courts, which the Mother refused.

On November 7, 2018, the Mother took the three children in her custody to the United States. Defendants allege that member of the Lev Tahor community watched the Mother and the children—accompanied by the Mother's other brother, an attorney, and a member of the rival Kasho community in New York—go through the international airport. Defendants allege that a leader of Kasho bragged that to Mordechay Malka that he personally sponsored the international abduction and persuaded the Mother to come to the United States even though she wanted to stay in Guatemala.

When Teller learned that the Mother had taken three of the children to the United States, he attempted to file a Hague Petition claim; however, he learned that he would need valid identification in order to initiate the petition, **[*15]** which he did not have because the had possession of the passports of all six children. Teller went to the United States consulate in Mexico to apply for passports for the three children with him so that they could return to Guatemala. Defendants aver that Teller was detained for many hours and separated from his children. Teller and his travel companions including Jacob Rosner, were turned over to Mexican immigration authorities. By the time they were released, Teller could

not find his children despite retaining a lawyer and repeatedly calling the consulate.

After Minor-1 and her two siblings were separated from their father, they were brought non-Jewish clothing, provided non-Kosher food, and told to interact with other detained non-Jewish children. On about November 11, 2018, the Mother and several New York associates flew to Mexico, retrieved the three children, including the two Minors, and flew them to New York on a private plane funded by her New York associates despite protestations from the children that they wanted to go back to Lev Tahor and their father. One of the New York associates bragged to Mordechay Malka in a recorded conversation that he spent over $500,000 to coordinate [*16] the private plane and ensure that the Mother could get to New York with her remaining children.

## C. Mistreatment of the Teller Children in the United States

Upon arrival in New York, the children were taken by United States government officials and ACS to a hospital for medical screening, which was focused on finding abuse and malnutrition.

The consulate finally told Teller that his remaining children had been taken to New York and are subject to the control of the NYC Administration for Children's Services (ACS) in Brooklyn. He immediately went to New York and, on or around November 14, went to ACS where, after being forced to wait for many hours, was served with the orders granting sole custody to the Mother and prohibiting him from contacting the children. Defendants allege that the Mother told multiple lies to ACS in order to get custody and, further, that her accomplices may have paid off government staff to get it.

In the Mother's custody, the Teller children, including the Minors, were forced to live apart from each other and with strangers, and that the Mother allowed Kasho Members to verbally, physically, and sexually abuse them. They further allege that the Mother cut off all [*17] communication between the Minors and Lev Tahor and therefore, that Defendants and their community members made heroic efforts to surreptitiously provide phones to the Minors so that they could communicate with their family and community.

On November 16, 2018 Minor-1 called Yoil Weingarten, who was with Rosner at the time, to whom Minor-1

described that she was separated from her brothers and being forced to stay with strangers in Monroe, New York. Rosner told Minor-1 to contact his brother, Aron Rosner to assist her. Immediately after this call, Aron Rosner received a call from ACS. Aron Rosner left many voicemails for ACS, begging that they help the Teller children who were being detained against their will and faced grave danger from sworn enemies of Lev Tahor. Aron Rosner traveled to Monroe and provided Minor-1 with, among other things, clothing her father brought from Mexico, a cell phone, and a note Shmiel Weingarten had prepared for her stating her rights as a foster child.

In the early hours of November 18, 2018 Minor-1 called Shmiel Weingarten, dictating to him an emancipation petition to submit on her behalf to the Family Court. She signed the petition in front of a notary with [*18] the help of Shmiel Weingarten and tried to file the petition but was prevented by her Mother's associates, ACS staff, and the NYPD from doing so. Shmiel Weingarten was ultimately able to file Minor-1's emancipation petition on her behalf.

Defendants allege that Teller and Shmiel Wiengarten had a very hard time finding a lawyer that would help him secure the return of is children. They finally scheduled an appointment for November 26, 2018; however, hours before Teller was scheduled to go to the appointment, a watch group of the Mother's accomplices and threatened him. The NYDP dispersed the group but at least one member continued to harass Teller. The attorney requested a retainer of $25,000, which Teller did not have at the time but promised to raise quickly. When Teller returned to the guest house where he was staying his van was plastered with hateful messages and his family's personal information. Teller went to the Family Court to request a free legal aid attorney but was told that a judge had to approve such representation and would not be able to do so for over a month.

Mordechay Malka was told by a member of Kasho that Minor-1 was admitted to a psychiatric hospital to prevent [*19] her from running away or seeking legal help. Defendants allege that Minor-1 was never suicidal but was still locked up on suicide watch for fourteen days. The Mother told Minor-1 that her confinement at the hospital was justified because she keeps trying to run away. When a Kasho member picked Minor-1 up from the facility, he did not return her to the Mother but instead took her to a makeshift prison at an empty apartment he owns in Brooklyn. In this makeshift prison she was guarded by various members of Kasho.

Defendants further aver that Kasho members also closely watched Minor-2 and refused to provide him with kosher food.

**D. The 2018 Rescue Mission**

On or about November 29, 2018, Mordechay Malka learned that a Kasho leader was planning a holiday celebration in Woodridge, NY for the weekend of December 8, 2018. Defendants initially intended to merely encounter the Minors at the celebration to inform them of their legal right. However, Helbrans stated that the only help they could provide was to "liberate" the Minors because the Minors had no tools to otherwise vindicate their rights.

Defendants took various steps to secure the rescue of the Minors. For example, on or about December **[*20]** 5, 2018, Shmiel Weingarten, Mordechay Malka and others met at Helbrans' request in Brooklyn request to coordinate. Helbrans came to the United States via Mexico City on or around December 6, 2018. On or around that time, Shmiel Weingarten consulted Jacob Rosner and drove to Walmart to purchase secular clothing for the Minors and for Jacob Rosner who intended to go with Minor-1 to file her legal complaints after they rescued her.

A co-conspirator was able to visit Minor-1 prior to the rescue under the guise of bringing her kosher food and hid a cell phone for Minor-1. Defendants allege that Minor-1 thereafter coordinated with Shmiel Weingarten using the cellular phone to plan the rescue. Also on December 6, 2018 Jacob Rosner told Helbrans that he intended to help Minor-1 file legal complaints and Helbrans told Jacob Rosner that he should focus on getting back to Guatemala instead and booked him on a flight to California and instructed Jacob Rosner where to go from there. On December 7, 2018 collaborators at the party in Woodridge arrived at the party and scouted the best place for a vehicle to pick the Minors up. Defendants allege that the participants in the rescue met up at a hotel **[*21]** in Monticello and, once they got the all-clear call from Minor-1, went to rescue the Minors. Defendants intended to return the Minors to their father in Laredo.

After the Minors were rescued, they were provided secular clothing and brought to Scranton International Airport. Helbrans alleges that he did not have to present ID for the Minors and they all passed through the security checkpoint.

**III. Relevant Procedural History**

The Court set the initial schedule for pre-trial motions at a status conference on November 19, 2019. In February 2020, the Malkas requested a three-week extension of the briefing schedule that Co-Defendants either joined or did not object to and which the Government did not object to (ECF Nos. 65 and 66), which the Court granted (ECF Nos. 67 and 68). Before the motions were filed, Helbrans and Rosner sought leave to file *pro se* motions, (ECF No. 72), which the Court denied, stating that all motions shall be filed by counsel (ECF No. 73). On March 18, 2020, Jacob Rosner sought a one-month extension of the briefing schedule that Co-Defendants either joined or did not object to (ECF No. 74), which the Court granted (ECF No. 75).

On April 2, 2020, Mayer Rosner sought a **[*22]** hearing to consider his application for *pro se* representation, commonly referred to as a "*Faretta* hearing." (ECF No. 81.) By order dated April 6, 2020, in light of the COVID-19 Pandemic, the Court, *inter alia*, further extended the briefing schedule for the pre-trial motions and scheduled the *Faretta* hearing for Mayer Rosner to May 27, 2020. (ECF No. 82.) On May 13, 2020, Defendants requested a sixty-day extension of the pre-trial motion briefing schedule due to logistical impediments to attorney-client communication due to the COVID-19 pandemic (ECF No. 86), which the Court granted (ECF No. 87). In light of the COVID-19 Pandemic, the limited resources of the Courts, and the need to obtain a Yiddish interpreter, the Court, *inter alia*, adjourned the *Faretta* hearings for Mayer Rosner to July 29, 2020. (ECF No. 87.)

In June 2020, Helbrans requested a *Faretta* hearing (ECF No. 96), which the Court scheduled to July 30, 2020 (ECF No. 98). In mid-July 2020, the Defendants requested a further one-week extension of the pre-trial motion schedule due to additional voluminous discovery that, due to the COVID-19 Pandemic, Defendants were delayed in accessing. (ECF Nos. 99 and 100.) The Court granted **[*23]** this extension. (ECF Nos. 101 and 103.)

On July 19, 2020, Helbrans asked the Court to reschedule his *Faretta* hearing (ECF No. 104), which it did, rescheduling for September 15, 2020 (ECF No. 105). During a status conference on July 24, 2020, the Court adjourned the *Faretta* hearings and indicated that it would extend the motion schedule due to additional anticipated discovery. On November 20, 2020, Jacob and Aron Rosner requested that, since the Second

Circuit had issued a decision in *United States v. Houtar, 980 F.3d 268 (2d Cir. 2020)*, one week prior, Defendants be permitted to file their motions on or before December 4, 2020. (ECF No. 119).

On November 20, 2020, Helbrans, Matityau Moshe Malka, and Mordechay Malka filed their pre-trial motions. Helbrans moved (1) to dismiss the Indictment; (2) to suppress statements he made to law enforcement; (3) for an order directing various Government disclosures; and (4) for permission to join in any motions filed by his Co-Defendants. (ECF No. 120; *see* ECF Nos. 121 and 122.) Helbrans also asked the Court to schedule his *Faretta* hearing. (ECF No. 124.)

Matityau Moshe Malka moved (1) to dismiss the IKPCA Conspiracy and 2019 IPKCA Counts of the Indictment; (2) to suppress statements he made to law **[*24]** enforcement pitot to his arrest, (3) for *in camera* review of Grand Jury minutes; (4) for an order directing various Government disclosures; and (5) for permission to join in any motions filed by his Co-Defendants. (ECF No. 123.) Mordechay Malka moved (1) for an order directing various Government disclosures; and (2) for permission to join in any motions filed by his Co-Defendants. (ECF No. 125; *see* ECF No. 126.)

On December 2, 2020, the Court issued an order confirming the extension of Defendants' deadline to file their motions to December 4, 2020, directing the Government to file its opposition by February 5, 2021, and directing Defendants to file any replies by February 19, 2021. (ECF No. 130.) The Court also indicated that the scheduling of *Faretta* hearings would be addressed at the upcoming status conference. (*Id.*)

On December 4, 2020, Jacob, Mayer, and Aron Rosner filed their counseled motions. Jacob Rosner moved (1) to dismiss the Indictment; (2) for an order directing various Government disclosures; (3) for permission to join in any motions filed by his Co-Defendants; and (4) for permission to make any necessary subsequent motions. (ECF No. 131; *see* ECF Nos. 132 and 133.) Mayer **[*25]** Rosner moved for (1) a *Faretta* hearing as soon as possible; (2) a bill of particulars; and (3) permission to join in the motions of his Co-Defendants. (ECF No. 134.) Aron Rosner asked the Court for permission to join in the motions of Co-Defendants. (ECF No. 135.)

During a status conference on January 12, 2021, the Court directed that any additional pre-trial motions must be filed by January 22, 2021. At a status conference on January 29, 2021, Mayer Rosner and Helbrans renewed their requests for *Faretta* hearings to be scheduled as soon as possible.

On January 29, 2021 and February 5, 2021, the Court issued orders confirming the Government's disclosure obligations under *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*, and its progeny, which directed the Government to (1) disclose all *Brady* materials "to the defense promptly after its existence becomes known to the Government so that the Government may make effective use of the information," and (2) disclose any impeachment information under *Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)*, "sufficiently in advance of trial in order for the defendant to make effective use of it at trial." (ECF Nos. 153 and 168.) Also on February 5, 2021 the Government filed its memorandum in opposition to Defendants' motions. ("Opp'n Mem." (ECF No. **[*26]** 169).) On February 26, 2021, Defendants Jacob Rosner, Matityau Moshe Malka, and Modechay Malka filed reply memoranda. (ECF Nos. 190, 191, 193.)

Following *Faretta* hearings, Helbrans, Rosner and two Co-Defendants, were granted leave to represent themselves *pro se* and CJA counsel were appointed to serve as standby counsel. (ECF Nos. 183, 194, 195, 198.)

