1      IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
   UNITED STATES OF AMERICA,        )  Criminal Action
3                                   )  No. 1:22-CR-096-4
                    Plaintiff,      )
4                                   )  **BENCH TRIAL**
   vs.                              )
5                                   )  Washington, D.C.
   PAULA PAULETTE HARLOW,           )
6                                   )  **October 24, 2023**
                    Defendant.      )  **Time:  9:10 A.M.**
7

8             **TRANSCRIPT OF BENCH TRIAL**
        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
9               UNITED STATES DISTRICT JUDGE

10              A P P E A R A N C E S

11  For Plaintiff:      REBECCA G. ROSS
                        U.S. Attorney's Office
12                      610 D Street, NW
                        Washington, DC 20530
13
                        SANJAY HARIVADAN PATEL
14                      DOJ-CRT
                        Civil Rights Division, Criminal Section
15                      950 Pennsylvania Avenue NW
                        Washington, DC 20004
16

17  For Defendant:      ALLEN HOWARD ORENBERG
                        The Orenberg Law Firm, P.C.
18                      12505 Park Potomac Avenue
                        6th Floor
19                      Potomac, MD 20854

20

21
   Stenographic Court Reporter:
22
                        Tamara M. Sefranek, RMR, CRR, CRC
23                      Official Court Reporter
                        United States Courthouse, Room 6714
24                      333 Constitution Avenue, NW
                        Washington, DC  20001
25                      202-354-3246

1                        I N D E X

2   WITNESS                                        PAGE

3   CAROLINE DAVIS

4       Direct Examination by Mr. Patel        7, 54, 84

5       Voir Dire Examination by Mr. Orenberg       83

6       Cross-Examination by Mr. Orenberg           97

7
    SASHA PROCTOR
8
        Cross-Examination by Mr. Orenberg          36
9
        Redirect Examination by Mr. Patel          52
10

11  ASHLEY JONES

12      Direct Examination by Ms. Ross            118

13
    SPECIAL AGENT MICHAEL BISCARDI
14
        Direct Examination by Ms. Ross           138
15

16

17  GOVERNMENT EXHIBITS ADMITTED                   PAGE

    Exhibit 2015                                    66
18  Exhibit 3005                                    79
    Exhibit 1009                                    84
19  Exhibits 7360 and 7363                          94
    Exhibits 5001 and 5002                         148
20  Exhibit 5021                                   149
    Exhibits 5109, 5110, 5113                      150
21  Exhibits 5033, 5039, 5042, 5051, 5052          151
    Exhibits 3001, 3002, 3003, 3004, 3006          153
22  Exhibits 5066, 5070, 5072, 5082, 5083, 5091    153
    Exhibit 4001A                                  154
23  Exhibit 7361                                   178

24

25

1    P R O C E E D I N G S

2        THE COURTROOM DEPUTY:  United States v. Paula Harlow.

3    Counsel, would you please identify yourself for the record.

4        MS. ROSS:  Good morning, Your Honor.  Rebecca Ross

5    and Sanjay Patel on behalf of the United States.

6        Joining us at counsel table is Cody Smith, a

7    paralegal, and Special Agent Michael Biscardi.

8        THE COURT:  All right.  Good morning.

9        MR. ORENBERG:  Good morning, Your Honor.  Allen

10   Orenberg for Mrs. Harlow, Paulette Harlow, who is in the

11   courtroom.

12       I have a couple of preliminary housekeeping matters.

13       THE COURT:  All right.  Go ahead.

14       MR. ORENBERG:  Number one, with respect to the

15   Court's order at ECF 329 regarding whether or not character

16   evidence can be introduced -- I don't know if the Court

17   remembers that order or can pull it up.

18       THE COURT:  Right.

19       MR. ORENBERG:  It's my intention that during the

20   testimony of both Joan Bell and Jean Marshall to elicit from

21   them the background information and questions leading up to the

22   final question as to asking them for their opinion about

23   Mrs. Harlow's pertinent trait of being peaceful and

24   law-abiding.

25       THE COURT:  Okay.  So they're going to be character

1    witnesses besides fact witnesses, correct?

2              MR. ORENBERG:  Yes, Your Honor.  And the order

3    indicated that the Court would like to know ahead of time.

4              THE COURT:  Yes, because I want to make sure that

5    everybody does it correctly, which is not often.

6              MR. ORENBERG:  Right.  Okay.  All right.

7              THE COURT:  I'm not suggesting you are not going to

8    do it correctly, but it's useful to have it in advance.

9              MR. ORENBERG:  Very well.

10             THE COURT:  Okay.  So we'll have peacefulness

11   opinions as well as fact from Ms. Bell and Ms. Marshall.  Okay.

12             MR. ORENBERG:  Number two, during the defense

13   presentation of the case, it might be useful to the defense

14   witnesses if we have either an easel with paper on it or some

15   sort of whiteboard that they could draw, perhaps, diagrams of

16   the event scene and so forth.

17             I understand the government does not have an

18   opposition to this.

19             THE COURT:  As a demonstrative exhibit, I'm assuming?

20             MR. ORENBERG:  Correct.

21             THE COURT:  All right.  If it's a demonstrative

22   exhibit, it's demonstrative, it's part of the evidence; it's

23   not an exhibit being admitted into evidence.

