# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:22-cr-00327 |
| ) | Judge Aleta A. Trauger |
| [1] CHESTER GALLAGHER ) | |
| [2] HEATHER IDONI ) | |
| [3] CALVIN ZASTROW ) | |
| [4] COLEMAN BOYD ) | |
| [6] PAUL VAUGHN ) | |
| [7] DENNIS GREEN ) | |

## MEMORANDUM & ORDER

The Government has filed a Motion to Preclude Improper Arguments and Irrelevant Evidence (Doc. No. 359), to which the defendants have filed a Response (Doc. No. 384), the Government has filed a Reply (Doc. No. 412), and the defendants have filed a Sur-Reply (Doc. No. 419). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND

The Freedom of Access to Clinic Entrances ("FACE") Act creates both civil and criminal liability for any person who, "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services."[1] 18 U.S.C. § 248(a)(1). The protection of the FACE Act extends to the obtaining or providing of any "reproductive health services," which the Act defines to include all "medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the

---

[1] It also extends similar protections to religious worship and prohibits vandalism of qualifying facilities. 18 U.S.C. § 248(a)(2)–(3).

termination of a pregnancy," whether "provided in a hospital, clinic, physician's office, or other facility." 18 U.S.C. § 248(e)(5).

As the court has noted before in this case, the FACE Act has, in practice, been "particularly salient" to the strategy, adopted by some activists, of interfering with access to medical facilities that provide procedures or treatments resulting in the intentional termination of a pregnancy—that is to say, what are typically referred to as abortions. (Doc. No. 282 at 2.) Complicating matters somewhat, however, is the fact that actual interference in the provision of reproductive health services is not the only reason why such individuals might gather near facilities protected by FACE. Such individuals might, instead, choose such facilities as sites for peaceful, lawful protest. Protests targeted at facilities known to provide abortion-related services are, broadly speaking, protected by the First Amendment, in the same manner that the First Amendment would protect a protest of any other business based on, for example, its treatment of employees or consumers. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 909, 102 S. Ct. 3409, 3423 (1982).

In an attempt to draw the line between lawful protest and improper injury, intimidation, or interference, the FACE Act instructs that it shall not be construed "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." 18 U.S.C. § 248(d)(1)–(2). The Act also provides statutory definitions for the terms "interference," "intimidation," and "physical obstruction" that ensure that the Act applies only to actions involving restriction on physical freedom of movement, interference in access to property, or actions causing a person to experience reasonable fear of harm:

> (2) Interfere with.--The term "interfere with" means to restrict a person's freedom of movement.

> (3) Intimidate.--The term "intimidate" means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.
>
> (4) Physical obstruction.--The term "physical obstruction" means rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous.

18 U.S.C. § 248(e). Accordingly, even aside from any applicable First Amendment protections, the FACE Act, by its own language, criminalizes neither protesting at facilities that provide reproductive healthcare nor any other activity protected by the First Amendment. 18 U.S.C. § 248(a)(1).

The defendants are alleged to have violated the FACE Act on March 10, 2021, in connection with the barricading of a clinic in Mt. Juliet, Tennessee that provided "reproductive health services, including abortion." (Doc. No. 3 ¶ 1.). According to the Indictment, the defendants promoted their actions expressly as a "rescue," and spoken instructions that defendant Chester Gallagher gave to the other defendants during the events confirmed an understanding that those members of the group who physically obstructed clinic entrances would be arrested. (*Id.* ¶¶ 21–22.) Gallagher contemporaneously boasted over social media that the defendants' efforts had successfully "already turned away one couple" and that their intention was to "stop as many murderous appointments as we can." (*Id.* ¶ 27.)

The Indictment states two counts against all of these defendants. Count 1 is not a charge directly under the FACE Act, but rather 18 U.S.C. § 241, which makes it unlawful for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." 18 U.S.C. § 241. (*Id.* ¶¶ 5–27.) Count 2 is a FACE Act charge based on the allegation that the defendants,

> aiding and abetting one another, did by force, threat of force, and physical obstruction, intentionally injure, intimidate, and interfere with, and attempt to injure, intimidate, and interfere with Patient A, Employee A, and the other employees of the Clinic, because Patient A was obtaining, and the Clinic was providing, reproductive health services.

