1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF TENNESSEE
2               NASHVILLE DIVISION


3


4   UNITED STATES OF AMERICA      )
                                  )
5   VS                            )   No. 3:22-cr-327
                                  )
6   CHESTER GALLAGHER [1]         )
    HEATHER IDONI [2]             )
7   CALVIN ZASTROW [3]            )
    COLEMAN BOYD [4]              )
8   PAUL VAUGHN [6]               )
    DENNIS GREEN [7]              )
9   _____


10


11


12   BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

13              TRANSCRIPT OF PROCEEDINGS

14                 January 10, 2024

15              (Pretrial Conference)

16   _____

17

18

19

20

21   _____

22   **Roxann Harkins, RPR, CRR**
     Official Court Reporter
23   719 Church Street, Ste 2300
     Nashville, TN 37203
24   615.403.8314
     roxann_harkins@tnmd.uscourts.gov
25

1    **APPEARANCES:**

2    For the Government:        AMANDA J. KLOPF
                                US Attorney's Office
3                               719 Church Street, Suite 3300
                                Nashville, TN 37203
4

5                               KYLE RANDOLPH BOYNTON
                                WILFRED T. BEAYE , JR.
6                               U.S. Department of Justice
                                150 M St. NE
7                               Washington, DC 20530

8

9    For the Defendant Gallagher:

10                              JODIE A. BELL
                                Law Office of Jodie Bell
11                              214 Second Avenue North
                                Suite 208
12                              Nashville, TN 37201

13

14   For the Defendant Idoni:

15                              WILLIAM J. CONWAY
                                214 Second Avenue North
16                              Suite 208
                                Nashville, TN 37201

17

18   For the Defendant Zastrow:

19                              ROBERT LYNN PARRIS
                                200 Jefferson Avenue
20                              Suite 1500
                                Memphis, TN 38103
21
                                DAVID I. KOMISAR
22                              800 Broadway
                                Third Floor
23                              Nashville, TN 37203

24

25

```
 1   For the Defendant Boyd:

 2                         G. KERRY HAYMAKER
                           Haymaker & Heroux
 3                         300 James Robertson Parkway
                           Suite 306
 4                         Nashville, TN 37201

 5                         STEVEN C. THORNTON
                           PO Box 16465
 6                         Jackson, MS 39236

 7

 8   For the Defendant Vaughn:

 9                         STEPHEN CRAMPTON
                           Thomas More Society
10                         PO Box 4506
                           Tupelo, MS 38803
11

12   For the Defendant Green:

13                         MANUEL B. RUSS
                           340 21st Avenue North
14                         Nashville, TN 37203

15

16

17

18

19

20

21

22

23

24

25
```

1

2          The above-styled cause came to be heard on

3   January 10, 2024, before the Hon. Aleta A. Trauger,

4   District Judge, when the following proceedings were had

5   at 1:36 p.m., to-wit:

6

7          THE COURT:  Good afternoon.  We are here on

8   a pretrial conference.  I'm going to go through

9   appearances in US v Chester Gallagher, et al.  For the

10  government we have Amanda Klopf.

11          MS. KLOPF:  Good afternoon, Your Honor.

12          THE COURT:  Sanjay Patel.

13          MR. BOYNTON:  Mr. Patel is not present,

14  Your Honor.  The Civil Rights Division is going to be

15  represented by Kyle Boynton and Wilfred Beaye.

16          THE COURT:  Okay.  Kyle Boynton and Wilfred

17  Beaye.

18          MR. BEAYE:  Good afternoon, Your Honor.

19          THE COURT:  You are?

20          MR. BEAYE:  I am Wilfred Beaye.

21          THE COURT:  You're Beaye, all right.  And

22  Mr. Boynton is on the end.

23          MR. BOYNTON:  That's me.  I apologize,

24  Your Honor.

25          THE COURT:  And so the additional person?

1          MS. KLOPF:  Our case agent, Your Honor.

2          THE COURT:  Okay.

3          And then we have Chester Gallagher

4   represented by Jodie Bell.  Hello.  Heather Idoni

5   represented by Mr. William Conway.

6          MR. CONWAY:  Thank you, Your Honor.

7          THE COURT:  Calvin Zastrow.

8          MR. PARRIS:  He's present, Your Honor.

9          THE COURT:  Represented by Robert Parris

10  and David Komisar.  Coleman Boyd represented by Kerry

11  Haymaker.

12         MR. HAYMAKER:  Good afternoon, Judge.

13         THE COURT:  And Steve Thornton, pro bono.

14         Paul Vaughn.

15         MR. CRAMPTON:  Yes, Your Honor.  Mr. Vaughn

16  represented by Stephen Crampton.

17         THE COURT:  Where's Larry Crain?

18         MR. CRAMPTON:  Mr. Crain is not with us

19  this afternoon.  I apologize.

20         THE COURT:  Did he file a motion to be

21  excused?

22         MR. CRAMPTON:  He did not.

23         THE COURT:  Okay.  Well, he should have.

24         And Dennis Green and he's represented by

25  Ben Russ.

1          MR. RUSS:  That's correct, Your Honor.
2    Mr. Green's here, obviously.
3          THE COURT:  And Mr. Manson was excused.
4          Okay.  We have a number of things to deal
5    with today.  First in terms of kind of the logistics of
6    the courtroom, there's a huge uptick in COVID in our
7    court.  I don't know if in your own experience you're
8    seeing it, but we're seeing it at our court.  So I
9    presume it is in the populous in general.  I'm not going
10   to require the wearing of masks, but I will tell the
11   jurors and I will tell all of you that anyone is free to
12   wear a mask.  And as you know, during the pandemic we
13   conducted trials with everyone in masks, so we know that
14   lawyers can speak through masks, as can the Court.  So
15   anybody who wants to wear a mask should feel free to wear
16   a mask.  And I will tell the jurors that.
17          To avoid the congestion -- I usually hold
18   my bench conferences at this corner, those of you who
19   have had trials in here know that that's what we do, but
20   there's too many of you to do this.  So we're going to
21   use what we used during the pandemic and that is the
22   transponders.  How many of you had experience with those
23   during the pandemic?  Not very many of you.
24          Well, it's a little gadget.  One lawyer
25   from each team -- each team will be given one

transponder.  And they have two or three channels on
them.  And we can turn on the white noise so the jury
doesn't hear us.  And the lawyers and -- can speak to me
and I can speak to the lawyers without the jury hearing
and you can remain seated.  So that's how we will do
bench conferences.  And I think we're going to probably
have to have a little instruction in that at some point.
We probably won't need too many bench conferences during
the jury selection, so maybe we can do it during the
first break during jury selection or something where
Ms. Beasley can show you how to use those.  But that's
what we'll be -- what we will be doing.

Depending upon how many challenges for
cause are executed this week where those people won't
even show up -- and we may -- we probably will have a
meeting about that on Friday.  I was going to be out of
town, but I'm not going to be out of town.  So we
probably will assemble just the lawyers on Friday to
finalize the challenges for cause.  And then those people
will just not show up at all.

And depending on how many are left of
the -- I believe 148 people completed the questionnaires,
and so depending on how many people are left, we will
either bring everybody in at one time or we will do it in
two groups.  And we'll bring in the first half of them

1  and the other half will be stashed in two jury

2  deliberation rooms while we're dealing with the first

3  half.

4              You will be given -- as you know, the

5  computer scrambles the names and we usually give you a

6  full chart at the beginning, but we can't do it with that

7  many jurors.  So they will be -- they will be brought in

8  by their -- the number that the computer gives them and I

9  always fill the back row of the jury box and then the

10 front row of the jury box and then we'll fill this side

11 and this side.

12             So they'll be brought in in the order that

13 the computer has scrambled them.  But you will have their

14 jury number.  You will have a list of them -- the list

15 will be in their scrambled order?  Right, Katheryn?  Not

16 the jury number, but the seat number.

17             COURTROOM DEPUTY:  Right.

18             THE COURT:  You will be given that list

19 which will have the seat number and the jury number and

20 the name and a little bit of the information from the --

21 what you normally get.  Of course, you have the

22 questionnaires.  And so when you question the jurors, you

23 can call their name and their seat number and their juror

24 number if you want to.  And we'll have two microphones

25 and we'll ask them to stand to answer any individual

questions that you have.

I can't imagine there will be too many collective questions because all the collective questions are in the questionnaire. So I imagine it will be individual voir dire questions.

I have decided, based upon the motion for additional peremptory challenges, I'm going to allow each defense team one additional peremptory challenge. And then based on how many jurors we have left after the for cause people are excused, I may give you two each. I don't want to run out of jurors. So I'm going to base that decision upon how many people are left.

I must say, you haven't made a good case at all for the fact that your defenses are contrary to each other. Almost every motion you have filed has been filed by all of you at one time taking exactly the same position. So there's not a whole lot of justification in my mind to give you any additional peremptories, but I am willing to give each of you one and maybe two. So that's how I will make that decision.

MS. KLOPF: Your Honor, may I request, given that the defense is getting six additional peremptories that the United States be given some additional peremptories too? I know they cited the *Frazier* case that was held before Judge Crenshaw where he

1 gave counsel additional.  I understand from speaking to
2 the lead prosecutor that the way Judge Crenshaw did that
3 was he did give defense counsel additional, but he also
4 gave the United States some additional peremptories as
5 well.
6               THE COURT:  All right.  I will consider
7 that.
8               MR. CRAMPTON:  Your Honor, I may just add,
9 Steve Crampton for Mr. Vaughn.  In the United States
10 against Handy case in the District of Columbia, while the
11 Court afforded five additional challenges to the defense,
12 it afforded no additional challenges to the plaintiff.
13 So we would object.
14               THE COURT:  Okay.  I will make that
15 decision.
16               All right.  I'd like to go through some
17 issues in the trial -- the government's trial brief.  No,
18 let me do a few more logistical things first.
19               I do allow jurors to take notes and I give
20 them an instruction on that.  If you are going to use any
21 demonstrative evidence in your opening statement, please
22 run it by opposing counsel and let me know in advance if
23 there are any objections to any demonstrative evidence
24 used in opening statement.
25               We are going to start each day at 9:00 and

1  end at 5:00.  If we're in the middle of a witness that
2  we're almost finished with and everybody says they can
3  stay a few minutes extra, we'll go a few minutes extra.
4  Typically I have one break in the morning, one break in
5  the afternoon, and typically an hour for lunch.

6  Once the jury is selected.  We will be
7  providing them lunch in the jury deliberation room so
8  that they do not have to go out for lunch.  I guess we
9  call it a semi sequestered jury.  They obviously will go
10 home at night, but they will not be going out for lunch.

11 Now, on the government's trial brief, I
12 just had a few questions.  I'm glad you explained what
13 blowfishing was.  We've all been wondering, what's
14 blowfishing.

15 Okay.  All right.  On page 84, when you're
16 talking about witnesses, the cooperator Caroline Davis
17 will identify the defendants and testify about her prior
18 experience with some of the defendants.  I want to ask
19 the government, I presume this is not going to be prior
20 experience participating in additional blockades with the
21 defendants.