On April 19, 2021, the Government filed a Superseding Indictment (S2). (ECF No. 229.) With respect to the IPKCA Conspiracy Count, the Superseding Indictment alleges the following overt acts: "on or about December 5, 2018, [Mordechay Malka] rented a car for the purpose of transporting the Minors" (S2 ¶ 25a); "on or about December 5, 2018, [Jacob Rosner, Mordechay Malka, and Shmiel Weingarten] drove to a retail store to purchase clothing that the Minors could wear during the kidnapping to hide that they were ultra-Orthodox Jews" (S2 ¶ 25b); "on or about December 8, 2018, [Nachman Helbrans, Mayer Rosner, Shmiel Weingarten, Mordechay Malka, and Jacob Rosner] kidnapped the Minors from a residence in the Village of Woodridge, Sullivan County, New York, where they were staying with the Mother" (S2 ¶ 25c); "on or about December 8, 2018, [Nachman **[*27]** Helbrans] used his own children's identities to allow the Minors to enter a secure area of an airport, board an aircraft and—ultimately—to leave the United States" (S2 ¶ 25d); "on or about December 7, 8, 9, and 19, 2018, [Aron Rosner] sent money to co-conspirators via Google Pay in order to facilitate the removal and retention of the Minors" (S2 ¶

25e); "on or about December 16, 2018, [Mayer Rosner] called a co-conspirator not named as a defendant herein ("CC-2") to convince him to come to Mexico to evade law enforcement" (S2 ¶ 25f); "on at least four occasions in or about March 2019, [Matityau Moshe Malka] provided Minor-1 with cellular telephones in order to facilitate her removal and retention" (S2 ¶ 25g); and "in or about March 2021, CC-1 approached the Minors and attempted to take them back to Guatemala (S2 ¶ 25h).

Helbrans, Rosner, and their Co-Defendants were arraigned on the Superseding Indictment in May and June 2021. During these proceedings, the Government indicated that it had provided Defendants with a Proposed Protective Order and that once all Defendants had executed the Proposed Protective Order, which the Government provided to Defendants on or about May 12, 2021, the **[*28]** Government would produce the 3500 materials. (*See* Minute Entry dated May 20, 2021.)

On July 6, 2021, the Government informed the Court that it had made one additional discovery production consisting of (i) recently obtained jail records and video visits from Westchester County Jail, and (ii) materials related to the alleged March 2021 kidnapping by a member of Lev Tahor. (ECF No. 283.) The Government further indicated that it had provided all Defendants with a Proposed Protective Order on or about May 12, 2021 requiring their signatures, and that none of the pro se Defendants had signed and requested that the Court enter the Proposed Protective Order. (ECF No. 283.) On July 7, 2021, the Court entered the Protective Order. (ECF No. 285.)

On July 8, 2021, the Court issued an opinion and order denying with prejudice Defendants' counseled motions (1) to dismiss, (2) for a bill of particulars, (3) for *in camera* review of the grand jury minutes, and (4) for disclosure of the identities and statements of co-conspirators; and denying without prejudice as premature and/or moot Defendants' motions for orders directing pretrial disclosures of *Brady, Giglio*, 3500, and [Rule 404(b)](#) materials, and trial exhibits, **[*29]** demonstratives, and summary charts. ("Opinion on Pretrial Motions" (ECF No. 287, **[United States v. Helbrans](#)**, No. 19 Cr. 497 (NSR), 547 F. Supp. 3d 409, 2021 U.S. Dist. LEXIS 127618, 2021 WL 2873800 (S.D.N.Y. July 8, 2021).)

The Court repeatedly informed the Defendants before and after they were granted *pro se* status, that they would be permitted to supplement the counseled pretrial

motions. On July 8, 2021, the Court set the briefing schedule for any non-duplicative pretrial motions the *pro se* Defendants wished to file, pursuant to which moving papers were due August 9, 2021. (ECF No. 291.)

By letter dated July 12, 2021 the Government stated "on July 9, 2021, the Court instructed the Government (1) that a maximum of two defendants can be tried at once; (2) that the first trial in this case is scheduled for October 18, 2021; and (3) that the Government should submit a letter setting forth a proposal for which defendants should be tried together, and in what order." (ECF No. 229.) The Government indicated that the first trial would involve Helbrans and Rosner. (*Id.*)

No supplemental pretrial motions were filed on the due date of August 9, 2021, nor was an extension of that deadline sought. Instead, on August 11, 2021, the Court received a message from Helbrans through his standby counsel indicating that although Helbrans wished **[*30]** to file a motion both as to the charges originally brought and to the new charges now pending against him, he was unable to file his motion on or before August 9, 2021 due to "insurmountable difficulties." (ECF No. 306.) On August 12, 2021, the Court received a similar message from Rosner. (ECF No. 307.) On August 13, 2021, the Government responded to the Helbrans and Rosner letters indicating that it did not object to an extension of the deadline to file the *pro se* motions and suggesting that the Court should request information from the Defendants as to how much additional time they required. (ECF No. 308.)

August 13, 2021, the Court issued an opinion and order denying the two pending suppression motions, one of which was filed by Helbrans. ("Suppression Op." (ECF No. 309.))

On August 14, 2021, the Court issued an order (1) directing each *pro se* Defendant to confer with his standby counsel on or before Wednesday, August 18, 2021, to create a list of the motions he plans to file and for standby counsel to file those lists on or before Friday, August 20, 2021; (2) extending the time for all *pro se* Defendants to file their supplemental pre-trial motions to August 31, 2021; and (3) confirming **[*31]** the trial date and setting the pretrial deadlines for the trial of Helbrans and Rosner. (ECF No. 310.)

In compliance with the Court's order, the *pro se* Defendants through their standby counsel filed letters setting forth, *inter alia*, the motions they intend to file. (ECF Nos. 316, 317, 318, 319, and 320.) The Court directed the Government to respond to the "legal

issues" raised in the Defendants' letters. (ECF No. 321.) The Government misconstrued the Court's order and only addressed the legal issues "apart from their [proposed] substantive motions," raised by the Defendants' letters (i) their alleged inability to file motions due to a purported lack of tools and resources at Westchester County Jail ("WCJ"); and (ii) the alleged constitutional violations posed by their alleged inability to speak in Court and the Court's "ex parte" orders. (ECF No. 327.) The Government indicated that it would not object to the Defendants' apparent requests to extend the motion deadline and to adjourn the current trial date of October 18, 2021. (*Id.*) The Court ordered the Government to respond to the substance of the Defendants' proposed supplemental motions.[10] (ECF No. 333.) The Government enumerated the [*32] motions proposed by the Defendants, emphasizing that each Defendant's letter indicated that his list was not exhaustive and characterized them as duplicative or remaining. (ECF No. 341.)

During an in-person status conference with Rosner and Helbrans on September 13, 2021, the Court repeatedly asked Helbrans and Rosner whether they wanted additional time to file supplemental pretrial motions and state that if they did, the Court would adjourn the trial scheduled to begin on October 18, 2021. Both Defendants repeatedly stated that unless they were provided with "additional means," additional time would make no difference and they wished to go to trial without further delay. The Court probed what the Defendants meant by "additional means" and then stated, as it had during nearly every conference in this matter since the Court began holding *Faretta* hearings in February 2021, that as detained non-lawyers the Defendants would not have access to all the resources that licensed attorneys who are not detained have and that the Government and WCJ have already made special accommodations so that Defendants would have more access to computers, including the materials produced by the Government [*33] in this case, than most detainees and further that Defendants should rely on their standby counsel for assistance with research and drafting of materials for this matter. The Court further observed that

despite their protestations, Defendants had in fact been able to file motions, including a motion to disqualify and various lengthy submissions regarding their access to resources at the facility, both of which contain numerous legal citations. The Defendants reiterated that they wanted to continue to represent themselves and that if things were not going to change, they did not want to postpone the trial.

Accordingly, the Court confirmed the pretrial deadlines including for proposed jury instructions, proposed verdict sheet, witness lists, exhibit lists, and copies of pre-marked, tabbed exhibits (in binders). The final pretrial conference is scheduled for October 13, 2021 at 11:00 AM.

On September 24, 2021 the Government filed its motions *in limine*. (ECF No. 352.) Standby counsel for Rosner filed Rosner's motion *in limine* with one of eleven exhibits, stating in a cover letter that Rosner had given standby counsel the motion and single exhibit on September 24, 2021 and that the remaining [*34] exhibits would be filed as soon as Rosner provided them to standby counsel. (ECF No. 353.) Helbrans requested leave to join Rosner's motions. (ECF No. 354.) On September 27, 2021 Rosner filed the remaining exhibits to his motion, which totaled over 3,000 pages. (ECF No. 355.) Standby counsel then requested that Defendants' motion and exhibits be filed under seal, which the Court granted. (ECF No. 359.) Standby counsel has since filed a redacted version of the motion. (ECF No. 382.)

The Court issued an order on September 27, 2021 granting Helbrans's request to join Rosner's motions *in limine* and ordering Defendants to clarify, through standby counsel if necessary, on or before September 30, 2021 what relief they mean to seek through their motions *in limine*. (ECF No. 356.) Pursuant to the request of standby counsel for Helbrans, the Court extended Defendants' deadline to provide clarification on the relief sought in their motions *in limine* to October 1, 2021 and extended deadline for the briefing on the motions *in limine* as follows: opposition papers shall be filed on October 4, 2021 and reply papers shall be filed on October 11, 2021.

Defendants filed letters in response to the Court's [*35] request for clarification. (ECF Nos. 366 and 367.) The Government opposed the Defendants motions *in limine*. (ECF No. 370.) Rosner opposed the Government's motions *in limine* in a memorandum of over fifty handwritten and typed pages with seven exhibits

---

[10] On September 11, 2021, Helbrans filed a motion to disqualify the Court on the basis that in the early 1990s, well before I was on the federal bench, I served as an assistant district attorney in Brooklyn during a period that overlapped with the prosecution of Helbrans's father by the Brooklyn District Attorney's Office. (ECF No. 339.) Following in-person argument on the motion during the September 13, 2021 status conference, the Court denied the motion.

totaling over 100 additional pages. (ECF No. 371.) Helbrans sought leave to join Rosner's opposition papers. (ECF No. 373.)

On October 8, 2021, the Government filed a letter "in advance of the final pretrial conference."[11] ("Oct. 8. Ltr." (ECF No. 376).) The Government intends to seek admission of excerpts from the *pro se* Defendants' filings in this case, including their motion *in limine*, opposition to the Government's motion *in limine*, and personal affidavits, either as statements of a party opponent under *Federal Rule of Evidence 801(d)(2)* and, in the evident the Defendants do not testify, as statements against penal interest under *Federal Rule of Evidence 804(b)(3)*. (*Id.* at 3.) The Government also noted that the proposed jury instructions in this case will require the Court to instruct the jury on specific provisions of Mexican and Guatemalan law and, to that end, provided translations of Mexican law criminalizing sex with children and an affidavit from a Mexican legal expert as well as a translation of **[*36]** an affidavit regarding Guatemalan law banning child marriage.

The Government filed its reply brief on October 11, 2021. (ECF No. 379.) Defendants did not timely file a reply.

## LEGAL STANDARDS

### I. Admissibility of Evidence

The party seeking to introduce evidence bears the burden of establishing its relevance. *See Dowling v. United States, 493 U.S. 342, 351 n.3, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)*. Though the "standard of relevance established by the Federal Rules of Evidence is not high," *United States v. Southland Corp., 760 F.2d 1366, 1375 (2d Cir. 1985)*, the Court has "broad discretion to balance probative value against possible

---

[11] In addition to the issues the Government raised described above and addressed in this opinion, the Government also raised the following issues, which will be addressed at the final pretrial conference: (1) Defendants' discovery obligations under *Rule 16*, including whether they intend to call any expert witnesses; (2) the need for Defendants to disclose witness statements; (3) imposing reasonable time limits on opening and closing statements at trial; and (4) the use of pseudonyms for the minor victims. The Court will also address at the final pretrial conference the sealed application filed by Minor-1 on October 8, 2021, regarding her testimony.

prejudice" under *Rule 403*, *United States v. Bermudez, 529 F.3d 158, 161 (2d Cir. 2008)*.

With certain exceptions, all relevant evidence is admissible, and evidence which is not relevant is not admissible. *Fed. R. Evid. 402*. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." *Fed. R. Evid. 401(a)-(b)*. Relevant evidence may still be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Fed. R. Evid. 403*; *see United States v. Hsu, 669 F.3d 112, 119 (2d Cir. 2012)* (noting that "[d]istrict courts have broad discretion to balance probative value against possible prejudice"). **[*37]** Applying *Rule 403*, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by unduly distracting their attention from the charged crimes through sympathy. *See, e.g., United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991)* (affirming district court's exclusion of evidence that defendant's son had cerebral palsy because such evidence "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case"); *United States v. Sabir, No. 5-CR-673 (LAP), 2007 U.S. Dist. LEXIS 34372, 2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007)* (excluding evidence because it "would suggest that the jurors should have sympathy for Dr. Sabir because of his troubled childhood and would implicitly encourage them to nullify by acquitting him based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt"); *United States v. Crown, No. 99-CR-1044 (AGS), 2000 U.S. Dist. LEXIS 7443, 2000 WL 709003, at *3 (S.D.N.Y. May 31, 2000)* (precluding evidence regarding defendant's medical condition as irrelevant and holding that even if the evidence were relevant, "its probative value would be outweighed by its potential prejudicial effect on the jury" because it "would likely appeal to the jury's sympathy, and thus constitute an improper influence on the jury members' consideration of the factual and legal issues bearing on the merits of the case").