24             MR. ORENBERG:  Correct.

25             THE COURT:  Okay.  That's fine.

1    MR. ORENBERG:  So it's okay to --

2    THE COURT:  We'll get something.

3    MR. ORENBERG:  Thank you, Your Honor.

4    THE COURT:  Anything else?

5    MR. ORENBERG:  I guess a little update on the

6    witnesses; the defense witnesses, Joan Bell and Jean Marshall.

7    I did speak again with both of their attorneys.  Mr. Brennwald

8    indicated that he -- again, he's not really -- he's standby

9    counsel.

10    THE COURT:  Right.  I just wanted to make sure that

11    he discussed with her the ramifications of doing this.  I will,

12    obviously, make an inquiry as well just to make sure it doesn't

13    come back to bite us.

14    MR. ORENBERG:  Correct.  He indicated that he was in

15    agreement or was acceding to -- it was his client's wishes to

16    go forward with her testimony.

17    THE COURT:  All right.

18    MR. ORENBERG:  And with respect to Jean Marshall and

19    Mr. Machado, Mr. Machado is somewhat on the same page.  I spoke

20    with him last night.  He says he's finishing up a trial today

21    in the Superior Court, and he would like to be present during

22    her testimony tomorrow.  I indicated to him it most likely

23    would be tomorrow sometime.  He said he should be able to be

24    available tomorrow.

25    THE COURT:  All right.  I'm not going to hold the

1    whole thing up to get him here, but we certainly can work

2    around schedules as much as we can.

3           MR. ORENBERG:  Okay.  Thank you, Your Honor.

4           THE COURT:  I understand that he would want to be

5    here.

6           Since we don't have the witness, my suggestion --

7    it's not a jury -- you can call another witness, and when she

8    shows up, we'll then do the cross.

9           MR. ORENBERG:  Okay.

10          THE COURT:  So we're not wasting time here.

11          Who is your next witness?  Can I just ask, is

12    Ms. Proctor, I think it is, on her way?

13          MR. PATEL:  Yes, Your Honor.  She was having car

14    trouble, but she's on her way.

15          THE COURT:  All right.  Is somebody going to know

16    when she shows up?

17          MR. PATEL:  Yes, we'll know.  We believe Ms. Caroline

18    Davis is here.  We need to check.  But she would be our next

19    witness.  If she's here, we'll put her up.

20          THE COURT:  All right.  That's fine.

21          MR. PATEL:  Your Honor, would it be all right with

22    you if our first witness, who is in the middle of -- she was

23    about to be cross-examined, Ms. Proctor, when she arrives, can

24    we take a break during Ms. Davis' testimony and have

25    Ms. Proctor --

```
 1              THE COURT:  It depends on where she is as to whether
 2     we, sort of, break in the middle.
 3              MR. PATEL:  Okay.
 4              THE COURT:  But if we're in -- we'll see where we are
 5     when she shows up.
 6              MR. PATEL:  Yes.  Thank you.
 7              THE COURT:  Is Ms. Davis here?
 8              MR. PATEL:  Yes, she is, Judge.
 9              THE COURT:  All right.  Ms. Davis, if you would step
10     up.  Thank you.
11              (Witness sworn.)
12              THE COURT:  All right.  Ms. Davis, you know you can
13     move the chair up and back.  Make sure you speak into the
14     microphone.
15              Also, make sure counsel finishes their question
16     before you start to answer even if you know what they're asking
17     you, and they should do the same for you.  If you hear the word
18     "objection" or they start to stand -- they're going to
19     object -- don't answer if you haven't started; and if you're in
20     the middle, if you would stop.  All right?
21              THE WITNESS:  Yes.
22              THE COURT:  Go ahead.
23              MR. PATEL:  Thank you, Your Honor.
24                          DIRECT EXAMINATION OF
25                             CAROLINE DAVIS
```

BY MR. PATEL:

Q.  Ms. Davis, could you introduce yourself; state your name
for the record, please.

A.  Yes.  My name is Caroline Davis.  Did you say spell it?

Q.  Sure.

A.  C-a-r-o-l-i-n-e, D-a-v-i-s.

Q.  Ms. Davis, how old are you?

A.  I'm 25 years old.

Q.  What state do you currently live in?

A.  State of Georgia.

Q.  Currently work?

A.  Yes.

Q.  What do you do?

A.  I'm a paralegal at a criminal defense law firm.

Q.  What state were you born in?

A.  I was actually born in the state of Georgia.

Q.  At any point in your life did you live in Michigan?

A.  Yes.

Q.  During what years or what time period did you live in
Michigan?

A.  The year 2017 through May of 2021 is when I moved away.

Q.  During the time you lived in Michigan, were you involved in
the pro-life movement?

A.  Yes, I was.

Q.  Did you meet a woman named Heather Idoni after you had

1    moved to Michigan?

2    A.  Yes, I did.

3    Q.  Who is Heather Idoni to you?

4    A.  Heather Idoni was a woman that I met at an abortion clinic,

5    and she became kind of like a mother figure to me; kind of took

6    me under her wing, spent a lot of time with me.

7    Q.  Do you remember approximately when it was that you first

8    met her?

9    A.  It would have been around when COVID first hit.  So I think

10   it was April or May of 2020, if my memory serves me correctly.

11   Q.  And Ms. Heather Idoni was a defendant in this case; is that

12   correct?

13   A.  Yes.

14   Q.  How often did you communicate with Ms. Idoni between the

15   time you met her and October of 2020?