(Doc. No. 3 ¶ 29.)

On March 8, 2023, the defendants filed two Joint Motions to Dismiss Indictment (Doc. Nos. 240, 242), followed the next day by an Amended Joint Motion to Dismiss Indictment (Doc. No. 245) that superseded one of the earlier motions (Doc. No. 242, which the court then denied as moot). The defendants argued, among other things, that the Government has engaged in improper selective prosecution based on the defendants' views and that the FACE Act is inconsistent with the First Amendment and/or the Religious Freedom Restoration Act.

On July 3, 2023, the court denied the motion. (Doc. No. 283.) The court acknowledged that there are "serious constitutional issues implicated by this case" that will require the Government to "hew[] closely to the lines Congress and the Constitution have set." (Doc. No. 282 at 31.) At the same time, however, the court noted that the FACE Act had repeatedly been held to be constitutional, including by the Sixth Circuit, and that a prosecution that scrupulously honored the boundaries set by Congress would not violate the First Amendment. (*Id.* at 18–19 (citing, *inter alia*, *Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002) ("[W]e are satisfied that the Act easily passes muster . . . .")).) The court also cautioned the defendants against focusing their energy and attention on issues that, whatever their rhetorical weight in the minds of the defendants themselves, were either entirely unmeritorious or were far removed from the actual matters at issue in this case. (*Id.* at 31–32.)

The Government has now filed a Motion to Preclude Improper Arguments and Irrelevant Evidence (Doc. No. 359), asking the court to set some basic ground rules for navigating these

issues at trial. Some of the governments' requests involve detailed issues of hearsay and the completeness doctrine, which the court has discussed with the parties and will resolve at a later date. The other arguments, however—which involve the more general boundaries of the defendants' arguments and evidence—will be considered together herein.

## II. ANALYSIS

### A. Improper Encouragement of Jury Nullification

"The settled conclusion of American courts has been that nullification is a power" of juries, "but not a right." *Wofford v. Woods*, 969 F.3d 685, 709 (6th Cir. 2020). The defendants have assured the court that they do not intend to argue for jury nullification in this case "as a general principle." (Doc. No. 384 at 2.) There are, however, ways to encourage jury nullification without expressly acknowledging it—particularly, by trying to draw the jury's attention away from the facts and law that are actually relevant to the charged offenses and toward either the sympathetic plight of the defendant or the supposed overzealousness of the Government. Such arguments are impermissible not only because they encourage the jury to violate its oath, but because they, by definition, involve prejudicial appeals to factors irrelevant to any matter actually before the jury. *Cf.* Fed. R. Evid. 402, 403.

The Government has asked the court to forbid the defendants from pursuing three tactics that, it says, would amount to encouraging jury nullification: (1) arguing that the defendants are victims of vindictive prosecution; (2) discussing the punishments or collateral consequences associated with conviction; and (3) discussing or presenting evidence of the defendants' political or religious views. The defendants have not disputed that those topics could, in theory, be used to bolster an improper attempt to entice the jury into nullification. They argue, however, that there are legitimate grounds for raising at least some of the topics cited and that preventing the

defendants from presenting probative evidence or legitimate argument out of a fear of nullification would violate the defendants' rights to present a defense to criminal charges.

### 1. Vindictive Prosecution

"Under Article II [of the Constitution], the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *United States v. Texas*, 599 U.S. 670, 678 (2023). (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021)). Accordingly, "the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the government's] discretion." *Wayte v. United States*, 470 U.S. 598, 607 (1985). There are limits to that discretion, but they are, for the most part, not strict, as long as the government avoids plainly unlawful practices, such as enforcing a law exclusively against members of one race or nationality but not others. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996) (acknowledging that prosecutorial discretion must not be used in a way that violates the defendant's right to equal protection under the law). The defendants argued, in connection with their Motion to Dismiss Indictment, that the Government has engaged in unlawful vindictive or selective prosecution in this case, but the court rejected those arguments. (*See* Doc. No. 282 at 14–17.) The Government now asks the court to forbid the defendants from resurrecting that issue at trial in an attempt to encourage the jury to reject this prosecution as fundamentally unfair, even if the charges are supported by the facts.