22 MS. KLOPF:  Absolutely not, Your Honor.
23 Simply -- we will skirt around any issue of a prior
24 blockade.  It would just be how she met them, when she
25 met them.  She did meet some of them just protesting

outside of other abortion clinics, so I do think that
will be elicited.  But we will not talk about Sterling
Heights or any of the other blockades that happened prior
to this event.

                THE COURT:  Okay.  She will testify she met
some of them protesting outside of --

                MS. KLOPF:  Exactly.

                THE COURT:  -- abortion clinics elsewhere.

                MS. KLOPF:  Yes.

                THE COURT:  Okay.  And the National
Physical Security Policy.  I guess maybe I need to ask
defense counsel, do you intend to use that in any way?  I
can't see any potential relevance.

                MS. KLOPF:  Yes.

                THE COURT:  Tell me how you're going to use
it, Ms. Bell.

                MS. BELL:  I think that it's relevant --

                THE COURT:  Maybe you should come to the
podium.

                MS. BELL:  I'm sorry, Your Honor.  I think
it is relevant cross-examination to some of the actions
of the witnesses that are going to be testifying.

                THE COURT:  Such as?

                MS. BELL:  Carefem employee who's under a
pseudonym, so I guess I can't say who, but, you know,

1   does not follow their policies and procedures.

2              THE COURT:  What's the relevance of that?

3              MS. BELL:  The relevance is that that

4   particular employee -- and this has come up before, is

5   going to talk about how scary it was and how fearful she

6   was and that sort of thing.  And she's the same one that

7   took the video.  And she wasn't afraid and she wasn't

8   fearful and she was snarky to these people.

9              THE COURT:  Well, you can show all that.

10  You've all agreed now that the video's coming in, the

11  audio is coming in.  It speaks for itself.  So I still

12  don't see the relevance of any security policy.

13             MS. BELL:  That she was so aggravated with

14  these people that she wasn't even following how they had

15  been instructed to respond.

16             THE COURT:  And how did she not follow the

17  policy?

18             MS. BELL:  She's not supposed to engage

19  them at all.  She's not supposed to go out -- she goes in

20  the clinic -- well, actually she comes to work, she tries

21  to film them with her camera.  She's allowed to go in the

22  clinic.  She's going to claim that her -- the

23  government's going to claim that her ability to move

24  around was somehow hindered and that's a FACE act

25  violation, right.  Well, she goes into the clinic.  She

1  realized her camera didn't work on her phone, so she

2  adjusts it and goes back out and confronts them again,

3  and that's when she films the video.

4          THE COURT:  Again, what's the relevance of

5  the policy?  You can bring all of that out, I presume.

6          MS. BELL:  I suppose her credibility, her

7  demeanor.  She's going to come in and be acting as though

8  she is a victim here.  And it is our position she is not.

9  And that these people were acting towards her in a

10  professional way.  You know, it's annoying they're in the

11  hallway.  I don't think anyone's going to dispute that.

12  It would be annoying to anyone coming to work.  But they

13  were not ramping up.  She was not only ramping the sort

14  of temperament out there, but that was in violation of

15  what she had been trained to do.  So she's coming in, as

16  a witness, saying these people were acting

17  inappropriately in the hallway, so I think it is fair

18  game to come back and say, you were the one who went out

19  and you approached them and that was actually in

20  violation of what your own company had trained you to do.

21  I think that's fair.

22          THE COURT:  And the company policy says

23  that in that situation she's supposed to do what?

24          MS. BELL:  She's not supposed to engage.

25  And I actually have it.  And I'll go to the portion

because I had seen it in their -- in the government's
trial brief as well.  So it starts out by talking about
how you need to exercise good judgment.  You need to act
and remain professional at all times.  Threats,
threatening conduct or any other acts of aggression in
the workplace shall not be tolerated.

Then they go to antichoice protesters
trespass and invasion, avoid speaking with protestors and
discourage visitors from doing likewise.  I mean, she
went in and got her -- and got her camera working and
walked back out and confronted them.

Remain calm and nonconfrontational.  Do not
speak with or respond to protesters.  Avoid any and all
physical contact with protesters.  Do not -- pardon me --
identify your co-worker by name.

MR. BOYNTON:  Your Honor, the government
wants to raise a concern about -- the very issue in the
trial brief is raising concerns about this security
policy becoming a public record.  And we are in open
court and parts of that are coming in.  I just -- I'm not
concerned about what's been expressed so far, but --

THE COURT:  Okay.

MR. BOYNTON:  -- I just don't want more of
the policy coming in in this hearing.

THE COURT:  Yeah.  Well, and the policy

doesn't need to come into evidence.  You can certainly

cross-examine her on it.

          MR. BOYNTON:  The government agrees with

that, Your Honor.

          MS. BELL:  Well, then that's fine.

          THE COURT:  That solves that problem.

          MS. BELL:  Sure, problem solved.  Thank

you.

          THE COURT:  All right.

          Okay.  The handbill.  It's not clear to me

how exactly the government intends to use the handbill.

It obviously has up to and including imprisonment on it,

which is not going to be coming in.  And so why don't you

tell me exactly how you intend to use it.  I don't know

if any of you -- I requested that somebody furnish me

with a copy of the handbill, so I have it so I know what

we're talking about.  Go ahead.

          MR. BOYNTON:  Your Honor, I think the most

likely way that this is coming in at trial is through the

testimony of Caroline Davis, who was familiar with

conversations about the handbill and was also familiar

with the fact that the handbill was generated before any

arrests were made at the carefem clinic that morning.

That's pretty significant because the handbill declares

that people -- nonviolent protesters were arrested.

1          If that handbill was printed before anyone

2   was arrested, it indicates that there was knowledge

3   beforehand of what was going to take place.  The

4   government has -- in its case anticipates just eliciting

5   testimony about the handbill and about that specific

6   issue withing the handbill; that it was generated prior

7   to arrest and talked about people being arrested.

8          The government doesn't want to introduce it

9   as an exhibit at trial.  If -- if it was going to be

10  introduced as an exhibit, the government's position is

11  that it would have to be heavily redacted, and we're

12  concerned about what conclusions, if any, that jurors

13  might draw from a document that's heavily redacted.

14         Much of what the handbill discusses is

15  directly related to Your Honor's decision on the

16  government's motion in limine on issues of nullification

17  and relevant evidence.  And for that reason we would just

18  ask that it not be able to be used or introduced into

19  evidence in cross-examination of the government's

20  witnesses or through a defense witness.  It's

21  inadmissible hearsay.

22         THE COURT:  Does anybody intend to use any

23  parts of this?

24         MS. BELL:  Your Honor, may I approach

25  again?

1                    THE COURT:  Sure.

2                    MS. BELL:  This is, again, this rule of

3     completeness problem, though.  The government wants to

4     limit -- I understand the redacting imprisonment out of

5     the handbill, but by even referencing the handbill and

6     what it says, I almost feel like they open the door to

7     placing it in context again.  It explains their beliefs.

8     It explains why these people are there and what they're

9     doing.

10                    THE COURT:  Well, you wait until I rule on

11    some of the video excerpts, okay?

12                    MS. BELL:  Okay.

13                    THE COURT:  I think you're going to be able

14    to get your stuff in.

15                    MS. BELL:  Okay.

16                    MR. CRAMPTON:  Your Honor, may I be heard

17    as well?  Steve Crampton for Mr. Vaughn.

18                    THE COURT:  Okay.

19                    MR. CRAMPTON:  Just, again, in the same

20    vein as Ms. Bell's argument, the notion that the

21    government may introduce testimony regarding the handbill

22    but then seek to preclude defense from ever referencing

23    it in cross is simply beyond the pale.  So I don't have a

24    specific instance in mind, but I would simply state for

25    the record, we would reserve the right to reference it to

the extent the government introduces it in the first place.

THE COURT: Well, there certainly could be something appropriate about it on cross-examination, but that's a far cry from admitting it into evidence. So I think we'll just approach that bridge when we come to it.

All right. And then just the last question I had was page 7, cross-examination of the defendants. This is awfully vague. I have no idea what you're talking about, about the defendant's whereabouts on a particular date and they're waiving their Fifth Amendment protection from questions on cross about their involvement in any offense on some particular dates. What are you talking about?

MR. BOYNTON: Your Honor, the government is concerned about a possibility, and that possibility is that despite Your Honor's ruling on the motion in limine, that a defendant may, understandably, want to take the witness stand and tell their truth, what they believe the story was of what happened at Mt. Juliet that day.

That truth may involve a lot of objectionable testimony. It may involve, in the defendant's mind, testimony about defense of others, testimony about how they were called to be there and their purpose there that goes beyond what Your Honor has

allowed to be admitted in this trial.  Much of this
evidence is the type of evidence that the government
flagged as having the potential to elicit a nullification
decision by the jury.

And so the government is concerned that
should a defendant take the witness stand, either
potentially against the advice of counsel, and want to
testify to these things that Your Honor has expressly
precluded in the ruling on that motion, fine that they
are unable to testify to those things because of
sustained objections by the government to the
admissibility of such testimony, they are still
subjecting themselves, having placed themselves at
Mt. Juliet on March 5, 2021, having started to testify
about what was happening there, even if the rest of their
testimony doesn't come in because of sustained objections
by the government, the government still should have an
opportunity, under controlling case law in the Sixth
Circuit, to cross-examine them about their conduct at the
carefem Health Clinic that day.

THE COURT:  So you're suggesting that it's
a wide-open cross of a defendant who decides to take the
stand even though what they want to testify about I don't
let them testify about.  Is that what you're saying?

MR. BOYNTON:  I don't -- I would not go

that far at all, Your Honor, and I don't think it's -- it
would be fair for the government to take the position
that it should just be a wide-open cross. The cross has
to be tethered to what issues their testimony on direct
examination had been put at issue and why they were there
at the clinic that day, what their conduct was at that
clinic.

            If they begin to testify to some of those
things, we're imagining a situation where there's about
five or six minutes of introductory testimony about how
they got there and what they were doing there and where
they went that day. Then if the rest of that testimony
is objectionable, the government still gets to ask some
questions related to what they were doing there, the
purpose of being there, on cross-examination. Frankly --

            THE COURT: You will be eliciting the
testimony you don't want if you ask them why they were
there.

            MR. BOYNTON: Well, Your Honor, I think
we'd have the opportunity to ask leading questions, but
that is a fair point that there are risks to the
government in asking those questions and drawing out the
very testimony that the government had previously
objected to on direct. But the hope would be that
there's a brief opportunity for cross-examination with

1  particularized leading questions to make it clear to the

2  jury that some of the elements of the offenses charged

3  are not actually at issue in this case.

4              THE COURT:  Okay.  Well, these are calls

5  that I'll have to make at the time.

6              MR. BOYNTON:  Yes, Your Honor.  Thank you.

7              THE COURT:  Thank you for that further

8  elucidation.

9              And now on these rulings on these video

10  edits.  The first issue on the employee video, you-all

11  have agreed that the sound is going to be played.  So

12  that one's taken care of.

13             On the Gallagher video, I appreciate that

14  you-all have come to agreements on several of these

15  issues at my urging.  I appreciate that.  Okay.  Video

16  Request No. 1, this is on page 4 the -- this is

17  Ms. Bell's motion, I believe.  Let me make sure I

18  understand.  In the middle of the page where it says:

19  Mute putting oneself between the child who's about to be

20  slaughtered in this place at the hands of baby killers,

21  that by agreement is being muted out?