**[*38]** Evidence is also inadmissible if it is hearsay not subject to a hearsay exception. "Hearsay" is a statement "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the

statement." *Fed. R. Evid. 801(c)*. There are various exceptions to the hearsay rule including that certain out of court statements are not hearsay if (1) they are a declarant-witnesses' prior statement, or (2) an opposing party's statement offered against the defendant. *Fed. R. Evid. 801(d)*.

## II. Motions *in Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008)* (citing *Luce v. United States, 469 U.S. 38, 41 n. 4, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)*). An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)*. "[C]ourts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *United States v. Ozsusamlar, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006)*. "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez, No. 09-CR-1153 (MEA), 2011 U.S. Dist. LEXIS 39399, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011)* (quoting *Palmieri, 88 F.3d at 139*).

## DISCUSSION

## I. Defendants' Ability to Prepare and Present their Defense

The Court first addresses the Defendants' repeated contentions that they lack access to necessary and/or **[*39]** constitutionally required resources to prepare their defense, an issue that the Court has addressed at every conference in this matter since at least the first *Faretta* hearing in January 2021.

The Supreme Court has observed that "*Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal defendant." *Kane v. Garcia Espitia, 546 U.S. 9, 10, 126 S. Ct. 407, 163 L. Ed. 2d 10 (2005)*. The Supreme Court acknowledged that "federal appellate courts have split on whether *Faretta*, which

establishes a *Sixth Amendment* right to self-representation, implies a right of the *pro se* defendant to have access to a law library" but has not has occasion to resolve the issue. *Id., see, e.g., Hawkins v. Dexter, No. C08-1087 SI (PR), 2008 U.S. Dist. LEXIS 120057, 2008 WL 1777375, at *2 (N.D. Cal. Apr. 18, 2008)* (explaining that while a criminal defendant "had a right to represent himself, there is no clearly established law from the U.S. Supreme Court as to the supplies and services that had to be provided to him to conduct that representation"). "*Faretta* itself recognized that '[w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.'" *United States v. Denton, 535 F. App'x 832, 835 (11th Cir. 2013)* (quoting *Faretta, 422 U.S. at 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562*) (holding that court did not impose unjustified and extreme restrictions on defendant's ability to access legal materials relevant to the criminal **[*40]** proceedings against him where defendant who was awaiting trial in county jail without a law library who was for a period of two weeks transported daily to the United States Marshals' office in the courthouse where he could review discovery and request legal materials from the court's law librarian. The magistrate judge allowed Denton to be brought to the United States Marshals' office in the courthouse on a daily basis for a two-week period, where he could review discovery and request legal materials from the court's law librarian and thereafter, instead of routine visits to the courthouse, he could file requests for specific legal materials that were relevant to the remaining trial proceedings); *Samuels v. Walker, No. ED CV 10-01164 DMG, 2011 U.S. Dist. LEXIS 154492, 2011 WL 7637265, at *4 (C.D. Cal. Oct. 12, 2011)*, *report and recommendation adopted*, *No. EDCV 10-01164 DMG RZ, 2012 U.S. Dist. LEXIS 44092, 2012 WL 1068075 (C.D. Cal. Mar. 27, 2012)* (denying *pro se* petitioner's claim that trial court, after granting him *pro se* status and appointing him a defense investigator, denied his constitutional rights when it rejected his motions for extra law-library time (compared to what ordinarily was accorded to *pro se* jail inmates) and, possibly, for toll-free phone calls). The Second Circuit has "recognize[d] of course, that the right to represent oneself in criminal proceedings is protected by the *Sixth Amendment*. But **[*41]** this right does not carry with it a right to state-financed library resources where state-financed legal assistance is available." *Spates v. Manson, 644 F.2d 80, 85 (2d Cir. 1981)*; see *Wesley v. City of New York, No. 05 CIV. 9227 (DLC), 2006 U.S. Dist. LEXIS 73270, 2006 WL 2882972, at *4 (S.D.N.Y. Oct. 10, 2006)* (holding that at the time defendant who was

representing himself in a criminal case in the early 2000s "neither the Supreme Court nor the Second Circuit had held that a defendant who declines state-funded representation is entitled to any access to a prison library-let alone access at a given time of day").

The Court has been honest with Defendants throughout this case about the perils of proceeding *pro se* and provided for extraordinary resources to enable Defendants to proceed *pro se*. First, since Defendants sought to proceed pro se, the Court has frankly apprised each and every Defendant that proceeding *pro se* despite their lack of formal legal training, and/or facility in the English language would inevitably result in challenges, especially during the COVID-19 pandemic. Each Defendant repeatedly and unequivocally asserted his right and preference to proceed pro se.

Second, the Court has provided resources to enable Defendants to vigorously defend themselves (as reflected by their voluminous motions). For example, the Court appointed standby counsel **[*42]** who are under clear instructions to assist the Defendants, including by conducting legal research for them. The Court also ordered the Government and standby counsel to coordinate with the Westchester County Jail (the "Facility") to ensure that the Defendants received access to the discovery produced in this matter and to laptops on which they could use basic translation software and take notes. The Defendants confirm that by early June 2021 they received their laptops.[12]

Even if Defendants believe that, under different circumstances, they could have raised additional issues, or raised issues more clearly, the record belies their claim that they have been prevented from presenting issues to the Court. Defendants' motion *in limine* accompanied by over 3,000 pages of exhibit (ECF Nos. 353 and 355)—to which the Government responded (ECF No. 370) and the Court addresses herein—and their 50-page opposition to the Government's motions *in limine*, which contains seven exhibits that span over 100 pages—which the Government addressed in its reply memorandum and the Court addresses herein—

demonstrates that the Defendants do in fact have the ability to access the Court and present their defense. **[*43]** Likewise, the sheer number of legal issues raised in the motions, which are discussed below, demonstrate that Defendants adopted a scorched earth approach to their defense and undermines any suggestion that Defendants would have raised multiple times as many arguments had they been afforded different (unspecified) resources. The Court has reviewed these submissions, construes them broadly, and addresses the issues raised below.

## II. The Government's Presentation of Evidence

The Court begins with the issues relevant to the Government's presentation of its case.

### A. Allegedly Inflammatory Terminology

Defendants ask the Court to preclude the Government from using various inflammatory terminology. They aver that they are unable to determine which allegations in the indictment are provided for background versus elements of the charged crimes. (Def's Opp'n at 48.) The Court clarifies that Defendants are charged under the statutes listed in the indictment and the Government must prove each element of the crimes charged beyond a reasonable doubt.

As to the use of inflammatory language, lawyers are entitled to "broad latitude in the inferences they may suggest to the jury during closing arguments." **[*44]** *United States v. Suarez, 588 F.2d 352, 354. (2d Cir. 1978)*; *see also United States v. Rude, 88 F.3d 1538, 1548 (9th Cir. 1996)*, *as amended on denial of reh'g* (Sept. 10, 1996) ("the law permits the prosecution considerable latitude to strike 'hard blows' based on the evidence and all reasonable inferences therefrom"). However, counsel may not "refer to 'facts' that are not in the record" nor may counsel "misstate the evidence." *Id.* Similarly, lawyers may not, in closing remarks, "indulge[ ] in an appeal wholly irrelevant to any facts or issues in the case." *Viereck v. United States, 318 U.S. 236, 247, 63 S. Ct. 561, 87 L. Ed. 734 (1943)*. Nevertheless, courts may prohibit the use of certain "pejorative terms" during argument, questioning, or testimony, when such categorizations are "inflammatory and unnecessary to prove a claim" or "do not bear on the issues being tried." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017)*.

---

[12] Any delay in the provision of these materials to *pro se* Defendants was, in part, the result of Defendants' own conduct inasmuch as they refused to sign protective orders in order to access confidential discovery materials. Certain provision of resources was further delayed by ongoing COVID-19 pandemic, which has disrupted supply chains and delayed manufacturers from fulfilling orders for resources including laptops.

The Court addresses the arguably inflammatory language and allegations that the Defendants seek to preclude in turn. The Court notes at the outset, however, that it will not permit the use of inflammatory media articles by any party during the trial.

## 1. "Kidnapping" and "Abduction"

Defendants ask the Court to prohibit the Government from using terms such as "kidnapping" or "abduction" to describe the Defendants' actions because the Government admits the Minors were not removed by force. The Government avers **[*45]** that the Court should reject this request because (1) it would be "highly impractical" to avoid the term "kidnapping" given that "kidnapping" is part of the statutory title of four of the counts charged and the jury instructions will necessarily include the terms; (2) courts routinely allow the use of terms—even highly prejudicial terms—when the terms are necessary to complete the story of the crime alleged; (3) Defendants are aware that they are charged under the IPKCA and that consent of the child is not a cognizable defense; and (4) courts routinely use the words "kidnapping" and "abduction" when discussing IPKCA cases that do not involve the taking of children by force.

The Court agrees with the Government that where, as here, the language objected to including "kidnapping" and "abduction" constitute the "common name" for the crime charged, parental kidnapping, "there is no rule of evidence or ethics that forbids the prosecutor from referring to the crime by its common name . . . . [t]here is no rule requiring the prosecutor to use a euphemism for it or preface it by the word 'alleged.'" *United States v. Rude, 88 F.3d 1538, 1548 (9th Cir. 1996)*, *as amended on denial of reh'g* (Sept. 10, 1996). The Court also agrees that the term "kidnapping" **[*46]** at least must be used in its instructions to the jury describing the crimes with which the Defendants are charged and the elements of those crimes. It therefore declines to preclude the government from using the terms "kidnapping" and "abduction". *See, e.g., People of Territory of Guam v. Torre, 68 F.3d 1177, 1180 (9th Cir. 1995)* (holding that no objection to prosecutor's use of terms "rape" and "raped" would have been sustained where defendant was being tried for three counts of first-degree criminal sexual conduct, two counts of second-degree criminal sexual conduct and one count of second-degree kidnapping), *United States v. Ahmed, 94 F. Supp. 3d 394, 435-36 (E.D.N.Y. 2015)* (denying motion to preclude government witnesses from using

terms "terrorist," "terrorist activity (or activities)," or "terrorism" where "charged offenses require the Government to prove, *inter alia*, that the Defendants assisted a designated foreign *terrorist* organization" and noting that "it is unclear how the Government could meet its burden of proving, for example, that al-Shabaab was a designated foreign terrorist organization, without using the word 'terrorism'").

## 2. "Victim"

The Defense also asks the Court to preclude the Government from using the term "victims" to describe the Minors. The Government opposes this request on the basis that **[*47]** (1) it has a "good faith basis for arguing that the Minors were victims of the defendants' criminal conduct"; (2) use of the word "victims" particularly in opening and closing arguments is fair argument and any prejudice would be cured by the Court's standard jury instruction that lawyers' arguments are not evidence; and (3) the term "victim" accurately reflects the Minors' status under the Crime Victims' Rights Act, *18 U.S.C. § 3771(e)(2)(A)*), which defines a "crime victim" as a person directly and proximately harmed as a result of the commission of a Federal offense."

The Court agrees with the Government and declines to preclude the use of the term "victim." *See, e.g., United States v. Gasperini, No. 16-CR-441 (NGG), 2017 U.S. Dist. LEXIS 114166, 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017)*, *aff'd*, *729 F. App'x 112 (2d Cir. 2018)* (rejecting defendant's request to exclude terms "victim" and "victimized" based on merits of his case because the "Government is within its rights to take and advocate for a different view of the evidence" and the court did not "view the use of the challenged terms as unduly prejudicial in light of the issues being tried").

## 3. "Cult" and Related Terms and Characterizations

Defendants renew and extend the objections raised in counseled pretrial motions to the Government's reference to Lev Tahor as a "cult," clarifying that their issue **[*48]** is not with the word "cult" per se, but with the "false portrayal of a religious community as if they are involved in a mysterious 'brain washing' and somehow the religious leaders or community elders 'control' the minds of the members of the religious community." (Def. MIL Opp'n at 25.) Similarly, the Defendants object to the Government's reference to

former members of Lev Tahor as "survivors." (Def. MIL Opp'n at 28.) Defendants state that if the Government is going to insinuate that the leaders of Lev Tahor engage in coercion or force certain practices within the community, Defendants intend to "provide hundreds if not thousands of accepted psychological opinions that determine . . . that there is no such thing 'religious mind control' or 'brain washing.'"

The Government stated in its opposition to the counseled pretrial motions that it would not refer to Lev Tahor as a cult or intentionally elicit testimony such that the term "cult" would be used. The Court expects the Government to uphold this promise.

Additionally, the Court agrees with Defendants that suggestions that the leaders of Lev Tahor "brainwash" or "coerce" their members and characterizations of former members of Lev Tahor **[*49]** as "survivors" are neither evidence of the charged crimes nor do their provide context more necessary than it is prejudicial. Accordingly, the Government may not refer to the Lev Tahor community or its leaders as members of a "cult" nor may it insinuate that leaders brainwash or force members of the community to behave in or observe their religion in a certain way.