16   A.  Well, it would have been -- it became almost on a daily

17   basis.  We spent a lot of days together because I was out at

18   the abortion clinic almost every single day, so she would a lot

19   of the time be standing with me.

20   Q.  And what would you do when you're outside of the abortion

21   clinic?

22   A.  We did what most people would refer to as, like, sidewalk

23   counseling.  So we just called out to moms and would tell

24   people our religious beliefs and try to hold them to that

25   standard.

1    Q.  And during that time, what was your position as it relates

2    to abortion care?

3    A.  At that time I was very against abortion.  I still am.

4    So -- yeah.

5    Q.  Did Heather Idoni share the same views as you did regarding

6    abortion?

7    A.  She did.  And at the time we held such extreme beliefs that

8    we even both agreed -- and she kind of brought me in on this --

9    to the rescue movement.  So previous to meeting Heather Idoni

10   and the people associated with her, I had never heard of rescue

11   before.  But she kind of educated me a lot on that as well.

12   Q.  What do you mean by rescue?

13   A.  Rescue as in the historical Christian doctrine of peaceful

14   interposition.  It's kind of like how it would be defined.

15   Really, it just means blockading abortion clinics, from keeping

16   patients from accessing.

17             MR. ORENBERG:  Objection, Your Honor.

18             THE COURT:  Why?  She's indicating what she has

19   been -- what she has called being educated in.  What's the

20   objection?  It's her understanding of what the education has

21   given her.  So it's her view of what this is.

22             MR. ORENBERG:  Right.

23             THE COURT:  What's the objection?

24             MR. ORENBERG:  It was along those lines and the fact

25   that she's beginning to testify as some sort of expert.

```
 1              THE COURT:  She's not talking -- I don't view it as

 2      an expert.  She's discussing what it is that she views herself

 3      as being educated in as views, period.

 4              MR. ORENBERG:  Very well.

 5              THE COURT:  I don't know whether you finished your

 6      answer or not.

 7              THE WITNESS:  I think I did finish.

 8      BY MR. PATEL:

 9      Q.  I'll follow up.  You used the word interposition.

10      A.  Yes.

11      Q.  How did that relate to blocking access to clinics?

12      A.  So interposition, from my understanding, was, basically,

13      placing yourself between the victim and the aggressor or

14      oppressor, however you want to say it.  So my understanding

15      was, like, the way that Jesus put himself on the cross for us

16      and our sin to, like, be an interposer for us.

17              We were to interpose ourselves between the baby and

18      the abortion doctor.

19      Q.  So the baby would be the victim, and the abortion doctor

20      would be the aggressor as you described it?

21      A.  Yes.

22      Q.  So this doctrine of interposition was -- is it fair to say

23      that's what was the -- that's what you meant by the word rescue

24      when you used it?

25      A.  Yes.
```

1    Q.  Now, you mentioned rescue generally meant blocking access

2    to a clinic.  Did I understand you correctly?

3    A.  Yes.  But I will say there are other forms of rescue, as I

4    understand, than just blocking access to the abortion clinic.

5    I actually participated in a rescue that did not have any

6    blocking involved, and then even some would say that rescue

7    could just be standing on a sidewalk and opening your mouth for

8    the weak and the destitute, to quote scripture.

9    Q.  I'll ask you about different types of rescue and your

10   understanding regarding that.

11         But before we get there, did you participate in any

12   clinic blockades or blocking access to clinics in Michigan?

13   A.  Yes.

14   Q.  Were you involved in a clinic blockade at -- in Sterling

15   Heights, Michigan?

16   A.  Yes, I was.

17   Q.  And that's a suburb of Detroit?

18   A.  Yes.

19   Q.  And did that incident or your participation in that

20   blockade occur in August of 2020?

21   A.  Yes.  I believe so, yes.

22   Q.  Did you also participate in blocking access to a clinic in

23   Nashville, Tennessee?

24   A.  Yes.

25   Q.  And did that occur in March of 2021?

1    A.  Yes, it did.

2    Q.  Were you indicted by the Department of Justice for your

3    involvement in the August Michigan blockade?

4    A.  Yes.

5    Q.  And were you also indicted by the Department of Justice for

6    your involvement in the March -- or the 2021 Nashville

7    blockade?

8    A.  Yes, I was.

9    Q.  Are you familiar with a rescue that occurred here in D.C.

10   in October of 2020?

11   A.  Very familiar.

12   Q.  Did that occur at the Washington Surgi-Clinic?

13   A.  Yes, it did.

14   Q.  Were you at the Surgi-Clinic when the clinic was blockaded

15   in October of 2020?

16   A.  Yes, I was.

17   Q.  How did you learn about that event taking place?

18   A.  Through Heather Idoni.

19   Q.  Can you tell the judge how it was that Heather Idoni came

20   to tell you about it; what she told you about the event that

21   was being planned in Washington, D.C.

22   A.  Yes.  I was told about it by Heather Idoni, I believe,

23   initially out in front of an abortion clinic in Flint,

24   Michigan.  She mentioned that Joan Bell, one of her heroes, was

25   going to be rescuing, and she saw this as an opportunity to

1   rescue with one of her heroes.

2           And at the time I was very much on the rescue train,

3   had very different beliefs than I do now.  And I -- she asked

4   if I was wanting to participate; and I didn't get a whole lot

5   of details other than Joan Bell was going to be there, and she

6   was very excited.  And she would take care of travel and

7   everything if I wanted to come along.

8   Q.  What was your understanding of what kind of rescue -- what

9   kind of rescue was going to take place in D.C.?