In the defendants' Response, they state that they are "aware that the Court has rejected their arguments as to the selectivity and the vindictiveness of these prosecutions," and they do not argue that they should be permitted to raise those arguments to the jury. (Doc. No. 384 at 2.) The court, therefore, will treat this issue as generally conceded.

6

The defendants do, however, take issue with one assertion by the Government in this regard. The Government states that it expects the defendants to argue that the defendants could and should have been charged only for state-law trespass. As the government correctly notes, such a criticism of the Government's exercise of prosecutorial discretion would simply be an argument about selective prosecution by another name. The defendants respond that the Government is wrong to think that their alleged crimes were not comparable to trespass (Doc. No. 384 at 4–5), but that is beside the point. Whether the two crimes are comparable is irrelevant to any issue that the jury will be called on to decide. The defendants' argument regarding state trespass charges is, therefore, simply a rehashing of its vindictive prosecution argument. The court will grant this Government request in full, and the defendants may not discuss the possibility of being charged in state court with trespass.

2. Severity of Punishment/Collateral Consequences

"It is well established that[,] when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed'" or to any other "possible consequences of the verdict." *Shannon v. United States*, 512 U.S. 573, 575, 579 (1994) (citing *Rogers v. United States*, 422 U.S. 35, 39, 95 S. Ct. 2091, 2095, (1975)). The defendants state that they are "cognizant of the fact that they may not reference their clients' criminal exposures." (Doc. No. 384 at 2.) They argue, however, that a blanket prohibition on any argument or evidence regarding the potential sentences and/or collateral consequences likely to arise from convictions under these statutes would prevent the defendants from cross examining witness Carolyn Davis regarding "her potential punishment for similar offenses as well as the benefits she is receiving from the Government in relation to those charges based on her cooperation." (Doc. No. 384 at 2.)

In response, the Government asserts that Davis only entered into her cooperation agreement *after* she had received the government's offer related to her plea, which, the government states, should render any argument regarding her exposure irrelevant. (Doc. No. 412 at 5 n.2.) In a recent telephone conference, however, the defendants raised the concern that Davis's proffer may have been motivated by the desire for preferential treatment in another federal case in another district.

Because the defendants have offered no argument in opposition to the Government's request, other than with regard to the cross examination of Davis, the court will grant the request as a general matter. The court, however, cannot resolve the issue of the scope of Davis's cross examination on the briefing alone. Accordingly, the court has requested that the Government provide evidence regarding the full timeline of Davis's relevant dealings with the Department of Justice, and the court will consider whether to make an exception to its ruling at a later date.

### 3. Discussion of Religious or Political Views

It does not appear to be disputed that these defendants' actions were motivated, at least in part, by their religious objections to the intentional termination of pregnancies. The Government argues, however, that evidence of those motivations would be "totally extraneous" to the "nature of the" charged offenses and should, therefore, be excluded. (Doc. No. 359 at 7–8 (citation and quotation marks omitted).) The Government's argument, however, is in significant tension with the FACE Act itself, which affirmatively places the defendants' states of mind at issue by criminalizing only "intentional" acts taken "because [the victim] is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). The defendants' subjective motivations are, therefore, an unavoidable aspect of this case, and it is not clear to the court that those motivations

8

Case 3:22-cr-00327   Document 440   Filed 01/05/24   Page 8 of 17 PageID #: 1960

can be accurately represented without at least some incidental reference to the details of their beliefs—which happen, in this instance, to be based in religion.

The Government expresses concern that the defendants will go beyond that limited relevance and will "elicit[] witness' views about abortion or religion, including the Defendants', *in order to present those views as a defense*." (Doc. No. 359 at 7 (emphasis added).) Because no such defense exists, the Government argues, the court should forbid any such line of questioning or argument. The Government points out, moreover, that its concerns are not purely speculative. For example, the Government alleges that Gallagher used a recent state court preliminary hearing as an opportunity to launch into a gruesome and irrelevant description of what he believed to be the anatomical details of some abortion procedures. (*See* Doc. No. 412 at 3.) The Government is concerned—reasonably, in the court's view—that such unnecessary, inflammatory testimony would amount to an attempt to present a legally invalid defense that violating the FACE Act is permissible if done in the furtherance of opposing abortion—which it is not. In Response, the defendants complain that their "anti-abortion beliefs are at the core of what occurred on March 5, 2021" and that they cannot present a full defense without acknowledging that fact. (Doc. No. 384 at 3.)