22             MS. BELL:  I don't think the government

23  wants any of that out.  I am -- or any of the whole

24  excerpt in, excuse me.  But I am proposing that that

25  excerpt in that paragraph come in and without the putting

1  oneself between the child who's about to be slaughtered

2  at the hands of the baby killers.  I think we submitted a

3  video to the Court where that was spliced out.

4            THE COURT:  Okay.  That was what was not

5  clear to me --

6            MS. BELL:  Sorry about that.

7            THE COURT:  -- somebody wanted that in.  So

8  nobody wants that in.

9            MS. BELL:  Per your directive when we had

10 the phone conference last week, I believed that the Court

11 would say that shouldn't be there.  So in an effort to

12 propose a video that was tailored to the Court's

13 comments, I suggested this paragraph without that part in

14 it.  But I don't believe the government agrees to that

15 paragraph with or without that language.

16           THE COURT:  So without that, it would be:

17 What we are doing today peacefully, nonviolently, no

18 damage to property, no injury to others, trying to

19 interpose, and those who are being interpose will protect

20 them.  It's time to pray and show this video to other

21 people praying as well.

22           That's out, period.  But with that out and

23 the muted part out, does the government still object to

24 that?

25           MS. KLOPF:  Yes, Your Honor.  This was one

that we did not feel necessary that didn't fall under the
rule of completeness and wasn't necessary to tell the
full story.  So while we were willing to make some
modifications to the others, this was not one that we
were willing to -- to change.

THE COURT:  All right.  Well, I'm going to
overrule the government on that and allow this in, except
for it's time to pray and show this video to other people
praying as well.

Trying to interpose, I mean, that -- that's
what this case is about.  They're putting themselves
between.

MS. KLOPF:  Certainly, Your Honor.  And as
the Court knows, because I think we've shared a lot of
clips with the Court, there are a lot of other clips that
capture that.  We're just -- we don't have to play all of
those clips.  And, you know, trying to select out the
ones where they don't -- we don't want to look like we're
hiding anything from the jury.  You know, we've been
trying to avoid places where we are muting just because I
think -- I think in this day and age as soon as
something's muted, people are immediately clued into why
is that muted.  We've been trying to avoid that.

I think we've tried very hard, when counsel
has given us requests, to consider them thoughtfully and

come back with, you know, a response that we think is
appropriate.  But that's -- I agree with you, Your Honor,
that is what this case is about.  I just think there are
other clips that capture it where they don't have to be
muted.  And that in terms of the rule of completeness,
the rule of completeness isn't implicated by this
particular clip.

THE COURT:  Okay.  Ms. Bell, with my ruling
that it's time to pray and show this video to other
people praying as well, do you still want this in?

MS. BELL:  Yes.  And I want, in candor to
the Court -- because how the video will look is that
Mr. Gallagher will be making these statements.  Then per
your order we would take out, it's time to pray and show
this.  And then they're actually going to pray for about
five seconds and then the office -- or five to 10 seconds
and then the officer says, okay, okay, then he starts
his, it's time to go.

So I want to make sure the Court's aware of
that so you're not thinking we're misleading.  I think,
you know, it's fine to show it that way.  I mean, I think
the Court knows my position is to let the whole video
play and that a picture is worth, you know, a thousand
words and really captures the essence of what was
happening that day.

1              THE COURT:  You're saying that the
2    government is intending to show that -- show that part of
3    the video --
4              MS. BELL:  No.
5              THE COURT:  -- where it says it's time to
6    pray and show this video --
7              MS. BELL:  No.  No, they're not.
8              THE COURT:  Okay.
9              MS. BELL:  I want to make sure that the
10   Court understands what is played on -- what the video
11   depicts.  The language -- and Mr. Gallagher standing
12   there saying what Your Honor's just approved.  Then he
13   stops -- that kind of stops and the people are singing
14   and praying that are there, and then the officer walks
15   up.  And I'm just bringing that to your attention because
16   I don't want us to play it or the government to play it
17   and you be surprised that there is a moment of praying
18   when you just said I don't want the language about
19   praying.
20             THE COURT:  There's a whole lot of praying
21   and singing.
22             MS. BELL:  I just want to make sure.
23             THE COURT:  I'm not really worried about
24   that.
25             MS. KLOPF:  I do want to be clear, this

1  particular clip that we've proposed is just a law

2  enforcement officer walking in and saying, basically,

3  please disperse. So it's not that the defendants are, in

4  fact, making any statements here. It is just this law

5  enforcement officer asking them, pretty shortly after

6  they've arrived, to leave. So this isn't like a half

7  statement of what the defendants are saying. We're

8  actually, for this particular clip, not introducing

9  anything.

10            So this will -- if the Court orders this,

11  there will be two different spots that will be muted.

12  The slaughtering mute, and then it would be the time to

13  pray and show people and other people praying. And then

14  the defendants will be able to show themselves praying

15  for multiple minutes -- or seconds, excuse me.

16            So this really expands that clip from

17  simply being a law enforcement officer telling them to

18  disperse into allowing the defendants to show them in the

19  act of praying and all of this other actions and words.

20            THE COURT: I'm not really understanding

21  why that has to be shown.

22            MS. KLOPF: That's what I'm saying. What

23  needs to be shown, the police officer asking them to

24  disperse?

25            THE COURT: No, the praying.

1          MS. KLOPF:  That, I believe, is what

2     Ms. Bell is requesting.  Our clip is just the law

3     enforcement officer saying disperse.  What Ms. Bell is

4     suggesting adding is them -- Mr. Gallagher's words about

5     explaining what he's doing there that day --

6          THE COURT:  Yeah.

7          MS. KLOPF:  -- and then showing them

8     praying.  We are not doing that.  It will be the law

9     enforcement officer asking them to disperse.  Now, you

10    will see, it's not just honed in on the officer.  You'll

11    see the defendants in the picture as well and they will

12    be -- I think -- don't hold me to it because I don't have

13    these memorized, but I think you can see Bibles in the

14    image.  So it's not like we're hiding anything.  This

15    pretty drastically expands what the intention of that

16    clip is.

17         MS. BELL:  It shows the lead-in to the

18    officer coming, Your Honor, is what I would think is

19    important.  It shows what they're doing as the officer

20    steps up.  I think it captures the essence --

21         THE COURT:  All right, I've ruled.  If they

22    see people praying, then they see people praying, okay.

23         All right.  No. 2 you've agreed to.  No. 3

24    has been withdrawn.

25         4.  And the defense is -- the shaded part

1  is what you want in and you are going to mute the murder

2  mill in this place of murder, is that what you're saying?

3          MS. BELL:  That's correct.  Yes.  Just of

4  murder.  I think we submitted that as well.  Just taking

5  out that little part and it's just like a blip in the

6  video.  You can see like a little blip where she just

7  sort of cut that little part out.

8          THE COURT:  Okay.  That will be coming in.

9  You can bring that one in.  As long as you excise murder

10 mill and murder.

11          No. 5.  The first shaded part I will not

12 allow.  The second shaded part I will allow.

13          MS. KLOPF:  And actually, Your Honor, we

14 communicated back to counsel that we had further clipped

15 this.  So to avoid the rule of completeness issue, we had

16 clipped it down to, listen make no mistake this is not a

17 protest, this is not a demonstration, and it ends there.

18          THE COURT:  I see.  So you're hoping to

19 avoid the rule of completeness because you've eliminated,

20 these are not acts of civil disobedience, this is

21 obedience of scripture.

22          MS. KLOPF:  Yes, Your Honor.

23          THE COURT:  I see.  Well, that -- that's a

24 good point.

25          MS. BELL:  I still think it puts it in

context.  This is not a protest, this is not a

demonstration.  This is the obedience of scripture

following the command of the king who's promised us to

that extent that we do the least of his, he will do for

us.

So he's just explaining, it's not this, but

it's this.

MS. KLOPF:  I mean, this is one of the more

concerning statements in there.  It's inviting the jury

to put the law of God above the law of man.

THE COURT:  It is.  And you've taken out

civil disobedience.  This will not come in.  I agree.

It's an invitation to jury nullification.  We're going to

have enough of that.

Okay.  No. 6, the earlier shaded things,

just step in here so I can, you're literally --

MS. KLOPF:  We had communicated about this.

I think this is a pretty hard clip to hear.  We didn't

catch this.  We had informed counsel that we're going to

review their transcript, but this is simply that our --

perhaps their ears are better than ours and hadn't caught

that.  So where our clip ends is right where it says,

ma'am, I believe -- I believe it ends right where it

says, ma'am, have mercy on your baby, please.

Because she says -- this patient says, I'm

1  not going in, this is too much, this even makes me

2  uncomfortable, and walks away.  And an unidentified

3  blockader says, ma'am, have mercy on your baby, please.

4  And then the officer says, she has an appointment.  And

5  then the officer, where it says unknown speaker, the

6  officer says, did she leave?  Okay, well, never mind.

7         And then Gallagher -- they start clapping

8  and Gallagher explains to them that they shouldn't be

9  applauding.  We don't believe any of that is necessary.

10  All that needs to be shown is to the point where the

11  woman turns back and walks away.  The police officer

12  explaining that she has an appointment isn't necessary.

13  And, again, this -- this is not rule of completeness.

14  This is just Mr. Gallagher getting to introduce his own

15  self-serving hearsay.

16         MS. BELL:  And, again, Your Honor, I think

17  this is all putting these -- these moments into context.

18  It's what happened that day.  It's how everyone reacted.

19  It shows Mr. Gallagher calming them down.  If they cheer

20  or applaud, that is not appropriate, we're being

21  peaceful, this is why we're here.  And I think that

22  that's fair.  It's just a fair representation of what

23  happened that day.

24         THE COURT:  It is not coming in under the

25  rule of completeness.  So that's out.

1          7 you've stricken.

2          8.  First of all, what is the -- I think

3    it's the defense argues the relevance of the -- of the

4    time where he says we have five minutes to discuss that.

5    And then I'm going to go back with Paul.  Who made that

6    argument?  Was it you, Ms. Bell?

7          MS. BELL:  Yes.  Again, I think it's

8    putting things in context.  They're not out there long.

9    This is -- you'll see as we --

10          THE COURT:  It's four hours.  They show up

11    at 7:30, don't they?  And it's not over until 11:30.

12          MS. BELL:  They show up 7:45, 7:30.  They

13    are, I believe, arrested before 11:00.  And the

14    government might correct me if I'm wrong.  The clinic

15    opens back up.  It is not that long.  It is not quite as

16    long as it seems.