The parties are reminded that a faith community is not on trial and this Court will not entertain the public spectacle of litigating the sincerity or coercion animating the conduct of adherents of a faith community insofar as it is irrelevant to the charged conduct. Accordingly, the Government is prohibited from using incendiary and irrelevant references to Lev Tahor, including but not limited to referring to it as a cult and its former adherents as survivors. Likewise, the Court will not permit Defendants to present thousands of (unspecified and irrelevant) psychological opinions regarding the nonexistence of religious mind control.

## B. Additional Testimony Regarding Rules and Practices Within Lev Tahor

The Government seeks to elicit testimony from Minor-1, the Mother, CC-1, and another former Lev Tahor member ("Witness-1") **[*50]** about the rules and practices within Lev Tahor.[13] The Government avers

---

[13] In its opposition papers, the Government suggests that the terms "kidnapping" and "abduction" are crucial to the offense conduct at issue, relying, *inter alia*, on the use of comparably inflammatory terms in organized crime cases. (Gov't Opp'n at

that this testimony is admissible as direct evidence of the kidnapping and sexual exploitation conspiracies. Insofar as this testimony relates to marriage and sexual practices involving individuals under the age of sixteen, the Court agrees that it constitutes direct evidence of charged crimes.

The Government further contends that, insofar as any of this testimony constitutes "evidence of any other crimes, wrong or act," it is alternatively admissible pursuant to *Federal Rule of Evidence 404(b)*, to show a defendants' motive, intent, knowledge, opportunity, and a common scheme or plan. The Defendants oppose the introduction of "bad acts" testimony on the basis that it is unduly prejudicial and that the Government failed to timely disclose what such evidence it plans to introduce.

## 1. "Other Acts" Evidence Under *Rule 404(b)*

Evidence of a defendant's "crime[s], wrong[s], or other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Fed. R. Evid. 404(b)(1)*. "In other words, evidence that a defendant committed crimes beyond those presented to the jury is not admissible **[*51]** to show that the defendant is a bad person who is therefore likely to be guilty of the crimes

---

3 (citing *United States v. Giovinco, 382 F. Supp. 3d 295, 298 (S.D.N.Y. 2019)* ("The Court is not persuaded that references to 'La Cosa Nostra,' the 'Mafia,' and the 'Genovese Crime Family' would unfairly prejudice Giovinco. As the Government notes in its opposition, evidence of Giovinco's membership in or association with the Genovese Crime Family is an element of the charged offenses.")). While it is true that Courts routinely permit prosecutors to refer to "the Mafia" to identify the "enterprise" when defendants are tried for violations of the Racketeer Influenced and Corrupt Organizations Act for unlawfully associating as an "enterprise" to commit illegal activities, *see, e.g. United States v. Napolitano, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)* (denying motion to strike surplusage from indictment references to "the Bonanno Family of La Cosa Nostra" and the "government is entitled to prove that 'the Bonanno Family of La Cosa Nostra,' the enterprise it has described, exists and that the defendants are associated with it"); *United States v. Rastelli, 653 F. Supp. 1034, 1055 n.13 (E.D.N.Y. 1986)* (distinguishing *United States v. Dickens, 775 F.2d 1056, 1058 (9th Cir. 1985)* in which defendant was on trial for drug conspiracy and possession, and his association with a person named Mitchell, who was connected with "the mob," was not relevant to the prosecution's case), the Court does not find this analogy persuasive insofar as the Government contends that it can refer to allegedly coercive or abusive aspects of the Lev Tahor community or its leadership.

charged." *Hsu, 669 F.3d at 118*. However, *Rule 404(b)* expressly permits the introduction of evidence of other crimes for a variety of other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Fed. R. Evid. 404(b)(2)*. The Second Circuit has therefore "adopted the 'inclusionary' rule that other crimes evidence is admissible for any purpose for which it is relevant, except to support the prohibited inferences of bad character or propensity to commit crimes." *Hsu, 669 F.3d at 118*. Additionally, "evidence of criminal behavior may be admissible as direct evidence of the crime charged if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Id.* In other words, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes [*52] an element of the crime." *United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997)*

### 2. Application

Based on the record currently before the Court, it does not appear that the Government failed to provide timely notice of its intent to introduce evidence of other acts or practices within Lev Tahor. Specifically since at least April 2021, Defendants were on notice of the Government's allegations regarding Defendants "control every aspect of the lives of Lev Tahor's adherents," including by "embrac[ing] several extreme practices including strict, invasive monitoring of members, frequent beatings, and forced marriages of minors to adult members." (S2 ¶¶ 4, 5.) Unless Defendants can point to other acts evidence the Government seeks to introduce that was not previewed to them well in advance of trial, the Court is disinclined to find the disclosures untimely.

In support of its motions, the Government provides a representative list of testimony regarding rules and practices within the Lev Tahor community that may include instances of uncharged criminal conduct or other wrongs or bad acts. (Gov't MIL at 10-11.) Many of these examples relate to testimony from CC-1 and Witness-1 regarding Helbrans and Rosner's practice of arranging marriages involving [*53] children as young as twelve or thirteen years old, and Rosner's instructions to

Witness-1 regarding how and when to have sex with his wife. (Gov't MIL at 10-11.) The Court agrees that evidence of the Defendants' involvement in arranging marriages including marriages involving children as young as twelve or thirteen years old, and particularly the marriage of Minor-1 to Jacob Rosner when she was fourteen years old is "inextricably intertwined with the evidence regarding the charged offense[s]," *Hsu, 669 F.3d at 118*, particularly the Counts One and Two involving transportation of a minor with intent to engage in criminal sexual activity.

The Court, however, precludes the Government from eliciting testimony from any witness that Rosner or any other Defendant told husbands that they should use force if necessary to adhere to the proscribed schedule for sexual activity. Unless the Government seeks to introduce evidence that any illegal sexual activity Minor-1 engaged in with Jacob Rosner that occurred after transport from the United States involved force, *see United States v. Weingarten, 632 F.3d 60, 61-62 (2d Cir. 2011)* (holding that "*§ 2423(b)* applies to conduct occurring outside the United States," but that "travel between two foreign countries, absent *any* territorial nexus to [*54] the United States, does not constitute travel in foreign commerce for the purpose of *§ 2423(b)*"), any evidence or suggestion that Defendants advocated that husbands force their wives to have sex is both irrelevant to the charged conduct and unduly prejudicial.

The Court also disagrees with the Government's contention that it must present evidence as to "the rationale for the Mother leaving Guatemala." (Gov't MIL at 12.) As the Court discusses in more detail below, this Court lacks jurisdiction to review the Family Court's Order granting the Mother custody and prohibiting Teller from contacting her children. Accordingly, the Mother's motivations for leaving Guatemala and for seeking sole custody of her children are not pertinent to any of the charged crimes. Moreover, if the Government can persuade the Court that the Mother's motivations are in fact necessary context and the Court allows limited presentation of evidence on the Mother's motivations, the Government is forewarned that presentation of such evidence may open the door for Defendants not only to cross-examine the Mother as to the veracity or sincerity of her motivations but also to put on evidence contradicting her account.

Certain excerpts [*55] the Defendants included in their opposition papers from the counseled pretrial motions refer to non-sexual abuse of children in Lev Tahor

including malnutrition and non-sexual physical abuse. Presenting evidence of alleged abuses other than those directly related to marriage or sexual relations involving children under sixteen years of age described above would be unduly prejudicial to the Defendants and is not necessary to the Government's case on the charged counts. Accordingly, the Government's evidence regarding uncharged wrongs or bad acts within the Lev Tahor community must be limited to evidence directly related to the Defendants' involvement in arranged marriages and/or encouragement and facilitation of sexual activity involving children under the age of sixteen.

Insofar as the Government intends to introduce any 404(b) evidence that does not fall squarely within the above approved categories of marriage or sexual relations involving children under sixteen years of age, the Government will need to demonstrate both relevance an that such information is more probative than prejudicial.[14] The Court also notes its intention to provide a limiting instruction regarding any testimony about [*56] sexual and marriage practices in Lev Tahor other than evidence regarding the relationship between Minor-1 and Jacob Rosner.

## C. Co-Conspirator Statements

At trial, the Government intends to introduce certain statements made by the Defendants' Co-Conspirators through testimony from, among others, CC-1, the Mother, Minor-1, and Witness-1, and through electronic evidence (including communications retrieved from cellphones and email accounts). For example, the Government anticipates that CC-1 will testify that during planning and execution of the December 2018

_____

[14] Relatedly, the Government has indicated that it intends to introduce evidence demonstrating that Helbrans and Rosner exercise sufficient control over other members of the Lev Tahor community that they could effectively force other members into carrying out the goals of the conspiracy. The Government has failed to offer a cogent explanation for how or why the control wielded by Helbrans or Rosner, _outside of the context of their role in facilitating charged conduct_, is relevant at trial. On the other hand, the prejudice resulting from admission of evidence indicating that Defendants are generally manipulative is facially obvious. While this evidence may be pertinent and admissible in the later trials of co-conspirators, Government has not, at this stage, persuaded the Court that the evidence of manipulation is admissible in the instant trial.

kidnapping, co-conspirators emphasized that Jacob Rosner wanted to be reunited with his wife and then referenced their reunion. (Gov't MIL at 18.) The Government contends that these statements are admissible as co-conspirator statements, pursuant to _Rule 801(d)(2)(E) of the Federal Rules of Evidence_, and as statements against interest, pursuant to _Rule 804(b)(3) of the Federal Rules of Evidence._ The Government further avers that several of these statements are non-hearsay because they are being offered not for the truth of the matter, but rather for the effect on the listener or for another non-hearsay purpose.

### 1. Availability of Co-Conspirators

As a preliminary matter, **[*57]** the parties appear to dispute whether certain co-conspirators or members of Lev Tahor constitute "unavailable witnesses" as that term is defined by the relevant hearsay exceptions.

A declarant is considered unavailable as a witness if, for example, he or she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure: (A) the declarant's attendance, in the case of a hearsay exception under _Rule 804(b)(1)_ or _(6)_; or (B) the declarant's attendance or testimony, in the case of a hearsay exception under _Rule 804(b)(2)_, _(3)_, or _(4)_." _Fed. R. Evid. 804(a)_. One such process is that the Court "may order the issuance of a subpoena requiring the appearance as a witness before it, . . .if the court finds that particular testimony . . . is necessary in the interest of justice." _28 U.S.C. § 1783(a)_. "[I]ssuance of a _§ 1783_ subpoena is appropriate only upon a judicial order" and only applies to United States citizens living abroad. _United States v. Brennerman, No. 17-CR-0155 (LAK), 2017 U.S. Dist. LEXIS 161103, 2017 WL 4513563, at *2 n.2 (S.D.N.Y. Sept. 1, 2017)_.

The Government states in its moving papers that a number of co-conspirators including both charged Co-Defendants and other members of the Lev Tahor community are located abroad, beyond the Government's subpoena power and would likely invoke the _Fifth Amendment_ if they were questioned under **[*58]** oath. (Gov't MIL at 19.) Defendants respond that "anyone, male or female, who is a member of Lev Tahor will definitely come to testify at [their] trial, if invited and if the subpoena would be given to [them] as soon as possible. No one of Lev Tahor will invoke the _5th Amendment_ regarding any issue by the prosecution,

the defense and the courts. Nevertheless, some of them will not be able to come if they will not be guarantee the very similar conditions to those requested by the 3 brothers Weingarten" attached as Exhibit J to Defendants' Motions *in Limine*. (Def's MIL Opp'n at 49.) Defendants note that such conditions would be required for other witnesses, including Teller, the father of the Minors, as well as Chaim Malka, whose affidavit the Defendants submitted to the Court as Exhibit D to Defendants' Motions *in Limine*. (*Id.*)

The Court understands the Defendants' representation to be that various witnesses would consent to testify on Defendants' behalf only if the Court or the Government guarantees certain conditions for their transportation and treatment by United States authorities. As to the three Weingarten brothers who are currently detained in Guatemala awaiting extradition in conjunction **[*59]** with this case that the Court and/or the Government will guarantee that the Weingartens can, *inter alia*, travel on their own from Guatemala to the United States by land instead of by air, that they will be arrested when they arrive in Texas and that within 24 hours they will have their first appearance before a court, be granted leave to proceed *pro se* and be granted bail. (Ex. J to Def. MIL.) The Court lacks jurisdiction to order such conditions. *Cf. United States v. Meza, No. 15CR3175 JM, 2017 U.S. Dist. LEXIS 53972, 2017 WL 1321383, at \*2 (S.D. Cal. Apr. 7, 2017)* ("[T]his court does not possess the authority to order the United States to submit a request to a foreign government, on behalf of the defendant, pursuant to an [Multi Lateral Assistance Treaty]." (cleaned up)).

If either the Government or the Defendants seek a subpoena directing that any United States citizens who are currently living abroad appear to testify at trial, that party must request the issuance of a subpoena under *Section 1783*.

## 2. Admission of Co-Conspirator Statements

"[S]tatements proffered as co[-]conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of [relevant] prerequisites." *United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993)*.