10  A.  I knew it was going to be a blockade.  Generally, when

11  people in the pro-life movement use the word rescue, stand

12  alone, like, if it's not Red Rose Rescue or something else, if

13  they just say rescue, generally, it's understood that means

14  blockade.

15  Q.  What's the point of participating in a rescue or a

16  blockade?

17  A.  The point is to prohibit women from having abortions that

18  day at that place.

19  Q.  Would it also be to prevent the clinic from being able to

20  provide abortion services?

21  A.  Absolutely.

22  Q.  You mentioned earlier there are different types of rescues?

23  A.  Yes.

24  Q.  Could you tell the judge what a traditional rescue is?

25  A.  Well, in my opinion, a traditional rescue would be to try

1    and block the doors for as long as possible to an abortion

2    clinic.

3    Q.  And how would you block the doors in a traditional rescue?

4    A.  In my opinion, from what I've seen, from what I've

5    participated in, generally, that includes sitting in front of

6    the doors.  Different methods can be used to try and buy time.

7              But from what I've seen, the majority is sit in front

8    of the doors as long as you can.

9    Q.  Would you or anybody participating in a traditional-style

10   rescue use your body to block the door?

11   A.  Yes.

12   Q.  Are you familiar with what a lock-and-block rescue is?

13   A.  Yes.

14   Q.  What is that?

15   A.  From my understanding, a lock-and-block rescue is when you

16   use different chains or bike locks or anything similar that can

17   keep you in your position for a longer amount of time.  It's a

18   method of rescue that tries to buy more time and keep you there

19   longer.

20   Q.  What is the point of buying more time?

21   A.  Well, the longer that you're there, the more the chances

22   that babies will not be aborted that day in that clinic.

23   So the goal is to try and sit there as long as possible.

24   Q.  How would the chains or locks prolong the rescue?

25   A.  When you have a bike lock or chains, generally, the police

1    department has to call the fire department or something like

2    that to try and figure out how to get rid of the chains or bike

3    locks.  I've seen it happen with my own eyes.

4            Actually, a rescue Heather Idoni participated in in

5    Saginaw, Michigan, she used a bike lock around her neck and

6    connected it to a gas pipe, and so it was this whole thing, and

7    they had to figure out, like, how to disconnect her safely.

8            So it bought a lot more time given that she

9    participated in it with only one other person.

10   Q.  Is it fair to call that a delay tactic?

11   A.  Absolutely.

12   Q.  What would a -- what is your understanding of why delay

13   tactics would be employed in a rescue?

14   A.  My understanding is that they would do so to try and sit

15   there longer to get the clinic shut down for the day.

16   Q.  Was there also a delay tactic involved -- that involved

17   passively resisting arrest?

18   A.  So my understanding -- especially because for the D.C.

19   rescue, it was discussed at the meeting --

20           MR. ORENBERG:  Objection.  It's outside the scope of

21   the question.

22           THE COURT:  Well, I think she's indicating what --

23   where she -- are you indicating where you heard about it; is

24   that what you're trying to say?

25           THE WITNESS:  Yes.

```
 1              THE COURT:  All right.  Let's move to what it is so
 2       we can get to where you heard about it.
 3              THE WITNESS:  Okay.
 4       BY MR. PATEL:
 5       Q.  Okay.
 6       A.  Going limp is one of the passive ways that I understand
 7       that people will try to buy time in that way.
 8       Q.  Are you familiar with what the FACE Act is?
 9       A.  I'm very familiar.
10       Q.  What is your understanding of what it is?
11       A.  My understanding is that the FACE Act is the Freedom to
12       Access Clinic Entrance Act.  It was enacted by the Clinton
13       Administration back when lots of blockading was taking place in
14       the '80s and '90s to abortion clinics by hundreds and hundreds
15       of people.
16              And so they brought up the FACE Act to try and stop
17       that and make people more scared to try and prohibit abortion
18       access.
19       Q.  Were you familiar with the FACE Act before you came to D.C.
20       to participate in the rescue that occurred at the Washington
21       Surgi-Clinic?
22       A.  Yes.
23       Q.  Is that a crime that you were charged with, with respect to
24       your participation in the blockades in both Michigan and
25       Nashville?
```

1    A.   Yes.

2    Q.   So let's pivot back to October of 2020.

3         Do you remember approximately when it was that Heather

4    Idoni contacted you about the event that was going to take

5    place in D.C.?

6    A.   I don't remember the exact time that she contacted me.  I

7    know we talked on Facebook about it, and I know we talked about

8    it in front of an abortion clinic in Flint, Michigan.  But it

9    would have been really close to when the rescue took place,

10   like, I barely had time to prepare to go.  And so it would have

11   been very close, like, days probably before.

12   Q.   Do you remember anything particular that she told you about

13   the event that was being planned in D.C. when you were

14   discussing it in Michigan?

15   A.   Specifically, Joan Bell rings in my head.  That was her big

16   thing, was Joan Bell was going to be there.

17   Q.   Is Joan Bell another defendant in this case?

18   A.   Yes.

19   Q.   What did Heather Idoni tell you about Joan Bell before you

20   came to D.C.?

21   A.   So she talked about the book that Joan Bell wrote.  My

22   understanding is that Joan Bell wrote a book while she was in

23   prison for doing rescue.  And the book was about her rescue

24   endeavors.

25         And so Heather had read the book and was very

1  inspired by it.