Insofar as the Government's request is limited to attempts to raise the defendants' religious or political beliefs "as a defense," it will be granted. The court has already ruled that, as a matter of well-settled law, religious motivations are not a defense to a violation of either the FACE Act or the conspiracy statute. (Doc. No. 282 at 23.) The court, however, will not go so far as to wholly forbid the discussion of the defendants' religious beliefs for the limited purpose of establishing or refuting intent or purpose. After all, the Government itself will have to present evidence regarding some aspects of the defendants' motivations, because, without establishing those motivations, the

9

Government cannot make its case. An artificial, confusing exercise of dancing around the basis of the defendants' beliefs—which the jury will almost certainly deduce anyway—would accomplish nothing.

The court stresses, however, that discussion of the defendants' views on abortion will be permitted only insofar as those views are relevant to the actual elements of the crimes charged or to some genuinely viable defense, and the amount of time and attention devoted to that evidence should be proportionate to the actual needs of the case. For example, the Government acknowledges, in its Reply, that the defendants might elicit testimony acknowledging their anti-abortion beliefs as "what led them to the clinic." (Doc. No. 412 at 2.) Such evidence, if presented, will be relevant and admissible. The defendants, however, will not be permitted to use that limited, legitimate purpose as an excuse for an irrelevant, prejudicial digression into why those defendants hold their anti-abortion beliefs or what they believe abortion to entail. *See United States v. Lucero*, 895 F. Supp. 1421, 1426 (D. Kan. 1995) (excluding evidence regarding the "medical details and philosophical implications of abortion" as "irrelevant to any material issue in the case"). The defendants cannot turn an ounce of relevance into a gallon of irrelevant political messaging. The court, however, will not bar discussion of the defendants' views altogether.[2]

## B. Arguments Regarding the First Amendment

As the court has already discussed at length, Congress drafted the FACE Act so as to avoid criminalizing any purely expressive activity. As a result, any activist (or other individual) who restricts his actions solely to those protected by the First Amendment is, by definition, not guilty of violating the Act. Such a defendant could prevail simply by mounting an ordinary criminal

---

[2] Although the Government's request also references the possibility of evidence related to the views of other, non-defendant witnesses, neither side has briefed this issue in detail. The court will, if necessary, address the issue at trial.

defense focused on the Government's failure to establish the requisite elements of the charged offense—without bringing up any additional issues specifically relating to the First Amendment. The Government, therefore, asks the court to bar the defendants "from eliciting evidence or arguing to the jury that Defendants' statements and conduct are Constitutionally-protected activity." (Doc. No. 359 at 8.)

The defendants respond that they have a "[v]alid First Amendment [d]efense" and should be permitted to present it. (Doc. No. 384 at 6.) They say that they wish to "argu[e] to the jury that their assembly, speech and religious practice prior to March 5, 2021, during meetings . . . where they prayed and worshipped," were protected by the First Amendment, as were certain expressive actions they took on the day of the alleged FACE Act violations. (Doc. No. 384 at 7.)

The disagreement between the Government and the defendants appears to hinge, at least in part, on terminology. Some or all of the defendants wish to argue that, in the events leading up to and surrounding the March 5, 2021 clinic action, they did not violate the FACE Act or conspire to do so, but rather engaged only in lawful activities like praying, worshipping, or espousing their views. And they *can* argue that. It *is* a defense. But it is not some freestanding affirmative "First Amendment defense" to an alleged violation of the FACE Act or the conspiracy statute, because neither statute prohibits any of those actions in the first place. What the defendants insist on characterizing as a "First Amendment defense" is, in fact, nothing more than the ordinary strategy, raised in nearly every criminal trial, of arguing that the Government cannot establish the elements of the charged offenses. Each of these defendants, like every other criminal defendant, has a right to dispute whether the Government has carried its burden to establish each element of the charged offenses.