17          The same thing -- you know, I think

18    Your Honor's thinking we're asking to put on six or seven

19    hours of video.  We're asking to put on one video that's

20    about an hour and 40 minutes.  And I know Your Honor's

21    made your ruling, but it's not as long, it is very

22    orderly.  That is going to be part of our defense.  They

23    negotiate everybody leaving.  It's very --

24          THE COURT:  Minding the police is not a

25    defense to a criminal charge.  Cooperating with the

1  police is not a defense to a criminal charge.  It's very
2  nice.  It shows they're nice people.  It's not a defense.
3            MS. BELL:  I think it goes to some of the
4  elements of harassment, whether or not they were
5  harassing that day, their demeanor that day, all these
6  different things.  I'm not saying that being cooperative
7  with the police is a defense, but it is showing what
8  happened that day.  I'm not saying they committed a
9  criminal charge at all.
10            THE COURT:  I'm sure you aren't.
11            MS. BELL:  They were there acting
12  appropriately, standing up for a cause that they believe
13  strongly in.
14            THE COURT:  And you're going to have plenty
15  of opportunity for everybody to see that, Ms. Bell.
16            MS. BELL:  But, see, with all due respect,
17  Your Honor, we're not, because they're not going to see
18  any of the video.  Again, it comes back to this idea that
19  the videos capture the essence of what happened that day.
20  And the government wants to take little teeny blurbs of
21  it.  And for some reason -- if our clients are so guilty,
22  just play the video and let the jury decide.  But
23  anything that's somewhat favorable to them or pushes back
24  on their theory they want excised from the jury's
25  consideration.

1          I'm not trying to argue with the Court, I'm

2 trying to represent Mr. Gallagher.  But to me it's just

3 kind of astounding that we have all of this video

4 coverage and we're literally going to see a couple

5 seconds when it's over and done with.

6          So I'll respect the Court's ruling, I'll

7 note my objection.  I think this puts things in context.

8 They're negotiating with the police right away to handle

9 what happened.

10          MS. KLOPF:  And just so the record's clear,

11 I think the Court is very clear on this, but we're not

12 just playing seconds of this.  We're playing 39 clips.  I

13 expect, unfortunately, it will actually feel very long

14 once we're all through with that.  But we are simply just

15 trying to present our case within the bounds of the Rules

16 of Evidence.

17          THE COURT:  So the government is going to

18 play the first paragraph.

19          MS. KLOPF:  Yes, Your Honor.

20          THE COURT:  Mr. Gallagher saying, and

21 so-and-so will make this clear, Paul -- by the way,

22 Pastor Paul, of all things you could have wanted to

23 witness today except this amazing worship going on, which

24 this part is to hear how well Paul engaged the police.

25          And Mr. Zastrow says, praise the Lord.  And

1  Mr. Gallagher says, I was so overjoyed to be with you.

2  Thank you...  Okay, we have five minutes to discuss that

3  and then I'm going to go back with Paul and we're going

4  to report to the police what we found out.

5              So why can't we just have -- take out those

6  three middle sections and just add the last one?  That's

7  what you want to talk about is engaging with the police.

8  And the government's showing that you're engaged with the

9  police.  What's the harm in having Mr. Gallagher, okay,

10  we have five minutes to discuss that, then I'm going to

11  go back with Paul and we're going to report to the police

12  what we found out.  Can you agree to that?

13              MS. KLOPF:  We can add that -- it will be a

14  distinct clip just so we don't have to do the muting, but

15  we will add that.

16              THE COURT:  All right.  So you're going to

17  get that last paragraph, Ms. Bell, but not the three in

18  between which have nothing to do with anything.

19              No. 9, again, is this the government simply

20  not hearing things that others are hearing?

21              MS. KLOPF:  Yes, Your Honor.  And also just

22  so the Court knows, we provided transcripts to counsel

23  and asked for corrections.  We just haven't gotten any

24  feedback on them yet.  Otherwise we would have

25  incorporated these and reviewed these with the aid of --

1    you know, the additions that they've got here.

2                The last line on page 12 of the motion is

3    what we are not including.  Praise God for this rescue.

4    Praise God, faithful blowfish.  It will stop at blowfish

5    are leaving.  If you watch the clip, there's actually a

6    little bit of a pause.  It's a reasonable place to stop.

7    It doesn't reference praising God for this rescue.  It

8    just ends it at the blowfish are leaving.

9                THE COURT:  Yeah.  And I'm sure Ms. Davis

10   will be explaining what blowfish -- what she means by

11   that.

12               MS. KLOPF:  Yes, she will.

13               THE COURT:  And we don't need to have

14   praise God for this rescue, so that's out.  Those last

15   two sentences are out.

16               All right.  That's the Gallagher.

17               On the Vaughn, the first two clips I'm not

18   going to allow.

19               MR. CRAMPTON:  Your Honor, excuse me, it's

20   only two clips.

21               THE COURT:  I thought there was a third one

22   on page 3.

23               MR. CRAMPTON:  No, it's just a repeat of

24   the first excerpt.

25               THE COURT:  Oh, I'm sorry.  All right.  Let

me see what I was thinking, then.  You agreed to remove

the we had, I believe, nine adults and four children --

you've agreed to remove that.

            MR. CRAMPTON:  Yes.

            THE COURT:  So it would be, we came into

the building, we sat down at the door peacefully and

nonviolently, laid down our freedoms and said that if

babies were going to die here today, that it was going to

be necessary they had a Christian witness, that someone

would show them an act of kindness, act of love and try

to save that little baby's life.

            That is an invitation to jury

nullification, and I'm not going to allow that.

            And we do not need the further

explanation -- first of all, local people that are out on

the sidewalk regularly.  That's injecting something

totally irrelevant.  And he already says we're from other

places and Lebanon, that's enough.  So that doesn't

really add anything.  So nothing additional on the

Vaughn.

            And on the Boyd, it's a little inconsistent

for the government to take the position it's taking, but

I understand why they are with Boyd, because he didn't

blockade any doors.  He's just filming.  And so in order

to show his intent, you need in this statement:  So what

1  you got here is a mom is coming to kill her baby.

2  Correct?

3            MS. KLOPF:  Exactly, Your Honor.

4            THE COURT:  And I'm going to allow that in.

5            MR. HAYMAKER:  May I be heard, Judge?

6            THE COURT:  Sure.

7            MR. HAYMAKER:  I think it would be

8  different -- clearly the statement is prejudicial.  It

9  may also be probative as the government points out.  I

10 think it would be different if there were no other

11 evidence suggesting why these people were here and why

12 Mr. Boyd was there.  I think everybody -- it's going to

13 be very clear why they are there.

14           Because of that, I think this just adds to

15 the cumulative evidence that already exists as to why

16 they're there.  I don't think that's going to be a secret

17 to anyone.  And I think it just -- so I think the

18 prejudice is -- outweighs the probative effect.  Judge,

19 you've already ruled that --

20           THE COURT:  I have.  You haven't convinced

21 me to reverse my ruling, but thank you.

22           MR. HAYMAKER:  Thank you, Judge.

23           THE COURT:  Okay.

24           I will be issuing a written decision as

25 soon as I go back to chambers on the motion for

protective order.  The clinic employees will be allowed
to testify under pseudonym, but not the patient.  It's a
totally different rationale, and you've given me some
strong evidence about people who work in these clinics.
But the -- nothing additional about the patient.

MS. BELL:  Your Honor, just for the record,
can we note our objection?  That was a pleading that we
got yesterday at noon right in the middle of everything
that I thought was quite a distraction.  We didn't even
get an opportunity to investigate any of the allegations
in that, nor did we get an opportunity to file a timely
response.

Moreover, the lawyers that filed it never
even called us to try to work something out as required
by the rules.  So I would just note my objection to the
Court's ruling for the record.

MR. CRAMPTON:  Your Honor, if I may add to
that by the way, we were issued, I think, your written
decision on this issue moments before we began this
afternoon.  In addition to Ms. Bell's objections, we
would also note for the record that in that civil case
brought by carefem, they actually submitted into evidence
documents containing the names of presumably one of the
clinic employees that now seeks anonymity in this case.
They also submitted a declaration from the doctor

himself.  No attempt to obtain a protective order to seek
anonymity in any fashion.

And to date one of the things those
declarations are completely silent about is any adverse
action taken by anyone, let alone by the defendants in
this case, against any of those individuals whose
identity were already revealed.  So we would object, as
Ms. Bell, and ask the Court for an opportunity to perhaps
brief this matter.

THE COURT:  You can brief the matter.  You
can brief the matter.  You might convince me otherwise.

MR. CRAMPTON:  Okay, thank you.

THE COURT:  I thought it was important to
get a ruling out since the trial is in a few days.  I
will certainly hear -- consider any response.

MR. CRAMPTON:  Thank you.

THE COURT:  And you can call it a motion to
reconsider, if you wish.  If the government wants to file
a response, you better do it quickly.

Okay.  So I hadn't realized that that
actually got out before the hearing.  All right.

We have spent a significant amount of time
on instructions.  And I'm going to distribute to you now
the core instructions.  We have seen all your submittals,
all your objections and your responses -- you can

distribute them.  And this is going to be my first draft
of the core instructions.  Of course, it doesn't have all
the standard stuff, which I will add.  And I don't want
to hear any argument or anything about it right now.
It's just for your edification and we will discuss it at
a later time.

I'd like to see if there's any revised
estimate of how long it's going to take to try.  Try as I
might, I can't envision how this is going to take two
weeks.

MS. KLOPF:  That is on my to-do list to
discuss with the Court today.

THE COURT:  Good.

MS. KLOPF:  We're struggling a bit trying
to figure out how long cross will take, given six defense
counsel.  We've pared our list down back to ten
witnesses.  If jury instruction -- I'm sorry.  If jury
selection really does take just Tuesday and we do
openings Wednesday morning, we actually think that there
is a chance, I don't know how big of a chance, but that
we could even be done with our proof by Thursday
afternoon.

Now, that anticipates, like, very limited
cross.  And I think that's probably incorrect, but given
the Court's recent rulings, you know, limiting what can

1  be crossed about and things like that, I actually think

2  there's a pretty solid chance that Friday we could be

3  closing our proof.  That's ambitious --

4           THE COURT:  That certainly cuts it back

5  significantly.  When we're picking the jury, we've got to

6  be -- you know, I don't want to tell them it's going to

7  be a two-week trial if, in fact, it's going to be, you

8  know, a week.

9           MS. KLOPF:  No.  With six defendants, we

10  don't know how many might testify.  We don't know if

11  there might be a bit of a rebuttal case that we put on.

12  And I would anticipate deliberations taking a while,

13  frankly.

14           THE COURT:  Yeah.

15           MS. KLOPF:  But all that said, I do think

16  we could very comfortably tell the jury that they will be

17  hopefully done by the end of the second week.

18           THE COURT:  Okay.  And let me ask, in terms

19  of voir dire, first of all, are you delegating that to

20  one of your counsel as opposed to having six people ask

21  questions?

22           MR. PARRIS:  No, Your Honor.  I think what

23  we've done is we've taken what you would see in just

24  about any voir dire and broken it down for each person to

25  do a certain section, like Fifth Amendment, right to

testify or not testify or right against

self-incrimination, in order so that we don't duplicate

anything.

          THE COURT:  Good.

          MR. PARRIS:  While I'm up on that -- and

I'm not jumping up and down screaming about this, but I

think you ought to -- think you ought to.  That's a bad

way to put it.

          I would suggest to the Court to reconsider

this idea of no individual voir dire.  And I don't mean

individual voir dire of every juror.  I'm talking about

there are going to be -- I think Questions 27 and 28, you

know, how important is abortion to you.  The nines and

tens are going to have to be questioned.