The Government states that it intends to elicit testimony, for example, from **[*60]** CC-1 that during the planning meetings for the December 2018 kidnapping one of the Defendants reported that Jacob Rosner was "distraught"

about being separated from his wife, and that after the Minors were removed from the residence another Defendant told CC-1 that Jacob Rosner was "reunited with his wife." (Gov't MIL at 18.) The Government also intends to introduce text messages from December 9, 2018, the day after the Minors were removed, from Rosner to Jacob Rosner asking which room Minor-1 is in. (*Id.*)

### a. Statements by Co-Conspirator in Furtherance of Conspiracy Under *Rule 801(d)(2)(E)*

*Rule 801(d)(2)(E) of the Federal Rules of Evidence* provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." *Fed. R. Evid. 801(d)(2)(E)*. To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)*; *United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999)*. A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals **[*61]** of that conspiracy." *Glenn v. Bartlett, 98 F.3d 721, 728 (2d Cir. 1996)*. A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green, 887 F.2d 25, 27-28 (1st Cir. 1989)* (coconspirator's statement to shooting victim admissible against co-defendant under *Rule 801(d)(2)(E)*); *see United States v. Gupta, 747 F.3d 111, 125 (2d Cir. 2014)* (a statement need not be made to a member of the conspiracy to be admissible under *Rule 801(d)(2)(E)* because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although only co-conspirator statements made "in furtherance" of the conspiracy are admissible pursuant to *Rule 801(d)(2)(E)*, the standard for what qualifies as a statement "in furtherance" of a conspiracy is not very restrictive. The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)*. It permits, for example, introduction of

any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino, 846 F.2d 1384, 1412, 269 U.S. App. D.C. 398 (D.C. Cir. 1988)*.

The Second Circuit has held that **[*62]** co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform each other as to the progress or status of the conspiracy" further the ends of the conspiracy, *United States v. Dresna, 260 F.3d 150, 159 (2d Cir. 2001)*, as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987)*; *see also United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994)* (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of conspiracy); *United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989)* (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Although the Government must demonstrate that the defendant and the declarant belonged to the same conspiracy, the defendant and declarant do not both need to be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant. *See United States v. Bowe, 221 F.3d 1183, 1193 (11th Cir. 2000)* ("[T]he conspiracy that forms the basis for admitting a coconspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993)*; *United States v. Lyles, 593 F.2d 182, 194 (2d Cir. 1979)* ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission **[*63]** by a co-conspirator need not be charged in the indictment."); *see also United States v. Stratton, 779 F.2d 820, 829 (2d Cir. 1985)* ("[I]t is not necessary that the Government charge a conspiracy to take advantage of *Fed. R. Evid. 801(d)(2)(E)*."); *Maldonado-Rivera, 922 F.2d at 962* (same).

The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must demonstrate only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See Stratton, 779 F.2d at 829* (the Government must demonstrate that the conspiracy

to which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also Lyles, 593 F.2d at 194*.

### b. Statements Against the Declarants' Penal Interest Under *Rule 804(b)(3)*

The hearsay rule does not exclude the out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See Fed. R. Evid. 804(b)(3)*; *United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007)*. A statement is sufficiently against the declarant's penal interest if: a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose **[*64]** the declarant to civil or criminal liability. *Fed. R. Evid. 804(b)(3)*. This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States, 512 U.S. 594, 599, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994)*.

To satisfy *Rule 804(b)(3)*, the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008)* (internal quotation marks omitted). A declarant is unavailable for purposes of *Rule 804* if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," *Fed. R. Evid. 804(a)(1)*, or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id. 804(a)(5)(B)*.

"A statement will satisfy *Rule 804(b)(3)*'s requirement that it 'tended' to subject the **[*65]** declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011)* (internal quotation marks omitted).

Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978)* (internal quotation marks and citation omitted).

The Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle, 130 F.3d 523, 543-44 (2d Cir. 1997)*. Statements made to co-conspirators, not in response to questioning and not made in coercive atmospheres, are sufficiently reliable for purposes of this Rule. *See, e.g., United States v. Matthews, 20 F.3d 538, 546 (2d Cir. 1994)*.

Moreover, although "non-self inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson, 512 U.S. at 600-01*, a statement describing inculpatory acts committed by the declarant and a defendant are admissible in full as statements against the declarant's self-interest, especially where the context of the statement demonstrates **[*66]** that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant], or curry favor with authorities." *Williams, 506 F.3d at 155*; accord *Wexler, 522 F.3d at 203* (admitting statements that implicated both declarant and defendant); *United States v. Saget, 377 F.3d 223 (2d Cir. 2004)* (admitting taped conversations implicating both the declarant and the defendant in joint criminal activity). Finally, because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the *Confrontation Clause*. *Williams, 506 F.3d at 157*.

\*\*\*

Based on the foregoing standards, the Court preliminarily admits the co-conspirator statements described above, "subject to the [Government's] submission of the necessary evidence of [relevant] prerequisites." *Tracy, 12 F.3d at 1199*.

### D. Defendants' Written Submissions

In its October 8, 2021 letter, the Government stated that because Defendants' various submissions, including draft affidavits, contain factual allegations, it intends to seek admission of such statements either—in the event that Defendants testify—as statements of a party opponent under *Federal Rule of Evidence 801(d)(2)*, or—if they do not testify—as statements against penal interest under *Federal Rule of Evidence 804(b)(3)*. Insofar as Defendants submitted these same documents and statements with the hopes that they **[*67]** would be considered by the Court and admitted at trial, it appears that there is no objection to the admission of any of these materials or statements.

In any event, provided that the Government lays the proper foundation, they are relevant, and their probative value is not outweighed by prejudice, the Court will admit these statements. *See, e.g., United States v. Bosch, 399 F. Supp. 2d 521, 522-23 (S.D.N.Y. 2005)* (admitting letter to the Court that contained inculpatory statements because a "defendant's voluntary statements made while in custody but not in response to any interrogation by law enforcement may be used against a defendant at trial").

### E. Business Records

The Government expects to introduce business records (the "Business Records") from several entities, including United Airlines, Google, Walmart, Super 8 Motel, and Westchester County Jail. In addition, the Government anticipates introducing video footage from several locations. The Government has provided notice of intent to offer these records and asks the Court to admit the records pursuant to written certifications under *Federal Rule of Evidence 902(11)*.[15] *Federal Rule of Evidence 803(6)* provides an exception to the hearsay rule for:

> A memorandum, report, record, or data compilation, in any form, of acts [or] events, . . . made at or near

---

[15] The Government indicates that on September 15, 2021, it inquired through standby counsel and via mailing a letter to WCJ as to whether the Defendants intend to contest the authenticity and business-records-nature of these materials, and if not, whether the Defendants would be amenable to stipulations for their authenticity. Though the Government requested a written response by September 20, 2021, no response was received as of September 24, 2021, the date the motions *in limine* were due. Insofar as the Defendants do not contest the authenticity of these records, the Court encourages the parties to stipulate to their authenticity to avoid unnecessary testimony by record custodians.

the time **[*68]** by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

_Fed. R. Evid. 803(6)_. _Rule 803(6)_ "favor[s] the admission of evidence rather than its exclusion if it has any probative value at all," _In re Ollag Constr. Equip. Corp., 665 F.2d 43, 46 (2d Cir.1981)_ (quotation omitted), and the "principal precondition" to admissibility "is that the record[ ] [has] sufficient indicia of trustworthiness to be considered reliable." _Saks Int'l v. M/V "EXPORT CHAMPION", 817 F.2d 1011, 1013 (2d Cir. 1987)_. Further, the proffered record must be supported by a proper foundation, namely, that the document was "'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the [record].'" _United States v. Freidin, 849 F.2d 716, 719-20 (2d Cir.1988)_ (quoting _Rule 803(6)_). This foundation must be established by the "'testimony of the custodian or other qualified witness' of the record." _Id. at 720_ (quoting _Rule 803(6)_).

"_Rule 902(11)_ extends _Rule 803(6)_ 'by allowing a written foundation in lieu of an oral one.'" _United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013)_ (quoting **[*69]** _5 Weinstein's Federal Evidence § 902.13[1]_ (2d ed. 2008).). If a party seeks to certify a business record pursuant to _Rule 902(11)_ rather than by providing live testimony pursuant to _Rule 803(6)(D)_, it "must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." _Fed. R. Evid. 902(11)_. This notice requirement "is intended to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration." _Fed. R. Evid. 902(11)_ advisory committee's note.

The Government indicates that it provided notice of its intent to introduce these business records by communication to Defendants directly and through standby counsel on or about September 15, 2021, over a month before the start of the trial, and again in its motions _in limine_. Accordingly, the Court preliminarily concludes that the Government has provided

Defendants with the reasonable notice required under _Rule 902(11)_. _See, e.g., United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013)_ (holding that reasonable notice had been provided where defendant "had five full days between when the government disclosed the records and when the records were admitted into evidence, which was sufficient time to verify the records' **[*70]** certification . . . . [and] [i]n those five days, Rom raised no concerns that the bank records were improperly certified or that the foundation was otherwise improper").

Assuming that the Government establishes the relevance of these business records, the Government will be permitted to authenticate them pursuant to written certifications under _Federal Rule of Evidence 902(11)_.

## III. Defendants' Presentation of Evidence

### A. Witnesses and Evidence

Defendants attached to their motions _in limine_ over 3,100 pages of exhibits with an 18-page "index."[16],[17] None of the Defendants motions papers make particularized arguments regarding the relevance or foundation for these voluminous exhibits. For example, Exhibit E to Defendants' motions _in limine_ alone is approximately 1,500 pages, which the Defendants describe as "a collection of documents related directly to

---

[16] It is unclear whether the index was made by or contains descriptions given by Defendants.

[17] In their opposition to the Government's motions _in limine_, Defendants state that

> all of the testimony and other evidence described in our motion in limine and in all of it's exhibits, as well as anything we orally mention or otherwise filed or tried to filed during any proceeding in this case, as well as orally mention or otherwise filed or tried to filed by the other defendants is admissible as direct evidence to debunked any "evidence" of the prosecution team about the so-called "crimes" charged. We also hereby provide notice that we also intend to offer the above mentioned evidence, in the alternative, to debunked any "evidence" that the prosecution team will silicite [sic] under guise of _rule 404(b)_.

(Defs Opp'n Mem. at 2.) This vague statement does not constitute a valid application to admit each and every one of the exhibits Defendants have ever submitted to the Court.

the case." (Defs MIL at 5.) Without any particularized assertions regarding their relevance or foundation the Court is unable to rule at this time, even preliminarily, as to whether they will be admissible at trial. The Court instructs the parties to confer to determine which if any of the records the Defendants apparently seek to introduce as evidence the Government will object **[\*71]** to and, if as a result of conferring, it appears likely that the sheer volume of proposed exhibits that Defendants seek to introduce, and to which Government objects, is so voluminous that it cannot be addressed during trial without significant disruptions, then the parties are to provide the Court with a chart concisely identifying disputed materials.

The Court does, however, note specific requirements and words of caution pertaining to certain categories of exhibits Defendants have attached to their motion papers.

Defendants have attached as exhibits various draft **[\*72]** affidavits and letters that they and their Co-Defendants have not previously submitted to the Court. Insofar as these submissions make legal arguments not addressed in this opinion, they will need to be presented to the Court before they are presented to the jury. For example, Defendants attached as an exhibit Helbrans's nearly 200-page draft affidavit, which sets forth his view of the evidence in this case. (Helbrans Draft. Aff.) Defendants cannot seek admission of this statement as truth of the matters asserted within.[18] The Court has, however, reviewed it to better understand his view of the evidence and how he intends to prove his defense. Insofar as that draft motion relies on evidence that is irrelevant to the charged offenses and defenses thereto, the Court has endeavored to indicate as much here.

Insofar as Helbrans and Rosner make opening and closing statements and question witnesses at trial, they should be aware that those statements and questions do not constitute evidence upon which the jury can make factual findings at trial. *See, e.g., Mucci v. Link, No. CV 16-2624, 2017 U.S. Dist. LEXIS 63836, 2017 WL 2952830, at \*6 (E.D. Pa. Apr. 26, 2017),* report and recommendation adopted, *No. CV 16-2624, 2017 U.S. Dist. LEXIS 104924, 2017 WL 2902907 (E.D. Pa. July 7, 2017)* (holding that statements of prosecutor who was "attempting to reiterate to the jury that Mucci's

opening **[\*73]** and closing statements were not evidentiary . . . . were appropriate to the context of the *pro se* defendant acting in the role of a lawyer who examines witnesses and argues, as it would have been fair for her in a counseled case to remind the jury that a defense lawyer's closing argument must be taken not as facts or testimony but simply argument."). The Court will instruct the jury that no statements made by the attorneys, including the *pro se* Defendants while they are acting as their own attorneys, constitute evidence. *See, e.g., United States v. Chavez, No. 19-3913, 2021 U.S. App. LEXIS 29131, 2021 WL 4429837, at \*2 (3d Cir. Sept. 27, 2021)* (noting approvingly that "at the outset, the court instructed the jury that Mendoza was representing himself and that his questions, statements, and arguments were not evidence"); *United States v. Espinosa, 771 F.2d 1382, 1399-400 (10th Cir. 1985)* (explaining in discussion of a case in which a defendant represented himself pro se at trial, that the trial court had "carefully instructed the jury, both before opening statements were given and, at the close of the trial, that it was to consider only the evidence introduced at trial and that nothing the lawyers said in their statements was evidence in the case").