2  Q.  Based upon what Ms. Idoni told you, did you know what type

3  of rescue was being planned for here in D.C.?

4  A.  I understood that it was going to be a traditional rescue.

5  But at the time -- like, before we got there and before we were

6  at the meeting before the rescue, I did not know all -- I

7  didn't know much.

8  Q.  Relative to when the event here in D.C. took place, when

9  did you leave Michigan to travel to D.C.?

10  A.  It would have been the day before.

11  Q.  And how did you get here to D.C.?

12  A.  We drove in Heather Idoni's car.  And Heather Idoni and Eva

13  Zastrow did the driving.  Eva Zastrow did a lot of the driving.

14  Q.  Who is Eva Zastrow?

15  A.  Eva Zastrow is -- she is the daughter of a man named Cal

16  Zastrow, and she was one of my friends.  And we would stand at

17  the abortion clinics a lot together, and she also participated

18  in rescues with me.

19  Q.  Why did you mention Cal Zastrow, her father?

20  A.  Because Cal Zastrow is kind of like the leader of the group

21  that I was in.  So the way that I look at it, more or less, is

22  the group that did the rescue here in D.C. was kind of like a

23  different group set apart.

24          The group I was in didn't generally work with that

25  group and -- except Heather Idoni had slightly different views

1    than the rest of us.  So Cal Zastrow, being the leader, I guess

2    my mind just always goes there.

3    Q.  Can you tell the judge about any conversations you had with

4    Heather Idoni or Eva Zastrow about what was going to take place

5    in D.C. during the car drive from Michigan?

6    A.  Well, there wasn't a whole lot of information that was

7    given on the way down.  Eva Zastrow and I felt very out of the

8    loop, like we both felt very underprepared for what was going

9    to happen.

10            Heather Idoni mostly just talked about, like,

11   Joan Bell, and then she also talked about her previous rescue

12   endeavors quite a bit; how many times the Lord delivered her

13   from, you know, the FACE Act charges, things like that.

14   Q.  When you say delivered her from FACE Act charges, are you

15   talking about Heather Idoni or Joan Bell?

16   A.  Sorry.  Heather Idoni.  She said that she had been -- done

17   a lot of rescues in the past and that God had delivered her

18   from being charged with FACE.

19   Q.  Did you ask Heather Idoni about where you were going or

20   where you were particularly driving to on your way to D.C.?

21   A.  Yes, I did ask questions.  But her answer was a lot of the

22   time something like, oh, the Holy Spirit is leading us, we

23   don't need to worry about it, or something like that.  She had

24   an address that we were driving to, and it was, like, a

25   pastor's house; and that's where the meeting was going to

1    happen.  And that's, like, all the information I had.

2              I didn't know who the pastor was.  I didn't know who

3    was going to be at the meeting.  Like, I didn't have a lot of

4    information.  I felt very underprepared.

5    Q.  Did you arrive in D.C. the same day when you left Michigan?

6    A.  Yes.  It was that late afternoon/early evening kind of

7    time.  I think around 5:00 or 6:00 p.m., from the best of my

8    memory.  I know that we arrived before everybody else.  Like,

9    we were really early; uncomfortably early.

10   Q.  So when you say 5:00 or 6:00 p.m., you meant that's when

11   you arrived in D.C.?

12   A.  I think so.

13   Q.  Was that the day before the rescue took place at the

14   Washington Surgi-Clinic?

15   A.  Yes.

16   Q.  Did you drive to the address that Ms. Idoni had, the

17   pastor's house?

18   A.  Yes.

19   Q.  Could you tell the judge about what happened when you got

20   there.

21   A.  When we got there, we went up to the door, and it seemed

22   like the pastor and his wife were not expecting us at that

23   time.  And it was very uncomfortable.

24             We -- they were still preparing for all of the people

25   to come, and so we kind of like sat in there and talked with

```
 1    them for a little bit.  And then, eventually, people started
 2    showing up.
 3    Q.  Who were you expecting to show up?
 4    A.  I was expecting to show up all the people who were going to
 5    participate in the rescue, and then I -- also, Heather said
 6    some people might come that might not do it but just want to
 7    hear about it.
 8    Q.  Did people eventually show up?
 9    A.  Yes.
10    Q.  Who are some of the people who came to this meeting?
11    A.  Well, everyone who was participating in -- who actually
12    participated was there, except I'm not 100 percent -- I don't
13    remember 100 percent sure if Will Goodman was there or not.
14    John Hinshaw, I'm also not 100 percent sure.  Everyone else,
15    though, was at that meeting for sure in my memory.
16    Q.  When you say everyone else, do you mean all of the
17    defendants who are charged in this case?
18    A.  Yes.  And aside from them, there was other people who did
19    not participate in, actually, blockading.
20    Q.  What happened after everybody arrived?
21    A.  Lauren Handy started talking about rescue.  She, like, gave
22    a history on rescue, like, brief.  She went through the FACE
23    Act.  She talked about why it was important for them to do the
24    rescue at the surgi-center.  And they talked about, like, a
25    brief idea of what the plan was.
```

1          They asked who -- when I say they, I mean her and

2     Jonathan.  Because Jonathan Darnel also, kind of, participated

3     in leading.  They asked who was going to rescue for sure.  They

4     asked people to raise their hands.  They talked about -- like

5     they answered people's questions.