11

Case 3:22-cr-00327    Document 440    Filed 01/05/24    Page 11 of 17 PageID #: 1963

The crux of the parties' disagreement, then, appears to be more about the narrow issue of whether the defendants can expressly invoke the First Amendment. That issue, though, is governed by the well-settled principle that it is the exclusive "province of the court to determine the applicable law and to instruct the jury as to that law." *United States v. Ahmed*, 472 F.3d 427, 434 (6th Cir. 2006) (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)). It is not the place of defense counsel—or, for that matter, the Government—to try to explain the First Amendment to the jury, because it is not the place of counsel to try to explain any purely legal principle to the jury. The court, accordingly, will grant the Government's request.

The court stresses that its ruling does not preclude the defendants from pursuing any factual defense based on his or her non-violation of the FACE Act or conspiracy statute. The operative term in that formulation, though, is "non-violation." The matter at issue in this case is whether the defendants violated the FACE Act and/or the conspiracy statute—not whether they might *also* have engaged in some other activities that *did not* violate the FACE Act and/or the conspiracy statute. Much of the defendants' briefing appears to proceed under the tacit—and mistaken—assumption that, if a defendant is able to establish that he engaged in some activity that was protected by the First Amendment at some point during the relevant events, then he must be acquitted, even if he engaged in other activity that was contrary to the FACE Act or conspiracy statute. For example, the defendants suggest that, "if persons met to plan the First Amendment protected activities, they obviously were not planning to commit a crime or to engage in criminal activity." (Doc. No. 384 at 8.) That, though, is not obvious at all, because—and the court is confident that it can take judicial notice of these facts—conversations sometimes cover more than one topic, and a person can do more than one thing in a day. If a group of people met to plan First Amendment-protected activities, planned those activities, but then also planned to commit other

unprotected, criminal actions, then the innocuousness of the first plan would not negate the plain criminality of the second one. There is no doctrine by which a defendant can use a little bit of First Amendment-protected activity to homeopathically immunize a criminal conspiracy.[3] *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[T]hough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission [of] a crime . . . .").

When the defendants prayed or discussed their religious views, those specific actions were protected by the First Amendment. But if, in the next breath, they turned to discussing a plan to unlawfully obstruct the entrance of a clinic, then that conspiracy was just as illegal as it would have been if it had been the sole topic of conversation. Similarly, if they engaged in activities that would, in isolation, be protected by the First Amendment, but they did so while also violating the FACE Act through physical obstruction or intimidation, then the non-criminal components of their actions are no shield against prosecution for the criminal ones. Any argument to the contrary would be improper and will be barred.

## C. Necessity, Duress, or Defense of Others

The Government next asks the court to forbid the defendants from offering argument or evidence related to the defenses of necessity, duress, or defense of others. "[W]here a defendant claims an affirmative defense, and that defense finds some support in the evidence and in the law, the defendant is entitled to have the claimed defense discussed in the jury instructions." *United*

---

[3] No one would argue, for example, that two defendants who planned a bank robbery should be acquitted because their planning was interspersed with digressions into political discussion. Nor, after those defendants embarked upon the robbery, could they shield themselves from prosecution by taking a mid-crime prayer break or by singing hymns while they held the tellers at gunpoint. The same principles apply here.

13

*States v. Wiseman*, 932 F.3d 411, 418 (6th Cir. 2019) (quoting *United States v. Clark*, 485 F. App'x 816, 818 (6th Cir. 2012)). The corollary of that principle, however, is that, where there is no legal and/or factual support for a defense, a defendant has no right to seek a jury instruction on that defense in the hope that the jury might, in their confusion or misunderstanding, believe it to be applicable. *Id.* The Government argues that, insofar as the defenses of necessity, duress, and/or defense of others are available under the FACE Act or conspiracy statute, there is no basis for providing instructions on those defenses in this case.

The defendants' discussion of this issue in their Response is notably vague. They do not offer any explanation of why or how they would support any of the cited defenses. They merely state that the court should refuse to address this issue pretrial and grant the defendants the opportunity to "produce evidence" in an attempt to justify an applicable jury instruction. (Doc. No. 384 at 12.) The court, though, cannot preemptively grant admissibility to evidence that the defendants refuse even to describe or explain the significance of.