          And this is not a death penalty case, I

know, but this is where I've done most of it.  Every time

I've had a death penalty, we always did that.  And

you're, quote/unquote, death qualifying a jury.  Well,

like the first rule of that is you want to -- when you

identify that person who has a problem and is questioning

whether or not they can follow the law, you want to do

that at sidebar because you don't want everybody else to

hear the answer that gets you out.  That's one.  You can

get a run.  As soon as some of the jurors find out what

the answer to the question is that gets me out of here,

1  they're going to do it.  Some of them will.

2              And in a lot of ways this case is the same.

3  As soon as they get a whiff of what this is about, I

4  think a lot of people are not going to want to have

5  anything to do with this.  So that's one thing.

6              And there's another reason, and that's --

7  I've haven't gone through all of them yet, but I know at

8  least two of the jurors that I've seen at this point I'm

9  sure the government's going to want to strike for cause,

10  and I don't think the information in the questionnaire

11  itself is enough.  It says something to the effect -- I

12  wish I would have brought it with me, but is there

13  anything about this case is that might cause you

14  problems.  Might --

15              THE COURT:  Sort of the last question, I

16  think.

17              MR. PARRIS:  27, Question 27.  Well, I

18  would like an opportunity to rehabilitate that juror just

19  like I have in every other trial I've ever had.  If you

20  want me doing that in front of everybody, I'll do it, but

21  I think that's dangerous.  And I think if we narrow it

22  down to -- because I'm pretty sure -- I don't want to

23  speak for the government for sure, but I'm pretty sure

24  we're all pretty focused on that one basic issue.  That

25  if we limit it to that, we're talking about five minutes

for anybody that's a nine or a ten or has volunteered to write something really -- I don't -- volatile might be the name or come out and give their position.

Frankly, it was part of my suggestion on the jury form was to not -- purposefully not ask the jury to make -- take a side. Just let us know if it's really important to you. That's somebody you need to kind of question, both sides, both ways.

That's one thing I've learned about this is there are really high emotions on both sides. So I want to know just like they want to know. And I also want an opportunity to rehabilitate what I think would be a good juror for me. And I don't think you want me doing that in front of the other 70.

THE COURT: Tell me logistically how we do that. As I've told you, I've never had to do individual voir dire. I mean, we're going to have a courtroom full of people. I cannot get eight lawyers up here for a bench conference. I mean, maybe we'll have to do it in my chambers. Leave everybody in the courtroom and we go back to my chambers.

MS. KLOPF: I spoke to the attorneys who tried the *Maund* trial where they ended up having to do some individualized voir dire. And what I understand is that they also had a questionnaire and they submitted a

list to the Court beforehand of people that they thought
merited individual voir dire.  And then basically the
jury pool was kept back in the jury room and then
individual jurors were called in and sat in the jury box
by themselves while everybody did that narrow voir dire.

And so if I would suggest to the Court, I
know tomorrow at noon our strikes are due.  Perhaps we
expand that list and say the ones we think are for cause
and then the ones that we think merit individual voir
dire.  I know we're planning on reaching out to counsel
to see how much we can mesh those lists together, but
maybe we try and do it that way.

THE COURT:  I think it's a great idea.

MR. PARRIS:  That's exactly how I've done
it before.  I will say this:  I'm hopeful, but I don't
expect there's going to be a lot of agreement on -- and I
think I've seen a couple that clearly had hardships at
home, I think one gentleman -- but there's not going to
be any agreement on anything else.  So that's why I'm
bringing this up.  That really needs to be vetted out
before you bring everybody in.  And then once they're in,
it's quick.  At least that's my experience.

THE COURT:  Well, I'm going to ask
Ms. Kinkade, I don't know where we would -- there's no
place to put hundred and however many people on this

1   floor.

2               MR. PARRIS:  No, I think your idea about 70

3   first, break it into two groups of 75 or whatever it is.

4   And then we take the -- we identify who needs to be -- of

5   that 70, probably, from the percentage I'm looking at, if

6   there's 75, maybe 20, about 20 of them you're going to

7   want to bring in for two or three minutes and talk to

8   them.  And have that 20 put in the jury room and the

9   rest, everybody else can be waiting downstairs.  And it

10  shouldn't take an hour for all 20 to get through the

11  first and then take a break, bring them all back after

12  the first break and then we start with what you would

13  traditionally call voir dire.

14              THE COURT:  So you're suggesting we do

15  individual voir dire first.

16              MR. PARRIS:  That's what I would -- if

17  you're asking my opinion.

18              THE COURT:  The ones that are problematic.

19              MR. PARRIS:  I'd keep it broke up in groups

20  of 75 and hope and pray that we get a jury in the first

21  75.

22              THE COURT:  Yeah, we've got two jury rooms

23  we can use.  So the ones, depending on how many you think

24  we need individual voir dire, we could put those in the

25  two jury rooms and call them in one at a time.  That's a

1   good idea.  Do that first.

2               So by Friday -- so you'll give me two

3   lists.  You'll give me a list of who you think should be

4   stricken for cause.  And then you'll give me a list of

5   who you think needs to have individual voir dire.  And

6   would you put the question number that is causing you to

7   want to have individual voir dire with that person.

8               MR. CRAMPTON:  I think it's a great idea

9   too, Your Honor.  May I just ask, perhaps a little

10  additional time for the questionable jurors since we're

11  concentrating on a tight timeline on the striking for

12  cause.  Can we have until the end of tomorrow or Friday

13  morning to get that?

14              MR. PARRIS:  I thought you originally said

15  at lunch tomorrow.

16              THE COURT:  Oh, it is tomorrow noon, I'm

17  sorry.  I'm sorry, it's tomorrow noon.  Yeah.  Let's see.

18  How about --

19              MR. PARRIS:  See, we just got this thing

20  yesterday afternoon.

21              THE COURT:  Yeah, I know, I know.  Because

22  Monday is a holiday.  Can't do anything Monday.  What are

23  you suggesting?

24              MR. CRAMPTON:  I was thinking, Your Honor,

25  if we could get the strikes for cause by all means, if

possible, by tomorrow noon, but then have until early
Friday where the ones we think we're going to need
additional voir dire for.

THE COURT: Okay. Maybe 10 o'clock on
Friday or something?

MS. KLOPF: If -- hearing what counsel's
saying, it sounds like there may not -- there may not be
a joint filing. So I don't think that will take --
initially I was expecting that to take a while, but
perhaps we don't endeavor to -- okay. There may be a
joint filing for the hardships, but it sounds like for
the other bits -- I think we can do 10:00 a.m. on Friday
for the voir dire.

THE COURT: For the other ones that you
want to do individual voir dire on? Does that work? All
right. Good.

I mean, you-all have so much to do. Why
don't you just give me your individual lists of who you
think should be stricken for cause and we'll figure out
if you're in agreement about any of them. Okay? Rather
than having to have a discussion.

MS. KLOPF: Thank you, Your Honor.

THE COURT: Especially there's skepticism
as to whether there's going to be any agreement anyway.
So let's not waste time.

1          MR. PARRIS:  To cause, but it's going to be

2    a short list.  From what I can tell so far, the cause is

3    going to be a very short list.

4          THE COURT:  Okay.

5          MR. PARRIS:  But there's going to be a lot

6    of individual -- there's going to be a lot of attempts to

7    rehabilitate.  That's my prediction.  I promise you I'm

8    going to be doing some.

9          THE COURT:  Okay.  And then -- Katheryn, we

10   have two things Friday.  Ms. Kinkade is going to be

11   fixing up the -- we're adding counsel tables and doing

12   all kinds of stuff.

13         COURTROOM DEPUTY:  We could go to the fifth

14   floor.

15         THE COURT:  Yeah, that's true.  We could go

16   to the fifth floor courtroom to have a meeting about

17   whatever else we need to meet about, including these

18   individual voir dire.  Let's do that.  The fifth floor

19   courtroom.  It's in this part of the building, and it's

20   the extra courtroom.  5D.  Friday afternoon I would like

21   to meet and talk about these individual voir dire.

22         MR. PARRIS:  Are we going to be able to

23   move this forward just a little?  Okay.  So it's not

24   going to look like this?

25         MS. KINKADE:  It will look different on

1  Tuesday.

2          MR. PARRIS:  Thank you.

3          THE COURT:  It's going to be moved forward.

4  There's going to be one section added here, one section

5  added there.  Vicki, why don't you tell them about how

6  you anticipate everybody being seated and everything.

7          MR. PARRIS:  I kind of like Mr. Komisar

8  sitting on the bench.

9          THE COURT:  He probably likes sitting

10  there.

11          MS. KINKADE:  If any of you were involved

12  in trials in Judge Campbell or one for Judge Richardson

13  back in November, we moved -- when we have multi

14  defendants, we move the table out.  It will come out

15  about two feet.  We move the government down just a few

16  inches, enough to give room to -- for a person to walk

17  through right there.  It gives us more room back here for

18  the defendants and counsel can still communicate, but it

19  pulls it out.  In Judge Trauger's courtroom, we are

20  fortunate that we can add two more tables, one here and

21  one on the end down there.  And we will add the

22  microphones.  And the additional tables will not have the

23  courtroom technology, but we will connect them through

24  what already exists.  So you will have a screen for

25  evidence and a microphone.

1          MR. CRAMPTON:  Your Honor, have you given

2  us a time Friday afternoon?

3          THE COURT:  No, we haven't gotten that far.

4          MR. CRAMPTON:  Wasn't sure if we missed it.

5          THE COURT:  I'm trying to -- Katheryn, what

6  do we have Friday afternoon?

7          COURTROOM DEPUTY:  We have that 4 o'clock

8  telephone conference for one thing.  And I'll look at the

9  calendar.

10          (Pause in proceedings.)

11          THE COURT:  I'd say 2:30, maybe.  2:30 on

12  Friday in Courtroom 5D.  Good, I think that will work.

13          Now, we talked a little bit about this on

14  the phone conference, I think we did, about the reading

15  of the indictment.  Didn't we talk about that some?  And

16  we were discussing that the Court would read the

17  indictment with Caroline Davis's name included and all

18  the overt acts and all that.  At the beginning -- at the

19  beginning of -- not at the beginning of voir dire.  Or

20  should I do it at the beginning of voir dire?  What do

21  you think?  I mean, I have to summarize the indictment

22  for them for the purposes of voir dire, but I don't think

23  I have to read the whole indictment for voir dire.

24  Thoughts?

25          MR. PARRIS:  Judge, do you normally read

1  the indictment?

2              THE COURT:  No, I don't.

3              MR. PARRIS:  I would respectfully --

4              THE COURT:  I thought someone requested it.

5  Someone suggested it.

6              MR. PARRIS:  I would object to that.  I

7  definitely don't want you reading the indictment.  I

8  think that would give a negative inference.  It would be

9  an inference of validating the indictment.  I've never

10  seen a judge read the indictment.  It's always the

11  government.

12             THE COURT:  Okay.

13             MR. PARRIS:  That's -- you sort of took me

14  aback there.

15             THE COURT:  Well, somebody suggested it.

16  And I don't remember who it was.

17             MR. CRAMPTON:  Your Honor, as I recall, it

18  was included in an early proposed jury instruction from

19  the government.  Isn't that right?

20             MR. BOYNTON:  It was in an early --

21  Your Honor, the government's not requesting that

22  Your Honor read the indictment to the jurors in this

23  case.

24             THE COURT:  Okay.  Let's deal with this

25  now.  Is the indictment going to go back to the jury?

1   Sometimes it does, sometimes it doesn't.

2             MS. KLOPF:  Our proposal was baked into the

3   jury instructions that we proposed to the Court where

4   it's a truncated description of the indictment where we

5   stripped out the one language that we flagged in some of

6   the briefing about we're not going forward on a theory of

7   violence.  The indictment uses the word violence.  That

8   is not included in the jury instructions.  So that's our

9   proposal about -- rather than sending back the

10  indictment, just handle it that way with the

11  instructions.

12            THE COURT:  Well, we haven't included the

13  indictment -- I mean, we've included the statutes.  We

14  haven't included the indictment at all in the proposed

15  instructions.  It's got the statutes and the elements and

16  so forth.  Well, we can talk about that later in terms of

17  instructions, but.

18            COURTROOM DEPUTY:  That Friday thing is

19  just for the lawyers; right?

20            THE COURT:  Yeah.  The meeting in the

21  courtroom on Friday afternoon at 2:30 is just for the

22  lawyers.  It's just counsel.  Defendants don't have to be

23  there.

24            All right.  I think that's the end of my

25  agenda.  Does the government have any additional points

1  to discuss?

2          MS. KLOPF:  Just a few quick ones,

3  Your Honor.

4          THE COURT:  Okay.

5          MS. KLOPF:  First off, we wanted to let you

6  know that we have already disclosed our witness list

7  under an agreement that the defense counsel would not

8  share those names with their clients or anyone who hadn't

9  agreed at this point.  All of the counsel have agreed to

10  that.  So they've been provided with all of the witnesses

11  who had been anonymized to this point and their *Jencks*

12  have been identified.  I want that to be noted for the

13  record.

14          THE COURT:  So they have the names of the

15  witnesses.

16          MS. KLOPF:  Exactly.  They had already --

17  because of that -- because of the third party motion, we

18  were trying to be cognizant of that when we provided that

19  information, but -- so that's how we did it under

20  agreement.  If the Court would like, we could file

21  something under seal as well.  I do want the record to

22  reflect that as of today, every single defense counsel

23  have been provided with that list.

24          THE COURT:  Okay.

25          MS. KLOPF:  I just want that to be on the

1 record.

2                 THE COURT:  Okay.

3                 MS. KLOPF:  In terms of exhibits, we're

4 going to incorporate today's rulings into the exhibits

5 and make those changes.  Our goal is to have them on a

6 flash drive to give counsel on Thursday.  It may be

7 Friday because sometimes making clips take a little

8 longer, it just depends.  But I just want that to be

9 flagged for the record that we're trying to get exhibits

10 to everybody before trial.

11                We will be using one demonstrative that

12 kind of pulls the Facebook communications together.

13 That's in almost final form.  We're going to try and

14 provide that to counsel either this evening or tomorrow.

15                There's just two -- just housekeeping

16 stuff.  Caroline Davis has changed her last name.  She's

17 indicted in this case as Caroline Davis.  I think all of

18 the reports call her Caroline Davis.  Or Caroline Davis,

19 excuse me.  And I think all the defendants know her as

20 Caroline Davis.

21                I expect that I will just call her Caroline

22 Davis, but I wanted to flag for the Court -- we'll

23 probably ask her that she's changed her name, but we

24 probably will call her Caroline Davis, even though that

25 is not her legal name anymore.  I just wanted to flag

1  that for you.

2           THE COURT:  Okay.

3           MS. KLOPF:  Lastly, as this Court, I think,

4  knows, there's some safety concerns about this case.

5  We're taking some steps with witnesses to ensure that

6  everybody's safe.  We just wanted to flag for the Court,

7  we may not make use of the ante rooms like we would in a

8  normal trial where we have witnesses just waiting there.

9           So it's not going to be with every witness,

10 but we would just ask for the Court to bear with us if

11 there's a little bit more of a lag while they're being

12 escorted down from our office.  Normally we try to --

13          THE COURT:  Up from your office.  We keep

14 saying that too.

15          MS. KLOPF:  What has it been, like, two

16 years, and I'm still -- I don't know if I'll ever shake

17 that.

18          Last but not least, I just ask the Court --

19 I know the Court is very well aware of all the safety

20 issues that we're trying to deal with, but that no

21 photographs be allowed in the courtroom.  There's already

22 been one taken today.  I don't know what of, but one of

23 the defendants has taken a picture.  I saw -- the team

24 saw the flash go off.  Mr. Paul Vaughn took a photo

25 earlier today.  We flagged it for the marshals.  I would

ask the Court that if that picture was of anyone in this courtroom that it be deleted or that the Court review it. There are --

THE COURT: Who took the photo?

DEFENDANT VAUGHN: I did, Your Honor.

THE COURT: Let me see the photo.

MR. CRAMPTON: He has already deleted it. We have addressed it. He was unaware of the rule. We've explained it to him. The marshals explained it to him. Photo no longer exists, there will be no more photos.

THE COURT: Thank you.

We are posting a special notice outside the courtroom that says that there's to be no demonstration of agreement or disagreement with any testimony by head movements or certainly anything said or hand movements or anything else; that cell phones may not be used in the courtroom, period, paragraph. And if the court security officers see a cell phone, the person will be asked to leave.

And, of course, nothing can be recorded in the courtroom by cell phone or any other means. And that will be clearly posted outside. I understand for Judge Campbell's trial he actually distributed that notice individually to people in the courtroom. I hope I don't have to do that. But that's one thing we've done

1  to deal with that.

2              MS. KLOPF:  With that, Your Honor, I think

3  that -- let me just check with my trial team -- okay.

4  That's all we had on our to-do list.

5              THE COURT:  Let me hear from any defense

6  counsel.

7              MR. PARRIS:  Just briefly, Judge.  And that

8  is just so I don't forget and it's for Mr. Crampton as

9  much as you, because he's going to file something today.

10 As for the pseudonyms, one of the...

11             As for the pseudonyms, I just want to bring

12 back up the issue -- I just want to put it in your head.

13 First of all, I respect if there's a genuine threat to a

14 witness, I get that.  I have no problem with that.

15 Frankly, I question whether there is.  And I know they're

16 not from these people.  I already know that.

17             THE COURT:  The concern is not just from

18 the defendants, as you well know.

19             MR. PARRIS:  I get that, and I totally get

20 it.  But I do -- I'm trying to think of a way to

21 safeguard this so if somehow or another it comes up and

22 this jury finds out that they're testifying under

23 pseudonyms, I mean, I'll be the first to ask for a

24 mistrial.  Now I hear that Caroline Davis has changed her

25 name.  If it comes out that she's changed her name, I'll

1  be the first to ask for a mistrial.

2              THE COURT:  Well, she got married.  What's

3  the problem?

4              MR. PARRIS:  Okay.

5              THE COURT:  Isn't that what you said?

6              MS. KLOPF:  She got divorced.

7              MR. PARRIS:  I didn't understand that.  I

8  didn't understand that.

9              THE COURT:  Okay.

10             MR. PARRIS:  I didn't understand that.

11             THE COURT:  She didn't change her name to

12  protect herself.

13             MR. PARRIS:  I thought this was in the

14  context of fear, I've changed my name.  I'm fine with

15  that.  But I still have the issue of, you know, these

16  witnesses are from this area.  And if we're going to have

17  150 jurors -- I mean, it is a small chance, but is there

18  a chance one of them knows them.

19             THE COURT:  Well, we provided for

20  photographs to be shown.

21             MR. PARRIS:  I'll sit down then.

22             THE COURT:  That's right in my order, which

23  apparently you haven't had a chance to read yet.

24             MR. PARRIS:  I missed it, I'm sorry.

25             THE COURT:  Okay.  And the government is

going to provide photos that will be displayed.

          MR. CRAMPTON:  Your Honor, just one other comment regarding the government's disclosure of the witness list.  We appreciate that.  I would note that it is just in alphabetical order so we have not been apprized of the order in which they intend to call them.  I understand that there's trial strategy involved and so forth, but obviously it would help matters to move along to the extent we had some idea of who was going to be testifying in what order.

          THE COURT:  I make them reveal that as we go along.  I will say who are your first three witnesses, and then when we break for the evening, who's testifying tomorrow.  And so that does cause me to ask the question -- I thought I'd asked it, but I don't think I have.  Are you splitting up the witnesses so that we don't have six lawyers cross-examining every witness?

          MR. PARRIS:  Generally, yes.  I mean, I think we all reserve the right to cross-examine if we need it, but we each have specifically taken a group.

          THE COURT:  Good.

          MR. PARRIS:  And I think that this group's probably going to be thorough enough, I doubt there will be a whole lot of overlap, if any.

          THE COURT:  Okay.  Anything else?

```
 1                 MS. BELL:  Yes, Your Honor.

 2                 THE COURT:  Wait.

 3                 MS. KLOPF:  Our paralegal, who is much more

 4     technologically savvy than I, reminded me that I need to

 5     verify that the photo was deleted from the recently

 6     deleted folder.  Because I guess photos can still be

 7     saved if they've been recently deleted.  So I just -- I

 8     would like to ensure that there was taken --

 9                 THE COURT:  Has it been double deleted,

10     Mr. Crampton?

11                 DEFENDANT VAUGHN:  I will make sure it is

12     completely gone.

13                 THE COURT:  And so will your lawyer.

14                 MR. CRAMPTON:  Yes, Your Honor.

15                 MS. BELL:  Couple housekeeping, Your Honor.

16                 So the first thing that we had talked

17     about, the defense lawyers together, is if we could get

18     the rough drafts every day from the court reporter.

19                 THE COURT:  I don't know.  Not -- rough

20     drafts?

21                 MS. BELL:  That's what she told me they're

22     called, dailies is what --

23                 THE COURT:  That's between you and her.

24                 MS. BELL:  All right.  That's easy.

25                 I'm going down -- we just talked about the
```

mechanics of the cross-examinations and how we've divided

them up.  What I would further ask that we had discussed

is that whoever the lawyer is that is the lead, it

wouldn't necessarily start with me each time since I'm

defendant 1.  Is it okay if you can say something to the

effect of after the witness testified for the government,

okay, who for the defense.  And then maybe it's

Mr. Haymaker that is taking that particular witness, so

he would go first.  And then the rest of us would be

shorter and just go down the line.

THE COURT:  Yeah, I wouldn't be calling on

each of you.  I'll just say cross-examination.  And

whoever's supposed to do it, stand up.  And then I'll say

anybody else want to cross-examine.

MS. BELL:  Perfect.

The other thing that we were going to ask

is if we could get the room on the second floor during

the course of the trial.  I think it's the ADR room, is

that what it's called?  If we can arrange to do that

through Ms. Kinkade, I guess is how we would do that, so

that we have a space.

THE COURT:  Okay.

MS. BELL:  Then there were two sort of more

substantive issues that I wanted to address with the

Court and clarify.  As to the Court order on the motions

1  in limine regarding the criminal trespass issue because I
2  don't want to violate that order, your Honor had ruled
3  that we could not comment that this should be a criminal
4  trespass case or that that was the more appropriate
5  charge I believe is kind of how the order reads.
6              I want to make sure -- I am not going to
7  argue that, I am not going to cross that, but the reality
8  was is that is what these people are arrested for, and so
9  I think that is fair game when the witnesses testify.
10 Because otherwise if the police come in and say, yes, we
11 arrested everyone, we don't want the jury thinking it was
12 for a FACE Act violation or a criminal conspiracy.
13 That's one area where I just want the Court to know that
14 we intend to sort of establish that the arrest was for
15 criminal trespass.
16             THE COURT:  Before you go any further,
17 seems logical to me, I don't know.
18             MR. BEAYE:  Your Honor, the government has
19 no objection to defense counsel eliciting the fact that
20 the defendants were arrested for criminal trespass.
21             THE COURT:  All right.
22             MS. BELL:  Then another area of
23 cross-examination that may get into that is there have
24 been a lot of reference in the prior testimony of
25 Caroline Davis and in some of the 302s about this idea of

risking arrest and talking about FACE and these prior

meetings preparing for the rescue.

I think that that also is fair game that

when they talk about risking arrest, when these people

talk about risking arrest, they're talking about

disorderly conduct as well.  They're talking about things

like criminal trespass.  It's not necessarily we're going

out and risking arrest for FACE.

So I think that is -- I think part of how

we would establish the cross-examination through

Ms. Davis when she's talking about, you know, we were

talking about FACE in advance and Mr. Zastrow told me

about it, they were talking about how to act

appropriately and to avoid risking arrest for things like

criminal trespass, FACE, assault, a whole bunch of

different things.  So we want to be sure that we can

cross-examine that witness about the reality of what they

were talking about.  Does that make sense?

THE COURT:  Not really.  Ms. Klopf?

MS. KLOPF:  I would object vehemently to

that.  First of all, I actually don't think that's how

the proof will come in.  I think the proof will come in

that one of the defendants on February 19 was on

Cornell's website looking up 18 USC 248.  I think there

will be proof that multiple defendants actually spoke to

others about the FACE Act, how it got -- was instituted,
what the penalties were -- well, not what the penalties
are, excuse me, but more generally what it is and what it
criminalizes.  In fact, one of the defendants uses terms
of art from it saying, we have two doors to block, things
like that.  So I think that, frankly, that's not factual.

Second off, I think this Court well knows
there are multiple crimes that can be committed and
someone might have the thought that I am committing this
crime, but they're also committing -- they're a felon in
possession of a firearm but they're also committing a
924(c).  They don't need to be cognizant of what crime
they are exactly committing in order to do this.

Now, obviously mens rea does play into
this, but I don't think the kind of arrest that they are
risking is in any way relevant.  I think what's relevant
is the fact that they understand that they are breaking
the law, and that by doing so that a police officer may
arrest them.

MS. BELL:  And I think there's going to be
a lot of talk about risking arrest.  And I think putting
that in context with Caroline Davis is fair.  If she
starts talking about risking arrest and what her
expectations were of risking arrest were on this
particular day, I don't believe for one second Caroline

1  Davis thought she was risking a FACE Act arrest.

2           If she says the words risking arrest, I

3  think it is fair for each and every one of us to tell --

4  to cross-examine her about, you on that day believed you

5  were risking arrest for criminal trespass and, in fact,

6  you were arrested for criminal trespass.  Those are fair

7  questions.

8           And there's going to be a lot of talk

9  about, I believe, how going into a rescue you understand

10 that you are risking arrest potentially, depending on

11 what your conduct is.  I just think those are fair

12 questions and they accurately depict what happened in

13 this case, what was discussed, what people's mindset

14 contained.

15          And I just -- I'm bringing this to your

16 attention because of the order about criminal trespass

17 and trying to follow the rules of the Court.  I think we

18 all want to and don't want to run afoul of that and

19 streamline the trial as well.

20          THE COURT:  Well, I'm trying to figure out

21 if it's relevant what was in her mind about what she was

22 risking arrest for.

23          MS. BELL:  I think -- yes, because she's up

24 there -- I think she's going to come up there and

25 testify -- well, I don't know what she's going to say.

1    Maybe we have to cross that bridge when we come to it.

2    But if there is this idea that people in advance were

3    talking about risking arrest, that necessarily -- and

4    there's this suggestion from the government that meant

5    they were going out to do a FACE act violation, right,

6    and that they knew what they were doing, I think it is

7    fair to say that when they were talking about risking

8    arrest, it wasn't -- it wasn't limited to the idea of

9    FACE Act.

10                And the reality was -- and the reality is

11    today, Your Honor -- I don't know if you know this, that

12    nobody really had been criminally charged with the FACE

13    Act, definitely not in this group of people, ever.  No

14    one's -- there are not criminal FACE Act charges out

15    there until now, really.

16                THE COURT:  Washington, DC had a trial.

17                MS. BELL:  No, but this is -- yes.  That

18    was after this happened.  Prior to March 5, 2021, nobody

19    was being charged with FACE.  So when people are talking

20    about we're going out to a rescue and we're risking

21    arrest and these people are very well-educated on the

22    prolife movement and the different kinds of legislation

23    that there is, so, sure, they know what FACE is, they've

24    read FACE.  Some of them may know people that have been

25    civilly charged with FACE, but when we're talking about

risking arrest and people being responsible when they're
going out and taking these rescue activities and doing
their advocacy, what they're talking about risking arrest
on March 5, 2021, is not for the FACE Act.

 And I think that if the government is
coming in and suggesting because they talked about the
FACE Act, that meant they knew they were violating the
FACE Act, thus they are guilty, it is fair for us to
cross-examine who's testifying about risking arrest on
what that really meant.

 THE COURT:  Okay, I understand your
argument.

 MS. BELL:  Thank you.

 MS. KLOPF:  Your Honor, I think
alternatively, I think actually it's completely unfair
and puts that in front of the jury to consider, wait, why
were they arrested for trespass, why are we here now.  I
think the obvious corollary is when someone goes out and
robs a local gas station, in their mind they may think, I
am risking arrest for a state charge for this.  And then
they get arrested by the feds for Hobbs Act robbery, a
much more significant crime, and they get arrested for a
924(c).  I mean, you've heard it many-a time on jail
call, oh, my gosh, I just got charged with a federal
crime; I thought I committed a state crime.

1            None of that is relevant.  All that is
2    relevant is, yes, the mens rea of these folks is that
3    they went in understanding, even before they walked in,
4    that they were going to commit a crime and that meant
5    that they were risking arrest.  I don't think -- I do
6    think there will be discussion of what they understood
7    about FACE, but I don't think anyone's going to be
8    implying that they were arrested for FACE that day.  But
9    I think if we inject the fact that they thought that they
10   were risking arrest for trespassing, which has no
11   relevance to the elements that are charged herein, we're
12   going to quickly get into the area that this Court has
13   already said is completely off limits.
14            MS. BELL:  Your Honor, I'm not trying to
15   suggest to the jury what they should have been arrested
16   for or that's what they really did.  But the conversation
17   about risking arrest is about avoiding arrest for all
18   kinds of things, right.  That if -- I don't want to give
19   my whole defense away, but apparently it looks like I
20   might have to to some degree.  If these people are going
21   out to do a rescue and they want to do it safely and they
22   want to advise one another, this is how you do this
23   safely, this is how -- you don't lose your temper, for
24   example, you talk politely to people.  We aren't talking
25   over one another, they aren't doing these certain things.

You know that if you do certain things, you're risking
arrest, okay.  You could risk arrest -- you get close to
that door, you could risk arrest.

Hiding the fact that what they thought and
what they believed and what actually really did happen
was that they were arrested for criminal trespass, I'm
sorry it's a fact that the government doesn't like, but
it is the truth.  It is what happened.  I thought -- I
mean -- I mean, this is a search for the truth to some
degree.

It also brings into how they're planning
partially of going over there, I would submit, is
cautioning one another about how to behave to avoid
arrest, but knowing that if you get close to that line,
you risk arrest for certain things.  We aren't going to
stand up here and say, what they really did was criminal
trespass, don't convict them of FACE.  That's not the
point of this.

This is an important fact.  This is an
important distinction.  And the reality of what happened
was that day they were arrested for criminal trespass,
just like I suspect Caroline Davis would say that's what
she thought she was risking arrest for.  And I think that
that's fair.  And I'm sorry it's not helpful to their
side of the case and maybe doesn't make the analysis

perfect, but there's a ton of facts they have that I
don't particularly like either.

MS. KLOPF:  Your Honor, politeness is not
at issue here.  What happened here is that these
defendants blocked doors for hours, refused to comply
with the police officers' directions to move and they
intended to do so.  They understood that by doing so that
they were committing a crime; and that, therefore, they
were risking arrest.  But delving into what they thought
they were risking arrest for invites the jury to consider
a whole host of issues that are not relevant to this
trial and shouldn't be brought before.

And I did just want to make clear that
there was a period of time where these weren't happening.
You'll actually hear testimony, I believe, that the FACE
Act was actually fairly successful in stopping rescues
from happening and that they had kind of -- we won't get
into that.  So the Court knows, they had started ramping
up again.

THE COURT:  I see.

MS. KLOPF:  That, of course, the Court has
already ruled is far out of bounds for any sort of
discussion before the jury, but I did want the Court to
have that information.

MR. THORNTON:  May I be heard, Your Honor?

1          THE COURT:  Would you put your name on

2   record.

3          MR. THORNTON:  This is Steve Thornton for

4   defendant Coleman Boyd.  You have ruled in the motion in

5   limine that the government must move the intent of the

6   defendants in conspiring and they must agree to an

7   agreement to commit a crime.  The government would have

8   us have evidence come in of an act and then infer

9   circumstantially what their intent was.

10          But if you want to know what their intent

11   is, the United States has a long history of people

12   engaging in peaceful protests and being arrested on a

13   whole host of charges, blocking a sidewalk, disorderly

14   conduct, and on we go.

15          So for these defendants to be talking in

16   advance about what they're risking when they're standing

17   out there either on the sidewalk, out in the parking lot,

18   there are many different aspects of what sort of thing

19   they're risk by engaging in this protected activity.

20          So to prove their intent you say, well,

21   they were talking about risking arrest so, therefore --

22   and they did block a door, so therefore they were

23   conspiring to block the door.  Those don't fit together.

24   If they were talking about risking arrest for being

25   arrested on the sidewalk and they're arrested some number

1 -- some of their number's arrested for going inside of a

2 building and sitting inside the door, the government has

3 to prove for each defendant what their intent was

4 specifically and that they agreed specifically to commit

5 a crime. They don't have to know the --

6             THE COURT: No, they need to agree to act

7 together to intimidate a person in the free exercise of

8 the right to supply or seek reproductive healthcare.

9             MR. THORNTON: Thank you. That's the

10 crime.

11             THE COURT: That's what they have to prove.

12             MR. THORNTON: They have to prove it was

13 their intent to do that.

14             THE COURT: To do that. Whether or not

15 they knew it was a crime. Whether or not they knew it

16 was a crime. People are convicted of crimes every day

17 when they didn't know it was a crime. I had one just

18 yesterday. It's against the law to be a habitual user of

19 marijuana and to possess a gun. He didn't know that. He

20 got convicted anyway.

21             MR. THORNTON: Doesn't the Sixth Circuit

22 case law say they have to know it was unlawful? You

23 said he didn't know it was unlawful. They have to know

24 it's unlawful. It would be quite an interesting world if

25 they --

1           THE COURT:  People get convicted every day

2      for crimes they didn't know were a crime.  That may be a

3      bad example.

4                MR. THORNTON:  Well, I would have to submit

5      to you, I don't think that's the precise rulings of the

6      Sixth Circuit, but you may be using language that we can

7      parse.  But the defendants have to know that they're

8      doing something unlawful, do they not, to conspire to do

9      something unlawful?  They can't conspire to do something

10     unlawful if they don't know it's unlawful.  If they think

11     it's legitimate, if they think it's protected activity.

12               THE COURT:  And they -- and they are

13     risking arrest, so they know that it's somehow unlawful.

14     They may not know it's a violation of the FACE Act, but

15     if they say they're risking arrest, isn't that an

16     admission that you know it's unlawful?

17               MR. THORNTON:  Well, if you know that there

18     are folks who are arrested for, let's say, putting on a

19     display in military uniforms in Houston in 1960s to

20     protest the Vietnam War, you know they did that, the

21     Supreme Court has ruled that was not unlawful at all.

22     But they were arrested and charged.  Or *Houston versus*

23     *Hill*, a man speaks to a police officer in a disrespectful

24     way, he's arrested for disorderly conduct.  Supreme Court

25     said that's free speech.  That's not disorderly conduct.

He was arrested.

So if our defendants say, hey, we've got
*Houston versus Hill*, we've got a long history of
people -- Mr. Lewis in Birmingham arrested for disorderly
conduct for standing on the sidewalk and making a speech
that the government officials didn't like, these people
are risking arrest by getting out there and engaging in
Second Amendment activity.

Just because they agree and understand that
they're risking arrest doesn't mean they're agreeing to
commit a crime or even do anything unlawful. They might
be doing something they genuinely believe -- and the
Supreme Court would agree, it's protected activity,
they're doing it and they plan to do it. They're not
planning on committing a crime or doing anything
unlawful, but they may be charged for doing something
unlawful even though they don't believe they are.

Now, if they say we wouldn't be
trespassing. To be trespassing do they not have to go
into a place of public business and then he said -- and
be told you're not welcome here, leave. Until they're
told, you're not welcome here, leave, you must go, they
haven't committed a trespass. They're coming at an
invitation to come into a public building, public office
building or medical plaza. They're doing something

1  perfectly legal.

2          If the -- some -- a tenant says, you're

3  trespassing, leave, at that point they're not welcome,

4  they need to leave.  If it doesn't happen, they haven't

5  committed a trespass.  But they recognize there's a risk

6  that someone may come out and say you're trespassing,

7  then the risk kicks in.

8          But what were they thinking and planning

9  the day or two before whenever they're talking about

10 risking arrest?  Okay, we're going to plan to do

11 something unlawful, we're going to plan to commit a crime

12 even if they don't know it's a crime.  This all goes to

13 the intent of the defendants in committing a crime of

14 conspiracy.

15          And so for the government to say, well, if

16 they were talking about anything at all, then they must

17 have been talking about a violation of the FACE Act.

18 Those two don't fit together, Your Honor, I respectfully

19 submit.

20          THE COURT:  Thank you.

21          MS. KLOPF:  Your Honor, I think the Court

22 well knows, we don't have to say that they were

23 conspiring to agree to a particular crime.  What they

24 were conspiring to do here was to violate a protective

25 right.  I think the proof will be very clear that they

1  were doing that.  I think in the terms of mental state,

2  the fact that they're talking about arrest is very

3  probative of the fact that they understand what they're

4  doing or it's not an accident or mistake or anything like

5  that.

6        Past that what they think, what kind of a

7  crime that they think -- because that is the default, the

8  most likely thing that they will be arrested for is not

9  something that should enter or be considered by the jury.

10 And the serious concern here is that the jury will

11 consider that.

12       THE COURT:  I'm going to have to make this

13 call when the examination takes place.  I just don't

14 think I can make this in advance.

15       MS. BELL:  Fair.

16       MR. HAYMAKER:  Thank you, Your Honor.

17       THE COURT:  Just a minute.

18       I think some of you know, but we're --

19 they're predicting some inclement weather Sunday, Monday

20 Tuesday.  And, you know, we will deal with it if it

21 comes.  If it comes.  They often say we're getting these

22 things and we don't get them.  So if the court is not

23 open on Tuesday, the court will be open on Wednesday or

24 whenever.  So, you know, you will hear whether or not we

25 are open.

1          MR. CONWAY:  Your Honor, to that aspect.

2    Will Conway for Ms. Heather Idoni.  She's the only person

3    that's in custody right now.  They have her at Grayson

4    County.  I know several of the attorneys here have been

5    to that jail.  It's not the easiest jail to access if

6    there is inclement weather.  I would ask if Your Honor

7    has the authority, if she can ask the marshals to move

8    her closer to Nashville.

9          THE COURT:  I've already addressed that,

10   and the marshals say that Grayson County is probably the

11   best place for her.  The Davidson County jail, we have no

12   contract that covers female defendants in Davidson

13   County.  So there's no place to house her here.  That's

14   what I thought we should do, house her here, but

15   apparently we don't have a facility that the marshal has

16   a contract with that can house a female.

17          And then the closer jail, apparently the

18   personnel at Grayson are better getting people here on

19   time and so forth.  So the marshals think Grayson County

20   is the best place for her.  Can I just ask why is she

21   still in custody?

22          MR. CONWAY:  She's awaiting sentencing on

23   the Washington, DC case.  There were several

24   interlocutory appeals that were happening about them

25   being taken into custody directly after the verdict,

1  which pushed sentencing off.  So sentence has just been

2  prolonged and prolonged.

3            THE COURT:  So she's still on release (sic)

4  before sentencing?  She hasn't been sentenced in DC.

5            MR. CONWAY:  She has not been sentenced in

6  DC.  The Judge found basically sua sponte that it was a

7  crime of violence, and upon that finding she took all of

8  the defendants into custody pending sentencing.

9            THE COURT:  I see.

10            MR. CONWAY:  There were several appeals in

11  between that, which kept postponing everything.

12            THE COURT:  I see.

13            MR. CONWAY:  She has not been sentenced.

14            THE COURT:  I see, okay.

15            MR. RUSS:  Your Honor, I did have one

16  question on behalf of Mr. Green.  Ben Russ.  He'd asked

17  me about any kind of seating or what the Court's policy

18  about family or friends that were going to be in the

19  courtroom.  Some of the defendants, including Mr. Green,

20  have very large families, and I didn't -- I've said I

21  knew it was going to be open to the public and, of

22  course, other rules apply.  But I didn't know if the

23  Court was going to restrict the number of people that

24  could attend.

25            THE COURT:  We are not having an overflow

courtroom.  I doubt we will have any room for any

spectators during jury selection.

MR. RUSS:  I told him that, yes.

THE COURT:  And it will be first come first

serve.  I'm not going to reserve half of the gallery for

family members, I'm sorry.  Anything else, anybody?

MS. BELL:  Your Honor, I have one last

thing.  I did want to ask the Court if I can, in brief

voir dire, talk to the jury about my visual problem

because sometimes during trials I don't see things, I

trip over things, I bump into things.

THE COURT:  I've never noticed that.

MS. BELL:  Well, Mr. Crampton, I didn't see

his hand when he reached out to have me shake it at

first.  It's just something I want to just spend a half

second -- or you can tell them, but I don't want them,

when one of the lawyers over here comes to hand me a

piece of paper and I just sit there -- because I see

here, I don't see here.  So just being able to briefly

just say, I've got this issue, you know, if you see me

bump into something, I promise I'm paying attention.

THE COURT:  Do you have any objection?

MS. KLOPF:  I think in *United States versus*

*Justice* we handled something kind of similar with our

defense counsel and I think it came from the Court.

1           MS. BELL:  And that's fine.

2           MS. KLOPF:  I don't know if you recall, our

3   defense counsel was having a health condition where his

4   face turned red occasionally.

5           THE COURT:  Oh.

6           MS. KLOPF:  You just said something very

7   quickly in passing to the jury, and I think we kind of

8   dealt with it that way.  Our preference was just, no

9   offense, Ms. Bell, that it come from the Court as opposed

10  to Ms. Bell.

11          MS. BELL:  No, that's fine.

12          THE COURT:  Okay.  And what would you have

13  me say --

14          MS. BELL:  Just Ms. Bell's one of the

15  lawyers here, she has low vision.  She might bump into

16  things.  Yeah, she's got a visual impairment, however you

17  want to say it.  So sometimes she'll bump into things or

18  something along those things.  I bump into things, I trip

19  over things.  I don't see -- you know, it can be -- I one

20  time in court -- I clip the tables a lot, and I did that

21  during a prelim and everybody winced.

22          THE COURT:  Clipped the table?

23          MS. BELL:  With my hip.  I won't clear it.

24          THE COURT:  Ouch.

25          MS. BELL:  So I do things like that.  So I

1  just don't -- the last trial I had, I just got up and

2  told them.  And it was fine, so.  If you want to tell

3  them, you can tell them.

4          THE COURT:  I'll say something.

5          MS. BELL:  Thank you.

6          THE COURT:  If I don't, just give me a

7  heads-up, tell me to do it.

8          MS. BELL:  Sure.

9          THE COURT:  Anything else?  All right.

10          MS. KLOPF:  Nothing from the government.

11          THE COURT:  Thank you all.  And we will see

12  you Friday afternoon at 2:30 in courtroom 5D.  And

13  Ms. Beasley has that look on her face like I've forgotten

14  something.  What about?  Yes, I need a court reporter for

15  that hearing.

16          Thank you, folks.  We're in recess.

17          (Whereupon, at 3:24 p.m. these were all of

18  the proceedings had in the above-captioned cause on the

19  above-captioned date.)

20

21

22

23

24

25

**REPORTER'S CERTIFICATE PAGE**

1

2

3          I, Roxann Harkins, Official Court Reporter for

4  the United States District Court for the Middle District

5  of Tennessee, in Nashville, do hereby certify:

6          That I reported on the stenotype shorthand

7  machine the proceedings held in open court on

8   January 10, 2024, in the matter of UNITED STATES OF

9  AMERICA v. CHESTER GALLAGHER, ET AL., Case No.

10  3:22-cr-327; that said proceedings were reduced to

11  typewritten form by me; and that the foregoing transcript

12  is a true and accurate transcript of said proceedings.

13

14          This is the 20th day of January, 2024.

15

16                    s/ Roxann Harkins_____
                     ROXANN HARKINS, RPR, CRR
17                    Official Court Reporter

18

19

20

21

22

23

24

25