Defendants have also submitted affidavits and letters from Co-Defendants and non-parties. Insofar as Defendants call **[\*74]** these declarants to testify at trial, they may refer to affidavits to refresh their recollection regardless of whether the affidavits are introduced as evidence. However, these affidavits may not be admissible as evidence of the matters asserted within. Whether the declarant testifies or not, these affidavits and letters may be inadmissible hearsay—out of court statements offered for the truth of the matter—that do not constitute evidence upon which the jury can make findings of fact unless they fall within established hearsay exceptions. As discussed already, the hearsay rule does not exclude the out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See Fed. R. Evid. 804(b)(3).* Insofar as the Defendants seek to invoke this exception to the hearsay rule, they will need to demonstrate that the exception applies.

## B. Psychological and Expert Evidence Regarding Historic Persecution of Lev Tahor

The Government asks the Court to preclude Defendants from advancing at trial any argument about historical persecution of Lev Tahor by the United States or any other country. Defendants in turn have stated that if the

---

[18] As indicated above, the Government may properly seek admission of such out of court statements under the hearsay exceptions for statements of party opponents and statements against penal interest.

Government presents evidence claiming or suggesting **[*75]** that Lev Tahor and its leaders engage in coercive or otherwise improper influence over members of the community, the Defendants intend to introduce psychological opinions debunking the concept of "religious mind control" and "brain washing" and/or academic and other opinions that have characterized the instant and other allegations against the Lev Tahor community as "religio-politically motivated" because "the jury will need to understand that potential motives and biases of the witness[es], including any persons, entity or ideology that may have influenced the witnesses' perception of the Lev Tahor community." (Defs. Oppn Mem. at 10 (quoting and adopting Matityau Counseled Mem at 5).) Defendants indicate that while their desired expert psychological expert witnesses are unavailable to testify at the trial and, instead, they have attached letters from psychological experts written in Hebrew about legislation proposed in Israel in 2014 regarding cults that provide the necessary context for the jury to understand potential motivations of witnesses. (Exs D, E, F to Defendants' MIL Opp'n.) Generally speaking, expert testimony must be presented live.

If the Government presents evidence suggesting **[*76]** that Lev Tahor is coercive or that particular aspects of religion constitute indoctrination, they are opening the door to some, though not all, of the evidence that Defendants may seek to introduce to indicate that their practices are not coercive.

### C. Defenses under the IPKCA

#### 1. Statutory Defenses

As the Court previously held, Opinion on Counseled Motions at 19 n.9, in *Amer*, the Second Circuit held that "the IPKCA's listing of three, and only three, affirmative defenses is a strong indication that the defenses arguably inferred from the Hague Convention are not available in an IPKCA prosecution," *110 F.3d at 880-81*. The three affirmative defenses codified in the IPKCA are:

> (1) the defendant acted within the provisions of a valid court order granting the defendant legal custody or visitation rights and that order was obtained pursuant to the Uniform Child Custody Jurisdiction Act or the Uniform Child Custody Jurisdiction and Enforcement Act and was in effect at the time of the offense;
> (2) the defendant was fleeing an incidence or

pattern of domestic violence; or

> (3) the defendant had physical custody of the child pursuant to a court order granting legal custody or visitation rights and failed to return the **[*77]** child as a result of circumstances beyond the defendant's control, and the defendant notified or made reasonable attempts to notify the other parent or lawful custodian of the child of such circumstances within 24 hours after the visitation period had expired and returned the child as soon as possible.

*18 U.S.C. § 1204(c)*. Defenses one and three clearly do not apply here. Instead, the Defendants appear to be planning a defense based on "domestic violence." While there are not many cases involving the affirmative defense of "fleeing an incidence or pattern of domestic violence" under the IPKCA, the United States Court of Appeals for the Seventh Circuit held in a case involving this defense that the judge limited the defendant to "showing [physical abuse] toward her or her daughter," prohibiting her from adducing evidence of "emotional, psychological, and financial abuse." *United States v. Nixon, 901 F.3d 918, 919 (7th Cir. 2018)*. The Seventh Circuit explained that it

> could not equate "violence" with "abuse" without converting every child-kidnapping prosecution into a replay of the child-custody proceedings, in which the defendant would try to relitigate the domestic-relations case by showing that he or she really should have received custody. Yet *§ 1204* is designed **[*78]** to take the outcome of the domestic-relations case as a given. It provides that the loser in a child-custody proceeding must accept the decision (subject to appeal within the state system) and may not spirit the child across an international border. Allowing an "abuse" defense would defeat that function by effectively subjecting the child-custody decision itself to review in the criminal case.

*Id. at 920*. While the Second Circuit has not squarely addressed the issue,[19] it held that a district court that

---

[19] In *United States v. Bontzolakes*, the court confirmed that the affirmative defense of "fleeing an incidence or pattern of domestic violence" can relate to abuse of the fleeing parent who takes a child with them, and not just abuse to the child. *585 F. App'x 794, 798 (2d Cir. 2014)*. This makes sense given that the statutory language is that "*the defendant* was fleeing an incidence or pattern of domestic violence." *18 U.S.C. §*

failed to explain the term "domestic violence" in the context of a IPKCA defense to the jury could well have prejudiced the defense and therefore the district court had acted within its discretion to grant a new trial. _United States v. Huong Thi Kim Ly, 507 F. App'x 12, 13 (2d Cir. 2013)_. In a footnote, the Second Circuit appeared to express skepticism of the district court's apparent view that "the jury should have been instructed that purely emotional abuse, involving neither incidence nor threat nor attempt of physical harm or force, also qualifies as domestic violence, so that flight from such conduct would constitute a defense to international child kidnapping under _18 U.S.C. § 1204_" and "urge[d] the district court to request full briefing of the issue before instructing the **[*79]** jury in the new trial."[20] _Id. at 13 n.1_. Accordingly, this Court follows the guidance from the Seventh Circuit, which held that "domestic violence" refers to "physical (including sexual) misconduct" and not "emotional, psychological, and financial abuse."

Defendants' various submissions repeatedly claim that the Mother and her collaborators "abused" the Minors. (See, e.g., Helbrans Draft Aff. at 82 ("Hospital records released by Sara to the Brooklyn Federal Court on November 17, 2019, reveal some details on the torture program described by [Minor-1]").) Defendants further aver that after taking them from Lev Tahor and their father unlawfully, the Mother "abandoned" the Minors when the Mother sent them to stay with various strangers. (See, e.g., id. at 162.) Insofar as they intend to assert a defense under _18 U.S.C. § 1204(c)(2)_ for "fleeing an incidence or pattern of domestic violence," they must demonstrate that they removed the Minors from an incidence or pattern involving _physical abuse_.

### 2. Force is Not Required Under the IPKCA

---

_1204(c)(2)_ (emphasis added). Here, until they came to the United States to retrieve the minors and return them to Guatemala, the Defendants were located in Guatemala. Insofar as they claim that the Mother was abusive, it does not appear that Defendants were ever subjected to physical abuse by the Mother. Accordingly, it does not appear that Defendants can claim that they personally were fleeing a pattern of domestic abuse.

[20] The district court did not ultimately address the issue or hold a new trial because months after the Second Circuit's opinion was issued, the defendant pled guilty to a superseding information for making a false statement. _United States v. Huong Thi Kim Ly_, No. 08 CR 382(SJ)(SMG) (E.D.N.Y. May 24, 2013), ECF No. 81.

Defendants appear to contend that, because the Government admits that the Minors were removed from their Mother without **[*80]** force, the Defendants cannot be convicted of parental kidnapping. This argument is based both on their conflation of parental kidnaping under _18 U.S.C. § 1204_ with kidnapping under _18 U.S.C. § 1201_, under which they were not indicted, and their contention that the IPKCA must be interpreted according to the "generic definition of kidnapping." Relatedly, the Government requests that the Court preclude Defendants from arguing that the fact that the Minors left willingly with the Defendants excuses their conduct. As explained below, the IPKCA, unlike other kidnapping statutes, does not require the Government to demonstrate that the victims were removed by force; all it requires is a showing that the defendants acted to interfere with the lawful exercise of parental rights. Accordingly, lack of force and consent of the Minors is not a cognizable defense to parental kidnapping and Defendants are precluded to asserting such a defense at trial.

In support of their claim that force is required, Defendants cite to numerous cases evaluating kidnapping charged under _18 U.S.C. § 1201(a)_ rather than the IPKCA. (Def.s' MIL at 8-12 (discussing e.g., _United States v. Macklin, 671 F.2d 60 (2d Cir. 1982)_ (stating in context of _Section 1201(a)_ prosecution that force was essential); _Chatwin v. United States, 326 U.S. 455, 66 S. Ct. 233, 90 L. Ed. 198 (1946)_[21] (holding that federal rather than state **[*81]** kidnapping laws applied where victims were transported across state lines). While the original Complaints filed against the

---

[21] Not only did _Chatwin_ involve Section 1201 and predate the adoption of the IPKCA, at the time of the events involving the marriage of a fifteen-year-old girl to a 68-year old widower, the law of Utah, the state in which their relationship began, provided that "any alleged victim over the age of 12 is considered sufficiently competent so that his consent may be used by an alleged kidnapper in defense to a charge under the state kidnaping statute." 326 U.S. at 461. As further explained below, the custody of the Minors was at the time of the alleged kidnappings, dictated by the Family Court Order. Not only does _Chatwin_ involve a different statute and predate the codification of the IPKCA, within the context of the IPKCA the law of the state of habitual residence regarding custody is only consulted where that law is not superseded by, for example, a court order. _See United States v. Zodhiates_, 235 F. Supp. 3d 439, 454-55 (W.D.N.Y. 2017) (holding that where parental rights are governed by "court order . . . . the state of a child's 'habitual residence' is irrelevant") _aff'd_, 901 F.3d 137, 145 (2d Cir. 2018).

Defendants in this matter charged them under _18 U.S.C. § 1201_[22] ; all of the indictments returned by the grand jury have charged them under _18 U.S.C. § 1204_ without mention of _18 U.S.C. § 1201_.[23] Accordingly, the Defendants are mistaken that they have been "charged with kidnapping according to _18 USC § 1201_, in order to pressure us to enter a guilty plea to at least International Parental Kidnapping according to _18 USC § 1204_." (Defs MIL at 12.)

Defendants also cite to many cases discussing the "generic definition of kidnapping." (Defs. MIL at 19-20.) However, generic definitions only apply where a term is undefined or where a generic definition is explicitly adopted within a statute. _See, e.g., Kouichi Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566, 132 S. Ct. 1997, 182 L. Ed. 2d 903 (2012)_ ("_When a term goes undefined in a statute_, we give the term its ordinary meaning.") (emphasis added). The IPKCA states that "[w]hoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights" is guilty of international parental kidnapping. _18 U.S.C. § 1204(a)_. Accordingly, "[t]o establish a violation of **[*82]** the IPKCA, the government must prove: (1) that the child had previously been in the United States; (2) that the defendant took the child from the United States to another country or kept the child from returning to the

United States from another country; and (3) that the defendant acted with the intent to obstruct the lawful exercise of another person's parental rights." _United States v. Houtar, 980 F.3d 268, 274 (2d Cir. 2020)_ (citing _United States v. Miller, 626 F.3d 682, 688 (2d Cir. 2010)_). Neither the statutory language nor the courts applying the statute require a showing of force. In fact, multiple courts have held that parental kidnapping is not categorically a crime of violence. _See, e.g., Woolverton v. City of Wardell, No. 1:17 CV 170 ACL, 2018 U.S. Dist. LEXIS 80655, 2018 WL 2193663, at *5 (E.D. Mo. May 14, 2018)_ (stating in context of analyzing claim for failure to train and supervise police officers that felony parental kidnapping is not a crime of violence).

In fact, the legislative history at H.R. Rep. No. 103-390 does not mention the will or desires of the removed, retained, or abducted child—defined as "a person who has not attained the age of 16 years"—other than to observe that "parental kidnappings seriously affect both the children and the parents deprived of rightful custody. Some child psychologists believe that the trauma children suffer from these abductions **[*83]** is one of the worst forms of child abuse." H.R. REP. 103-390, 2. The fact that children may suffer from being separated from their parents does not in and of itself mean that the removal or retention that is the basis for the IPKCA charge entailed force.

Because the law is clear that neither lack of force nor consent of the child are cognizable defenses under the IPKCA, Defendants are precluded from arguing to the jury that that they are innocent of parental kidnapping because the Defendants did not remove the Minors by force. Any such argument would only serve to "confus[e] the issues, [and] mislead[] the jury." _Fed. R. Evid. 403_.

### 3. The Validity of the Family Court Order

Defendants' papers suggest that they intend to dispute whether the Mother had "lawful" parental rights because they take issue with the process by which the Family Court issued its Order or the Family Court Order itself. (Defs MIL at 18.) They also seem to assert that the inclusion of the phrase "lawful exercise of parental rights" in the IPKCA invites inquiry into whether the Family Court had granted the Mother custody of the minors. They are mistaken on both counts.

As the Court held in its July 8 Opinion, "[d]efendants' contention **[*84]** that the Kings County Family Court should not have granted sole custody to the Mother did

---

[22] The federal crime of kidnapping under Section 1201 has since its adoption in 1934 "specifically excluded parental kidnapping" or the "taking of children without the consent of the other parent." _United States v. Mobley_, 971 F.3d 1187, 1203 and 1203 n.21 (10th Cir. 2020) (declining to incorporate definition from Section 1204 as opposed to Section 1201 in 18 U.S.C. § 875(b), which relates to, _inter alia_, transmission in interstate or foreign commerce of communication threatening to kidnap or demanding a ransom or reward for the release of any kidnapped person). Among other things, there is a lower statutory maximum sentence for kidnapping under the IPKCA (three years per count) than under Section 1201.

[23] Insofar as the Defendants further claim that me Rabbi Helbrans was wrongfully convicted in the 1990s because the Rabbi was helping the thirteen year old victim in that case to run away from abusive parents, the Second Appellate Division explicitly rejected that argument and held that "the acquiescence or even the willingness of a child will not satisfy the consent element of the statute," under which the late Rabbi Helbrans was charged, _New York Penal Law § 135.20_, kidnapping in the second degree. _People v. Helbrans, 228 A.D.2d 612, 617, 645 N.Y.S.2d 307 (2d Dep't 1996)_.

not entitle them to disobey it." *United States v. Helbrans, No. 19 Cr. 497 (NSR), 547 F. Supp. 3d 409, 2021 U.S. Dist. LEXIS 127618, 2021 WL 2873800, at *11 (S.D.N.Y. July 8, 2021)*; *see also McDonald v. Head Crim. Ct. Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988)* ("An order issued by a court must be obeyed, even if it is later shown to be erroneous.").

As addressed above, this Court does not have the authority to review the propriety of the Family Court Order or the process that resulted in it. Where a custody order has "supplant[ed] the default custody arrangement provided by state family law," that order and not the law of the child's state of habitual residence governs "parental rights" under the IPKCA. *Zodhiates, 235 F. Supp. 3d at 454-55*. Where, as here, parental rights are governed by "court order . . . . the state of a child's 'habitual residence' is irrelevant." *Id.* That Teller did not effectively challenge the Family Court's order even if Defendants sincerely believe it to be defective, did not give him or the Defendants leave to flagrantly disobey it and interfere with the sole parental rights it conferred on the Mother. *See United States v. Miller, 626 F.3d 682, 689 (2d Cir. 2010)* (affirming district court's exclusion of certain evidence proffered by IPKCA defendant because there was no evidence that the operative custody order in effect at the time of the alleged kidnapping was ever appealed **[*85]** or stayed and therefore, at the time defendant took the child, defendant was "required to comply with the Vermont court order which gave [the other parent] lawful parental rights to full custody, rights [the defendant] frustrated by keeping [the child] outside the United States").

Insofar as Defendants seek to further claim that the fact of Minor 1's marriage to J. Rosner somehow extinguished any parental rights held by either the Mother or Teller, that is an argument that should have been made to the Family Court. This Court does not have jurisdiction to second-guess or alter the Family Court's Orders. *Cf. Tuggle v. Cnty. of Cherokee., 147 F. App'x 52, 53 (10th Cir. 2005)* (stating in context of state prisoner's *28 U.S.C. § 2254* habeas petition that while federal courts have an "inherent power" to "make its records speak the truth," that power does not "permit[] a court to correct . . . a judgment of another court," including a state court). Additionally, insofar as Defendants claim that Minor-1 is in the process of seeking legal emancipation, no final order of emancipation has been presented to the Court and, in any event, the only relevant court orders in existence at the time of the charged crimes was the Family Court Order, which gave the Mother sole custody. **[*86]**

In sum, any arguments about the process by which the Family Court Order was obtained or the terms of the Family Court Order are irrelevant to whether Defendants intended to obstruct the Mother's exercise of parental rights, which clearly existed at least pursuant to the Family Court Order, and would only serve to "confus[e] the issues, [and] mislead[] the jury." *Fed. R. Evid. 403*; *see also United States v. Sardana, 101 F. App'x 851, 855 (2d Cir. 2004)* (holding that the district court did not abuse its discretion in excluding evidence defendant father sought to introduce in IPKCA prosecution suggesting that mother was unfit to be a custodial parent: "[s]uch evidence might have been relevant if Sardana had pursued a custody challenge against his wife in New York courts. It could not, however, justify his removal of their child from the United States to India in order to obstruct his wife's exercise of parental rights.").

### 4. Allegations that the Mother and Others, Rather than the Defendants, Engaged in Unlawful Acts Including But Not Limited to Parental Kidnapping

In their moving papers, Defendants contend that the Mother is a "clearly abducting parent, trying to take advantage by coming [to the United States]. (Defs. MIL at 15.) If the Mother interfered with Teller's **[*87]** parental rights, he could have pursued the return of his children through Hague Convention proceedings, which he unsuccessfully attempted by failing to comply with the Hague Court's orders, resulting in the dismissal of his petition with prejudice and dismissal of the subsequent appeal for failure to pay a required fee. As with the unsuccessfully challenged Family Court order already discussed, Teller's unsuccessful attempt to secure the return of his children through a Hague Convention petition did not give him or members of his community license to violate the Family Court order.

As the Court indicated above, the Mother's motivations for leaving Lev Tahor are irrelevant to the elements of the charged crimes and that, even if they provide context, their probative value would be outweighed by their potential to prejudice the jury against the Defendants. Except insofar as allegations regarding the circumstances surrounding the Mother's decision to or means of leaving Lev Tahor are directly relevant to a defense that Defendants were assisting the Minors to escape from a pattern or incidence of "domestic violence," their probative value is far outweighed by their prejudicial effect. Insofar **[*88]** as Defendants contend that the Mother should not have been granted custody of her children, including the Minors, that is an issue that

should have been presented to the Family Court and cannot be considered by this Court. Accordingly, to the extent that Defendants intend to present evidence of marital problems between the Mother and Teller, or describe her falling out with the Lev Tahor community, (*see, e.g.* Helbrans Draft Aff. at 40-78 (describing the Mother's opposition to the decisions of Lev Tahor Leaders; her subsequent threats to leave the community with her children and refusal to come to an agreement with Teller about who should keep their children; and, ultimately her efforts to take all six of her children with the assistance of various individuals, including people in Guatemala and from the United States, by abusing Guatemalan and other legal systems and using trickery violence), they are precluded from doing so.

Defendants also seem intent on offering evidence that various members of the rival Hasidic Jewish community Kasho assisted the Mother to engage in allegedly unlawful activity including removing the Minors from Guatemala, helping her to secure the Family Court Order, **[*89]** and assisting her to keep the Minors in the United States after she was awarded custody. As described above, insofar as Defendants wish to adduce evidence of purported mistreatment by the Mother and her colleagues in order to undermine the validity of the Family Court Order, such arguments are irrelevant to this proceeding. The only statutory defense that seems to be available to the Defendants is that the interfered with parental rights because the Minors were "fleeing an incidence or pattern of domestic violence." Insofar as Defendants allege that under the custody of the Mother, others, including members of Kasho, engaged in domestic violence—that is, physical violence—against the Minors, that evidence would be relevant to their possible statutory defense and its probative value would likely outweigh any prejudice. However, alleged mistreatment by the Mother or others of the children other than the Minors is not relevant to the charges against Defendants for kidnapping and transporting the Minors.

Additionally, insofar as Defendants seek to broadly introduce evidence of the "bad character" of the Mother or any of her alleged collaborators that is not directly related to their treatment **[*90]** of the Minors or the offenses charged in this case, that evidence is irrelevant to the issues on trial and will not be permitted. The Court also precludes Defendants from presenting evidence of Kasho's decades of crimes against Lev Tahor or attacks on Lev Tahor members not directly related to domestic violence toward the Minors.

## D. Transporting a Minor to Engage in Criminal Sexual Activity

Defendants appear to assert two theories of defense for the crimes charged in Counts One and Two: (1) Minor-1 consented to have sex with Jacob Rosner; and (2) any sexual relations between Minor-1 and Jacob Rosner were protected because they occurred within a marriage to which both of Minor-1's parents consented. The Government contends consent is not a valid defense under *18 U.S.C. § 2423* ("*Section 2423*" or "the Mann Act") and also alleges that Minor-1 and Jacob Rosner were never legally married. The Court addresses the viability of these defenses in turn.

### 1. Minor-1's Consent to Engage in Sexual Activity

Insofar as Defendants intend to argue that their conduct should be excused because Minor-1 consented to be transported and have sex with Defendant J. Rosner, an adult, such a defense is invalid under *Section 2423*.

*Section 2423(a)* provides:

> A person who knowingly **[*91]** transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

*18 U.S.C. § 2423(a)*. *Section 2423(a)* does not mention consent of the victim or lack thereof. "[C]onsent is irrelevant to a conviction under *§ 2423(a)*. Indeed, the very purpose for enactment of the Mann Act was to address situations where the victim consented to the exploitation." *United States v. Bennett, 258 F. App'x 671, 683 (5th Cir. 2007)*. Accordingly, Courts have consistently interpreted this provision to apply even where the victim consents to transportation or to engage in sexual activity. *See, e.g., Gebardi v. United States, 287 U.S. 112, 119, 53 S. Ct. 35, 77 L. Ed. 206 (1932)* (stating the Mann Act is drawn to include those cases in which the woman consents to her own transportation"); *United States v. Brooks, 610 F.3d 1186, 1199 (9th Cir. 2010)* ("[T]he victim's willingness to engage in sexual activity is irrelevant, in much the same way that a minor's consent to sexual activity does not

mitigate the offense of statutory rape or child molestation."); *United States v. Williams, 529 F.3d 1, 6 (1st Cir. 2008)* ("consent is not a defense to a prosecution under *section 2423(a)*"); *United States v. Abad, 350 F.3d 793, 798 (8th Cir. 2003)* ("The consent or willing **[*92]** participation of the 13-year old girl is insignificant and hardly relevant. '[W]hen sexual assaults are committed upon children . . . , consent is not a defense. The reason is that the victims in these cases, because of ignorance or deceit, do not understand what is happening to them. Therefore their 'consent' is of no significance.").

Instead of specifically defining which sexual activity is criminalized, *Section 2423(a)* states that it covers "sexual activity for which any person can be charged with a criminal offense." The indictments indicate that in addition to *Section 2423(c)*, the Defendants are charged with knowingly transporting Minor-1 with the intent that she would engage in "sexual activity for which any person can be charged with a criminal offense" under, *inter alia*, *New York Penal Law § 130.30* and Article 273 of the Penal Code of the State of Mexico,[24] (S2 ¶ 17; S3 ¶ 17.) The Court addresses these provisions in turn.

### a. Sexual Activity Proscribed by New York Law

New York law provides that "a person is guilty of rape in the second degree when . . . being eighteen years old or more, he or she engages in sexual intercourse with another person less than fifteen years old." *N.Y. Penal Law § 130.30*. The New York Penal Code states that "[w]hether or not specifically stated, **[*93]** it is an element of every offense defined in this article that the sexual act was committed without consent of the victim," *N.Y. Penal Law § 130.05(1)*, however, "lack of consent results from . . . incapacity to consent," *id.* at *§ 130.05(2)(b)*, and "a person is deemed incapable of consent when he or she is . . . less than seventeen years old," *id.* at *§ 130.05(3)(a)*. In other words, New York law "deems a child under age 17 to be incapable of consenting to sexual acts, and that presumption is irrebuttable." *People v. Simmons, 103 A.D.3d 1027, 960 N.Y.S.2d 527, 529 (3d Dep't 2013)*.

Accordingly, New York law defines anyone under the age of seventeen as legally incapable of consenting to

sexual activity, and therefore Defendants are legally prohibited from claiming as a defense that Minor-1 had the requisite mental capacity to consent despite her age.

### b. Sexual Activity Proscribed by Mexican Law

"Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence." *Fed. R. Crim. P. 26.1*. The Government has submitted the text and a translation of Article 273 of the Criminal Code of the State of Mexico and an affidavit by a Mexican legal expert, Jaime Cancino León. (Exs. A and B to Oct. 8 Ltr. (ECF Nos. 376-1 and 376-2).) **[*94]** Mr. León attests that under Article 273 of the Criminal Code of the State of Mexico, from at least 2010 to the present, it has been and continues to be a criminal offense for an adult to have sex with a fourteen-year-old and that it is no defense that the offender was religiously married to the victim. Unless Defendants provide competent evidence to the contrary, the Court is inclined to hold as a matter of law, and charge the jury, that Article 273 criminalizes sex with someone under fifteen years old, and that a religious marriage is not a defense to that crime.

### 2. Whether Minor-1 and Jacob Rosner's Marriage was Legally Recognized

Defendants appear to claim that any sexual activity between Minor-1 and Jacob Rosner was non-criminal because it was within a marriage to which both of her parents consented and which was consistent with their religious practices. The Government avers that Minor-1 and Jacob Rosner were never legally married and that religious marriages are not, without more, recognized by law.

New York recognizes marriage as a defense to sex offenses where the perpetrator was married to the victim. *N.Y. Penal Law § 130.10(4)* ("In any prosecution under this article in which the victim's lack of consent **[*95]** is based solely on his or her incapacity to consent because he or she was less than seventeen years old, . . . it shall be a defense that the defendant was married to the victim as defined in subdivision four of *section 130.00* of this article."). However, to invoke that defense, New York law requires "the existence of the relationship between the actor and the victim as spouses which is *recognized by law at the time the actor*

---

[24] The Indictments also allege that the intended sexual activity violates Guatemalan law; however, the Government indicated in its October 8, 2021 letter that it did not intend to pursue this allegation at trial.

*commits an offense* proscribed by this article against the victim." *N.Y. Penal Law § 130.00(4)* (emphasis added). Until July 20, 2017, New York permitted minors between the ages of sixteen and eighteen to marry with parental consent and minors between the ages of fourteen and sixteen to marry with parental consent and judicial approval; however, as of July 20, 2017, "[a]ny marriage in which either party is under the age of eighteen years is hereby prohibited," and in order for a seventeen-year-old to marry, both parental and court consent is required. *N.Y. Dom. Rel. Law § 15-a*, as amended by L. 2017, ch. 35, eff. July 20, 2017. In other words, New York no longer allows individuals under seventeen years of age to marry.

New York generally recognizes marriages conducted in other states or foreign countries under the doctrine of [*96] comity. *In re Est. of Ranftle, 81 A.D.3d 566, 917 N.Y.S.2d 195 (1st Dep't 2011)*. However, a marriage defense is only cognizable if the purported marriage was recognized by New York law. *See, e.g., People v. Ezeonu, 155 Misc. 2d 344, 588 N.Y.S.2d 116, 117-18 (N.Y. Sup. Ct. 1992)* (rejecting defendant's attempt to raise marriage defense where the purported marriage was not legally recognized in New York).

The Government has asked the Court to instruct that jury that Guatemala bans child marriage. (Oct. 8 Ltr.) Specifically, the Government has provided an affidavit from a Guatemalan legal expert, Mónica Medrano, which states that under Article 83 of the Guatemalan Civil Code, any marriage involving minors under the age of 18 is prohibited if it occurred after September 21, 2017 and that there are no exceptions for religious marriages. (Exhibits C and D to Oct. 8 Ltr (ECF No.s 376-3 and 376-4).) Unless the Defendants present competent evidence to the contrary, the Court is inclined to hold as a matter of law that child marriage is prohibited in Guatemala and to instruct the jury accordingly.

### 3. Religious Marriage is not Cognizable

Defendants do not appear to contest that Minor-1 and Jacob Rosner were never legally married. For example, Helbrans refers to the union as a "celestial marriage." (Helbrans Draft Aff. at 18 ("Jacob and [Minor-1], [*97] two inseparable and endearing lovebirds who joined in celestial marriage. Although both are young, there is no question or doubt whether there is an eloquent connection between the two."); *see also* Chaim Draft Aff. at ¶ 14 ("Jacob and [Minor-1] joined in celestial

marriage and lived as two inseparable and endearing lovebirds.").)

Courts have routinely held that "celestial marriages" are not legally cognizable. *See, e.g., State v. Fischer, 219 Ariz. 408, 415, 199 P.3d 663 (Ct. App. 2008)*, *as amended* (Aug. 6, 2008) (affirming trial court's ruling that "it would not instruct the jury on the statutory 'spouse' defense because whether [the minor] was his spouse was not an issue in the case due to the lack of evidence of a valid marriage" where defendant claimed that he and the minor had a "celestial marriage" and acknowledged that his "celestial marriage" did not comply with the civil requirements for a valid marriage under Arizona law); *see also Combs v. Tibbitts, 148 P.3d 430, 434 (Colo. App. 2006)* (holding in context of separation following couple 20-year domestic relationship that relationship, which the couple themselves referred to as a "religious" or "celestial" marriage was not legally cognizable).

Courts have similarly held that without a valid marriage license, religious marriage ceremonies do [*98] not create legally cognizable marriages. *See, e.g., United States v. Mancuso, 185 F. Supp. 3d 502, 503 (M.D. Pa. 2015)* (differentiating between a "religious marriage, performed pursuant to the religious tenets of the Islamic faith" and a "legal marriage" in the context of an international parental kidnapping case); *United States v. Bey, No. 10-CR-164, 2014 U.S. Dist. LEXIS 179090, 2014 WL 7465663, at *1 (E.D. Pa. Dec. 31, 2014)* (defendant convicted of violating *§ 2423(c)* where underlying offense conduct included sex with 14-year-old girl who he had married under Islamic law); *see also Pinkhasov v. Petocz, 331 S.W.3d 285, 291 (Ky. Ct. App. 2011)* (holding that couple could not "reasonably argue that a legally valid civil marriage was ever intended, effectuated or supposed" where the couple "directed Rabbi Litvin to solemnize a purely religious marriage ceremony, based solely upon the law of their Jewish faith, with no reference to the establishment of a civil marriage and absent certification or filing of any legal record documenting any marriage ceremony, religious or civil"); *Preure v. Benhadj-Djillali, 15 So. 3d 877, 878 (Fla. Dist. Ct. App. 2009)* (finding that no lawful marriage existed because under Oregon law "a lawful marriage presumes that the parties at least undertook efforts to satisfy the state's requirements for a valid marriage, one of which is to obtain a marriage license" and the evidence showed that the "parties intended a purely religious ceremony and that a legal marriage would occur [*99] later, and took no steps to obtain a marriage license").

Accordingly, unless Defendants demonstrate that the relationship between Minor-1 and Jacob Rosner was a marriage "*recognized by law*" in December 2018, the Court will not instruct the jury on a marital or spousal defense and Defendants may not argue to the jury that they are entitled to one.

The Court further notes that religious motivation is not a defense to otherwise criminal conduct. *See, e.g., United States v. Cleveland, 329 U.S. 14, 20, 67 S. Ct. 13, 91 L. Ed. 12 (1946)* (holding that the fact that a practice "is supported by a religious creed affords no defense in a prosecution" for that conduct because to hold otherwise "would place beyond the law any act done under claim of religious sanction"); *United States v. Rahman, 189 F.3d 88, 135 (2d Cir. 1999)* ("If the evidence showed that [the defendant] conspired to levy war against the United States or solicited others to commit crimes of violence . . . it would not constitute a defense that he was justified in doing so within a framework of Islamic Law."). Accordingly, Defendants may not claim at trial that the sexual relationship between Minor-1 and Jacob Rosner was sanctioned by their religious beliefs and therefore inoculates them from prosecution.

**E. Selective Prosecution**

The Government asks the Court to **[*100]** preclude any argument that the Defendants are being prosecuted because of their religious views. Typically, "a defendant who advances a claim of selective prosecution must do so in pretrial proceedings." *United States v. Sun Myung Moon, 718 F.2d 1210, 1229 (2d Cir. 1983)*. However, since the issue was not raised in the counseled motions filed in this matter and Defendants have not filed supplemental motions, the Court addresses it here.

Selective prosecution claims are rooted in "the equal protection component of the *Due Process Clause of the Fifth Amendment*, which dictates that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)* (internal quotation marks omitted). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *United States v. Armstrong, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)*. "The requirements for a selective-prosecution claim draw on ordinary equal protection standards. The claimant must demonstrate that the

federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)* (quotation marks and citations omitted). In order to be entitled to discovery on a selective prosecution claim, courts "require some evidence **[*101]** . . . [of] discriminatory effect and discriminatory intent." *United States v. Armstrong, 517 U.S. 456, 468, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)*. Evidence of discriminatory effect means a "a credible showing of different treatment of similarly situated persons." *Id. at 470*.

Defendants have failed to adduce any evidence of either discriminatory intent or discriminatory effect. While they observe that the IPKCA is a rarely used statute, they have failed to point to any factually similar instances in which individuals that were similarly situated but for their religion were not prosecuted. Their singular reliance on the prosecution of the late Rabbi Helbrans by the Brooklyn District Attorney in the 1990s does not come close to meeting the evidentiary requirement. First, the Defendants' purely speculative allegation that federal authorities declined to bring the case against the late Rabbi Helbrans "apparently because of clear supreme court precedent,"[25] (Defs MIL at 19) is insufficient to raise an inference of discriminatory intent or effect.

Second, Defendants are incorrect that "the case of the late Rabbi Helbrans was the only case in US modern history that the federal or the state uses the law of kidnapping when the 'generic definition of kidnapping' were not met. . . . The second **[*102]** case in history, or at least in modern history, is the present case." (Defs MIL at 20.) Multiple individuals have been convicted under the IPKCA without an allegation that the child was

---

[25] Defendants' reliance on *Dickson v. Ashcroft, 346 F.3d 44, 51 (2d Cir. 2003)* is unavailing. That case held, in the context of a case determining whether alien was subject to removal because his prior convictions constituted a "crime of violence." The Court held that "unlawful imprisonment of an incompetent person or a child under sixteen is not a crime of violence under *18 U.S.C.] § 16*, because it neither has as an element the use of force nor categorically involves a substantial risk that force may be used." *Id. at 52*. In support for that holding, the Court cited to the Second Department's decision upholding the conviction of the late Rabbi Helbrans, explaining that the late Rabbi Helbrans had been convicted "for second-degree kidnapping and finding that the thirteen-year-old victim had been restrained within the meaning of *NYPL § 135.00(1)(b)*, despite the victim's acquiescence to the restraint and the lack of use of force."

abducted with force, including individuals who are neither members of Lev Tahor nor Jewish. *See, e.g., United States v. Amer, 110 F.3d 873, 880 (2d Cir. 1997)* (upholding IPKCA conviction of father who removed his three children, the oldest of whom was ten years old, to Egypt from the United States without consent of their mother arguing, inter alia, that Egyptian law entitled the children to an Islamic upbringing, without any reference to consent or lack thereof of the children); *United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 51 (1st Cir. 2004)* (affirming IPKCA conviction of father who took two children from the United States to India, interfering with the mother's parental rights, without any allegation of force and where the court rejected defendant's claim that certain evidence was introduced to stoke "anti-Muslim fervor" because the whole family was Muslim).

Because "a selective prosecution defense alleges a defect in the institution of the prosecution, [it] is an issue for the court rather than the jury." *United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011)* (internal quotation marks omitted). Accordingly, because the Court has now determined that Defendants have not **[*103]** made the requisite showing to pursue a selective prosecution claim, they are precluded from making such a claim before the jury. *See Farhane, 634 F.3d at 127* (holding that the district court did not abuse its discretion in precluding defendant from arguing in summation that the Government had targeted him for prosecution based on his religion); *United States v. Loera, No. 09 Cr. 466 (BMC), 2018 U.S. Dist. LEXIS 96132, 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018)* (precluding defense arguments to the jury that the Government's motives were improper); *United States v. Stewart, No. 03 Cr. 717(MGC), 2004 U.S. Dist. LEXIS 789, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004)* (same).

### F. Historic Persecution by the United States or Foreign Countries

The Government asks the Court to preclude Defendants from arguing that the Lev Tahor community has faced persecution by the United States and/or Israel and Canada. Defendants' submissions, especially the draft affidavits of Jacob Rosner and Chaim Malka, provide decades of background regarding the historical conflict between Lev Tahor and Kasho, repeatedly claiming that due to improper financial and other influence from Kasho, various governments, including with the United States, Israel, and Canada, have persecuted Lev Tahor, including by smearing their community in the media. As

the Court has already stated, insofar as Defendants seek to introduce evidence of historic persecution to undermine the legitimacy **[*104]** of the Family Court Orders, those orders are not reviewable by this Court. Defendants have failed to explain the relevance of historic persecution, especially incidents that occurred decades ago, to either the elements of the charges against them or their defenses. Absent compelling argument regarding the relevance of historic persecution, Defendants will be precluded from presenting evidence at trial of historic persecution by the United States or any other government entity or from detailing long-standing tensions between Lev Tahor and any other community.

### CONCLUSION

For the foregoing reasons, the Government's motions *in limine* are granted in part and denied in part, and the Defendants' motions *in limine* are granted in part and denied in part, as explained above.

The Clerk of the Court is respectfully directed to terminate the pending motions at ECF Nos. 352, 353, 355, 366, 373, 382. Standby counsel for Helbrans and Rosner are directed to provide a copy of the Court's order to their respective pro se Defendants and to file proof of service on the docket.

Dated: October 12, 2021

White Plains, NY

**SO ORDERED**:

/s/ Nelson S. Román

**HON. NELSON S. ROMÁN**

**UNITED STATES DISTRICT JUDGE**

---

**End of Document**