6          There was discussion about locking and blocking.

7     That wasn't really brought up by Lauren.  I think it was

8     brought up by, like, group discussion.  People were talking

9     about wanting to do that.  She said if the Holy Spirit leads

10    you, that's your decision.  And the same thing with going limp,

11    that was discussed.  So, yeah.

12    Q.  So you mentioned two names.  You said Lauren Handy and

13    Jonathan Darnel?

14    A.  Yes.

15    Q.  They're defendants in this -- they were defendants in this

16    case, also charged, right?

17    A.  Yes.

18    Q.  Is that your understanding?

19    A.  Yes.

20    Q.  Were you able to determine during this meeting who, at

21    least to you, appeared to be the leaders or organizers of this

22    rescue?

23    A.  Yes.  From my perspective, it was clearly Lauren Handy, and

24    then Jonathan Darnel also seemed to lead as well.

25    Q.  You mentioned Lauren Handy talked about rescue; is that

1    right?

2    A.  Yes.

3    Q.  Is what she discussed regarding rescue consistent with what

4    your understanding of rescue was --

5    A.  Yes.

6    Q.  -- as you explained it to the judge today?

7    A.  Yes.

8    Q.  You also said Lauren Handy talked about the FACE Act; is

9    that right?

10   A.  Yes.

11   Q.  Did she discuss FACE Act in a way as you understood it and

12   you explained it to the judge today?

13   A.  Yes, she did.  And she also discussed the possible

14   penalties that you could face if you were charged with the FACE

15   Act.

16   Q.  Was there any discussion about risking arrest?

17   A.  Yes.

18   Q.  Could you tell the judge about that, please.

19   A.  Yes.  So, basically, she let everyone know that if you did

20   participate in blockading that you would be risking arrest and

21   that most likely you would be going to jail.  But she also

22   talked about how, if you didn't want to risk arrest, there was

23   ways that you could assist and help without going to jail.

24   Q.  When you say she, who are you referring to?

25   A.  Sorry.  Lauren Handy.

1  Q.  Did anyone collect any information regarding who it was

2  that was planning on risking arrest?

3  A.  Yes.  So after everyone raised their hands indicating that

4  they would be risking arrest and would want to blockade,

5  Jonathan Darnel passed around a sheet of paper, and he asked

6  the rescuers to write their emails on the sheet of paper.  That

7  way if anything went haywire or wrong or he felt the need to

8  send out urgent information, he would have the emails necessary

9  to do that.

10        I, actually, put my name on the list because I was,

11  like, well, even if I'm not getting arrested, I still want to

12  know what's going on if something goes bad, and so did Eva

13  Zastrow.  So that paper went around.  I don't know who all put

14  their emails on it, but I know for sure everyone that risked

15  arrest did.

16  Q.  What else was discussed at this meeting in terms of what

17  was going to happen the next day?

18  A.  So the night before, at that meeting, I didn't pay a whole

19  lot of attention to a lot of it, mostly because I was pretty

20  sure I wasn't going to risk arrest.

21        From my memory, they talked about the clinic a little

22  bit, they talked about abortion, they talked about rescue, they

23  talked about FACE.  They went back and forth on ways to buy

24  time.  And other than that, I don't really remember.

25  Q.  Can you tell us what it was that was clear to you that was

1     going to happen the next day at the clinic?

2     A.  It was clear to me that people were going to be blocking

3     the doors of an abortion clinic.

4     Q.  What was your understanding of why they were going to be

5     blocking the doors?

6     A.  My understanding is that they believed that they were going

7     to be keeping moms from having abortions.

8     Q.  And had you decided what you were going to do the next day?

9     A.  So I was very much on the fence, like, leading up to it.  I

10    had discussed the possibility of doing it with Eva Zastrow

11    specifically, but she was told by her dad that she was not to

12    participate, and I asked her why that was.  And I actually

13    heard -- I heard the conversation she had with her dad on the

14    phone too.

15          She -- her dad didn't want her to participate because

16    there was Catholics involved, and he didn't believe that

17    Catholics were legitimate Christians, from my understanding.

18    And so -- that's why I say, like, I was part of a different

19    group at the time.

20          So my understanding was, like, okay, so it's wrong to

21    participate with Catholics then; and I don't believe that now.

22    I mean, I don't believe anyone should be breaking the law.  But

23    he, basically, said that that was wrong.

24          And then there was a transgender individual that was

25    also participating, and he was, like, these people are doing it

1    for the wrong reasons.  And so I followed that lead.  And also,

2    when I saw the group, it just kind of did seem very different

3    from what I was used to and very eclectic.  And so I was, like,

4    okay.  So I chose not to participate in risking arrest

5    Q.  So by choosing not to participate in risking arrest, what

6    did you -- what were you not going to do?

7    A.  I was not going to block doors, but I was comfortable with

8    helping in other ways.

9    Q.  What was your understanding of what somebody had to do to

10   participate in the rescue in order to be arrested?

11   A.  Well, my understanding was that you couldn't ever be

12   100 percent sure that you weren't going to be arrested if you

13   were in the nearby vicinity and breaking the law in one way or

14   another.  So if you're trespassing, you have a really good

15   chance of getting arrested.  That was my understanding.

16          But if you block the doors and you're not getting up,

17   for sure, if the police show up, you're probably going to go to

18   jail.  So my understanding was to keep away from the -- that

19   area where the doors were and to keep away from the police

20   officers as much as possible to avoid getting arrested.

21   Q.  At this meeting, I believe you mentioned there was some

22   discussion about using locks?

23   A.  Yes.

24   Q.  Could you tell the judge about that, please.

25   A.  Yes.  From my understanding, there was individuals who were

1  very passionate about using chains and locks, that believed

2  that buying more time was crucial even though they had a large

3  number of people that were going to participate.  My

4  understanding was that that was a divisive topic, though.

5       Some people didn't want to add charges and felt like

6  that would do that or that it was unnecessary.  Some people

7  were, like, this is -- of course, this is what we have to do;

8  we should go all the way.  So there was back-and-forth on that.

9  Q.  Do you remember who it was that talked about the locks and

10 chains?

11 A.  At the time I did not know their names.  This was my first

12 time meeting almost everybody there.  So at the time I wasn't

13 familiar with who it was.

14      I do remember the vicinity of the room where the

15 discussion was mostly being had.  I remember it was a lot of

16 older -- older women, and that's about it.

17 Q.  Did you later learn who it was that was doing some of the

18 talking?

19 A.  Yes.  Later, I definitely started putting faces to names,

20 especially by now.  I've had a lot of time going through the

21 events in my head.  But at the time I did not know.

22 Q.  So who was it that was talking about the locks and chains?

23 A.  Well, I know for sure that Joan Bell was one of those

24 individuals, and I believe the defendant here today was one of

25 those individuals.  And there was another lady who was a

1    defendant in the last trial that had the bandana.  I still --

2    her name is not sticking in my head, but -- yes, those women.

3    Q.  You said the defendant here today.  Do you know her name?

4    A.  Is it Pauletta?  Paulette?

5    Q.  If you know.

6    A.  I don't remember exactly.  Every time I read it, I'm, like,

7    oh, yeah.  My -- my memory is not very good.

8    Q.  When you say the defendant who is here today, could you

9    point at her and describe something she's wearing for the

10   judge, please.

11   A.  Yes.  She's wearing glasses.  She has hair that seems to go

12   down a little past her chin.  She's wearing a top with

13   multicolors.  It's got purple and yellow and green and white.

14   Q.  What color is her hair?

15   A.  Her hair is white.

16           MR. PATEL:  Your Honor, will the record reflect an

17   in-court identification of the defendant?

18           THE COURT:  Any objection?

19           MR. ORENBERG:  No objection.

20           THE COURT:  Let the record reflect that she's

21   identified Ms. Harlow.

22   BY MR. PATEL:

23   Q.  Was there any discussion at this meeting about keeping the

24   police occupied?

25   A.  Yes.

1    Q.  Could you tell the judge about that.

2    A.  Yes.  My understanding was that Lauren Handy was going to

3    handle talking with the police officers and that the goal was

4    to educate them on rescue, as well as try and convince them to

5    join in and not arrest anybody that was participating in the

6    rescue; to try and buy time and things of that nature.

7    Q.  Was there any talk about the number of people that were

8    needed or who were needed to participate in blocking the clinic

9    doors?

10   A.  I don't remember if there was discussion about how many

11   people were needed.

12   Q.  Just circling back to the locks and chains, was there any

13   other discussion about employing delay tactics, as you

14   described earlier in your testimony?

15   A.  Well, there was a discussion about -- I don't believe we

16   talked about blowfish at this rescue.  So I don't think so.  I

17   think those were the main time -- the main time -- time wasters

18   or whatever.

19   Q.  You mentioned the word blowfish.  What does that mean?

20   A.  In rescue, a common tactic to buy time is to have people --

21   from my understanding, is to have people who don't want to

22   actually risk arrest look like they're going to risk arrest,

23   and then when the police officers start giving warnings, that's

24   when the blowfish exit the scene.  And then just the people who

25   are actually going to risk arrest are left.

1          The thinking behind that is, A, police officers

2    are looking at it from a paperwork perspective, according to

3    rescuers.  They don't want to do that paperwork; they don't

4    want to arrest all of those people.  Maybe they'll just let

5    everyone sit there for the whole day; that's happened before.

6          There's other thoughts on it too.  It looks a lot

7    more intimidating when you have more people than less people.

8    So, yeah, it buys time to have extra people that actually

9    aren't going to risk arrest.

10   Q.  When the topic of risking arrest came up, was there any

11   discussion about going limp?

12   A.  There was discussion about going limp, but it was brief.

13   And Lauren Handy said, if it -- if the Spirit leads you to do

14   that, I will not stop you; like, that's your thing.

15         It seemed like Lauren wasn't saying, like, everyone

16   needs to do that.  It was more of, like, a personal decision.

17   Q.  And what would the point be of going limp?

18   A.  The point would be to buy more time.  It's a lot easier for

19   a police officer to arrest and take away a person that's

20   cooperating than somebody that is a really heavy person going

21   completely limp, and they maybe have to have an extra officer

22   help with that.  So it buys more time at the very end of the

23   rescuer.

24   Q.  Did either of the group's leaders, Lauren Handy or Jonathan

25   Darnel, talk about a fake appointment that was made at the

1    clinic?

2    A.  There was discussion about a fake appointment, but I don't

3    believe I heard about that until the morning of the rescue at

4    the meeting before we went over to the clinic.

5    Q.  We'll get to that in a second.  I just want to cover all of

6    the things that were discussed at the meeting the night before.

7    A.  Okay.

8    Q.  Is there anything else that was talked about at this

9    meeting that you haven't covered?

10   A.  Off the top of my head, I can't think of anything.  It's

11   possible.

12   Q.  How about a walk-through of what was going to happen the

13   next day?

14   A.  There was a walk-through.  But at that time I don't think I

15   was really paying attention at the night before when they went

16   through that.  I did pay attention the next day.

17   Q.  What was the plan once this meeting was concluded?

18   A.  The plan was for everybody to go to the place that they

19   were going to sleep.  There was a host home in the area that I

20   stayed at with, actually, the majority of the rescuers, as well

21   as other individuals that were going to help but not risk

22   arrest.

23        Lauren Handy didn't stay there, Jonathan Darnel did

24   not stay there, and Herb did not stay there.  They went

25   somewhere else.  We were going to meet up the next day.

1          So there was a plan to do so.  I didn't have the

2     address of where we were going to meet.  I don't remember the

3     time of where we were going to meet.  But there was a plan to

4     meet up the next day before going to the abortion clinic.

5     Q.  You mentioned the name Herb.  Are you referencing Herb

6     Geraghty, who was also a co-defendant in this case?

7     A.  Yes.

8     Q.  Did everybody except for Lauren Handy, Jonathan Darnel, and

9     Herb Geraghty stay at a common location the night before?

10    A.  Yes.

11    Q.  Did it appear to you as though there were many rescuers who

12    had traveled from out of state to participate in this rescue

13    here in D.C.?

14              MR. ORENBERG:  Objection, speculation.

15              THE COURT:  Unless -- either she knows or she doesn't

16    know.

17    BY MR. PATEL:

18    Q.  Do you know?

19    A.  So based off, like, common sense, everyone staying at a

20    house that's not their own, would indicate that people are not

21    from that area.  So I could have put that together.  But I

22    didn't specifically sit around and think about it at the time.

23    Q.  Did many of the rescuers who participated in the rescue the

24    following day stay at a common house?

25    A.  Sorry.  Could you ask that one more time.

1    Q.  Did many of the rescuers -- except for Lauren Handy,

2    Jonathan Darnel, and Herb Geraghty -- did you all stay at a

3    common house?

4    A.  Yes.

5    Q.  The night before the rescue?

6    A.  Yes.

7    Q.  Who had the details of what time to wake up and where to

8    meet the next morning?

9    A.  It seemed like everybody was pretty informed, and I was

10   just following around.

11          MR. ORENBERG:  Objection.  It seemed like; that's

12   speculation..

13          THE COURT:  All right.  It has to be something that

14   you know with more certainty than just seemed like.

15          THE WITNESS:  Okay.

16   BY MR. PATEL:

17   Q.  Did Heather Idoni know -- did she stay with you at this

18   home the night before the rescue?

19   A.  Yes.  Heather Idoni stayed with us, and I just followed her

20   around.  So she had information; I didn't, really.

21   Q.  Did you know what time to wake up the next morning?

22   A.  I did know.  I don't remember right now what time that was.

23   Q.  And then who did you -- who led you or took you to the

24   meet-up location the following morning?

25   A.  So from my memory, we went in Heather Idoni's car, and

1  people went in other cars.  I think there was even a big van,
2  but I don't specifically remember.  All I know is that we made
3  it from point A to point B.
4  Q.  And this point B, was it at a location near the Washington
5  Surgi-Clinic?
6  A.  Yes.
7  Q.  Do you know how long or what time approximately you met
8  relative to when the clinic actually opened?
9  A.  I mean, I don't remember the exact time.  It wasn't long
10  before the clinic opened.  But there was a period of time where
11  I was, like, are we ever going to do something?  I remember
12  going and getting coffee at one point.
13        So it was enough time to have a discussion and have
14  everybody there and ready to go, but it wasn't, like, two hours
15  or anything like that.
16  Q.  Okay.  And then the following morning, did you and the
17  other rescuers meet up at this location?
18  A.  Yes, we did.
19        MR. PATEL:  Your Honor, would it be okay if we take a
20  break at this point and we have Ms. Proctor return to the stand
21  for cross-examination?  She's arrived.
22        THE COURT:  All right.  Mr. Orenberg, if you don't
23  have a problem, we can do that, and then we can excuse the
24  other witness.
25        MR. ORENBERG:  No.  No problem, Your Honor.

```
 1              THE COURT:  We have to finish another witness.  I'll
 2     ask you to step down.  You know not to talk about your
 3     testimony, and then we'll bring you back as soon as we're
 4     finished.
 5              THE WITNESS:  Okay.
 6              (Interruption of Witness Davis.)
 7              THE COURT:  Ms. Harlow, if you ever want to stand,
 8     that's not a problem, if that makes it easier for you.
 9              MR. ORENBERG:  She wants to stretch her legs a
10     little.
11              THE COURT:  That's fine.  Not a problem.  We don't
12     have a jury here, so it doesn't make any difference.
13              If you can go ahead and sit down.  I would just
14     simply remind you that you're still under oath.  If you could
15     give us your name, please.
16              THE WITNESS:  Sasha Proctor.
17              THE COURT:  Okay.  We were at the point of doing
18     cross, the direct having been concluded.  Mr. Orenberg?
19              MR. ORENBERG:  Thank you, Your Honor.
20                         CROSS-EXAMINATION OF
21                           SASHA PROCTOR
22     BY MR. ORENBERG:
23     Q.  Good morning, Ms. Proctor.
24     A.  Good morning.
25     Q.  My name is Allen Orenberg.  I represent the defendant in
```