In context, it appears likely that the defense that the defendants would like to raise—but are still, on the eve of trial, being unnecessarily coy about—is that their alleged crimes should be excused because they were taken in connection with a "rescue" operation directed at fetuses that the defendants believed, contrary to established law, to be entitled to the full rights of legal human persons. (*See* Doc. No. 412 at 3 (discussing statements in other proceedings).) Whatever the defendants' personal religious or philosophical beliefs, however, there is no support for such a defense in caselaw, statutes, or the Constitution. The defendants have no right to argue for a defense that does not exist.

If, somehow, the facts at trial support an unanticipated affirmative defense on some other basis, the court can, of course, revisit this issue. For now, though, the Government's request will be granted.

**D. Character Evidence**

Finally, the Government asks the court to bar the defendants from "introducing evidence of, or referencing, their general good character or specific instances of good conduct, including but not limited to, charitable works, affiliations with religious or social organizations, admirable family lives, or other evidence of their standing in the community." (Doc. No. 359 at 13.) The Government argues that presentation of such evidence would violate Rule 404(a)(1) of the Federal Rules of Evidence, which states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(2)(A).

Rule 404(a) recognizes a substantial exception to its prohibition, pursuant to which "a defendant may offer evidence of the defendant's pertinent trait." Fed. R. Evid. 404(a)(2)(A). In the defendants' Response, however, they make no argument that that exception is applicable here. Rather, they state that the defendants' religious activities and beliefs are so bound up with the events underlying this case that some discussion of those matters will be necessary in order to sufficiently "inform the jury of what occurred among these Defendants prior to and on March 5, 2021." (Doc. No. 384 at 16.) The defendants, however, assure the court that they will not "attempt to indicate to the jury that the Defendants are honest and of good moral character because of their religious activities and devotion." (*Id.*) Defendants, in other words, effectively concede the Government's argument that presenting such evidence as character evidence would be improper, but they ask the court not to impose so broad a bar that they will be forced into an unnecessary and

confusing exercise of concealing both the root of their motivations and many of the events that occurred alongside the charged conduct.

In light of the defendants' concession, this issue is simply a recapitulation of the parties' dispute regarding whether the defendants should be permitted to reference their religious views at all, and the court's resolution of that issue will carry over to this one. The defendants' argument that some mention of religion will be necessary to tell their stories is persuasive—up to a point. The limited relevance of such evidence, however, means that the court's ruling should not be misconstrued as an excuse for straying beyond the actual contested issues of this case. Although the defendants will not be required to conceal or outright avoid any mention of religion, they will be required to confine themselves to the presentation of evidence relevant to the material facts of this case.

### III. CONCLUSION

For the foregoing reasons, the Government's Motion to Preclude Improper Arguments and Irrelevant Evidence (Doc. No. 359) is hereby **GRANTED** in part and **DENIED** in part. It is **ORDERED** that:

1. The defendants shall not make any argument encouraging jury nullification, either explicitly or implicitly;

2. The defendants shall not present argument or evidence intended to establish vindictive or selective prosecution;

3. The defendants shall not present argument or evidence regarding the availability of state-law charges against the defendants or suggesting that prosecution solely at the state level would have been adequate and/or preferable;

4. The defendants shall not present argument or evidence regarding the severity of the defendants' potential punishments or the collateral consequences of conviction;

5. The defendants shall limit all references to their religious activities or beliefs to those that are necessary to the presentation of a defense on the merits;

6. The defendants shall not present any argument either explicitly or implicitly inviting the jury to decide any issue of law, including with regard to the First Amendment;

7. The defendants shall not present any argument to the jury regarding necessity, duress, justification, or defense of another;

8. The defendants may not present evidence of their general good character or specific instances of good conduct, including but not limited to, charitable works, affiliations with religious or social organizations, admirable family lives, or other evidence of their standing in the community, provided that the defendants are not barred from making incidental reference to their religious activities or beliefs insofar as such references are necessary for the presentation of a defense on the merits.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge