1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF TENNESSEE
2                       NASHVILLE DIVISION

3

4   UNITED STATES OF AMERICA        )
                                    )
5   VS                              )   No. 3:22-cr-327
                                    )
6   CHESTER GALLAGHER [1]           )
    HEATHER IDONI [2]               )
7   CALVIN ZASTROW [3]              )
    COLEMAN BOYD [4]                )
8   PAUL VAUGHN [6]                 )
    DENNIS GREEN [7]                )
9   _____

10

11

12    BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

13                  TRANSCRIPT OF PROCEEDINGS

14                     January 29, 2024

15                      (Volume 5-B)

16  _____

17

18

19

20

21  _____

22  **Roxann Harkins, RPR, CRR**
    Official Court Reporter
23  719 Church Street, Ste 2300
    Nashville, TN 37203
24  615.403.8314
    roxann_harkins@tnmd.uscourts.gov
25

**APPEARANCES:**

For the Government:    AMANDA J. KLOPF
                            US Attorney's Office
                            719 Church Street, Suite 3300
                            Nashville, TN 37203

                            KYLE RANDOLPH BOYNTON
                            WILFRED T. BEAYE , JR.
                            U.S. Department of Justice
                            150 M St. NE
                            Washington, DC 20530

For the Defendant Gallagher:

                            JODIE A. BELL
                            Law Office of Jodie Bell
                            214 Second Avenue North
                            Suite 208
                            Nashville, TN 37201

For the Defendant Idoni:

                            WILLIAM J. CONWAY
                            214 Second Avenue North
                            Suite 208
                            Nashville, TN 37201

For the Defendant Zastrow:

                            ROBERT LYNN PARRIS
                            200 Jefferson Avenue
                            Suite 1500
                            Memphis, TN 38103

                            DAVID I. KOMISAR
                            800 Broadway
                            Third Floor
                            Nashville, TN 37203

1    For the Defendant Boyd:

2                                    G. KERRY HAYMAKER
                                     Haymaker & Heroux
3                                    300 James Robertson Parkway
                                     Suite 306
4                                    Nashville, TN 37201

5                                    STEVEN C. THORNTON
                                     PO Box 16465
6                                    Jackson, MS 39236

7

8    For the Defendant Vaughn:

9                                    STEPHEN CRAMPTON
                                     Thomas More Society
10                                   PO Box 4506
                                     Tupelo, MS 38803
11

12   For the Defendant Green:

13                                   MANUEL B. RUSS
                                     340 21st Avenue North
14                                   Nashville, TN 37203

15

16

17

18

19

20

21

22

23

24

25

1  **I N D E X**

2

3  Closing argument by Government.........................6

4  Closing argument by Defendant Gallagher...............29

5  Closing argument by Defendant Zastrow.................45

6  Closing argument by Defendant Boyd....................50

7  Closing argument by Defendant Vaughn..................69

8  Closing argument by Defendant Green...................90

9  Closing argument by Defendant Idoni..................98

10  Government Rebuttal argument.........................108

11

12  Jury Charge.........................................130

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          The above-styled cause came to be heard on

3   January 29, 2024, before the Hon. Aleta A. Trauger,

4   District Judge, when the following proceedings were had

5   at 12:22 p.m., to-wit:

6

7          THE COURT:  All right.  Are we ready for the

8   jury?  Okay.  Bring the jury in.

9          (Whereupon, at 12:23 p.m. the jury returned

10  to open court.)

11         THE COURT:  Good afternoon.  We apologize

12  for the delay.  We are starting today at 12:25 with the

13  jury.

14         Has everyone followed my instructions to not

15  talk about the case amongst yourselves or with anyone

16  else?

17         Has everyone followed any instruction to

18  ignore any news coverage that you may have stumbled upon?

19         Everyone followed my instruction to not do

20  any research about anyone or anything connected to the

21  case?  Very good.

22         Members of the jury, we're going to have

23  closing arguments and then we will be passing out

24  individual copies of the instructions so that you may

25  follow along as I read them to you.  And then you will

1    begin your deliberations.

2              So the government begins and ends the

3    closing arguments.  Mr. Boynton.

4                   GOVERNMENT CLOSING ARGUMENT

5              MR. BOYNTON:  Thank you, Your Honor.

6              When Sergeant Schneider of the Mt. Juliet

7    Police Department heard that a woman needed to get into

8    the clinic that morning, he did his job as a police

9    officer to enforce the law.  It didn't matter to him

10   whether the woman was an employee or a patient.  And if

11   she was a patient, it didn't matter to him what kind of

12   appointment she was there for.  He walked down the

13   hallway to the clinic entrance, shepherding the woman

14   down the hall with him.

15             Sergeant Schneider saw the group ahead.  The

16   group that included defendants Paul Vaughn, Calvin

17   Zastrow, Chester Gallagher and Dennis Green, as well as

18   Caroline Davis.  The blockaders crowded in front of him,

19   obstructing the path into the clinic.

20             But Sergeant Schneider didn't turn back.  He

21   kept doing his duty as a police officer.  Sergeant

22   Schneider had to use his hands to force defendant Zastrow

23   out of their way.  That's what it took, force, to try to

24   get this patient to the clinic door.

25             Listen to the words defendant Paul Vaughn

said, telling Sergeant Schneider to not do his job.
Listen to the words of defendant Chester Gallagher
telling Sergeant Schneider they won't let him do his job.
And watch Chester Gallagher keep trying to block the
patient as they moved forward.

(Playing video.)

Remember the words of the woman Sergeant
Schneider escorted, the patient seeking medical care.
You heard her exclaim that she wasn't there for an
abortion.  Her words didn't matter to the blockaders.
Think about that.  It didn't matter what kind of
reproductive healthcare she was there for.  And it didn't
matter to the blockaders that this was an officer of the
law telling them to move.

And remember the view from another angle,
Exhibit 2I.  Defendant Dennis Green is holding a camera.
And as Sergeant Schneider approaches he sits down behind
defendant Calvin Zastrow, the next line of the blockade.

Sergeant Schneider wasn't the only officer
that these defendants defied.  And this woman wasn't the
only patient these defendants prevented from seeing her
doctor to get reproductive healthcare.  There is simply
no question what occurred in this case.  The defendants
agreed and planned to blockade a clinic, and then they
worked together to do it.

1          There's overwhelming evidence that these six

2   defendants and the other co-conspirators planned their

3   crimes carefully, their scheme to block access to

4   reproductive health services, their scheme to interfere

5   with others' rights.  Many of them traveled from out of

6   state to come to Mt. Juliet, made travel plans, lodging

7   arrangements.  Most met in person to organize and plan

8   this conspiracy.  Several communicated by Facebook

9   Messenger.  They planned and they worked together.

10          And on top of all that, you have the

11   testimony of Caroline Davis, a member of the conspiracy,

12   who sat on that witness stand for over six hours taking

13   responsibility for her role in this, telling you how she

14   and these six defendants conspired to break the law and

15   did break the law.

16          Ladies and gentlemen, that's exactly what

17   they are charged with doing.  Each of these defendants is

18   charged with two crimes.  In Count One the conspiracy

19   count, the defendants are charged with conspiring to

20   oppress, threaten and intimidate providers from providing

21   and patients from receiving reproductive health services.

22          In Count Two, the FACE count, the defendants

23   are charged with using physical obstruction to interfere

24   with patients and providers because they are obtaining or

25   providing reproductive healthcare.

1            Judge Trauger will instruct you on the law

2    after all of our closing arguments.  You're likely to

3    hear that there are three elements to a conspiracy

4    against rights:  First, that the defendant joined in

5    agreement; second, that the aim of the agreement was to

6    oppress, threaten or intimidate a person from obtaining

7    or providing reproductive health services; and third,

8    that it was the defendants' intention to do just that.

9            Conspiracy is a fancy way to say an

10   agreement to do something unlawful.  It doesn't have to

11   be anything formal, just an agreement.  Makes no

12   difference if they joined at the beginning or the day of

13   or even after the blockade was already underway or even

14   whether they were active participants in the blockade

15   itself.

16           And I expect you'll hear the Judge tell you

17   that the defendant may be a conspirator without knowing

18   all of the details of the unlawful plan or the names or

19   exact identities of all the other alleged conspirators.

20   And I expect you'll hear that there doesn't have to be

21   some sort of formal agreement or a plan in which every

22   person involved sat down and worked out every detail.

23           Common understanding.  That is what you're

24   looking for.  Was there a common understanding among

25   those involved to commit this crime?  In this case a

1   defendant is guilty of Count One if they joined the

2   agreement to block the clinic and prevent patients from

3   accessing and employees from providing reproductive

4   health services with the intention of carrying that

5   interference out.  All six of them did.  It's the only

6   reason why we're -- they were there.

7             Now, don't be confused by the word right.

8   It's not talking about any right to an abortion.  The

9   Supreme Court has held there isn't such a right.  The

10  right charged here is the right to access legal

11  reproductive healthcare, whatever it may be.  And the

12  Judge will instruct you that it is a right, meaning you

13  don't have to wrestle with deciding whether it is or

14  whether it should be a right.  The law says it is a

15  right.

16            Let's talk about Count Two, the violation of

17  the FACE Act.  For Count Two the government must prove

18  beyond a reasonable doubt that the defendants used

19  physical obstruction to intentionally interfere with

20  Melissa Ashby or the employees because Melissa Ashby was

21  receiving or the employees were providing reproductive

22  healthcare.

23            Intentionally interfere.  That's all the

24  government is contending happened here.  Interfered with

25  patients and providers because they were obtaining or

1  providing reproductive healthcare.

2              There are actually two ways to prove that a
3  defendant used physical obstruction in this way.  The
4  first way is obvious.  A defendant is guilty if the
5  evidence shows that he or she directly used physical
6  obstruction; defendant Calvin Zastrow, defendant Chester
7  Gallagher, defendant Dennis Green, defendant Heather
8  Idoni, defendant Paul Vaughn.

9              A second way a defendant is guilty of this
10  crime is if the evidence shows that the defendant aided
11  and abetted a physical obstructor.  That means a
12  defendant is guilty of Count Two even if they did not
13  themselves physically obstruct, but they intentionally
14  helped or encouraged someone else to physically obstruct.

15              Again, ladies and gentlemen, the evidence of
16  these crimes is overwhelming.  Defendants Idoni,
17  Gallagher, Green, Vaughn and Zastrow directly used
18  physical obstruction.  All the defendants, all the
19  defendants, including defendant Coleman Boyd, helped and
20  encouraged the physical obstructors.  All were members of
21  the conspiracy to obstruct.  All are guilty.

22              This blockade wouldn't work without all the
23  pieces.  Think about that.  It took a whole group to shut
24  down the clinic that morning.  Two, four, even six people
25  crowding doors could have been carted off by police in

minutes.  It took more than that.  It took blockaders, it took blowfish, the people who crowd the hallway until the final order to disperse is given, manipulating the police into thinking many more people would need to be arrested.

It took negotiators to stall the police, to deceive the police into thinking that people might just leave.  It took planners and trainers and it took recruiters to gather people that day to stream their actions over the Internet to recruit and train others.

It was no coincidence that Caroline Davis and her six co-conspirators ended up at the clinic at 7:45 a.m. that morning.  None of them were just there from Michigan or Mississippi or Virginia or 90 minutes away in Tennessee just looking for a bathroom.  Before the first blockader ascended those stairs, they knew the crime they were about to commit and what their roles would be in carrying it out.

What they call a rescue is a blockade of a reproductive health facility.  They knew that.  You saw videos of defendant Gallagher reminding everybody not to be photographed in front of doors.  And all of the evidence of each of these six defendants' participation in a rescue proves their guilt on Count Two.  And all the evidence of their participation in the agreement to rescue proves their guilt on Count One.

1   You know why they were all there and what

2   role each of them played.  You don't even need to rely on

3   Caroline Davis, that young woman who took the stand to

4   tell you how she got caught up in all of this and who has

5   now taken responsibility for her participation in these

6   crimes.

7   The questions for you in deliberation are

8   ultimately very simple.  Is there proof beyond a

9   reasonable doubt that these six defendants obstructed

10  access and/or helped others obstruct access to this

11  clinic with the intent to interfere with reproductive

12  health services?  There's proof beyond all doubt.

13  And second, is there proof beyond a

14  reasonable doubt that they entered -- each entered into

15  an agreement to do so?  Again, overwhelming evidence,

16  proof beyond all doubt.  None of these defendants had

17  just pulled off the road wondering what this was all

18  about.  None of them was there for a doctor's appointment

19  at another office and just decided to stand around with a

20  group blocking doors.  They were all there intentionally,

21  and each had a role to play in helping the blockade

22  succeed for two and a half hours.

23  But of all the video in this case,

24  Government's Exhibit 4, the clinic employee's cell phone

25  video, may be one of the most significant.  The two

minutes of video illustrates clearly how defendant Zastrow, defendant Vaughn, defendant Gallagher and defendant Idoni blocked access and how defendant Coleman Boyd aided and abetted them. Exhibit 4 shows patient Melissa Ashby who had come to receive reproductive healthcare at the clinic. You heard her testify to how anxious she felt about the crowd in front of her blocking her path. You heard from Nicko Ashby, the husband and soldier, an Army veteran of two deployments, who felt he would need to turn into a human wrecking ball to get through this blockade.

Now take a look at Exhibit 4, a few moments after the Ashbys arrived. Look at what Melissa Ashby and her husband were facing. There's the clinic door all the way at the back; defendant Zastrow on the left, defendant Vaughn on the right; part of the horseshoe Caroline Davis talked about. The patients' path was blocked. She was never getting to that door.

In his opening statement defendant Vaughn's attorney told you his client only played a role, quote, disengaged from any actions near the clinic entrance. You know that was false. You know that in this moment in the clinic employee's video patient, Melissa Ashby was in this hallway, and right there is defendant Vaughn blocking her path to the clinic.

1          You've seen the video with the clinic
2   employee trying to get back into the clinic after coming
3   out to assist Melissa Ashby.  You know that is defendant
4   Cal Zastrow.  And you know from Caroline Davis that the
5   child in the camo hat and blue shirt is defendant Boyd's
6   son who defendant Boyd encouraged to blockade.  You're
7   trespassing.  Yes, ma'am, I am.  And a moment later as
8   the employee is blocked from returning to her office,
9   there's the patient entrance, blocked by defendant
10  Heather Idoni with defendant Chester Gallagher in front
11  of her.

12          In the two minutes that Exhibit 4 goes on
13  for, defendant Idoni, defendant Zastrow, defendant Vaughn
14  and defendant Gallagher are working together to block
15  access to this clinic.  And their blockade prevents
16  Melissa Ashby and Sarah Flowers, the clinic employee,
17  from gaining access.

18          And this is the moment in time from his own
19  videos that makes defendant Coleman Boyd's role as an
20  aider and abettor, someone who intentionally helps a
21  crime or encourages someone else to commit a crime,
22  clear.  Coleman Boyd is guilty of Count Two as an aider
23  and abettor.

24          Again, just look at Exhibit 4.  Remember
25  Caroline Davis's testimony that he kept watch for

1    patients from the elevator.  And remember patient Melissa

2    Ashby's testimony about the anxiety and intimidation she

3    experienced being filmed inside this private property in

4    the hallway.  Defendant Boyd asking her questions about

5    why she was there.  But take the closest look at

6    Exhibits 1A, C, D and E.  The video footage from

7    Mr. Boyd's own livestream video.  Listen to him take

8    advantage of the blockade to coordinate with the hallway

9    counselors, including his daughter, to pursue the Ashbys.

10          The defendants didn't care about the clinic

11    employees or the Ashbys or all the officers tied up on

12    this lengthy response that day.  Or the patients and

13    employees going to other medical offices in that building

14    during the two and a half hours that the defendants used

15    their bodies to prevent people from receiving

16    reproductive healthcare.  They didn't care because that

17    was their plan, their plan that began weeks before

18    March 5.  Their plan, their conspiracy was to shut down

19    that clinic for as long as they could.

20          Let's talk about the conspiracy.  This was

21    an agreement to violate the law.  You know this agreement

22    happened because of social media, Google research,

23    travel.  The strategy meeting that Caroline Davis

24    described, the specific roles for the blockade and, most

25    importantly, the coordination during the blockade itself.

1          Remember Caroline Davis testified that she

2    heard this plan hatched between Chester Gallagher and

3    Calvin Zastrow over phone calls.  The clinic in

4    Mt. Juliet was chosen because the sidewalk counselors

5    lawfully outside had no way to identify who was going to

6    the clinic and who was going to the orthodontist or

7    heading in for physical therapy.  They didn't know who to

8    talk to, so they needed a blockade at the clinic to turn

9    clinic patients around at the clinic doors.

10          By February 9 things were already rolling.

11    The defendant Heather Idoni on the bottom, Gallagher on

12    the top.  They're talking about housing in Nashville,

13    Defendant Zastrow's adult daughter.  They mentioned

14    defendant Boyd's family.  They mentioned contacting

15    defendant Green.  And right there is defendant Idoni

16    referring to rescuers bringing families.

17          By February 9 it's clear to these two that

18    this would be a blockade, a hoorah as defendant Zastrow

19    put it, and they need as many people as possible to

20    assist.

21          Five days later, defendant Calvin Zastrow

22    has a two-bedroom condo set.  Defendant Green and his

23    family are confirmed.  And when defendant Gallagher asks

24    about someone coming from Wichita, defendant Idoni wants

25    to know if she will be risking arrest, is she for real.

1  And look what defendant Gallagher says.  I will

2  prequalify any I send your way.

3          Before people showed up on March 5,

4  defendant Gallagher wanted to know who was planning on

5  blockading.  By February 22, talk has turned to what they

6  were doing when they get to Tennessee.  They would need

7  to meet in the evening.  There are three meetings, two at

8  the Wyndham, one at a church.  Defendant Idoni says

9  she'll share with the Greens, the Boyds and Cal Z.

10  That's defendant Zastrow.

11          And remember the conspiracy isn't just the

12  Facebook messages and the meetings beforehand.  You saw

13  this conspiracy happen live.  All of the coordination

14  between the defendants that day to help this blockade

15  begin, continue, adapt to the circumstances, adapt to

16  patients coming onto the floor, adapt to the decisions by

17  the police, all of those things were part of this

18  continuing agreement to blockade access.  You saw it

19  happen live.

20          Next we're going to walk through each

21  defendant's role in the conspiracy and the blockade

22  itself.  I'll start with defendant Coleman Boyd.  When

23  Mr. Haymaker, defendant Boyd's attorney, delivered his

24  opening statement, his last words to you was a question:

25  What did Coleman Boyd do?  The answer is very simple.  He

conspired with the other defendants to blockade access to this clinic, and he aided and abetted interference.

Mr. Boyd traveled from Mississippi, he spoke at the planning meeting. He created this plan to put blockaders in masks and on crutches to be able to get inside without being recognized, without anyone knowing that anything was up. He brought his minor children to blockade. He livestreamed the Ashbys. He was the spotter at the elevator. And he directed others to pursue the Ashbys. Remember Caroline Davis's testimony that she heard him counsel his minor children to blockade.

Giving encouragement in biblical verse might sound better, but it's still aiding and abetting, particularly when you're there to watch it all happen, to film it, to livestream it. Help coordinate counselors to go after the patients blockaded from getting in the clinic. Mr. Boyd was the spotter at the elevator and he directed others to go after the Ashbys.

Rewatch the clips from Governments Exhibits 1, 2 and 3. These three videos, including defendant Boyd's, are recruitment and training videos. Together the three videos show you how to blockade a healthcare clinic, get there before the patients, block the doors. Only people willing to go to jail should be

seen in front of the doors, have people designated to talk with the police in a play for time, have someone looking for patients.

Defendant Boyd highlights the importance of that last one. Listen to Exhibit 1C. He is reciting his plan to his audience live. While the blockaders hold the doors, defendant Boyd is by the elevator where clinic patients are likely to appear. He's the blockaders' first point of contact for patients and families. Slow people at the end of the hallway, then while the patient is blockaded from entering the clinic, direct the hallway counselors on the floor and elsewhere to the patients.

Remember this clip. Remember that Caroline Davis testified that she arrived right after patient Melissa Ashby left. This is defendant Boyd's video. You're about to see Caroline Davis and defendant Green arrive. And you're about to hear defendant Boyd on his cell phone telling someone that there's a girl coming back down. He's directing the person on the other end of that phone to go talk to them.

You know that that woman is Melissa Ashby. This is a key part of the conspiracy and the blockade. It's not just about blocking doors. It's about blocking doors so women and families can't get in and those working with the blockaders can pursue those women and

families, something Melissa and Nicko Ashby were very clear that they did not want.

The clinic employee called it harassment, but there are better legal terms for it, and they'll come from the legal instructions we expect Judge Trauger is about to give to you:  Interference, oppression, intimidation.  Defendant Coleman Boyd is guilty on both counts.

(Playing video.)

Defendant Calvin Zastrow.  Mr. Zastrow recruited Caroline Davis to blockade.  He hatched this plan with defendant Gallagher.  He traveled from Michigan.  He's one of the leaders in the planning meeting in the park and he blocked and blocked and blocked.  And he refused to leave after the final police warning and had to be arrested.

(Playing video.)

That's defendant Zastrow telling the police that today is not a protest.  It's not a protest.  It's a crime, it's a blockade to shut this clinic down for as long as possible.  And that's why he and others did not leave.  Defendant Zastrow is guilty on both counts.

Heather Idoni joined this conspiracy and blocked the entrance to the clinic.  You heard that Caroline Davis knows her well; that Ms. Idoni arranged

accommodations; that she wanted only people risking
arrest to bunk on her reservation.  She arranged the room
for the strategy meeting.  She drove from Michigan.  She
blockaded, she attended the planning meeting, she
blockaded the clinic entrance, and she refused to leave
after the final police warning.

Now, in this shot she's not directly in
front of this door, but you saw the still shot from
Exhibit 4 where she was completely in front of this door
when the clinic employee was trying to get inside.
Heather Idoni joined this conspiracy early.  She
participated in its purpose, blockading the clinic.
Heather Idoni is guilty on both counts.

Defendant Vaughn is also guilty on both
counts.  He came from Centerville, Tennessee, about 90
minutes away from Mt. Juliet.  He was an absolutely core
part of this stalling the police through what you know to
be fake negotiations.  You saw Officer Watkins testify in
defendant Vaughn's case.  Defendant Vaughn wasn't aiding
the police.  He was stalling the police.  He was
concealing information from the police.  He was
manipulating the police.

He was part of the horseshoe that blockaded
the Ashbys right here in this photo, Exhibit 4A.  This
was before there were any police to negotiate with.  And

he was the spit guy after the arrest.  He said, we came
into the building and we sat down at the door peacefully
and nonviolently.  We, not they.  We.  Defendant Vaughn
joined this agreement at the latest when he showed up
that morning, but he clearly knew its purpose and he
carried out that purpose during the blockade.

Take a look at the first few seconds of
Government's Exhibit 17 showing defendant Vaughn and
defendant Zastrow in the stairwell before heading into
the hallway to begin the blockade.  Defendant Vaughn knew
exactly what this day was about.  This video highlights
his important role.

(Playing video.)

One of the tactics we're employing now.
This is on video.  It's being streamed out on the
Internet to stall the police.  And Gallagher is telling
the world that he and the defendant Paul Vaughn are using
a tactic.  Mr. Vaughn doesn't disagree.  He doesn't say,
I thought we were just negotiating.  He was there, he had
a key role, not just in the blockade when Melissa and
Nicko Ashby were in the hall, but in stalling the police
to keep the blockaders there for as long as possible.

Defendant Vaughn's and defendant Gallagher's
fake negotiations are what allowed this to go on for two
and a half hours.  By 8:00 a.m. Mt. Juliet PD had over 20

1   officers presented, more than 40 sets of handcuffs, and
2   only needed five cars to transport those nine adults who
3   were determined to be arrested.  But defendant Vaughn and
4   Gallagher were able to draw this out for two and a half
5   more hours with the aid of the blowfish to keep this
6   clinic closed.

7           And if defendant Vaughn had really been
8   trying to help the police, he would have been telling his
9   codefendants to leave, go protest outside, the same thing
10  the police officers were telling them.  He didn't do that
11  because he was a part of this conspiracy and wanted to
12  see it succeed.  Defendant Vaughn is guilty on both
13  counts.

14          Let's talk about defendant Dennis Green.  He
15  was in touch with Heather Idoni before the blockade,
16  confirmed as of February 14, '21.  He traveled from
17  Virginia for it.  He brought his minor children to
18  blockade.  He attended the planning meeting.  He was a
19  videographer, and he was a blockader of Sergeant
20  Schneider and the patient he escorted.

21          He refused to leave after the final police
22  warning.  You see him here, cell phone camera in hand,
23  some sort of body camera on his shirt.  He joined this
24  agreement knowing its purpose, and he carried out that
25  purpose during the blockade.

1          Remember Exhibit 14 with his Facebook post,

2     a few months after the blockade that Coleman Boyd

3     reposted.  We sat down in front of the door.  Our

4     intention was not to protest, but rather to interpose

5     ourselves between the baby and the person hired to kill

6     them.  Defendant Green's intent is no mystery.  It was

7     not to protest, it was to sit in front of doors and block

8     people from getting reproductive healthcare.  Defendant

9     Green is guilty on both counts.

10          Remember this clip.  Defendant Green telling

11    Caroline Davis that he didn't see Caroline Davis's signal

12    that a patient had arrived.

13          (Playing video.)

14          He saw Coleman Boyd's signal, the

15    livestream.  Folks, signals are about coordination.

16    Coordination is part of making an agreement, and an

17    agreement to commit a crime is a conspiracy.

18          Let's talk about defendant Chester

19    Gallagher.  Mr. Gallagher hatched this plan with

20    defendant Zastrow.  He recruited and coordinated folks to

21    attend, including defendants Boyd, Green, Zastrow, Idoni

22    and many others.  He led the planning meeting in the

23    park.  He mentored Paul Vaughn, teaching him how to

24    manipulate the police, to maximize the effectiveness of

25    the blockade.

1          Again, he's using the recordings of these

2   criminal acts to recruit and train others to commit the

3   very same crimes that he and the other defendants were

4   committing that day.  He refused to leave after the final

5   police warning and had to be removed.  He played a key

6   role as a planner.  Remember his Google account search

7   histories in the weeks prior, the FACE Act charged in

8   Count Two, Tennessee medical license lookups and

9   researching the Mt. Juliet jail.  Defendant Gallagher is

10  guilty on both counts.

11          (Playing video.)

12          Now, Mr. Gallagher's attorney talked to you

13  in her opening statement about interposition and the idea

14  that to do that a rescuer needs to get close to that

15  person during this time of need and knows that sometimes

16  that means you're getting close to the door of the

17  clinic.  Framing this as just getting close to a clinic

18  door because you're trying to talk to people falls flat

19  when Mr. Gallagher records this statement on his own cell

20  phone video.

21          (Playing video.)

22          We have two doors to block.  That's not

23  happening to just get close to doors.  He says two doors

24  to block.  Blocking doors is about interfering with

25  access to that clinic, completely blockading access to

1    this clinic.  In this video you see defendant Green,

2    defendant Zastrow, defendant Vaughn and Caroline Davis.

3    And you know from Ms. Davis's testimony that defendant

4    Heather Idoni is back to the left of this video frame.

5    Think about all the roles that these defendants played.

6              Now think about Caroline Davis, the

7    defendant who pleaded guilty to blockading that clinic

8    and conspiring to do so.  What was her role?  She rode

9    down from Michigan.  She held people's cell phones.  She

10   blocked doors.  She refused to leave.  She had to be

11   arrested.  She wasn't a planner or a leader.  She was a

12   follower.  And yet she took responsibility for breaking

13   the law and told you what happened.

14             On March 5, 2021, these defendants broke the

15   law.  This was not a protest.  The defendants explicitly

16   stated that over and over again.  It was not sidewalk

17   counseling.  It was not lawful conduct.  It was a human

18   blockade agreed to and carried out by these six

19   defendants and others, and they did it all over the

20   Internet, seeking an audience as they filmed and even

21   livestreamed videos of their defiance of the law.

22             And now in this court of law they ask you,

23   the jury, to overlook their crimes.  Do not.  Because the

24   evidence in this case is simply overwhelming and because

25   the laws of this country mean something.  We are here

because these defendants believe they are above the law, that they can oppress and intimidate by imposing their will on others and they can violate the law without being held accountable.

People don't get to break the law without consequence simply because they think they are justified. Our laws would have no meaning if such a loophole existed. This loophole cannot exist and it does not exist. This case is not about the defendants' beliefs. It is not about the defendants' beliefs. They are beliefs that so many Americans share. They are beliefs that have led to changes in laws, changes in statehouses and courthouses. There are lawful ways to effect change. This was not lawful.

This case is about the defendants' actions. Unlawful actions on March 5 and in the weeks prior to through their conspiracy and blockade, these six defendants imposed their wills on the patients and clinic staff while tying up multiple shifts of officers. The defendants may have defied the law, but here in this courtroom you have taken an oath to faithfully apply the law.

And when you follow your oath, when you're guided by the law as the judge will provide to you and when you consider the facts that are so clearly

1   established in this case, you will reach the only verdict
2   that is supported by the law and the evidence and find
3   the defendant, all of them, guilty on both counts.  Thank
4   you.
5                  THE COURT:  Thank you, Mr. Boynton.
6                  Ms. Bell.
7              DEFENDANT GALLAGHER CLOSING ARGUMENT
8                  MS. BELL:  Yes, Your Honor.  I may need just
9   a second to switch the computer setup.
10                  I'm going to sort of start today where I
11  started before.
12                  THE COURT:  Ms. Bell, I think you're going
13  to have to be at that microphone.
14                  MS. BELL:  Thank you.  Start today where I
15  started before.  Thank you.  My client's intention at the
16  March 5 rescue in the hallways of the carafem was a
17  peaceful, nonviolent interposition.  Everything that
18  happened that day was peaceful, was nonviolent.  There
19  was no damage to property, no injury to other people.
20                  There was no agreement, no criminal
21  agreement that day to threaten anyone, to oppress anyone,
22  to intimidate anyone in their exercise of a right
23  guaranteed by the United States.  The goal that day, what
24  my client intended was that offer of help.
25                  And granted, it's unsolicited, unwelcome, a

little bit of a nuisance, arguably inappropriate, but
that's the reason these people were there, to offer that
help consistent with their religious beliefs, their
spiritual beliefs.

Now, before I go any further, I think it
would be -- I would be remiss on behalf of Mr. Gallagher
and on behalf of me not to thank you for your time, your
patience, your attention to this case.  I know this
probably started for many of you back that first day we
came on the 8th and filled out those juror
questionnaires.  That was 20 days ago.

So I know that to some degree that has
probably been an inconvenience, maybe has disrupted your
lives and the times that you -- the time that you spend
with your family, your friends, your loved ones.  I want
you to know that I do truly appreciate your time and
attention in this case and wanted to make sure that you
knew that on behalf of me and Mr. Gallagher.

Now, the government even cited to this
exhibit that they introduced.  And this is from Dennis
Green's Facebook, and I do think it sums up what happened
that day.  He says:  A group of Jesus followers went into
a building in Mt. Juliet.  They sat down in front of the
door and they prayed and worshiped.  Their intention was
not to protest, but to interpose themselves between a

baby and the clinic. After about three hours, which gave
counselors time to share truth and offer help to moms,
they were arrested and taken to jail.

I think there are a lot of things we don't
dispute about that day. And like I said in my opening,
this case is about rescue, interposition, and that idea
of, as part of those rescuing and interposition, they
risk arrest and they know that. There was a lot of talk
about that.

Rescue, again, that's saving the unborn to
these people. Interposition is that timely offer of help
to a pregnant woman or a couple. It's getting between
that pregnant woman at the clinic at a crucial time. Not
saying it's the best thing to do, not saying it's
welcome, but it's a crucial time where someone is facing
a difficult decision which cannot be taken back. And the
methods that these people exercise, my client, as part of
his rescuing, is to get in that path to offer that help.
This is organized and peaceful. And it is organized. It
is organized so that it is the opposite of oppressive,
threatening, intimidating; keeping the tone low.

The delay to interpose does allow the
rescuers to meet or cross paths with more women, more
pregnant people, more couples that are maybe facing this
difficult decision. And one thing Caroline Davis did

say, and to bring more attention to the cause.  I forget

exactly what the words were, but maybe make it more of a

spectacle.  It will generate more attention.  People will

see what is happening.  They'll tap into this issue.

Do these people risk arrest by doing this?

Yes, they know.  They're asked by the police to leave;

they don't leave.  They are risking arrest; they talk

about risking arrest.  They go in with their eyes wide

open.

I want to talk, though, again, about what

Ms. Davis said, bringing the cause into the light is what

my notes have.  You all probably have your own

recollection, so if it's not exactly right, I apologize.

But these rescuers are recording what they're doing.

They're livestreaming it.  I don't know if people

committing conspiracies that they believe are federal

crimes are livestreaming what they're doing.

But they're putting it out there for people

to see.  They're inviting people to come join them.

There are large groups in this case of pro-life advocates

both in and outside the clinic.  They're bringing

attention to the cause.  They talk to the press, they

post on Facebook during and after.

They intend to generate as much publicity as

possible to rally supporters and draw attention to their

cause while they're also engaging in that act of interposition.

As to my client, as I said in the opening, he's involved in pro-life ministry. Rally and rescue. I think we heard Caroline Davis say he was a rescuer from back in the day might have been exactly the words she used. He lives in Nashville area, so it makes sense that he would be helping organize this rally, worship and rescue. And there were other people, they were getting together and praying, they were going out to Planned Parenthood and protesting. They were eating together. They were talking together. They were sharing their similar beliefs. And making sure that if they were going to do a rescue, it was peaceful, nonviolent.

Mr. Gallagher at the rescue, he talked to the police in his role as a minister and as a former law enforcement officer. I submit that makes sense. He spoke to the cameras. I don't think he was disputing that what he was doing at the rescue was instructional to some degree.

He said they were blocking doors. We'll talk about that in the context of the FACE Act in a minute, but the word in the FACE Act is not blocking. It's obstructing. Obstruction. So we'll talk about that in a second.

1          He said this is not a protest, and I think

2    Caroline Davis even agreed, a rescue is not necessarily a

3    protest.  Sure, it could fall under the same umbrella,

4    but there's something a little bit different about that.

5    The aim is rescuing the unborn.

6          Mr. Gallagher helped arrange for orderly

7    arrest.  And this orderly arrest, I think, is very

8    important because if we're there to delay and delay and

9    delay and delay, that did not happen on this day.  These

10   people got there at 7:45 in the morning.  They're done by

11   10:30.

12          And when they were taken into custody,

13   nobody went limp, nobody resisted arrest, nobody tried to

14   make that process last longer.  It was very uniform, very

15   quick, they marched right out.  This was a peaceful,

16   nonviolent, no threats, no oppression, no intimidation.

17   The goal of what happened -- or excuse me.

18          Just to put Government Exhibit 13 up,

19   Mr. Gallagher did help promote the rescue.  And I wanted

20   everybody to take a look at this and see how he promoted

21   the rally in Middle Tennessee, that that is in the

22   government's discovery.  And Mr. Boynton went through the

23   various texts and various communications between people.

24   I don't think anyone disputes that any of that happened.

25   Those were there.

1         Mr. Gallagher's from here.  He's going to

2    arrange to set up that rescue, to set up that worship, to

3    make sure that everyone who's coming and wants to

4    participate can come and be part of things.  But in a way

5    that is orderly, peaceful, nonviolent.

6              This was the intent that day, to interpose,

7    to get in a place where that message could be delivered

8    to someone who was contemplating making a decision they

9    couldn't take back.  And you'll notice in that video,

10   it's Exhibit No. 4, that these two young women who are

11   with the rescuers approach Ms. Ashby.  They step back, no

12   one else steps up.

13             And you can hear in that video that they're

14   offering help.  They're asking her about her child.  Or

15   is she here for a procedure.  Babies are a gift from God,

16   that sort of thing.  You'll also remember what Caroline

17   Davis said, and you can see these women have things in

18   their hands.  Those were resource sheets.  These rescuers

19   are handing out resources so people know there is another

20   way before you make this final decision.  Please hear us.

21             And sometimes when we're confronted with a

22   decision that's really, really difficult, it might be

23   difficult to hear other sides.  That might be something

24   you don't want to hear.  You might be in a position

25   facing a difficult decision of fight or flight.  It's

1    pretty normal.

2             But that's also when maybe you need to hear

3    that information the most.  Even if it's unsolicited,

4    even if it's unwelcome, that might be when you need to

5    hear it.  I'd submit to you that these rescuers are aware

6    of that.  So we see that and we see the clinic worker

7    coming up.  We see Ms. Ashby in that video told to go to

8    the parking lot and she does, and she comes back later

9    that day for her appointment.

10            I want to stop briefly and just talk about

11   the clinic worker, Ms. Flowers, and her testimony and why

12   I think that it's important, especially on this issue of

13   blockade, obstructing access.  When Ms. Ashby gets to the

14   clinic that day -- and I would submit when you see her on

15   the video and compare her with the person that was here

16   testifying in court, we saw two very, very different

17   people for whatever reason.

18            But when she gets to the clinic that day,

19   Ms. Ashby -- excuse me, Ms. Flowers is notified that

20   people are up in the hallway.  And her response is what

21   the F, and she marchs on up there, where she says -- when

22   she gets up there, she takes her phone out and she starts

23   to film.  She says it's because she also sees Mr. Boyd

24   filming, but also she wants to have a record of who is in

25   the hallway, right.

1          She says there are approximately 20 people

2    in the hallway.  These are the rescuers.  She goes down,

3    takes out her key card.  Nobody blocks her.  She swipes

4    that card and she walks right into the clinic.  20

5    rescuers in that hallway, undisputed, nobody stops her

6    from going in.

7          She goes inside and then, contrary to

8    policy, she decides she's going to go back out and engage

9    them some more, gets her camera working and comes out and

10   starts filming before she's -- as she's opening that door

11   you can see.

12         She goes, she approaches these two young

13   women who are speaking with Ms. Ashby.  She tells

14   Ms. Ashby to go downstairs, Ashby's husband comes, you've

15   all seen that, and they leave.  They never get denied

16   access by anybody.  But then Ms. Flowers turns around

17   with that cell phone going, waving it around at the

18   rescuers in the hallway, and you can hear in her voice

19   her disdain and her disgust, her dislike of these people.

20   Her judgment:  Superpro-life, no masks.  She is ready to

21   get into it with them.

22         I would submit when she types the what the F

23   she's ready to get into it with them.  She violates

24   policy, she marchs right back out.  She's mad, she's

25   angry.  And I'm not saying that she's wrong to be mad,

angry, frustrated, any of those things it would be
annoying to come to work and find that. That's fair.

And she confronts and runs into, as she's
filming, Mr. Zastrow. You don't hear him yell at her.
He stays down, cowering. He's a big guy. He
deescalates. He doesn't threaten, he doesn't oppress, he
doesn't intimidate. He does the opposite. He keeps the
volume, the temperament, the mood low. She's calling the
police. Okay. He's trespassing. Okay. And she leaves.

So let's talk about Caroline Davis. She
came in. And the judge is going to instruct you about
witness credibility. And that witness credibility
instruction is going to say something along the lines
of -- and please rely on the judge's instruction, not my
memory of it -- but you can accept some of the testimony,
you can reject some, you can reject it all.

And then the instruction will go through all
these different factors you can look at. One of them is
how good was the witness's memory. And I'd ask you-all
to remember, Caroline Davis's memory was much, much
better about things that happened a long time ago when
the government was asking her about it than when I asked
her about things that happened weeks ago. Her tone, her
demeanor completely changed depending on what table the
questioner came from. So I'd ask you to keep that in

1   mind.

2          She does have two plea agreements.  She is a

3   cooperator.  And remember what she said.  She sought out

4   the government to cooperate.  These indictments were

5   psyching her out.  She was struggling with being charged

6   in federal court.  This was all of a sudden a much bigger

7   deal than what she had anticipated.  Also, keep in mind

8   that these people were family to her:  She was really

9   close to them, according to her, at one time.  I couldn't

10  see any of it.  Could you?  Did she seem like she was

11  still close with these people?  They seem like her enemy

12  at this point.

13         So I'm going to ask when you consider

14  Ms. Davis's testimony, and I'm going to talk about it

15  some more in a minute, you'll also consider another

16  instruction that the judge is going to give you and it's

17  the reasonable doubt instruction.

18         And part of that instruction is something

19  along these lines:  Proof upon -- proof beyond a

20  reasonable doubt is proof that's so convincing, so

21  convincing that you would not hesitate in making the most

22  important decisions of your life based upon that proof.

23  And so I'd ask you to keep that statement in mind when

24  you assess Ms. Caroline Davis and the weight that you

25  want to give her testimony.

1          So what does she add in this case?  Why does

2    the government call Ms. Davis?  Well, she helps establish

3    an agreement for the government that Caroline Davis

4    believes is criminal.  She says these are people who talk

5    about the FACE Act.  They know about the FACE Act.

6    They're aware about the FACE Act.  I think she even said

7    with respect to my client, Mr. Gallagher, who knows about

8    regulations from back in the day, that when she first met

9    him in 2020 in Michigan, he was talking about the FACE

10   Act.

11          Now, what doesn't make sense to me is if he

12   was so knowledgeable about the FACE Act back in Michigan

13   in 2020 why he'd be Googling it.  I submit to you she's

14   probably not telling you the truth about what she heard

15   people saying back in Michigan.

16          One thing Ms. Davis did say was there was

17   not a verbal agreement whatsoever to injure, oppress,

18   threaten or intimidate.  And I think Ms. Davis was pretty

19   clear on cross-examination from Mr. Parris that she said

20   nobody ever said anything about intimidation.  She then

21   tried to opine about how she would have felt and things

22   like that, but I believe that testimony was nobody ever

23   talked about intimidating anybody.

24          She does provide the government with an

25   expert on rescue.  And I'd say give that the weight that

you want to give it because she's been to three or four,
by my count.  And she's an expert at 24 or 25 years old
on the topic of rescue.

         And then the last area of testimony that I'd
ask you to recall, remember and assess is that Caroline
Davis said that, no matter what, she wasn't moving from
in front of that door, that that was her intent.  Her
intent that day.  She wasn't going to move.  And I think
she said that, I would submit to you, so that you'd think
that was everybody's intent.

         But out of the other thing that we heard
from her also was people pray on it.  They decide how
much of a role they're going to take.  They don't
necessarily know in advance.  They wait to hear from God
or get a message or pray or whatever their faith kind of
takes them to do.  So that was one other thing Caroline
Davis said.

         The other thing she said, though, about
blocking was she also was not going to leave that day
unless physically removed by the police.  That's what she
said.  Nobody was physically removed by the police.  They
were marched out.  They voluntarily stood up.

         The police did ask them to leave a bunch of
times and they didn't do it right away.  But when they
got up, they got up peacefully.  Nobody had to physically

remove them.  They very peacefully and orderly walked
out.

And then the other thing she said about
blocking, not moving, obstructing, that sort of thing, is
she didn't care, she was not moving even if somebody had
to hurt her.  And that didn't happen either.  So that's
Caroline Davis.

Let's talk about the conspiracy briefly.
I'm sure the other defendants' counsel will talk to you
about it too.  I will agree, there was an agreement that
day.  There was an agreement to rescue.  There was an
agreement to engage in the act of interposition, but it
has to be an unlawful agreement.  And what happened that
day was, as per Dennis Green, the intent was to share the
truth and offer help to moms.

Their roles were aimed at maintaining order,
running the rescue smoothly, keeping the peace, avoiding
personal or property damage.  The rescuers were peaceful
and nonviolent the entire time.  So when we think about
what was going on there, they were singing, they were
praying, they were reading Bibles.

The conspiracy count requires that the
objective of that conspiracy be a criminal one.  And in
this particular case it's the intent to specifically
threaten, oppress and intimidate someone in the exercise

1  of a right protected by the law.

2          Threaten, oppress and intimidate.  The

3  hallway was full of children, people singing, people

4  quoting Bible verses.  That's what was happening that

5  day.  They were unwelcome.  They were annoying.  They

6  were a nuisance.  They were all those things, but that's

7  not threatening, oppressing, intimidating.  They were

8  praying and doing as called upon by God, according to

9  Ms. Davis.  Zastrow humbly refused to move from the door.

10  He was defusing a tense situation.

11          The government has showed you the video

12  where the officer's coming down, Officer Schneider, part

13  the seas, part the seas.  They did move.  He's pushing

14  through them, fair enough.  Fair enough.  They're trying

15  to interpose.  They're slowing down his roll down the

16  hall with the lady.  You hear them.  Why are you coming

17  here?  They're wanting that opportunity to engage.  And,

18  again, it's unsolicited.  It's a nuisance, it's

19  unwelcome, but that's what's happening.  The clinic

20  reopened that afternoon.  Ms. Ashby had her appointment.

21          As to Count Two, the FACE Act, was there an

22  obstruction, was it impassable or unreasonably difficult

23  to go down the hallway?  I'd submit to you no.  An

24  approach that's uncomfortable or emotionally difficult,

25  the Judge will instruct you, is not an obstruction.

1          And due to that obstruction was there an
2     interference or attempted interference with someone's
3     freedom of movement?  You have to find the obstruction
4     first.  I'd submit you don't even get to the next one.
5     So that's your FACE Act allegation.
6          What happened that day was rescue and
7     interposition, which are timely acts, last-minute effort
8     to persuade someone not to terminate their pregnancy.
9     This happens under emotional and difficult circumstances,
10    and at the carafem it's particularly hard for those
11    trying to get their message across, their unsolicited
12    message across because of the location of the clinic.
13         So that offer of help cannot effectively
14    happen outdoors.  It occurs in the hallway to identify
15    potential patients.  Their environment the entire time is
16    one of prayer, worship and singing hymns.  This is all
17    happening in a peaceful, nonthreatening, nonintimidating
18    but possibly uncomfortable way for both the patients and
19    the workers.
20         I would submit to you that the March 5
21    rescue at the carafem was a peaceful, nonviolent offense
22    without threats, oppression or intimidation.  Without
23    threats, oppression or intimidation.  And as a result my
24    client, Mr. Gallagher, is not guilty of the conspiracy or
25    the FACE Act violation.  Thank you.

1           THE COURT:  Thank you, Ms. Bell.

2           Mr. Parris.

3           DEFENDANT ZASTROW CLOSING ARGUMENT

4           MR. PARRIS:  Good afternoon.  I think

5    Ms. Bell basically covered the whole thing, so I'm going

6    to be short.  But I do want to remind you that six days

7    ago I asked you to remember four words and I asked you to

8    write them down:  Injure, oppress, threaten, intimidate.

9    You can forget injure now.  That's off the table.

10          So we're down to three.  Oppression, threats

11   or intimidation.  I'm going to start with Count Two, I'm

12   going to work my way backward.  Count Two, by force,

13   threat of force or physical obstruction intentionally

14   intimidates or interferes with the person from obtaining

15   reproductive health services.

16          That's not exactly -- that's not the entire

17   law, and the Judge will instruct that to you, but that's

18   generally the idea.  I'm not going to walk through the

19   proof with you again.  That's already been done twice.

20   That is -- what I want to point out and what I want to

21   emphasize is Count Two is the act, what happened out

22   there, okay.

23          Count One strictly is involved with what the

24   agreement was.  And I think we all agree, I don't think

25   anybody -- well, I take that back.  Mr. Zastrow doesn't

contest that there was some agreement, but the agreement
was always just to save lives.  And certainly never by --
through oppression, threats or intimidation.  By the
opposite, by doing the opposite.

Officer Schneider testified that at that --
and you saw his testimony, you saw what he did when he
went down the hall.  He testified that they ended up
being charged with criminal trespass.

Sarah Flowers, when I cross-examined Sarah
Flowers, I asked her, did anybody threaten you?  No.  Did
Mr. Zastrow, which they just showed you the picture of
again, cowed down in the fetal position almost in the
floor, did he threaten you?  No.  Did anyone curse at
you?  No.  Did he curse at you?  No.  Was there any
physical contact by anyone?  No.  Did he physically
contact you?  No.  Was there any yelling or raised voices
by anyone or Mr. Zastrow?  No.  Were there any weapons?
No.  Were you aggravated?  Yes.  Were you annoyed?  Maybe
frustrated.  Were you angry?  Yes, I was angry.

She also testified that she was panicked.
We all saw that video, we all heard her tone.  There was
no panic in that voice.  And, again, as already been
pointed out, she went through the hall, through the
people into the office, then came back out of the office
to video.  There was no fear, no intimidation, no threat,

1    no oppression at all.

2              Now, again, I say this with a little bit of

3    trepidation because I don't want to confuse the issue.

4    We're talking about what the agreement was.  Now I'm

5    actually talking about what happened, but you can infer

6    from what actually did happen as to what the agreement

7    was.  Because further testimony from Caroline Davis was

8    that it was well-planned, and it was well-planned for

9    that very purpose.

10             She made -- one of her most telling

11   statements to me was that she had heard about rescues

12   that had gone bad.  And when asked, well, what does gone

13   bad mean?  That's when she testified, that's when we

14   start getting beat on.  That's when violence starts.

15   That's when things escalate.

16             And so the agreement by these men was to

17   keep all of that from happening.  Whatever you do, don't

18   injure anybody, don't touch anybody, don't threaten --

19   don't be threatening.  Don't be intimidating.

20             Stand up, Cal.  Thank you.  Now, you can see

21   me.  I'm a pretty good-sized man.  He's every bit of me

22   and more.  And what did he choose to do?  Literally make

23   himself as small as he could, not make eye contact, no,

24   ma'am, yes, ma'am, I understand, ma'am, yes, ma'am.

25             You can't be more docile than he was.  When

that officer pushed through him, he just let him throw
him into the wall.  If he wanted to resist that, I
promise you he could have resisted that.

So this is the opposite.  What they did was
the opposite.  And the fact that it was peaceful and the
fact that there was no oppression, no intimidation, no
threats, it's no accident because it was well planned
just for that purpose.  So this is the opposite.

What the planning was.  Officer Watkins
deserves some mention, and that's because he chose his
words wisely when asked what he saw when he got there.
He testified that when he got the call, he expected
something totally different when he got there.

I don't know anything about Westboro Baptist
Church, but he gave you an idea of what he expected and
it wasn't going to be pretty.  And when asked to describe
it, he thought and he said, what I saw was something very
quiet in personality.  At most I heard singing.  And you
heard it.  They're singing hymns.  They're holding
Bibles.

Even if you think there's something
inherently intimidating about that many people in that
space -- and Caroline Davis said the word intimidation I
think once, maybe twice later on into her testimony when
she was talking about more is better.  Even if you think

that, there is no evidence -- and, as a matter of fact,
the evidence is the exact opposite that that's what the
agreement was.  The only agreement that these people ever
made was to try and save lives.

Now, as Ms. Bell stated, it may have been
irritating, it may have been aggravating, it may have
been a nuisance, may have been distasteful to some of
you, but what it wasn't was illegal.  The agreement,
Count One, there was no intent to injure, oppress or
threaten.  And that's what Count One is all about.  Don't
mix it up with Count Two.  Count Two's about the act.
Count One is merely what is our agreement.  And their
agreement was to save lives --

MR. BOYNTON:  Objection, Your Honor.

MR. PARRIS:  For?

THE COURT:  Overruled.

MR. PARRIS:  Was to save lives in the
quietest, safest, least injurious way to do it.  And they
spent a lot of time working on that so that there wasn't
any problems.  And there wasn't.  And that's the evidence
I want you to take from what actually happened when
you're trying to decide for sure what was the -- what was
the agreement because the law is very specific, first
there has to be an agreement.

And second that the aim of the agreement was

to oppress, threaten or intimidate.  Again, we don't have
to worry about injury, that's out the window now.  A
person in the free exercise or enjoyment of any right or
privilege secured to that person by the laws of the
United States.  I submit to you there's no way that you
could find that any of them, that the agreement was to
oppress, threaten or intimidate any of those people and
you have to find them not guilty.  Thank you.

    THE COURT:  Thank you, Mr. Parris.

    Mr. Haymaker.

    DEFENDANT BOYD CLOSING ARGUMENT

    MR. HAYMAKER:  Afternoon.  I appreciate your
patience.  I'm going to try not to repeat what other
counsel have said.  I'm having to revise it as they speak
because I don't want to be too repetitive.  I'm always
nervous about a closing argument and the reason, one of
the reasons, is because the government gets two bites at
the apple.  We only get one.

    So not only do we have to respond to some
degree to what they argue, we have to anticipate what
they're going to argue when they get back up here.  And
this is the last time I'm going to be able to talk to
you, so I'm going to try and not repeat myself or repeat
what other counsel have said, but I have to be thorough.

    Of course, we're at a disadvantage because

1  when there's a disagreement, you always want the last
2  word.  And they get the last word.
3          There are two counts in this case.
4  Count One is a criminal conspiracy against rights.
5  Count Two is a FACE Act violation.  Now, what's
6  interesting about these two counts is they seem alike.
7  They seem similar.  It's easy to sort of jump to the
8  conclusion that, well, if somebody's guilty of one, they
9  must be guilty of the other.  And nothing could be
10 further from the truth.  They have different elements,
11 they have different requirements under the law and they
12 have to be considered separately.
13         In this case a violation of the FACE Act,
14 which is Count Two, is about what happened on March 5,
15 2021, in Mt. Juliet.  Count One, a criminal conspiracy
16 against rights, is a serious charge, and it is about what
17 individual defendants agreed to do before March 5 and
18 leading up to March 5.
19         As you consider the evidence, it is really
20 important that you keep these two counts separate in your
21 mind and recognize that Count Two is about what happened
22 that day, the videotapes you've seen and so forth.
23 Count One is about what happened, the nature of the
24 treatment, what happened leading up to March the 5th.
25         I'm going to start with Count Two, which is

the FACE Act violation.  And as we look at the FACE Act
violation, again, things that happened on March the 5th,
2021, in Mt. Juliet, that's going to lead me to the
question that I asked in the beginning of this case.

Myself and Steve Thornton represent
Dr. Coleman Boyd, who has been sitting behind me.  And in
my opening I asked the question, what did Coleman Boyd
do?  So let's talk about what he did in this case.  He
arrived on the second floor of the building at about
7:47 a.m.  He stepped off the elevator, he stood in the
corner at the end of the hallway.  He began to livestream
what was going on, and on the livestream he was asking
people to pray.

He was as far away on the floor from the
clinic as he could be and still have it on a livestream.
As a matter of fact, he was so far away that there was
actually another business in between him and the clinic.
He stood out of the way.

A woman came off the elevator, accompanied
by her boyfriend, and he engaged in a conversation with
her.  He spoke to her briefly about regarding a bathroom,
where a bathroom was.  He asked her if she was looking
for the abortion mill, and she ignored him.  She didn't
respond.  He then asked if he could talk to her, and she
didn't respond.  He then communicated with his daughter,

who was a teenager, and communicated with her so she
could go speak with the woman.

The woman walked down the hall towards the
clinic, and as she was down there on the Facebook
livestream, he asked people to pray for her.  He did not
follow her.  At some point the clinic worker came up on
the woman and the boyfriend came out of the bathroom, and
the clinic worker told them to leave.  And as they walked
out towards the elevator, Coleman Boyd is still standing
at the end of the hallway.  And Coleman Boyd says, in a
calm voice, sir, that baby is a gift from God, a blessing
from God.  They get on the elevator.

Coleman Boyd then calls someone else,
presumably someone downstairs, and says that they're
coming down and suggests that whoever he's talking to
might want to speak to them.  And he says, when you speak
to him, referring to the man, speak to him with love.

The government played that video for you a
minute ago.  I thought it was interesting that they left
off the last three or four seconds, when he says to the
person downstairs, speak to the man with love.

The couple were on the floor for about four,
five minutes at the most.  During all that time, Coleman
Boyd never raised his voice.  He never blocked anyone.
He never took any sort of aggressive action.  He never

1   took any sort of aggressive posture.

2              This entire episode took two and a half to

3   three hours from start to finish, from the point when

4   people arrived to the point when people were arrested and

5   taken to jail.  Coleman Boyd arrived at 7:47, and at 12

6   minutes after 8:00, he left.  He was there for 25

7   minutes.  The police came shortly after 8 o'clock.  They

8   told everyone to leave, and Coleman Boyd left.

9              In order for the government to prove that

10  Coleman Boyd is guilty of a FACE act violation, they have

11  to show he obstructed an entrance.  That is because

12  obstruction is the heart and soul of the -- of a FACE Act

13  violation.  If there's no obstruction, there's no

14  violation.  There is no evidence that Coleman Boyd did

15  any obstruction.  You can't conclude that, especially

16  beyond a reasonable doubt.

17             Now, the Judge is going to instruct you that

18  making the approach to a health facility emotionally

19  difficult or unpleasant is not enough to create an

20  obstruction under the FACE Act.  Now, because they can't

21  prove that he created an obstruction, they have to

22  proceed on an aiding and abetting theory, so I want to

23  talk to you about that.

24             To put it in a nutshell, the Judge is going

25  to instruct you that aiding and abetting is to help or

encourage someone else to commit a crime. The Judge is
going to tell you that proof that a person is present
when a crime is committed and that he knew about it is
not enough to find somebody as an aider and abettor. An
aider and abettor has to actually help or encourage the
criminal conduct. So the question becomes, how did
Coleman Boyd help an obstruction. So I'm going to go
through that. Again, I have to react not only to what
they've argued but what I anticipate they might argue.

So what did Coleman Boyd do and how did he
help? First, he livestreamed. Did that help the
obstruction? You'll note that on the livestream, it
appears as if he angled the camera away from the woman
that he was -- and you be the judge, you can look at the
video. But it does not -- it appears as if he's trying
not to show her face on the livestream.

There's a suggestion that on the livestream
he is somehow communicating with others and telling them
what to do on the livestream, but if you listen to what's
on the livestream, he's asking people to pray for this
woman.

And he's describing generally what's going
on. It's not as if he's on the livestream saying, hey,
go here, go there, if anybody's listening to this
livestream, we need more people up here or what have you.

He's not doing that.

It's also important to note that if you look at the video where he's standing, as he's looking down the hallway, there are people standing. Now, there may be people sitting down there as well. But from where he's -- where he's positioned, it looks like a bunch of people standing; some, to be sure, in front of a door, but people standing.

What else did he do? He spoke to the patient. He was essentially -- and Caroline Davis said this. He was essentially a sidewalk counselor, but in the building. That doesn't help an obstruction. He encouraged his teenager daughter to speak to the woman. Well, if him speaking to the woman doesn't create an obstruction, then certainly him encouraging his daughter to speak to the woman doesn't create an obstruction.

One thing that was brought into evidence was a -- it was either a text or a Facebook message, I'm not sure. It's Exhibit 18. And Caroline Davis is speaking with someone else or communicating with someone else electronically. And part of it reads this: Not to mention, as much as people are needed to block the doors, people are needed on the other side of things to help from outside of jail and the other parts of rescue. Coleman Boyd did the bulk of the hard work when we were

on the inside.  He was slaving away on the outside, even
in the middle of the night for us.  We worked hard and
sacrificed and he sacrificed his time to do the
behind-the-scenes work, so praise God for people like
Coleman.

It's very clear from the terms of that that
what she is talking about is not what happened that day,
but what happened that night after people were arrested.
He slaved away all night.  People -- when she says people
were inside, it's not the building they're inside.  It's
the jail they're inside at night.

The Judge is going to instruct you that in
order for an act to be help or encouragement under aiding
and abetting, it has to occur before the alleged criminal
conduct or during the alleged criminal conduct.  But it
can't happen after the criminal conduct -- the alleged
criminal conduct is over.

So what is in that exhibit?  If it refers to
them being in jail and him working while they're in jail
that night, that can't be help.  There was also testimony
that when Caroline Davis was arrested and the others were
arrested and they were taken outside, that Coleman Boyd
was outside and he said in a loud voice something to the
effect of, worthy is the lamb.  And Ms. Davis took that
as some form of encourage.  Again, that can't be help

with respect to aiding and abetting because that occurred
after any alleged criminal conduct was over with.

In another email or message, he asked --
Coleman Boyd asked Caroline if she was coming to the
Tennessee rescue. Caroline Davis testified about the
word rescue. And that's very important in this case.
She testified that rescue has lots of meanings. And
while blockades are rescues, not all rescues have
blockades. She said a rescue can be simply standing on a
sidewalk talking to people or holding a sign. So when
Coleman Boyd asks her if she's coming to the rescue in
Tennessee, there's nothing that's necessarily illegal or
nefarious about that inquiry.

What else did he do? And by the way,
certainly him asking her whether she's coming to the
rescue is not helping in an obstruction. What else did
he do? Well, it was insinuated that he encouraged two of
his teenage kids somehow in this.

The testimony actually was -- and it was not
clear exactly how she knew this, whether she was present
or not, but that he prayed -- being a religious man, he
prayed with two of his teenagers about being involved in
rescue and whether they were going to make a decision or
not to be involved in rescue. Again, rescue covers a
multitude of activities, some of which are illegal, but

1    most of which are not.

2              Now, if you're not a particularly religious

3    person, that may seem odd that you would pray with your

4    teenage children.  However, if you are a particularly

5    religious person and you want them to make important

6    decisions for themselves, praying with them is probably a

7    pretty reasonable thing to do.  But it is certainly not

8    helping or encouraging in blockading.  Coleman Boyd never

9    talks about blockading.  Coleman Boyd, to the extent he

10   talks about anything in this case, it's about rescue.

11             And the other thing -- I guess there's two

12   more things I think they would claim he was helping an

13   obstruction.  There was a suggestion that he suggested

14   that people use medical equipment to blend in.  One thing

15   that was mentioned were masks, another thing that was

16   mentioned was a wheelchair, and I believe there was some

17   reference to crutches.

18             I think Coleman Boyd, a physician,

19   suggesting that people wear masks in March of 2021,

20   especially when most buildings either suggested it or

21   required it, I don't think that really has anything to do

22   with whether or not they were engaged in a rescue.

23             Eva Edl was one of the women in the hallway.

24   Eva Edl was in her mid to late 80s.  And there was

25   testimony that she was able to get up out of the

1   wheelchair and get in a police car with no problem.

2   Anybody who has known somebody in their mid to late 80s

3   understands the fact that most people that age, if they

4   can walk perfectly fine -- a lot of folks that age can --

5   but if they're going to be on their feet for any period

6   of time or sitting for any period of time, it is not

7   uncommon for somebody, even though they can walk

8   perfectly fine, to need the assistance of a wheelchair.

9   So the fact that he suggested she have a wheelchair, that

10   didn't aid in the obstruction.

11           And then lastly there was a mention of

12   crutches, and that came from Caroline Davis. There's a

13   lot of video in this case. It looks like everything was

14   videoed, pretty much. I didn't see any crutches, so I

15   honestly don't know what to make of that. The point is,

16   none of that helped in the obstruction.

17           And lastly there's been a suggestion that

18   Coleman Boyd was in a position to where he could somehow

19   signal to the folks down the hall that someone was

20   getting off the elevator. You-all have seen enough video

21   that you're pretty familiar with the layout of this

22   floor. When someone gets off the elevator, to their left

23   is Coleman Boyd. They take two steps to the left, and

24   they're in the hallway. Anybody down the hallway that's

25   looking can see somebody come around the corner.

1           If Coleman Boyd was going to signal -- and
2   other than Caroline Davis saying that's what he was there
3   to do or she thought he was there to do that -- it
4   wouldn't give anybody down the hall any forewarning that
5   somebody's coming.  By the time he's signaled them,
6   they'd already be around the corner and on their way
7   down.  So that really doesn't make sense.  So in short
8   they haven't proven that Coleman Boyd helped in the
9   obstruction, and they haven't proved that he encouraged
10  anybody else to help in the obstruction.  And they
11  certainly haven't proved it beyond a reasonable doubt.
12          And really the salient question is this:
13  Did Coleman Boyd help or encourage?  And the way you know
14  he didn't is this question.  If Coleman Boyd was not even
15  there that day, would anything have turned out different?
16  The answer is no.  He didn't do anything that helped the
17  obstruction.
18          Coleman Boyd was not there to obstruct.  He
19  was there to persuade.  Now, you may not agree about his
20  methods of persuasion.  That's really not the question.
21  What was his motivation?  He was there to persuade, not
22  to obstruct.  Everything he did on that floor was
23  designed to persuade and not obstruct.  Where he stood,
24  his peaceful behavior, the conversation he engaged in,
25  the conversation he asked his daughter to engage in, what

he says to the boyfriend as they're exiting in the elevator, and when he tells the other person, when he suggests to them to go speak to the gentleman and to speak with him in love.

It raises an interesting question. If Coleman Boyd was there to obstruct and was there to help others obstruct and this couple, who he thought was there to terminate a pregnancy, they were turned away and they were on their way out of the building and his purpose is to obstruct, why would he talk to them? His job is kind of done. He can chalk that up as a win in his book if his goal is to obstruct, but he doesn't do that. He continues to try and engage. And he says in almost an imploring tone, sir, that baby is a gift from God, a blessing from God.

Now, you may agree with that and you may not agree with that, and that's cool. That doesn't matter. The point is what is he trying to do? Is he trying to obstruct? They're already on their way out. He then goes on, he takes it a step further and he calls somebody else and he says, you know, talk to these folks. The man's kind of gruff, so speak to him in love. Again, these are words of persuasion. And this is after they've already left.

Now, I suspect that's because he knows

1  there's going to be a tomorrow.  And there's going to be
2  a next week, and there's going to be two weeks from now.
3  He's not about obstruction.  He's about persuasion.
4          Now, in a case like this you have to draw
5  inferences as a jury.  Judge will instruct you that as
6  you listen to the evidence, you are allowed to make the
7  inferences.  And, you know, reasonable minds can disagree
8  when they hear a bunch of different facts.  You may
9  listen to this with respect to the FACE Act violation,
10  you may listen to all these facts and you may tilt your
11  head and think, you know, maybe Coleman Boyd did help a
12  little bit here.
13          On the other hand, you may look at all the
14  evidence and draw the inference that he didn't help
15  really in the obstruction and that things would have
16  turned out exactly the same way if he had not even been
17  there.  So the question is, which set of inferences do
18  you choose?
19          The good news is you don't have to decide.
20  If you've looked at all the evidence and you have two
21  sets of inferences and both sets of inferences seem
22  reasonable on some level, that's reasonable doubt.  And
23  the Judge is going to tell you if there's reasonable
24  doubt, you must find Coleman Boyd not guilty.
25          The other thing to note is there was

testimony that Coleman Boyd was trying to avoid violating
the law.  There was testimony that there was a lot of
talk and discussion of the FACE Act.  A question that was
raised by one of the other attorneys but I think it's
important, if he thought he was violating federal law,
why would he livestream it for all the world to see?
Caroline Davis testified that Coleman Boyd would not
blockade and that he would stay as far away as possible
to not violate the law.

She said that was because he was a
physician, he had lots of kids and he had
responsibilities.  She's testified that he would mostly
engage in sidewalk counseling.  And that's essentially
what he did on that floor.

I think he was a man who had a deep-seated
belief about when life begins based on his faith, and he
was trying to live up to that obligation and was also
trying to stay within the bounds of the law.  Not an easy
thing to do.

And I would suggest this:  If his goal was
not to violate the law, as Caroline Davis indicated, if
he knew that blockades were going to happen on that
floor, why would he go in?  He was only there for 25
minutes.  Why would he even go in, if he knew that
blockades were going to happen?  I would suggest that

1    it's more likely that he didn't know that blockades were
2    going to go on, that he went up there and others decided
3    to take it up a notch.
4                Now, I want to talk about Count One.
5    Count One is a criminal conspiracy against rights, a
6    serious charge.  Again, a violation of the FACE Act is
7    about what happened on March the 5th.  Criminal
8    conspiracy is about the agreement that happened prior to
9    March the 5th and leading up to March the 5th.  The Judge
10   is going to instruct you that if a person knew about a
11   conspiracy or was even present at times or associated
12   with members of the group, that's not enough, even if he
13   approved of what was happening and did not object to it.
14   Just because a person may have done something that
15   happened to help a conspiracy does not necessarily make
16   him a conspirator.
17               We have a very clear window as to what
18   happened with respect to the FACE Act that is March the
19   5th, 2021.  We have videos, we have audio, we have
20   stills, we have a lot of evidence.  When it comes to this
21   agreement in Count One that occurred sometime before
22   that, we don't have that much evidence.
23               The primary source of evidence is the
24   state's -- or the government's witness, Caroline Davis.
25   In order for you to find Coleman Boyd guilty, the

1   government must show that there was an agreement.  And I

2   think there was an agreement, I'm not -- I think that's

3   true.  There was a loose agreement amongst acquaintances

4   to engage in a rescue.

5           But, remember, a rescue means a lot of

6   different things to a lot of different people, according

7   to Caroline Davis.  The important part is that what the

8   aim of the agreement is.  Because the aim of the

9   agreement, in order for there to be a criminal conspiracy

10  against rights, the aim of the agreement has to be to

11  threaten, oppress or intimidate.  If you look at all

12  evidence and you get to that question and there's

13  reasonable doubt as to whether they aimed to threaten,

14  they aimed to oppress or they aimed to intimidate, then

15  on that count your job is done.

16          Again, it's not necessarily what happened

17  that day, it's what they planned to happen, what they

18  intended to happen, what they agreed the aim was to be.

19  The aim of Coleman Boyd's agreement was never to threaten

20  anyone.  The aim of Coleman Boyd's agreement was never to

21  oppress anyone, and the aim of Coleman Boyd's agreement

22  was never to intimidate anyone.

23          If the aim of their agreement was to

24  threaten or oppress or intimidate, it wouldn't be hard to

25  do.  And I would suggest if that was the aim of their

agreement, they would have done things very differently.
Instead of having children and women in the hallway, they
would get as many burly men as they could get in that
hallway.  That would be threatening, that would be
intimidating, that would be oppressive.

If they were planning to be oppressive,
intimidating and threatening, they would have raised
their voices.  They didn't do that.  And that certainly
wasn't their plan.  If they were trying to be oppressive,
intimidating and threatening, they would have planned to
yell at people and not sing church hymns.  And I think if
they were planning to do all those things to be
threatening and so forth, I think they probably would
have planned on carrying weapons or clubs, probably not
Bibles.

Caroline Davis gives you really the only
window into the aim of this agreement when she was asked
about Coleman Boyd's role.  She said she wasn't real
familiar with what he was doing.  Her testimony, the
government's own witness, when she described the plan,
when she described what the agreement was, she said the
following:  This was going to be peaceful, it was going
to be an orderly plan.  The intention was not to cause
violence.  The intention was not to upset people.  There
was not an intention to be out there to hurt feelings.

1  No one said they were going to intimidate.  Those are her

2  words.  Those were the aims of the agreement, to not be

3  violent, to not intimidate, to not threaten.

4           As you deliberate, the Judge -- the Judge is

5  going to instruct you before you deliberate that it is

6  entirely up to you, the jury, to decide what facts to

7  find from the evidence received during this trial and

8  what inferences to draw from that evidence.  Again, if

9  you have competing sets of inferences and you find that

10 there are -- they're both reasonable on some level, after

11 examining all the evidence, that is reasonable doubt.

12 And if you find that, you must find Coleman Boyd not

13 guilty.

14          I ask you to find Coleman Boyd not guilty of

15 Count Two, the FACE Act violation.  And I especially ask

16 you to find him not guilty of Count One, criminal

17 conspiracy against rights.  Thank you.

18          THE COURT:  Thank you, Mr. Haymaker.  We've

19 been at it about two hours, maybe it would be good to

20 take a break.  We'll be in recess for 15 minutes.

21          (Whereupon, at 2:09 p.m. the jury retired

22 from open court.)

23          (Whereupon, a break was taken from

24 2:09 p.m. to 2:30 p.m.)

25          THE COURT:  All right.  We're ready.

1          (Whereupon, at 2:30 p.m. the jury returned
2     to open court.)
3          THE COURT:  Mr. Crampton, we're ready for
4     you.
5               DEFENDANT VAUGHN CLOSING ARGUMENT
6          MR. CRAMPTON:  Yes, Your Honor.
7          I want to thank you again, ladies and
8     gentlemen.  Once more, my name's Steve Crampton.  I'm
9     here on behalf of defendant Paul Vaughn, as you may
10    recall.  It has been a long haul, and I too just want to
11    join in really sincerely thanking you for your patience
12    through the delays and so forth.  But also for the care
13    and attention that you've devoted to this case.  I
14    appreciate that you appear to have taken it seriously as
15    well.
16         And I know it may be frustrating that we get
17    to do all the talking up till now and y'all are sort of
18    just taking it all in.  But as my co-defense counsel
19    mentioned, in moments it will be up to you to decide the
20    facts and up to you to apply the law as the Judge
21    instructs.
22         Not the government that decides what the
23    facts are, not the defense counsel, not even the Judge.
24    It's you and you alone who decide the facts.  So with
25    your indulgence, I'd like to do what I can to help you in

1    that process as well.

2              Just big picture, a couple of things.  One

3    is my colleague mentioned, inferences and innuendo.  And

4    y'all are entitled to draw those inferences.  I want to

5    suggest to you that virtually the entirety of the

6    government's case against Paul Vaughn is based on nothing

7    more than inferences and innuendo.

8              Consider, again just big picture, how much

9    time they devoted to the FBI agent, Ms. Wood, who came in

10   with all the vast resources of the federal government,

11   combing through the web traffic, finding all the Facebook

12   messages, all the text messages, any trace of

13   communications among these defendants.  Remember what she

14   came up with against Paul Vaughn?  Not one iota.  Zippo,

15   zilch.

16             Then they had their star witness, Caroline

17   Davis, come and talk about how important planning is.

18   Oh, these are very important matters.  Meticulous

19   plannings for these rescues.  We've been planning for a

20   month.  We met at least three times.  Everybody has to

21   know their role before they go out there, on and on and

22   on.  Remember what the government showed you with regard

23   to Mr. Vaughn's participation in these planning sessions?

24   Zilch.  Not one mention.

25             So today we hear from the government, oh,

well, Mr. Vaughn was blocking in this horseshoe depicted
in Exhibit 4.  Never heard that before.  They say, well,
you know, you can join the conspiracy in the middle of
the activities.  That may be true as a matter of law,
but, again, I challenge you, find us in the evidence.
Where was it that Mr. Vaughn joined any agreement among
these other defendants?  As I said in opening --

       THE COURT:  Mr. Crampton, I'm sorry to
interrupt you.  Do you intend to have anything on the
screen?

       MR. CRAMPTON:  I want to play it in a
moment, yes, ma'am.

       THE COURT:  Okay, that's fine.

       MR. CRAMPTON:  You do not see Mr. Vaughn
oppressing, injuring, threatening, intimidating anyone.
But before we get to some of those specifics and dig a
little deeper into that, I want to pause here and point
out a couple of things about the government's opening
statement.  Counsel for the government has been quick to
point the defendant's opening statements and kind of
seize upon anything we said that might have been
untoward.

       Remember that the government controls the
preparation of their evidence in this case.  The
government goes first.  The government has all its

resources, as I said earlier.  So what does the
government say to you that they're going to show in this
case?  One of the things they said to you, they promised
you in opening, they're going to bring to you a clinic
employee who's going to testify about how frightened she
was locked inside that clinic, et cetera, et cetera.  I
didn't hear from a clinic employee to that effect.  Did
you?

             The only clinic employee who testified was
Ms. Flowers.  And as Ms. Bell pointed out, she hardly
looked frightened or certainly not trapped.  She came
right out of that clinic after she went in and you saw
her demeanor.  And we'll see it again in a moment, we'll
look at a videotape.

             The other thing the government said to you
in opening -- and in fairness, they are quoting some of
the defense's -- some of the defendants' statements.  Oh,
this is not a protest, this was not a demonstration.  But
then they went on, protests are a part of the fabric of
our nation.  That's what the government told you.

             And as I suggested to you in opening,
protest is kind of a loose term.  I suggested to you in
opening, once you see the evidence, there's a lot of
similarities between what happened at the carafem clinic
on March 5, 2021, and your everyday, ordinary -- maybe

1   not so much everyday today -- sit-in.

2              Just so happens, we meet today in downtown

3   Nashville, Tennessee.  Maybe y'all are not historians on

4   this, but Nashville actually is famous for the Nashville

5   sit-ins in the early '60s.

6              MR. BOYNTON:  Objection, Your Honor.

7              THE COURT:  Sustained.

8              MR. CRAMPTON:  What you have here is a group

9   of individuals, whether or not Mr. Vaughn was a part of

10  it, joining together as some of my co-counsel have

11  indicated, not simply as Caroline Davis tried to kind of

12  pull the wool over your eyes about, to simply block an

13  entrance or somehow prevent people from going into the

14  clinic.  There was a far more important component to what

15  these defendants were about.  And that is expression.

16  You heard it from some of the counsel already.  You've

17  seen some of the videos.

18             I want to remind you here in one of the

19  government's exhibit, Exhibit 3G, where they played for

20  you -- and they do this for your transcripts, they put

21  just this part of what is actually said in there and they

22  don't want you to hear the rest of it.  They quote

23  Chester Gallagher --

24             MR. BOYNTON:  Objection, Your Honor.

25             THE COURT:  This is argument.  Overruled.

1          MR. CRAMPTON:  Listen.  To make no mistake,
2     this is not a protest, this is a demonstration.  These
3     are not acts of civil disobedience, and they cut it off.
4     Here's the rest of what he said --
5          THE COURT:  Wait a minute, if this is not in
6     evidence, you may not --
7          MR. CRAMPTON:  Yes, Exhibit 3G is in
8     evidence.
9          THE COURT:  Okay.  Go ahead.
10         MR. CRAMPTON:  This is the obedience to
11    scripture.  Following the command of the king who's
12    promised us that to the extent that we do to the least of
13    his, he will do for us.
14         It's sort of the rest of the story, if you
15    will.  And I would suggest to you that this statement of
16    Mr. Gallagher is meant to convey that they are there, as
17    others have said, on behalf of those who can't speak for
18    themselves, the unborn children.  And to communicate with
19    those trying to go in to the clinic.
20         In fact, a couple of other points.  We're
21    going to get to this video, which the government just
22    told you on opening is perhaps the most important exhibit
23    in evidence, Exhibit 4.  We're going to play it for you
24    here in a moment.  I agree with the government.  It's a
25    rare thing, but I'll agree with them on this point.

1          The interesting thing about Exhibit 4, which
2     is Ms. Flowers' video when she came out -- we're not even
3     going to have to watch the entirety -- is that the
4     government has played it some four times as I count.  You
5     can look at the record.  The first time with sound, but
6     the next three without.
7          Again, I'd ask you to consider, why would
8     they not want the sound?  Counsel mentioned it again and
9     alluded to it here in his opening; didn't play it.
10    Didn't play it with sound.  We're going to hear it with
11    sound.  And the reason I suggest to you this is so
12    important is because, in my estimation, this is the heart
13    of what these defendants were about.  It is the
14    interchange between this young lady, we don't know her
15    name -- I'm going to call her Rachel, it's a common name
16    in pro-life circles -- Rachel and Ms. Ashby and you're
17    going to see this exchange, that one-on-one
18    communication.
19         Again, you're the ultimate judges here of
20    the facts.  You decide whether this is intimidating or,
21    as Ms. Flowers put it, harassing or as Ms. Ashby who, no
22    doubt, was emotionally distraught.  She -- you know, her
23    feelings are real.  She called it bombardment, I think,
24    of these young ladies who are desperately pleading and
25    offering help and hope to Ms. Ashby, thinking, they don't

know, we don't know as we sit here today that perhaps for
reasons of so-called terminating her pregnancy.

Before we get there, though, there's one
other little comment I want to make with respect to this
notion of protest and what we're about here. I would
suggest to you that the government's primary theory with
respect to the Count One, the conspiracy, is that these
defendants agreed to intimidate people coming to the
clinic. Intimidation was kind of their global theory.
You'll remember Ms. Davis testifying. Remember what she
said about just the size of a crowd? Remember that? Oh,
it's inherently intimidating.

That's how she could say to some of the
defense counsel on cross-examination, well, they may not
have intended to intimidate, but a large gathering, it's
just inherently intimidating. The inherent intimidation
theory let me call it. May I suggest to you, merely
assembled together just as folks outside this hallway,
this courtroom, gather together, they may be a large
crowd, it cannot be intentionally intimidating.

Whether you subjectively experience some
feelings of intimidation -- again, I am not questioning
the sincerity of Ms. Ashby or anybody else that tries to
come into a clinic like this one. But her subjective
feelings don't rule the day. You must step back and

1    objectively consider, is this really intimidating?

2             And if the theory of inherent intimidation

3    somehow carries the day by virtue of the size of a

4    gathering, however benign and peaceful as these folks

5    were on that day, then really I'm not sure what's left of

6    the right to assemble.

7             So inherent intimidation let's set aside for

8    a minute.  One other thing about Ms. Davis, who I would

9    suggest to you as the government's star witness was,

10   maybe is, a bit unstable, okay, for lack of a better way

11   to put it.  Y'all are the determiners of these issues and

12   credibility, but I want to point out a few things for you

13   on that point.

14            You saw her.  Look again on those videos if

15   you need to.  There is no one depicted in these videos

16   with more extreme emotional reaction, her hands up, she's

17   crying sometimes, she's crying out in song and perhaps in

18   prayer.  She was as all-in as one can be on March 5,

19   2021.

20            But then you saw her on the stand here.  I

21   would say she was all-in on the other side.  She

22   described her own activities on March 5, 2021, as well as

23   the activities of the other defendants, silly, useless.

24   The woman wants an abortion, you know, you stop a clinic

25   for a few hours, she's going to come back and get it the

next day or something.  It's just crazy.  That's her
position today.

She talks about blowfish.  Let's just harp
on blowfish for a minute.  Consider in your own notes,
your own recollection, every witness that testified,
every piece of video that you saw throughout this entire
proceeding.  Who else said blowfish?  No one.  Caroline
Davis says blowfish.  It does appear on one video.

Remember as they're counting down and
getting ready to be arrested?  And Mr. Gallagher hands
his camera to Ms. Davis and she's now videoing, and then
you'll hear her say, the blowfish are leaving, the
blowfish are leaving.  Almost as if she just had to get
it onto that camera.  Nobody else mentioned blowfish.

And consider this.  Given that the heart, as
I will suggest to you, of the activity is about
expression, how Ms. Davis characterizes in her great
expertise and experience, all the different roles in a
rescue, remember?  Well, there are blowfish, right?  One.
There are drivers for those after the fact and so on.
There are the blockaders that actually sit in front of
the door.  And then the only other category that I recall
her mentioning is police communicators.

Again, in this video we're about to watch,
you consider with the lady I'm just going to call Rachel,

1   was she just a blowfish?  That's the only category she'd

2   fit in in Ms. Davis's expert depiction of what a rescue

3   is about.  And I want to suggest to you that not one of

4   those individuals in the hallway that day were there in

5   some insincere role trying to manipulate and deceive as

6   the government suggests.

7               They were there out of deep conviction and

8   sincerity in their own way, as folks have testified

9   already and talked about, they were there to rescue too.

10  Whether they're praying, whether they're worshiping and

11  singing along, whether they're actually speaking one on

12  one with one of these ladies or whatever, there is

13  nothing artificial whatsoever about it.

14              Consider, who's the role player here?

15  Ms. Davis whose demeanor changed 180 degrees when

16  Ms. Bell starts asking her harder questions?  Or these

17  folks that you see on those videos?

18              Jodie, would you -- let's look at this.

19  Exhibit 4 with sound.

20              (Playing video.)

21              Stop right there if you would.  It's

22  obviously hard to hear because Ms. Flowers is coming out

23  of the door, but down the hallway already is Ms. Ashby

24  and these two young ladies, one of whom I'm going to call

25  Rachel because she's the speaker, okay.  You can't hear

1    it, you guys can listen.  I suggest to you what I think

2    she says is:  Are you here for an abortion?  We'd love to

3    talk to you.

4              And Ms. Ashby -- we can play it again if you

5    would, Jodie -- comes back and says, no, I don't want you

6    guys to talk to me.  And, yes, as Ms. Bell mentioned to

7    you, there may be a component here, it's unwelcome.

8    We'll concede that.  But that's not making it wrong, not

9    making it illegal.  Sometimes we need to hear what we

10   don't really want to hear.  Go ahead.

11             (Playing video.)

12             Stop if you would.  Now, did you hear what

13   the lady I'm going to call Rachel was saying there?  She

14   has seen Ms. Ashby with her phone out, and apparently on

15   that phone are photos of children.  And she asks, ma'am,

16   you have pictures, I'm assuming they're of your children

17   on your phone?

18             And go ahead.  Ms. Ashby starts to walk

19   away.  (Playing video.)

20             Stop.  No, we'll replay that in a moment

21   here.  This girl I'm calling Rachel, as I understand it,

22   says, are your children at home?  Are they more precious

23   to you than the baby inside your womb?  Can you play it

24   again, Jodie.

25             (Playing video.)

1          Now, as Ms. Flowers does her no masks,

2    et cetera, super pro-life comments, in the background you

3    hear someone -- and I am thinking it's Ms. Ashby -- say,

4    do you know my situation?  Responding to the girl I'm

5    calling Rachel.  Can we replay that just for a moment?

6    Try to listen, see if you can hear that.

7                    (Playing video.)

8          Stop right there.  Remember you hear

9    Ms. Flowers pretty plainly, I hope, you need to leave her

10   alone, this is harassment.  This is harassment.  Now,

11   here's Ms. Rachel, addressing Ms. Ashby, not speaking to

12   Ms. Flowers at all.  It's Ms. Flowers who interjects, one

13   might say, interposes between the two of them and

14   immediately labels it harassment.

15                    Again, these are loaded terms.  And it's

16   very, very important in this context where we have these

17   vague suggestions of intimidation and whatever.  I do not

18   doubt, again, even the sincerity of Ms. Flowers, I guess

19   Ms. Ashby might even agree with that.  That she receives

20   it, if you will, subjectively, as harassment doesn't make

21   it objectively so.

22                    If you can imagine a more sincere plea than

23   this Rachel is making here, I'd like to hear what it

24   would be.  Go ahead and play it.

25                    (Playing video.)

1    Stop right there.  There it is in a
2  nutshell.  Although Ms. Flowers is trying to disrupt and
3  interrupt, she steps away or whatever.  And here's what
4  this Rachel lady says as I hear it.  Do you know how many
5  moms we've helped?  I can show you pictures of babies
6  who've made it, whose mothers and fathers have chosen to
7  keep them and love them.  And we've helped them.  It's
8  been the most beautiful story.
9    Go ahead if you would, play on for a moment.
10   (Playing video.)
11   You can stop right there.  As she's walking
12  away, we'll be up here, we'd love to talk and help you
13  all however we can.  As sincere an offer of help and hope
14  as you get.  Again, we know nothing of the individual
15  circumstances here, but what I'll say you cannot conclude
16  from what you just witnessed is that this lady is a mere
17  blowfish, playing a role to deceive and make the police
18  delay and somehow engage in this as if it's theater or
19  some game.  This is no game.  To these folks, those are
20  matters of life and death.
21   You have less than 60 seconds on that tape
22  with the interchange between this Rachel and Ms. Ashby.
23  And even hearing that, you've got commotion on the side,
24  you've got Ms. Flowers interrupting, you've got Nicholas
25  Ashby coming out and taking Ms. Ashby away.  Very

difficult circumstances to communicate maybe a very hard truth.

Now, say what you will about the actions, but I want to suggest to you that there's more than meets the eye here, if you will, than just maybe somebody sitting in front of the door. These are heart-felt communications of maybe hard truths. Truth is a funny thing, right? You can ignore it, you can suppress it, but in the end you really can't deny it.

And when someone speaks hard truth to you, you might react, just as Ms. Ashby did, get away from me, this is harassment, you're bombarding me. Maybe because you just don't want to hear it, but maybe you need to hear it.

There's a proverb that says, a word thickly spoken is like apples of gold in settings of silver.

MR. BOYNTON: Your Honor, we object.

THE COURT: It's getting a little preachy here, excuse me. Can we stick to this case?

MR. CRAMPTON: Yes, ma'am. The point is, just because it's hard to hear doesn't mean that you should be precluded from speaking it. So I would urge you as you go into your deliberations, for all the other evidence, let's agree with the government, Exhibit 4 is the most important exhibit in this entire trial. The

1  whole thing is only about two minutes, ten seconds.
2  Won't take you long watch it again.
3           Well, Ms. Davis, the star witness and expert
4  on rescues, also tried to make light of people who are
5  praying and considering what exactly they're going to do
6  when they get to these events.  Remember that?  Well, you
7  know, they talk in terms of I'm seeking the Holy Spirit
8  or something, but they know what they want to do.  That's
9  what she said.  But then we got to her own experience and
10 she sort of contradicted herself.  She said, well -- I
11 think this was in the context of the DC thing, but you
12 look at the record and correct me.  I was on the fence
13 the whole time.  I didn't know what I was going to do
14 until the last minute.  That was her own experience.
15          Then she testified I think in response to
16 some of the questions that my co-counsel asked on cross,
17 that's how everybody is.  They don't know until the
18 moment arrives exactly what they're going to do.  This
19 isn't role playing, ladies and gentlemen.  It's very
20 serious undertaking.  Blowfishing, I would suggest to
21 you, is balderdash.  It is not what this group is about.
22          And Ms. Davis's testimony, you can accord
23 the weight you will, but it's a hard sell, it seems to
24 me, in this context to suggest that these people are just
25 role playing, they're out there to deceive.

1            Again, as you look at these videos, you look

2    at the faces of the people in the hallway.  Look at the

3    faces of these defendants.  See if you see the kind of

4    insincerity that the government and Ms. Davis suggest is

5    really what they're about.  They're all just tricking

6    everybody.  Paul Vaughn, he's only there to deceive the

7    police and try to buy additional time.

8            Well, I didn't hear a witness from the

9    government that said that that's what he was doing.  My

10   recollection, y'all look back, is the police negotiator

11   himself, Mr. Watkins, trained on these things, special

12   training on how to identify who's pulling the wool over

13   his eyes, what did he say about Paul Vaughn?

14           He said Paul Vaughn was sincere.  Paul

15   Vaughn was cooperative.  He had no doubt that Paul Vaughn

16   was definitely helpful.  He wasn't a hindrance, he was a

17   help, as I mentioned to you in opening.  He said he never

18   saw any sign of Paul Vaughn deceiving him.

19           Now, maybe Paul Vaughn is the greatest actor

20   that ever lived, y'all have to make that decision, but

21   Travis Watkins is a man with experience and training in

22   this area.  Travis Watkins dealt with Mr. Vaughn one on

23   one for quite a period of time there.  Travis Watkins'

24   testimony under oath is Paul Vaughn was not deceiving.

25   He was very cooperating.  He was very helpful to the

police and he ended up assisting in making this a
successful negotiation.  That's his testimony.  You check
it out.

Again, you must distinguish, I would suggest
to you, objective versus subjective.  There is no
question subjectively, there are all kinds of concerning
interchanges in this case.  And I wish it weren't so.
I'm sure the defendants wish it weren't so.  But you have
to decide in the context of these two charges' intent,
what was the intent of these defendants.  And let me at
this point just focus on Mr. Vaughn.  What evidence do we
have of his intent?  Precious little.  The government
can't point to you exactly how he got there.

The government hasn't shown you any
statement from Mr. Vaughn as to his intent.  The
government relies upon innuendo, inference.  That's what
they rely on.  That's a pretty thin sheet to be stepping
on and putting the weight of this federal charge on.

Remember what a couple of my co-counsel have
alluded to.  In the Judge's instruction, please pay
particular attention, it's a difficult concept, this
whole idea of beyond reasonable doubt.  It's easy to say,
but when you come to really applying it, it's not easy.
And it's up to you.  And I believe as some have already
kind of quoted or alluded to, it's the idea that it's so

1   convincing to you, you would not hesitate to rely on it

2   in the most important decision of your life.

3           Have y'all ever heard the story of the high

4   wire act?  He's walking across between two skyscrapers,

5   balancing along and makes it back and forth and the crowd

6   gets bigger and bigger.  He pulls out a wheelbarrow and

7   he goes across with a wheelbarrow and he makes it back

8   and forth.  The crowd's cheering and roaring.  Then he

9   gets somebody to come and sit in the wheelbarrow.  And he

10  makes it back across again.  And he stops and he asks the

11  crowd, how many of y'all think I can make it back across

12  without falling again?  Oh, we all believe you, yeah.

13  How many of you want to get into this wheelbarrow?  Guess

14  what?  There were no hands.

15          I would suggest to you that beyond a

16  reasonable doubt means you're willing to get into that

17  wheelbarrow.  You're not just going on, well, maybe it's

18  this way.  The government suggests, yeah, you know, Paul

19  Vaughn -- Jodie, can you find the part where they make

20  the horseshoe grouping?  I forget if that's before what

21  we were looking at or after.  Play it on.  This is in

22  that same video of Exhibit 4.  Yeah, right in there.

23  Stop.  Can you get -- there you go.

24          Okay.  Here is maybe the government's

25  smoking gun against Paul Vaughn.  Here he is, they say,

in the famous horseshoe shape that I think we've never
heard of until Caroline Davis testified that this is a
common tactic among rescues.  And, I mean, she is an
expert.  Notice there's no one walking down that way.

This video, you'll recall, is in the context
of Ms. Ashby, who's down at the other end of the hall,
and Ms. Flowers, who's already come and gone in between
those folks without any impediment whatsoever.  And look
where Mr. Vaughn is.  You see him over there on the far
right holding his phone, almost right up against the
wall?

That, ladies and gentlemen, is the
government's idea of a man intentionally obstructing
access to the clinic.  That's what they got against Paul
Vaughn.  I want to suggest to you that that's a whole lot
of inference and innuendo.  All right.  Whole lot of
inference.

Now, the government also mentions, well,
we've got video of Mr. Vaughn coming in the building.
And guess what, he's standing next to some of these
defendants.  Well, there you go.  I guess they got him.
Really?

Listen carefully to the instructions, if you
would.  Mere presence with the defendants -- and we'll
stipulate Mr. Vaughn was present with the defendants at

various times on these day, the other defendants.  Mere
presence is not enough.  Even if he knew about the
conspiracy so-called -- and there's no evidence that he
did, I would suggest to you.  If he even approved of the
so-called conspiracy, which, again, I would suggest
there's precious little evidence, maybe you can find some
inference here, not enough.  Not enough.

At the end of the day it seems to me,
contrary to the government's suggestion, the only
logical, fair, just conclusion with regard to Mr. Vaughn
is not guilty on conspiracy, not guilty on a FACE
violation.

Mr. Vaughn, as Travis Watkins testified,
served as a messenger for the police department.  They
were sending him down the hall to deliver these
instructions.  Find out how many are going to not leave
when we give the final dispersement order, et cetera,
et cetera.  He was a mere messenger.

The government has not explained anything
about Paul Vaughn, other than he happens to be present
when Chet Gallagher undertakes his instructional video
and says this is one of our tactics or whatever he says.
Not Paul Vaughn saying it, Chet Gallagher.  But they say,
look at Paul Vaughn, I think he nodded.  I think he
nodded.  And then one of them suggested later, oh, look

he's smiling.  A nod and a smile.  A lot of inference, a
lot of innuendo.

What Mr. Gallagher thought about these
proceedings is one thing.  What Mr. Vaughn actually did
and agreed to is an entirely different matter.  Remember
too in this whole picture with the police, the government
wants to say, gee, these defendants are responsible for
using up all these resources and so on.  We didn't ask
for mutual aid to respond.  We didn't call out EMS.  We
didn't ask every officer in the force to come down.

Remember why they did that?  It's a matter
of policy.  Mr. Watkins and the police department had a
duty to follow their own policy.  It's not Paul Vaughn's
fault.  Remember Mr. Watkins' testimony about why was
there a delay?  It does seem to have taken a long time.
Candidly, it's true, it took them a long time.

Remember what he said first.  Who was in
charge this entire time?  It wasn't Paul Vaughn.  It was
the police.  Had they wanted to initiate a mass arrest
immediately upon arrival, they could have done it.  The
government extracted testimony about how many handcuffs
and so forth were available.  They could do it.

It's their call, their call alone.  It's not
Mr. Vaughn's call.  It's not Chet Gallagher's call.  It's
no one's call but the police department.  They had their

1  own policy to follow, which I presume they followed.  And

2  they did what they did.  There were all those factors,

3  who's in charge.  There's children here, we need a

4  transport van, whatever.  Paul Vaughn didn't suggest any

5  of that.  There's no evidence that he did.

6         Paul Vaughn helped with the police and he

7  served as a messenger, and the government wants you now

8  to shoot the messenger.  My plea to you is don't shoot

9  the messenger.  Paul Vaughn is not guilty of any charge

10  in this case.  Thank you.

11         THE COURT:  Thank you, Mr. Crampton.

12         Mr. Russ.

13         And can we take the videos down unless

14  Mr. Russ requests something?  He doesn't want any videos.

15         DEFENDANT GREEN CLOSING ARGUMENT

16         MR. RUSS:  Good afternoon, everyone.  I'm

17  Ben Russ --

18         THE COURT:  Just a minute, Mr. Russ.  I'm

19  waiting for the screen to go blank.  Go ahead.

20         MR. RUSS:  I'm Ben Russ, I represent

21  Mr. Green.  I know you haven't had a lot of opportunity

22  to hear from me this week, but that's also because my

23  co-counsel's done such an amazing job.  We try and be

24  respectful with your time, and I do want to echo their

25  thanks for your attention.

1          You've heard, of course, there's two counts

2     here and the first count's conspiracy, the second count

3     is the violation of the FACE Act.  I'd like to talk about

4     Mr. Green specifically, and I'd like to give you a reason

5     both as to Count One and to Count Two, one that's

6     factual, one that's legal as to why he's not guilty on

7     either count.

8          I'll start with Count One and I'll start

9     about the factual basis.  This is the conspiracy count,

10    of course, and this is where the government has tried to

11    prove that Mr. Green is part of some conspiracy.  And,

12    again, an agreement to oppress, threaten or intimidate

13    someone at this clinic out of their constitutional right.

14         The evidence that the government has tried

15    to use to convince you of this is that someone, other

16    than Mr. Green, text messaged a handful of times in

17    February that the Greens might be coming to the Nashville

18    area for this.  They've also produced what's Exhibit 12,

19    which we talked about a little bit here and I'll talk in

20    a minute about a Facebook post that Mr. Green put up in

21    June of 2021, three months after this happened to show

22    that he was there and knew what was going on.  Well, we

23    knew that much.  We saw the video.

24         The only other evidence that they have

25    produced, they try to say the fact that he showed up with

1  a video camera and his children came with him is evidence

2  that he has reached an agreement prior to arriving to

3  violate the law.  The only evidence the government has

4  brought to you is through Caroline Davis.

5          Caroline Davis talked about a lot of things,

6  but the primary thing that she talked about involving

7  this alleged conspiracy is this meeting in the pavilion.

8  She talked about a meeting at the hotel the day before,

9  and there was a larger meeting, and then there was a

10  smaller meeting where they were outside by some picnic

11  tables.  And at that meeting, that's where she claimed on

12  her direct testimony that roles were assigned.

13          And there was the blowfish and drivers and

14  people who were going to blockade and people who were

15  going to negotiate and things of that nature which y'all

16  heard.  She said, yes, they were there, Mr. Green was

17  there.

18          But then in cross-examination, Ms. Bell

19  asked her, let's talk about this pavilion meeting again.

20  Who wasn't there?  And she said, well, Paul Vaughn wasn't

21  there.  And Mr. Green, he -- actually, I'm not a hundred

22  percent sure that he was there.

23          So, you heard a couple of times the

24  paraphrase of what the judge will instruct you in a

25  little while about reasonable doubt, would that evidence

allow you to make the most important decisions in your
life. I'll be more everyday: Getting married, buying a
house. If someone came in and said, this house is four
bedrooms, two bathroom and 3,000 square feet. And you
say, how many -- well, I think it's four, it might be
three. Maybe 2,000, I don't know -- I'm pretty sure
four. Would you know what you were buying then? Would
that allow you to rest your decision firmly?

Again, the evidence the government has
presented from all these witnesses, all these text
messages as to Mr. Green's involvement in this criminal
conspiracy, this agreement to violate civil rights
through intimidation, is Caroline Davis, and she's not
even sure he was there during this meeting where the
roles were assigned.

So I would submit to you that's a factual
reason. There are a lot of other people that were there
at this event at the clinic that are not charged here in
a criminal conspiracy. The fact that Dennis Green came
to the event doesn't mean he was part of the conspiracy
prior to being there.

And as we've talked a little bit about and
I'll reiterate, the fact that he knew the people were
going to show up or he associated with those people is
insufficient to say that he was a part of the conspiracy

1    and he agreed to be in it.

2              So as I said, that's a factual reason why

3    the government hasn't met their burden as to Count One as

4    to Mr. Green.  I have two legal reasons.  One has been

5    discussed at length, the other less so.  So I'll be as

6    quick as I can.  Again, as Mr. Parris said and various

7    other people said, the intent of the group when they

8    formed the agreement is what you have to focus on for

9    Count One.  Not what necessarily happened on March 5 at

10   the clinic.  What did they intend to do.

11             And what Ms. Davis said, again, is really

12   the only window we have into this conspiracy in any

13   detail other than a handful of text messages.  What she

14   said was no one intended to intimidate anyone.  No one

15   intended to threaten them.  No one intended to oppress

16   them.  And because that's the case, the government hasn't

17   proven the element of intent in this agreement that will

18   allow you to rest your verdict on that proof.

19             Another legal aspect has been touched on,

20   but I'll touch on it a little bit more since I was the

21   one who was questioning her.  And I said, you've said

22   three or four times during your testimony that during a

23   rescue, leading up to a rescue, do you know that you're

24   going to be a blockader, that you're going to risk

25   arrest, that you will actually be arrested?

1          And she said, no, you know, we have to seek

2     guidance and pray about whether we're going to go through

3     with it essentially.  And then I asked her, you know, if

4     you had this meeting in the pavilion where everybody had

5     their assigned roles, and according to her, as many as 12

6     to 24 hours before they knew who was going to blockade,

7     they knew who was going to be arrested.

8          Well, then why is Mr. Gallagher going around

9     at the very end, two and a half hours into them being in

10    the clinic, asking who's going to get arrested?  How do

11    you know who entered this agreement, if you have to pray

12    and it's an individual decision, as you've said yourself

13    you did in various other rescues she participated in.

14         She kind of alluded to, well, that was some

15    kind of a subterfuge.  Well, I mean, which one is it?

16    Did you know?  Was this agreement in the pavilion an

17    agreement or was this I think I'm going to risk arrest

18    and I'm going to rely on my own spiritual guidance and

19    pray about it?  If you don't know whether -- if they

20    didn't know who had entered the agreement, then you can't

21    find Mr. Green or anyone else guilty of the conspiracy

22    either.

23         I'll move on to Count Two, the factual basis

24    that I said.  We've watched again Ms. Flowers' video.  We

25    watched Mr. Boyd's video which is essentially two

1    different angles of the same thing.  We saw the

2    interaction with the Ashbys, we saw the interaction with

3    Ms. Flowers herself, of course.  We heard all of their

4    testimony.

5                And we also saw various other videos that

6    show when the Ashbys are encountered by various members

7    in the hallway, when they are told by Ms. Flowers to go

8    back to their car, when Ms. Flowers is trying to return

9    to the office and eventually exits the building and

10   doesn't come back.  Dennis Green wasn't even in the

11   building.  He was on his way up.  He never interacted

12   with Nicholas Ashby.  He never interacted with Melissa

13   Ashby.  He never interacted with Ms. Flowers at all.

14               So factually in order for you to find him

15   guilty of that -- and the jury instructions will make

16   these things more clear -- you have to show he either did

17   the act or he aided and abetted.  And there's been a

18   little discussion, but I'll hit on it again.  How did

19   Dennis Green help or encourage the people in the hallway

20   in this video we watched yet again about ten minutes ago?

21   What did he do to encourage or help them?  How did he aid

22   and abet them in whatever happened with the Ashbys,

23   whatever happened with Ms. Flowers?

24               I submit that the evidence can't show you

25   that he did that because he didn't.  He wasn't there.

Lastly, I'll talk about the legal basis for the second
count. And this has been discussed and is kind of the
crux of that kind of course, the interference. Again, we
have Ms. Davis's opinion. We have what she said in --
that was I wasn't moving no matter what.

However, you have to decide whether that --
well, let me rephrase this. Ms. Davis is the only person
that's saying that. She's the only person that's saying
that I'm going to block, I'm going to actively interfere
with these people's ability to get in the clinic no
matter what. I think he's Corporal Schneider now said
they weren't going to be a deterrent to me. Mr. Ashby
said they weren't going to be a deterrent to me.

Corporal Schneider said, if this young lady
wanted to go in the clinic, I was going to get her in the
clinic. Mr. Ashley said, if Melissa had decided she
wanted to go in the clinic, I was going to make sure she
was going to go in the clinic. It was only Ms. Davis who
said, absolutely we were going to lay in the road, so to
speak.

And then at the end of the day, as other
people have pointed out, it's not actually what they did.
They were arrested. They didn't chain themselves to
anything. So I'll say that as a legal basis as to
Count Two as to why you shouldn't find Mr. Green guilty.

1          I really do appreciate your time.  I

2     appreciate your attention.  And when you go back and you

3     deliberate here in a little while, I think you'll have to

4     find Mr. Green not guilty on both counts for the reasons

5     I'm discussed.

6               THE COURT:  Thank you, Mr. Russ.

7               Mr. Conway.

8          DEFENDANT IDONI CLOSING ARGUMENT

9               MR. CONWAY:  Thank you, Your Honor.  Ladies

10    and gentlemen, last again.  But I'd also like to say I

11    think that I'm also least in the fact that I represent

12    the only female who has, I think, the least amount of

13    evidence against her in this entire case.

14          Now, if you remember in my opening statement

15    what I said about a week ago, you know, what did I miss.

16    I didn't miss the prayer and Ms. Idoni lifting her hands

17    up in reverence, but those clips just weren't shown by

18    the government.  But we all know that there's a mountain

19    of video out there.  There's Mr. Green's video, there's

20    Mr. Gallagher's Facebook livestream, there's Mr. Boyd's

21    video.  There's the body cams on the patrol.  But the

22    government is introducing the clips that are germane to

23    the offenses.

24          So the other two and a half hours of them

25    praying and, you know, talking with police and things,

those aren't germane.  They're just introducing the clips.

My main point in the opening was to talk about how Ms. Idoni, how you're never going to see her, throughout anything that they could have presented, talking to any patients or interacting with any patients or talking with any providers or interacting with any providers or talking with any police or interacting with any police other than just the demographics of giving her name and location.

Now, speaking of those government clips, if you add them all up, it equals about 36 minutes total. So that's roughly six minutes per defendant.  Given the severity of the charges and given the serious nature, I would ask you-all that when you go back to just take the 36 minutes and review them collectively as a group.  Do so amongst yourselves without four hours of narration from a bias and self-interested party, which was Caroline Davis.

Do so remembering the transcripts that you had when you watched them initially.  And if you'll remember the transcripts, you'll remember that Heather Idoni was never mentioned.  The name Heather at all. Idoni, not mentioned.  She does not speak in any single video clip, just as she doesn't -- you don't see her

1    talking to anybody else.

2              This is not what she signed up for on

3    March 5.  You've heard from Ms. Davis that rescue can

4    mean a lot of different things to different people.  And

5    that some people are devout and they're deeply religious

6    and that they pray for these rescues and then they're

7    guided by the Holy Spirit.

8              Ms. Davis did say that at one point in time

9    that she wholeheartedly believed in this and

10   wholeheartedly believed in this prayer towards the Holy

11   Spirit.  Well, then you saw her when she testified this

12   week, and I guess now she just thinks it's kind of funny.

13   She thought the whole entire thing was funny.  She

14   laughed and giggled the entire time that she was up there

15   on the witness stand.  She just enjoyed and relished

16   being the center of attention.

17             Now, the demeanor certainly changed when

18   Ms. Bell started to ask her questions.  Folks, Ms. Davis

19   is going to be as prepared as any witness you will ever

20   run across.  She works full-time for a criminal defense

21   attorney.  She's got a criminal defense attorney in

22   Michigan, she's got one in Nashville.  She's met with the

23   government multiple times.  She's getting help on all

24   sides and all aspects in preparation for her testimony.

25             And the Judge is going to instruct you on

witness credibility.  I'd ask you to notice the difference in all of the other witnesses that testified in relation to how Ms. Davis testified.  Even the police officers that testified -- and they do this on a regular basis, it's part of their job -- they weren't near as comfortable as Ms. Davis was.

It kind of reminded me of the second day of work on my first legal job.  I was working for a friend of my grandpa's down in south Georgia.  It was the second day.  It was the first hearing I'd ever been to, the first time that he had ever asked any questions of any witnesses.

On the way back to Waycross, he told me, he said, son, he goes, you'll only ever run across two witnesses through your entire legal career.  The witness that wants to tell you their story and then there's the witness that wants to sell you a story.  And ask yourselves, what does Ms. Davis have to gain in her testimony?

Well, I think you heard it's a lot.  What is her relationship to the government?  Well, you know with her cooperation agreement, she's basically tied at the hip with the government.  And we get these little summaries of testimony after the end of each day, and in reviewing Ms. Davis's testimony about the planning of

1   these rescues, something stuck out to me.

2          And at first I want to tell you that what
3   the Judge is going to tell you, I think, is that you
4   don't check your common sense and you don't check your
5   life experiences that make us who you are at the door
6   when you're evaluating witness credibility and when
7   you're going over the facts.

8          Ms. Davis said that either she or someone
9   would call these clinics, they'd make a fake appointment
10  and make sure it was a, quote/unquote, kill day.  Back in
11  March 5, 2021, obviously *Roe* had not been overturned at
12  that point in time, but you-all are all Tennesseans and
13  everybody knows, Tennessee had a 48-hour waiting period
14  to get an abortion.

15         MR. BOYNTON:  Objection, Your Honor.  Facts
16  not in evidence.

17         THE COURT:  Sustained.  Facts not in
18  evidence, Mr. Conway.

19         MR. CONWAY:  Judge, may we approach?

20         THE COURT:  No.

21         MR. CONWAY:  It's common sense, I think,
22  that when you think about Ms. Flowers and you think about
23  the safety protocol, I think just a layperson common
24  sense if there's this much safety protocol, they're
25  probably not answering the phone, yeah, we're having a

bunch of abortions today. That's not consistent with
their safety protocol.

So what Ms. Davis testified to as far as the
planning, that certainly makes no sense. And keep in
mind that Ms. Davis and her testimony is the only person
that ties Heather up into the conspiracy. Well, that and
the evidence of those darn Wyndham points that she had or
credits or whatever that she allowed and she paid for all
of the lodging for everybody else.

But you're going to be instructed that just
because she helped some of these people out, just because
she was present in the hallway that doesn't mean that she
agreed with anybody to threaten or intimidate or oppress
anybody at all.

I'd submit to you that Mr. Zastrow's version
of a rescue might be a little bit different than
Ms. Idoni's of a rescue. Exhibit 16, that's the one with
Officer Schneider, a corporal, sergeant -- I kind of get
mixed up a little bit, but obviously Officer Schneider
everybody knows.

And you'll notice the difference, what
Officer Schneider does is he grabs the patient
immediately off the elevator and he walks quickly down
past who I would call Cal's counselors. These are the
counselors that are supposed to be talking to the people

prior to getting to the clinic. And then Mr. Zastrow
makes the independent decision to stand up and to get in
front of Officer Schneider.

Now, you'll see the video recording video
and Heather's nowhere in the video. And I know he
ultimately moves, but nothing shows that Heather signed
up for that, that she wanted to do that, that she agreed
to that.

Ladies and gentlemen, I want to point you to
Exhibit 13. You haven't actually seen the full
Exhibit 13, but it's been admitted. What you've seen is
you've seen the demonstrative PowerPoint that the FBI
showed you as far as what came back on the search
returns. Well, if you want to see the entire message
between Mr. Gallagher and Ms. Idoni and when they're
using the Wyndham hotel and everything, you can see that
and it will be in Exhibit 13.

It's just the demonstrative exhibit was just
cherrypicked from the government, but you're going to
have all of the exhibits when you go back there. I'd ask
that you review all of the exhibits. And you'll see the
conversation about the Wyndham, and I'd argue to you that
the only reason -- you look at all these videos, and the
only reason that Ms. Idoni is sitting at this defense
table is because she arranged and she paid for the

1  lodging at this Wyndham because she had the credits or

2  the points.

3              I want to talk just a little briefly about

4  the verdict form because even though I've been last in

5  everything, Ms. Idoni is -- for some reason, she's

6  sandwiched between Mr. Zastrow and Mr. Gallagher.

7              Well, you don't go in order or anything when

8  you're evaluating the different people.  The defendants

9  stand alone in their evaluation and when you go back and

10 you're deliberating.  I think that you've seen varying

11 levels of evidence against each defendant.  And just

12 realistically, Exhibit 16 of Mr. Zastrow in the hallway,

13 I think that is a significant piece of evidence as far as

14 in relation to Count Two.  But you'll never see that

15 Ms. Idoni encouraged that or that she wanted that to

16 happen.

17             So when you're deliberating and you're

18 evaluating these different levels of evidence, you're

19 going to say, I'm very sure that -- and I won't name the

20 defendants, but I'm very sure of their guilt as far as

21 maybe Count Two.  But when you go to Ms. Idoni, you're

22 going to say, well, I don't know about that, I don't know

23 about her as far as Count Two.

24             And I would submit to you that the Judge is

25 going to tell you, and you've heard it from some other

attorneys, that that hesitation that you have in making

the decision, that's what reasonable doubt is.  Now,

there's all kinds of doubt when you start talking about

the conspiracy, but I was talking about Count Two.

Now, at the beginning of the trial I gave

you a timeline of the case and I said that it was going

to come at you in three chapters, one was going to be

what happened prior to March 5, 2021, one was going to be

what happened in the hallway, and one was going to be

what happened when the federal authorities got involved.

Well, the last chapter, the conclusion is

going to be written by you-all in the deliberation room.

Ms. Idoni, her fate, is being held in you-all's hands and

it's a great responsibility.  It's one of the greatest

responsibilities you have as an American citizen.

And I want you to do something for me

because it's easy to lump all of these people in

together, but don't do what's easy.  At the beginning of

the trial you-all stood up and you raised your right hand

and you swore an oath.  You swore an oath to thoroughly

examine the facts, you swore an oath to hold off on

making any decisions until you've been instructed on the

law by Judge Trauger.

And after the jury instructions that she

gives you and when you go back in the deliberation room,

1  you're going to come to the conclusion that Ms. Idoni

2  never agreed with anybody to oppress or threaten or

3  intimidate anybody that day.  There's just no evidence of

4  any type of agreement, and she didn't obstruct anybody.

5  And once you do that, then you'll come back with a not

6  guilty as far as Mrs. Idoni's case is concerned.  Thank

7  you.

8              THE COURT:  Thank you, Mr. Conway.

9              Government rebuttal?

10          GOVERNMENT REBUTTAL CLOSING ARGUMENT

11              MS. KLOPF:  Yes, Your Honor.

12              The purpose of all of this was to stop

13  patients from accessing the clinic.  That is oppression,

14  that is intimidation.  Think of your understanding of

15  oppression.  Not in the sense of government oppression,

16  that's not what we're talking about here.  But another

17  person preventing a person from exercising their

18  freedoms, their rights.

19              Ask yourself, could the employees and the

20  patients of the clinic have gone about their business

21  that day or were they intentionally prevented from doing

22  so?  That's oppression.

23              Think about a different circumstance for a

24  minute.  Let's take it out of the hallway of carafem.  A

25  person wants to go exercise their right to vote.  The

1  person goes to the polls.  When they get there, the voter

2  sees 30 people in a hallway leading up to the polling

3  place.  These 30 people have gathered there together with

4  the express intention of blocking people from entering

5  the polling place.  They create a wall of people to

6  ensure that the voter cannot get inside, that the poll

7  workers cannot get inside.

8          They sing at the voter, they express

9  opinions against voting.  They're polite.  They don't

10  shout.  They are not violent.  But their intention is

11  still to oppress that voter, to prevent that person from

12  exercising a right secured by the constitution or the

13  laws of the United States.  And those 30 people acting

14  together in concert, they're conspiring to oppress, to

15  intimidate the free exercise or enjoyment of a right and

16  privilege secured by the law, in my example, voting.

17          A person is oppressed when they cannot

18  exercise their rights.  If they are prevented from

19  entering a polling place and exercising their right to

20  vote, if they're prevented from entering a church and

21  exercising their right to religious freedom, if they're

22  prevented from entering a clinic and exercising their

23  right to access -- their right to access to reproductive

24  healthcare, and that's what's happened here.

25          The purpose was to keep that clinic blocked

as long as possible and prevent any patients from accessing the clinic. Yes, the defendants didn't use the explicit words oppress or intimidate while they were making their plan, but you know from their words what they were doing and what they meant to be doing. No one ever had to say the word intimidate. They didn't have to. They were not going to let anyone in. And that's clearly evident when you watch that video of Sergeant Schneider trying to walk the patient down the hallway.

You heard Paul Vaughn saying, don't do this. You hear Chester Gallagher saying, I'm not -- we're not going to let you do this. And you see Schneider ultimately fail. He does not get that patient to the door. That is intimidation, that is oppression. That was the goal of this conspiracy.

And, yes, there is no explicit text message or Facebook post that says, let's go intimidate, let's go oppress, but you can use all of the evidence that's been provided to you to figure out what their intention was. Today if someone walked into this courtroom and they told you it's raining, you could believe them. But say they don't say that. They just walk in and they've got wet boots, you might say, okay, I think it's probably raining. Maybe they're holding a wet umbrella, you'd say, I really think it's raining.

1          In this case you've got wet boots, you've

2   got wet umbrellas, you hear thunder, your phone is

3   buzzing with thunderstorm warnings.  You know it's

4   raining.  You know don't need to be told with direct

5   words, it's raining, because you can look at these

6   defendants' conduct and know exactly what they were

7   trying to do.  They were trying to prevent people from

8   accessing that clinic for as long as possible.  And doing

9   that is oppression.

10         What they also did was intimidation.

11  Mr. Crampton asked you during his closing, objectively

12  consider if their conduct was intimidating.  And I'm

13  going to ask you to apply your reason and common sense.

14  They didn't have to yell.  They didn't have to be

15  violent.  They didn't have to bring weapons.  Doing that

16  would have elicited a massive police response, and they

17  didn't want that.  They wanted this to last as long as

18  possible.

19         And they had enough people there that they

20  didn't need to yell.  The sheer numbers alone, they were

21  successfully intimidating.  And all of the witnesses that

22  came before you testified to something like that.

23  Schneider, he testified that based on my training and

24  experience the average person would not walk down that

25  hall for being intimidated, overwhelmed, possibly in

1    fear.

2              Flowers described her panic.  She described

3    her response to seeing Melissa Mendez in the hallway.

4    Her gut reaction was that she wanted to protect her.

5    Mr. Parris said that Flowers wasn't scared because she

6    was being salty on the recordings.  But a person can both

7    be scared and annoyed.  They can be panicked and rude.

8    Ms. Flowers was intimidated by what was happening in that

9    hallway, and she was intimidated for the patient, for

10   Melissa Ashby.  She was worried about Ms. Ashby's safety.

11             Ms. Davis testified over and over again

12   about the purpose of having all of those people in the

13   hallway.  She said that a purpose of a blowfish is that

14   when mothers are coming to the door, it's even more

15   intimidating for them.  So that when they're walking

16   towards the clinic they see all those people and it's

17   like, whew, I don't even know what's going on here.

18             Later she said that if I were a patient --

19   something along the lines, if she was a patient and she

20   saw that massive group of people, she wouldn't go

21   through, that she would be intimidated.  She believed the

22   goal of having all those people was -- that it was

23   inherently intimidating.

24             She said that the natural consequence of

25   such a huge blockade was that it was intimidating.  She

1   was aware of a high probability that both patients and

2   employees would be intimidated by such a large group of

3   people.  Melissa Ashby, she testified to you that seeing

4   all of those people made her nervous; that Boyd's conduct

5   made her feel violated.

6           The women in the hallway, the two that came

7   up that I think Mr. Crampton was using the name Rachel to

8   describe, they were looking at her personal phone.  She

9   didn't want them talking to her.  They were looking at

10  the picture on her phone and asking her personal

11  questions, invading her space, making her feel

12  intimidated.  Because why did they want to intimidate

13  her?  They didn't want her going in that clinic.

14          Using intimidation meant that she wasn't

15  going to try to go down that hallway.  Ms. Ashby said

16  there were way too many people for me to get in that door

17  and it was just impossible.  She said she was maxed out

18  on her anxiety scale.  She felt violated and

19  uncomfortable, and she said it was extremely

20  intimidating.

21          Nicko Ashby.  Even him, a man who has been

22  deployed twice, all of those people made him feel

23  anxious, made him uncomfortable.  Made him think about

24  what he might need to do to protect Melissa Ashby.  He

25  was scared that either he was going to have to be

1  physical or that something physical might happen.

2           And you saw the eyes of the woman in

3  Exhibit 16.  Watch that video again and watch her eyes.

4  See how she looks as she's trying to follow Schneider

5  down the hallway saying, whoa, whoa, I'm just here for

6  birth control.  And see if her eyes tell you that she's

7  intimidated.

8           Even Gallagher's own words tell you that he

9  knows what the point is.  He says on one recording, we're

10 here with others, we're sitting blocking the door,

11 standing in this very crowded portion of the hallway

12 facilitating the rescue.  Having all of those people

13 there was part of the plan, part of the conspiracy to

14 intimidate and oppress these patients and the employees.

15          I'd like to talk a little bit more about the

16 fact that these defendants weren't yelling or being

17 violent.  What's charged here is nonviolent.  It doesn't

18 matter that they're not being violent.  During some of

19 the closings they were described as unwelcome, a nuisance

20 and annoying.  That is not -- you've seen these videos.

21 That's not an accurate description of what happened.

22 They are preventing and blocking people from accessing

23 reproductive healthcare.  That is oppressive and

24 intimidating.

25          Again, also, they were not harming anyone,

but something is not peaceful if laws are broken. That's truly not the definition of peace. This lasted two and a half hours while the defendants ignored law enforcement commands to leave, to get out of the way, to move, to let patients inside. Just because a defendant is polite does not mean they didn't break a law. A bank robber can say please and thank you and still rob a bank. Something can be quiet and still be illegal.

So don't let that distract you because, in fact, that was part of the plan because they didn't want a huge police response. They wanted to be able to stall police. If there was violence, if there was a lot of noise, it would have triggered a bigger police response, and they did not want that. They wanted this to last as long as possible.

Ms. Bell argued that this was, in fact, a rally to get more attention, that -- but you've watched all of these videos. You know that that could easily be done outside if that was actually the purpose, if what they wanted was truly attention. They didn't need to shut down the clinic to get that purpose done.

A lot of the different defense counsels also argued that the goal ultimately was not unlawful. But you know that, you've watched the videos. You hear them discussing being arrested. You've seen the Facebook

1 discussions about whether or not someone's willing to be

2 arrested. They were intending to violate the law. They

3 understood they were violating the law, and they did

4 violate the law.

5          Mr. Haymaker and a few other defense counsel

6 said that this conspiracy is about what happened before

7 March 5, and that's not accurate. A conspiracy -- you

8 can look at the whole period of the conspiracy. So it

9 includes what happened on March 5. The common

10 understanding that Mr. Boynton talked about on his

11 closing, that can be reached at any point during the

12 existence of the conspiracy.

13          So what happened that day is very much a

14 part of the agreement. It doesn't just have to be agreed

15 on beforehand. It can be agreed on in the moment.

16          When the Titans football team -- I guess

17 they're not taking the field, so let's say the Chiefs

18 take the field, everybody has a different job to do,

19 right. There's a quarterback, there's a tight end, and

20 during a play only three hands may actually touch the

21 ball.

22          But everyone on the field has a job to help

23 that play succeed. And it's not just what's happening on

24 the field. It's what's happening on the sidelines as

25 well. You've got coordinators, you've got trainers.

Everybody is helping the team to succeed.  And no one's showing up after a play and claiming that they were just passing by because the play went badly or something like that.  They each had a role to play in that game, and each of those defendants had a role to play in this blockade.  They're all accountable for it as part of the conspiracy and they're all accountable for it as aiders and abettors or actual blockaders.

Caroline Davis explained to you during her testimony that everyone mattered.  All these different roles mattered.  And in just days after the conspiracy, she actually posted basically the same thing on Facebook.  Exhibit 18 she said:  As much as people are needed to block the doors, people are needed on the other side of things to help from outside jail and the other parts of rescue.

She was saying in days after, she said it on the stand, everybody mattered in the conspiracy because this -- doing something so big for so long needed all these different players and their help and their agreement.

There's no way that any of these defendants or the other blockaders could have accomplished this blockade by themselves or independently.  It took all of them to create the atmosphere of intimidation.  It took

all of them to oppress these patients and the clinic
employees.  That's why they went to the trouble of
recruiting people, making sure the date worked for
everyone, arranging housing, having meetings beforehand
to talk about what was going to happen.

Again, this agreement is an agreement
generally.  You don't have to be agreeing to personally
block the door.  You have to be agreeing to generally
stop people from accessing their healthcare, to
intimidate them or oppress them from accessing that
right.  So it doesn't matter if someone in the moment
changes their mind and said, no, I'm actually not going
to block the door today or I've changed my mind, I think
I want to be a blowfish.

All of those people acting together, whether
they're sitting in front of the door or standing in the
hallway, as long as they've agreed to do this and that is
the end purpose, they are guilty.  All of those
defendants you have had ample proof that that is what
they were doing on March 5, 2021.

Mr. Haymaker argued that we don't know what
the agreement ultimately was, but we do.  Look at the
text messages that you've seen, the Facebook messages.
Recall Davis describing, for example, Boyd's role leading
up to the blockade.  Mr. Haymaker described it as a loose

agreement between acquaintances to engage in rescue. But
really, you know that's not what this is. You've seen
from the proof, what they intended to happen was stop as
many patients as possible from accessing that clinic.

There's also a lot of argument that the
ultimate aim was interposition or something about, you
know, saving -- I think it was something along the lines
of talking to the patients, things like that. Did any
patient who said I don't want to talk to you or this is
not welcome get inside of that clinic? No. Because
ultimately whether or not a patient wanted to be talked
to didn't matter because the ultimate goal was to close
down that clinic as long as possible.

In Exhibit 16 you can see the woman says,
I'm not here for an abortion, I'm here for birth control,
and that doesn't change anything. There is no different
conversation, nothing goes differently. It's just like
with Melissa Ashby where they've also assumed that she's
there for an abortion. They do not let her in. Caroline
Davis told you no matter what someone said, they were not
going to let any patients in the clinic that day.
Because that was the purpose. That was the purpose of
this conspiracy.

This wasn't an offer of help. This wasn't
just a conversation. And conversations might have been

happening.  In fact, Caroline Davis told you that the
sidewalk counselors were part of the plan.  They shut
down the doors, and the hope was as the women walked out
that they would be encountered by sidewalk counselors and
perhaps a conversation could happen, but that was not the
ultimate purpose or goal of this.  The ultimate purpose
and goal was to shut down the clinic.

The ultimate goal was, yes, getting between
the woman and the clinic and stopping the patient.  And
Gallagher himself said it over and over again.  When
you -- if you need to, you can go back and you can watch
all of the exhibits that you've watched.  Gallagher says,
we have two doors to block.  He says, we're sitting
blocking the door.  He's telling you what they're doing.
They're blocking the doors.  They're not going to let
anybody in.

Now, talking about the actual act of
blocking, there was a little bit of argument about that
there was not actually an obstruction of the doors.
You've seen the videos.  You've seen the exhibits.  I'd
like to put up Exhibit 4A.  That's Exhibit 4A.  Just a
brief moment in time from the two and a half hours that
the defendants were there.  That's a wall of humans.

Nicko Ashby said he would have to be a
wrecking ball to get through that.  That is not what is

required of people in order to access healthcare. They
don't need to physically push through other people so
that they can get to the doors of a clinic. The doors
were blocked. You can -- when you're back deliberating
you can comfortably feel there's multiple images
throughout the recordings of the doors being blocked.

And in terms of interference, you don't have
to be mean to accomplish this. It's fine to be polite.
It's simply interference by physical obstruction. Watch
the videos. Are they interfering with Patient A and the
clinic workers? Yes, they are.

You saw footage of Vaughn in the semi-circle
blocking people. You saw Gallagher blocking the door and
talking about having two doors to block. You saw Zastrow
blocking the employee entrance when Sarah Flowers tried
to get back in. You saw Idoni standing next to the main
entrance for almost the whole blockade. You saw Green on
his own recording move into place when Officer Schneider
tries to escort that woman down the hallway.

And if they weren't directly blocking, were
they helping to commit the crime or encouraging someone
else to block the doors, either before or during the
blockade? And did they intend to help commit and
encourage the blockade? Absolutely. Each of these
defendants did, including Boyd; therefore, each is guilty

1   of Count Two.

2              Okay.  Just want to talk briefly about

3   Caroline Davis.  The United States didn't pick her as a

4   witness.  These defendants did because they decided to

5   conspire with her to participate in this blockade.  They

6   asked her to join.  They persuaded her to come.  They

7   supported her in her decision to block the door, and they

8   helped her by filling the hallway, by delaying the police

9   response, making it last.

10             She sought out cooperation with the Middle

11  District of Tennessee after getting her offer here, after

12  getting separation from these defendants, and having

13  other people counsel her on what the best things were for

14  her.

15             There was some argument that perhaps she

16  made up the word blowfish, but listen to the recordings.

17  Mr. Gallagher himself is describing the role of all the

18  people in the hallway.  He says, we've got a crowded

19  hallway and it's helping.

20             And she told you that the other

21  co-conspirators weren't going to move.  How do you know

22  that they weren't going to move?  Because they didn't

23  move at any point.  They didn't let any patient in.

24             So as you go through -- I'm just going to

25  briefly walk through a couple points on the specific

defendants.  Listen for things where the defendants are
admitting what they did.  Gallagher, you'll hear him say,
today is not a protest, we expect to be arrested soon.
We have two doors to block.  There's actually a clip
where he's basically describing the FACE Act and saying
that someone has blocked access to a clinic.  He knows
exactly what he's doing and he's blocking the doors.  And
he's agreeing with all of those people around him to make
sure that no patients can access that clinic.

Defendant Green brings his kids.  He admits
on Facebook, we sat in front of the doors.  He moved into
place when Schneider and the patient came down the
hallway creating a second line of defense in front of
Caroline Davis.

Mr. Russ argued that you didn't see evidence
of Green committing the crimes.  And I would argue his
own videotapes are all evidence of him committing the
crime.  You see him move into position to get onto the
ground, to stop that patient from coming down the hallway
with Corporal Schneider.

You've seen the Facebook communications
where people are trying to ensure that the Greens are
coming.  You see his Facebook post afterward talking
about what he did.  Look at his very first clip.  It's
2A.  He's talking about missing a signal.  Him and

Caroline Davis, Davis said, I sent the signal. He said,
I didn't see it, but I was watching the live feed. So he
knows what's going on. That's part -- that's the
conspiracy. That's the agreement. That's the proof of
the agreement.

And what was his intent? Look at 2M. He
says, we have had -- we have had at least two -- three or
four girls who have come here to have their babies killed
and they have left the property and went downstairs.
That is exactly his purpose, he is part of the
conspiracy, and he is trying to oppress and intimidate
patients from accessing that clinic.

Mr. Russ argued that Green didn't block the
Ashbys specifically so that that means that he is not
guilty of Count No. Two. He certainly aided and abetted
it. He encouraged it. He blocked the employees from
getting to the clinic, and he blocked another patient.
So that's not correct. He is guilty of Count Two.

In terms of Idoni, Ms. Idoni, yeah, she does
not talk during the clips, but she talks in Facebook.
And you've seen all of those communications where she's
actively working to get as many people as possible.
She's out there, she's getting Green, she's getting Cal
Zastrow. She setting up housing, she's making all of
this come together.

1          Nothing in the statute requires talking.

2    It's about physical obstruction, which Idoni did.  And

3    you know from these Facebook communications that she knew

4    exactly what she was agreeing to because she wanted to

5    make sure that these people that were being invited that

6    she didn't know were willing to be arrested.  And

7    Gallagher agreed and said he would prequalify anyone.

8          Arrested.  She was intending to violate the

9    law.  She knew exactly what she was doing, exactly what

10   she was agreeing to.

11         In terms of Mr. Vaughn, you've seen the

12   clips where Gallagher describes what they're doing, that

13   they're stalling the police, it's a delay tactic and you

14   see him nodding his head.  That's being livestreamed.

15   Gallagher is actually communicating with his followers.

16   Watch that clip if you need to.

17         Gallagher is communicating with the people

18   who are watching in realtime and implicates Vaughn in a

19   crime, and Vaughn nods his head.  He doesn't say, whoa,

20   whoa, whoa, that's not what's happening.  I'm acting on

21   behalf of the police.  He nods.

22         And watch the other recordings.  There's not

23   a moment where you see Vaughn tell anyone to leave,

24   contradict Gallagher or make any effort to hurry along

25   the blockade.  Mr. Crampton said there's no evidence of

Vaughn's intent, and that is just not true.  Exhibit 5,
right after the blockade is finally broken up, Vaughn did
an interview with the police -- I'm sorry, with the news.
And he said exactly what he and his co-conspirators did.
He said, we came into the building.  We sat down at the
doors.  That's how you know what's going on in his head.

And he was not helping the police.  Before
the police even got there, he blocked Melissa Ashby from
entering the clinic.  When Schneider walks down the
hallway with that patient, Vaughn says in Exhibit 16,
don't do this.

It doesn't matter that the police themselves
might have needed more time.  The police responded the
way they did because of how these defendants acted, but
also because of what Vaughn and Gallagher did not
communicate to them.  When Travis Watkins, that
negotiator, was testifying, you knew something that he
didn't.  You knew that these defendants had been talking
about negotiations being a stall tactic.

Did you see his body language on the stand
when he learned that information, when he learned that
they were describing the negotiations as a stall tactic?
He was visibly uncomfortable, and it was absolutely news
to him.  He didn't know about the blowfish strategy.  He
didn't know about the handbill that was printed

beforehand, before negotiations had even begun, that said that people were arrested. So he was not helping the police. He was acting as an aider and abettor and a co-conspirator in their efforts to keep this clinic shut down. And his efforts were very successful. This went on for two and a half hours.

Briefly, Mr. Boyd. Mr. Haymaker asked, how did he help or encourage an obstruction? He brought his kids who actually obstructed. He instructed his children to interfere with Mrs. Ashby. He was the first point of contact for patients. They come out of the elevator, they see him. He finds out why they're there. He communicated to both the blockaders, being his children, and the people outside. You hear him on a phone call calling downstairs to describe Nicko Ashby to someone outside.

He himself intimidated Mrs. Ashby. She told you that on the stand. And he livestreamed. And that was the livestream that Dennis Green was watching when he knew that the blockade had started and patients had started appearing. So he did help Mr. Green knowing that things were getting going and it was time to go upstairs.

And listen to some of his recordings. Those are the ones in the one series, 1A, C, D and E. You know he knows exactly what's happening. One, he says we don't

1   have any moms that we know have tried to come in yet.  He

2   knows that what they're doing is intimidating.  He says

3   the workers in the other -- other clinics, not even the

4   carefem clinic, the other clinics, are a bit stirred up

5   at this point.  Did he leave when the police told him to?

6   Yes.  But it was only after 20 officers came on the

7   scene.

8          The question isn't how long he was there,

9   but why he was there.  He was there to aid and abet this

10  blockade and because he was conspiring with others.  It's

11  absolutely true that he didn't block a door and that he

12  left when the police arrived in force, but this isn't a

13  trespassing case.  It's a FACE act violation and it's a

14  conspiracy.

15         So those are the questions that you need to

16  ask yourselves, whether he took steps to help the goal of

17  the agreement, coming up with the idea for the wheelchair

18  for Eva Edl, coming up with the idea for people wearing

19  masks, livestreaming, promoting, spotting at the

20  elevator, coordinating the blockade, helping beforehand

21  for the blockade, he is guilty of both counts.  His

22  motivation was not to persuade, but ultimately to

23  obstruct.

24         Calvin Zastrow, watch the videos.  He

25  actually sits in front of a door.  He's clearly

conspiring with others, and he admits himself, today is
not a protest. Mr. Crampton tried to argue that this was
a protest, but Mr. Vaughn's own co-conspirator statements
make it very clear that this was not a protest, it was
not a demonstration.

At the beginning of this trial during voir
dire when explaining your role as a juror, Mr. Parris
said that if you don't follow the rules, it all falls
apart, and he's absolutely right. And it applies to this
situation.

Imagine a four-way stoplight. A person
might not want to stop when the light turns red, but they
have to because that is the law. And if we don't and we
start ignoring laws, we all crash.

A number of lawyers have talked to you today
about reasonable doubt. A reasonable doubt is a doubt
based on reason and common sense. You have to apply your
reason and common sense. It's actually a fairly simple
idea. Apply your reason and common sense to what you've
seen and heard over the last few days.

I'm confident that when you do that, when
you apply your reason and common sense to the evidence
you've heard and the law that the Judge instructs you on,
that you will find the defendants guilty on all counts.
Thank you.

1          THE COURT:  Thank you, Ms. Klopf.

2          All right.  We're going to pass out the

3  instructions at this point.  I'm going to give you the

4  instructions.  I'll tell the spectators that no one is

5  allowed to come or go during the reading of the

6  instructions.  So if you don't think you can hang in

7  there for another, I don't know, 45 minutes, perhaps, you

8  better leave because you will not be allowed to leave

9  during instructions.

10                      JURY CHARGE

11          THE COURT:  Members of the jury, these will

12  be your individual copies of the instructions.  You may

13  circle, highlight, star, whatever you want to do with

14  them.  And you'll be able to take them back with you to

15  the jury room along with your notes when it's time to

16  deliberate.

17          Why don't we all take a, what is it,

18  seventh-inning stretch?  Whatever the stretch is.  If you

19  want to stand up and just kind of wake up your body a

20  little bit before we get into a very important part of

21  the trial, the instructions.

22          So please follow along with me and don't

23  read ahead.  Members of the jury, now it is time for me

24  to instruct you about the law that you must follow in

25  deciding this case.  I will start by explaining your

duties and the general rules that apply in every criminal
case.  Then I will explain the elements or parts of the
crimes that the defendants are accused of committing.
Then I will explain some rules that you must use in
evaluating particular testimony and evidence.  And last I
will explain the rules that you must follow during your
deliberations in the jury room and the possible verdicts
that you may return.  Please listen very carefully to
everything I say.

You have two main duties as jurors.  The
first one is to decide what the facts are from the
evidence that you saw and heard here in court.  Deciding
what the facts are is your job, not mine.  And nothing
that I have said or done during this trial was meant to
influence your decision about the facts in any way.

Your second duty is to take the law that I
give you, apply it to the facts, and decide if the
government has proved the defendant -- any of the
defendants guilty beyond a reasonable doubt.  It is my
job to instruct you about the law, and you are bound by
the oath that you took at the beginning of the trial to
follow the instructions I give you, even if you
personally disagree with them.  This includes the
instructions I gave you before and during the trial and
these instructions.  All the instructions are important,

1   and you should consider them together as a whole.

2           The lawyers have talked about the law during

3   their arguments, but if what they said is different from

4   what I say, you must follow what I say.  What I say about

5   the law controls.

6           Perform these duties fairly.  Do not let any

7   bias, sympathy or prejudice that you may feel toward one

8   side or the other influence your decision in any way.

9           As you know, the defendants have pleaded not

10  guilty to the crimes charged in the indictment.  The

11  indictment is not any evidence at all of guilt.  It is

12  just the formal way that the government tells the

13  defendant what crimes he or she is accused of committing.

14  It does not even raise any suspicion of guilt.

15          Instead, a defendant starts the trial with a

16  clean slate, with no evidence at all against him, and the

17  law presumes that he is innocent.  This presumption of

18  innocence stays with him unless the government presents

19  evidence here in court that overcomes the presumption and

20  convinces you beyond a reasonable doubt that he is

21  guilty.

22          This means that a defendant has no

23  obligation to present any evidence at all or to prove to

24  you in any way that he is innocent.  It is up to the

25  government to prove that he is guilty, and this burden

1    stays on the government from start to finish.  You must

2    find each defendant not guilty unless the government

3    convinces you beyond a reasonable doubt that he is

4    guilty.

5              The government must prove every element of

6    the crimes charged beyond a reasonable doubt.  Proof

7    beyond a reasonable doubt does not mean proof beyond all

8    possible doubt.  Possible doubts or doubts based purely

9    on speculation are not reasonable doubts.  A reasonable

10   doubt is a doubt based on reason and common sense.  It

11   may arise from the evidence, the lack of evidence or the

12   nature of the evidence.

13             Proof beyond a reasonable doubt means proof

14   which is so convincing that you would not hesitate to

15   rely and act on it in making the most important decisions

16   in your own lives.  If you are convinced that the

17   government has proved a defendant guilty beyond a

18   reasonable doubt, say so by returning a guilty verdict.

19   If you are not convinced, say so by returning a not

20   guilty verdict.

21             You must make your decision based only on

22   the evidence that you saw and heard here in court.  Do

23   not let rumors, suspicions or anything else you may have

24   seen or heard outside of court influence your decision in

25   any way.

1          The evidence in this case includes only what
2    the witnesses said while they were testifying under oath,
3    the exhibits that I allowed into evidence, the
4    stipulations that the lawyers agreed to and any facts
5    that I may have judicially noticed.  Nothing else is
6    evidence.  The lawyers' statements and arguments are not
7    evidence.  Their questions and objections are not
8    evidence.  My legal rulings are not evidence.  And my
9    comments and questions are not evidence.
10          During the trial I did not let you hear the
11    answers to some of the questions that the lawyers asked.
12    I may also have ruled that you could not see some of the
13    exhibits that the lawyers wanted you to see.  And I may
14    have ordered you to disregard things that you saw or
15    heard or struck things from the record.  You must
16    completely ignore all of these things.  Do not even think
17    about them.
18          Do not speculate about what a witness might
19    have said or what an exhibit might have shown.  These
20    things are not evidence, and you are bound by your oath
21    not to let them influence your decision in any way.  Make
22    your decision based only on the evidence as I have
23    defined it here and nothing else.
24          You are to consider only the evidence in the
25    case, but you should use your common sense in weighing

the evidence.  Consider the evidence in light of your
everyday experience with people and events and give it
whatever weight you believe it deserves.  If your
experience tells you that certain evidence reasonably
leads to a conclusion, you are free to reach that
conclusion.  In our lives we often look at one fact and
conclude from it that another fact exists.  In law we
call this an inference.

A jury is allowed to make reasonable
inferences unless otherwise instructed.  Any inferences
you make must be reasonable and must be based on the
evidence in the case.  The existence of an inference does
not change or shift the burden of proof from the
government to the defendant.

Now, some of you have heard the terms direct
evidence and circumstantial evidence.  Direct evidence is
simply evidence like the testimony of an eyewitness,
which, if you believe it, directly proves a fact.  If a
witness testified that he saw it raining outside and you
believed him, that would be direct evidence that it was
raining.

Circumstantial evidence is simply a chain of
circumstances that indirectly proves a fact.  If someone
walked into the courtroom wearing a raincoat covered with
drops of water and carrying a wet umbrella, that would be

circumstantial evidence from which you could conclude
that it was raining.

It is your job to decide how much weight to
give the direct and circumstantial evidence.  The law
makes no distinction between the weight that you should
give to either one nor does it say that one is any better
evidence than the other.  You should consider all of the
evidence, both direct and circumstantial evidence, and
give it whatever weight you believe it deserves.

Another part of your job as jurors is to
decide how credible or believable each witness was.  It
is up to you to decide if a witness's testimony was
believable and how much weight you think it deserves.
You are free to believe everything that a witness said or
only part of it or none of it at all.  But you should act
reasonably and carefully in making these decisions.

Let me suggest some things for you to
consider in evaluating each witness's testimony.  Ask
yourself if the witness was able to clearly see or hear
the events.  Sometimes even an honest witness may not
have been able to see or hear what was happening and may
make a mistake.

Ask yourself how good the witness's memory
seemed to be.  Did the witness seem able to accurately
remember what happened?

1          Ask yourself if there was anything else that

2    may have interfered with the witness's ability to

3    perceive or remember the events.

4          Ask yourself how the witness acted while

5    testifying.  Did the witness appear honest or did the

6    witness appear to be lying?

7          Ask yourself if the witness had any

8    relationship to the government or a defendant or anything

9    to gain or lose from the case that might influence the

10   witness's testimony.

11         Ask yourself if the witness had any bias or

12   prejudice or reason for testifying that might cause the

13   witness to lie or to slant the testimony in favor of one

14   side or the other.

15         Ask yourself if the witness testified

16   inconsistently while on the stand or if the witness said

17   or did something or failed to say or do something at any

18   other time that is inconsistent with what the witness

19   said while testifying.

20         If you believe that the witness was

21   inconsistent, ask yourself if this makes the witness's

22   testimony less believable.  Sometimes it may, other times

23   it may not.  Consider whether the inconsistency was about

24   something important or about some unimportant detail.

25         Ask yourself if it seemed like an innocent

1   mistake or it seemed deliberate.  And ask yourself how
2   believable the witness's testimony was in light of all
3   the other evidence.  Was the witness's testimony
4   supported or contradicted by other evidence that you
5   found believable?  If you believe that a witness's
6   testimony was contradicted by other evidence, remember,
7   again, people sometimes forget things and that even two
8   honest people who witness the same event may not describe
9   it exactly the same way.

10          These are only some of the things that you
11  may consider in deciding how believable each witness was.
12  You may also consider other things that you think sheds
13  light on the witness's believability.  Use your common
14  sense and your everyday experience in dealing with other
15  people, and then decide what testimony you believe and
16  how much weight you think it deserves.

17          One more point about the witnesses.
18  Sometimes jurors wonder if the number of witnesses who
19  testified makes any difference.  Do not make any
20  decisions based only on the number of witnesses who
21  testified.  What is more important is how believable the
22  witnesses were and how much weight you think their
23  testimony deserved.  Concentrate on that, not the
24  numbers.

25          There's one more general subject I want to

talk to you about before I begin explaining the elements
of the crimes charged.  The lawyers for both sides
objected to some of the things that were said or done
during the trial.  Do not hold that against either side.
The lawyers have a duty to object whenever they think
that something is not permitted by the Rules of Evidence.
Those rules are designed to make sure that both sides
receive a fair trial.

And do not interpret my rulings on their
objections as any indication of how I think the case
should be decided.  My rulings were based on the Rules of
Evidence, not on how I feel about the case.  Remember
that your decision must be based only on the evidence
that you saw and heard here in court.

Next I want to say a word about the dates
mentioned in the indictment.  The indictment charges that
the crimes happened on or about certain dates.  The
government does not have to prove that the crimes
happened on that exact date.  But the government must
prove that the crimes happened reasonably close to those
dates.

Although the indictment charges that the
statutes were violated by acts that are connected by the
word "and," it is sufficient if the evidence establishes
a violation of the statute by any one of the acts charged

1    beyond a reasonable doubt.

2              That concludes the part of my instructions

3    explaining your duties and the general rules that apply

4    in every criminal case.  In a moment I will explain the

5    elements of the crimes each defendant is accused of

6    committing, but before I do that, I want to emphasize

7    that the defendants have all been charged with two

8    crimes.  The number of charges is no evidence of guilt,

9    and this should not influence your decision in any way.

10             And in our system of justice, guilt or

11   innocence is personal and individual.  It is your duty to

12   separately consider the evidence against each defendant

13   on each charge and to return a separate verdict for each

14   one of them.  For each one you must decide whether the

15   government has presented proof beyond a reasonable doubt

16   that a particular defendant is guilt of a particular

17   charge.

18             Your decision on any one defendant or

19   charge, whether it is guilty or not guilty, should not

20   influence your decision on any of the other defendants or

21   charges.  In the interest of simplicity and brevity, I am

22   using throughout these instructions the pronoun he to

23   refer to the defendants, but as you know, a woman is also

24   a defendant in this case.

25             Now, I want to read to you the indictment

1  wording for Count One, the conspiracy charge.  The

2  indictment reads:  From on or about February 10, 2021, to

3  on or about March 5, 2021, in the Middle District of

4  Tennessee and elsewhere, defendants Chester Gallagher,

5  Heather Idoni, Calvin Zastrow, Coleman Boyd, Caroline

6  dives, Paul Vaughn and Dennis Green --

7  MR. PARRIS:  Judge, I think you need to tell

8  them they don't have that.  They're looking for that.

9  THE COURT:  You don't have that.  Just

10  listen, sorry.

11  ...Dennis Green did willfully combine,

12  conspire and agree with one another and with other

13  persons known and unknown to the grand jury to injure,

14  oppress, threaten and intimidate patients and employees

15  of the clinic in the free exercise and enjoyment of the

16  rights and privileges secured to them by the laws of the

17  United States, namely, the right to obtain and seek to

18  obtain and to provide and seek to provide reproductive

19  health services as provided by Title 18 United States

20  Code Section 248(c) in violation of Title 18

21  United States Code Section 241.

22  That's the wording of Count One.

23  The wording of Count Two is:  On or about

24  March 5, 2021, in the Middle District of Tennessee and

25  elsewhere, the defendants, Chester Gallagher, Heather

1  Idoni, Calvin Zastrow, Coleman Boyd, Caroline Davis, Paul

2  Vaughn and Dennis Green, aiding and abetting one another,

3  did by force, threat of force and physical obstruction

4  intentionally injure, intimidate and interfere with and

5  attempt to injure, intimidate and interfere with

6  Patient A, that's Mrs. Ashby, Employee A, that is

7  Ms. Flowers, and the other employees of the clinic

8  because Ms. Ashby was obtaining and the clinic was

9  providing reproductive health services, all in violation

10 of Title 18 United States Code Section 248(a)(1) and

11 (a)(2) -- and (2).

12 Now, nature of the offense charged in

13 Count One.  We're back to page 15.  Count One of the

14 indictment charges each of the defendants with having

15 committed a criminal conspiracy against rights between

16 February 10 and March 5, 2021.  For you to find a

17 defendant guilty of this crime, you must be convinced

18 that the government has proved each and every one of the

19 following elements beyond a reasonable doubt:

20 First, that the defendant joined an

21 agreement with one or more persons either at the time the

22 agreement was reached or at some later time while the

23 agreement was still in effect;

24 Second, that the aim of the agreement was to

25 oppress, threaten or intimidate a person in the free

exercise or enjoyment of any right or privilege secured to that person by the laws of the United States;

Third, that at the time the defendant joined in the agreement or understanding, the defendant intended to oppress, threaten or intimidate a person in the free exercise or enjoyment of any right or privilege secured to that person by the laws of the United States.

You must consider each defendant separately in this regard. It is, however, not up to you to determine whether or not any particular right is one that has been secured by the laws of the United States. That is a purely legal question. You should consider these allegations with the understanding that as a matter of law, the right to obtain or provide reproductive health services without interference through physical obstruction is a right secured by the laws of the United States. I will define interference and physical obstruction later in these instructions.

In Count One the government is not required to prove that conspirators were successful in accomplishing the objective of the conspiracy. Keep in mind that Count One of the indictment charges a conspiracy and not that any offense, including the offense described in Count Two, was ultimately committed.

If you are convinced that the government has

proved all of these elements beyond a reasonable doubt as to a defendant, you must return a guilty verdict on this charge against that defendant. If you have a reasonable doubt about any one of these elements, then you must find that defendant not guilty on this charge.

I will now explain each of these elements in more detail. Existence of and membership in a conspiracy, Count One. The first element of Count One requires the government to prove beyond a reasonable doubt that two or more persons came to an agreement or mutual understanding and that the defendant voluntarily joined the agreement or mutual understanding and had a general understanding of its unlawful purpose, even if a defendant played only a minor part in the plan.

A defendant may be a conspirator without knowing all of the details of the unlawful plan or the names and identities of all the other alleged conspirators. A defendant need not know that the object of the conspiracy violated any particular law.

But proof that a defendant simply knew about a conspiracy or was present at times or associated with members of the group is not enough, even if he approved of what was happening or did not object to it.

Similarly, just because a defendant may have done something that happened to help a conspiracy does

not necessarily make him a conspirator.  A defendant's
participation in a conspiracy can be proved by direct or
circumstantial evidence.  A common purpose and plan may
be inferred from the totality of the circumstances,
including the defendant's statements, actions and
reactions to those circumstances.  You may but are not
required to draw the inference that a defendant intended
all of the consequences that a person standing in like
circumstances and possessing like knowledge should
reasonably have expected to result from any intentional
act or conscious omission.

The second element of Count One requires the
government to prove beyond a reasonable doubt that the
agreement the defendant joined had as its objective or
purpose to oppress, threaten or intimidate a person in
the free exercise or enjoyment of any right or privilege
secured to that person by the laws of the United States.

If you find that the defendant entered an
agreement solely for the purpose of some other lawful
activity, the agreement is not a criminal conspiracy,
even if such lawful agreement produced some incidental
effect on the rights of otherwise.  The government does
not have to prove that all of the defendants named in the
indictment devised the plan.

The government need only show that the

1 defendant you are considering agreed on the essential

2 nature of the plan and not that the defendant came up

3 with the plan or that he agreed on the details of the

4 criminal scheme.  The government also does not have to

5 prove that there was a formal agreement or plan in which

6 everyone involved sat down and worked out together the

7 details.  It is enough that the government prove beyond a

8 reasonable doubt that there was a common understanding

9 among those who were involved to commit the crime charged

10 in the indictment.

11          A defendant's knowledge can be proved

12 indirectly by facts and circumstances that lead to a

13 conclusion that he knew the conspiracy's main purpose.

14 But it is up to the government to convince you that such

15 facts and circumstances existed in this particular case.

16          The third element of Count One requires the

17 government to prove that the defendant acted willfully

18 and that the defendant's intent in joining the conspiracy

19 was to oppress, threaten or intimidate a person in the

20 free exercise or enjoyment of any right or privilege

21 secured to that person by the laws of the United States.

22          You are instructed that the right to obtain

23 or provide reproductive health services without

24 interference through physical obstruction is a right

25 secured by the laws of the United States.  I will later

define for you the term reproductive health services.

The word willfully means that the act was committed purposely with a specific intent to do something the law forbids. However, it is not necessary for you to find that the defendant in question or any other conspirator was thinking in legal terms or that they knew that their action was criminal. You must consider each defendant separately in this regard.

Some of the people who may have been involved in the events described in Count One of the indictment are not on trial here. This does not matter. There's no requirement that all members of a conspiracy be charged and prosecuted in one proceeding.

Now, Count Two. Count Two of the indictment charges the defendants with violating Title 18 United States Code Section 248(a)(1), the Freedom of Access to Clinic Entrances, in other words, FACE Act, and for violating the FACE Act either personally or as an aider and abettor under Title 18 USC Section 2.

In order for you to find a defendant guilty of this charge, the government must prove each of the following three elements beyond a reasonable doubt:

First, that the defendant engaged in physical obstruction;

Second, that the defendant, by his physical

1    obstruction, intentionally interfered with Melissa Ashby

2    or the employees of the clinic, or the defendant

3    attempted to do so;

4           And third, that the defendant acted as he

5    did because Melissa Ashby was obtaining or the clinic was

6    providing reproductive health services.

7           If you are convinced that the government has

8    proved each of these elements beyond a reasonable doubt

9    as to any defendant, say so by returning a guilty verdict

10   on this charge as to that defendant.  If you have a

11   reasonable doubt about any one of these elements, then

12   you must find that defendant not guilty of this charge.

13   I will now explain each of these elements in more detail.

14          The first element of the FACE Act violation

15   charged in Count Two requires the government to prove

16   beyond a reasonable doubt that the defendant engaged in

17   physical obstruction.  The term physical obstruction is

18   defined as rendering impassable an entrance to or exit

19   from a facility that provides reproductive health

20   services or rendering passage to or from such a facility

21   unreasonably difficult or hazardous.

22          Merely making the approach to health

23   facilities unpleasant or emotionally difficult without

24   rendering an entrance or exit impassable or rendering

25   passage to or from the facility unreasonably difficult or

1    hazardous does not constitute physical obstruction.

2              The second element of the FACE Act violation

3    charged in Count Two requires the government to prove

4    either that the defendant by his physical obstruction

5    intentionally interfered with Melissa Ashby or the

6    employees of the clinic or that the defendant attempted

7    to do so.

8              It is often difficult to establish intent

9    with direct evidence because there is no way for one

10   person to know what another person is actually thinking;

11   however, as with any other question that has been

12   submitted to you, you may also consider circumstantial

13   evidence and inferences based on that evidence.

14             You may, for example, infer the defendant's

15   intent from the surrounding circumstances.  This includes

16   any statement made or acts done or omitted by a defendant

17   and all other facts and circumstances received in

18   evidence that indicate the defendant's intent or

19   knowledge.  You may but are not required to infer that

20   the defendant intended the natural and probable

21   consequences of acts knowingly done.  It is entirely up

22   to you to decide what facts to find from the evidence

23   received during this trial and what inferences to draw

24   from that evidence.

25             The term "interfere with" means to restrict

1    a person's freedom of movement.  To find that the

2    defendant attempted to interfere with Melissa Ashby or

3    clinic employees by physical obstruction, the government

4    must prove that the defendant actually intended to

5    interfere with Melissa Ashby or clinic employees by

6    physical obstruction and that the defendant intentionally

7    performed an act that constituted a substantial step

8    towards interfering with Melissa Ashby or clinic

9    employees by physical obstruction.  Mere preparation is

10    insufficient.

11          If you find that the defendant acted

12    voluntarily and purposely to interfere with Melissa

13    Ashley or clinic employees by physical obstruction or

14    that the defendant attempted to do so, rather than acting

15    inadvertently or by mistake, then you may find this

16    element of the offense proved.

17          The third element of the 248(a)(1) offense

18    charged in Count Two requires the government to prove

19    that the defendant acted as he did because Melissa Ashby

20    was obtaining or the clinic employees were providing

21    reproductive health services.

22          "Reproductive health services" means

23    reproductive health services provided in a hospital,

24    clinic, physician's office or other facility and includes

25    medical, surgical, counseling or referral services

relating to the human reproductive system, including
services relating to pregnancy or the termination of a
pregnancy.  A provider of reproductive health services
includes any staff member who is an integral part of a
business where reproductive health services are provided.

If you find that the clinic employees were
working as staff members of a facility providing
reproductive health services, then you may find that they
provide reproductive healthcare.  If determining whether
the government has proved that a defendant acted as he
did because Melissa Ashby was obtaining or the clinic
employees were providing reproductive health services,
you may consider statements made or language used by a
defendant, the circumstances surrounding the alleged
offense and all other evidence that may shed light on the
defendant's motives.

So long as Melissa Ashby's status as a
reproductive health services patient or the clinic
employee's role as reproductive health services providers
was a but for cause of the defendant's conduct, that is
enough to satisfy the third element.  A but for cause
does not mean the sole cause or even the primary cause.

You must find that the defendant would not
have acted as he did had Melissa Ashby not been obtaining
reproductive healthcare or had the clinic not been

1  providing it.  Therefore, you may find that the third

2  element has been met even if you find that the defendant

3  also had other additional reasons for doing what he did.

4             Let me ask you to correct one typo.  That

5  bottom paragraph, the first line, so long as Melissa

6  Ashby, that should be a possessive.  Melissa Ashby's,

7  apostrophe S, status.  That's a typo.

8             Now, aiding and abetting.  For you to find

9  any defendant guilty of violating the FACE Act, it is not

10 necessary for you to find that he personally committed

11 the crime.  You may also find him guilty if he

12 intentionally helped or encouraged someone else to commit

13 the crime.  A person who does this is called an aider and

14 abettor.

15             For you to find a defendant guilty of

16 violating the FACE Act as an aider and abettor, you must

17 be convinced that the government has proved each and

18 every one of the following elements beyond a reasonable

19 doubt:

20             First, that the crime of violating the FACE

21 Act was committed;

22             Second, that the defendant helped to commit

23 the crime or encouraged someone else to commit the crime

24 either before or during the commission of the crime;

25             And third, that the defendant intended to

1   help commit or encourage the crime.

2            Proof that the defendant may have known
3   about the crime, even if he was there when it was
4   committed, is not enough for you to find him guilty.  You
5   can consider this in deciding whether the government has
6   proved that he was an aider and abettor.  Without more,
7   it is not enough.  What the government must prove is that
8   the defendant did something to help the crime with the
9   intent that the crime be committed.

10           That concludes the part of my instructions
11  explaining the elements of the crimes charged.  Next I
12  will explain some rules that you must use in considering
13  some of the testimony and evidence.  It is -- a defendant
14  has an absolute right not to testify or present evidence.

15           The fact that a defendant did not testify or
16  present any evidence cannot be considered by you in any
17  way.  Do not even discuss it in your deliberations.
18  Remember, it is up to the government to prove each
19  defendant guilty beyond a reasonable doubt.  It is not up
20  to the defendant to prove that he or she is innocent.

21           You have heard the testimony of Caroline
22  Davis.  You have also heard that she was involved in the
23  same crime that the defendants are charged with
24  committing.  You should consider Caroline Davis's
25  testimony with more caution than the testimony of other

witnesses.  Do not convict a defendant based on the unsupported testimony of such a witness, standing alone, unless you believe her testimony beyond a reasonable doubt.  The fact that Caroline Davis has pleaded guilty to a crime is not evidence that a defendant is guilty, and you cannot consider this against a defendant in any way.

You heard some video-recorded conversations that were received in evidence, and you were given some written transcripts of those video recordings.  Keep in mind that the transcripts are not evidence.  You will not have them back in the jury room.  They were given to you only as a guide to help you follow what was being said.

The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read.  And if you could not hear or understand certain parts of the recordings, you must ignore the transcripts as far as those parts are concerned.

During the trial you heard -- you saw and heard summary evidence in the form of charts by the FBI agent who testified.  These summaries were admitted in evidence, in addition to the material they summarized because they may assist you in understanding the evidence

1   that has been presented.  But the summaries themselves
2   are not evidence of the material they summarize and are
3   only as valid and reliable as the underlying material
4   they summarize.

5            That concludes the part of my instructions
6   explaining the rules for considering some of the
7   testimony and evidence.  Now let me finish up by
8   explaining some things about your deliberations in the
9   jury room and your possible verdicts.

10           The first thing you should do in the jury
11  room is choose someone to be your foreperson.  This
12  person will help to guide your discussions and will speak
13  for you here in court.  Once you start deliberating, do
14  not talk to the jury officer or to me or to anyone else
15  except each other about the case.

16           If you have any questions or messages, you
17  must write them down on a piece of paper, sign them and
18  give them to the jury officer.  The officer will give
19  them to me and I will respond as soon as I can.  I may
20  have to talk to the lawyers about what you have asked, so
21  it may take me some time to get back to you.  Any
22  questions or messages normally should be sent to me
23  through your foreperson.

24           One more thing about messages.  Do not ever
25  write down or tell anyone, including me, how you stand on

your votes.  For example, do not write down or tell
anyone you are split six-six or eight-four or whatever
your vote happens to be.  That is to stay secret until
you are finished.

Remember you must make your decision based
only on the evidence that you saw and heard here in
court.  During your deliberations you must not
communicate with or provide any information to anyone by
any means about this case.  You may not use any
electronic device, or media or application such as a
telephone, cell phone or computer, the Internet, any
Internet service or any text or instant messaging
service, any Internet chat room, blog or website such as
Facebook or other similar electronic service to
communicate any information to anyone about this case or
to conduct any research about this case until I accept
your verdict.

In other words, you cannot talk to anyone on
the phone, correspond with anyone or electronically
communicate with anyone about this case.  You can only
discuss the case in the jury room with your fellow jurors
during deliberations.  I expect you will inform me if you
become aware of another juror's violation of these
instructions.

You may not use these electronic means to

investigate or communicate about the case because it is
important that you decide this case based solely on the
evidence presented in this courtroom, which has been
admitted under the Rules of Evidence and Criminal
Procedure that govern federal trials and to which you and
your fellow jurors have been exposed.

Basing your decision on information known
only by you and not your fellow jurors or the parties in
the case would unfairly and adversely impact the judicial
process.  A juror who violates these restrictions
jeopardizes the fairness of these proceedings and a
mistrial could result, which would require the entire
trial process to start over again.

Your verdict, whether it is guilty or not
guilty, must be unanimous as to each count and as to each
defendant.  To find a defendant guilty of a particular
count, every one of you must agree that the government
has overcome the presumption of innocence with evidence
that proves his guilt beyond a reasonable doubt.

To find him not guilty of a particular
count, every one of you must agree that the government
has failed to convince you beyond a reasonable doubt.
Either way, guilty or not guilty, your verdict must be
unanimous as to each count.

The attitude and conduct of jurors at the

beginning of their deliberations are very important.  It
is rarely productive or good for a juror, upon entering
the jury room, to make an emphatic expression of his or
her opinion on the case or to announce a determination to
stand for a certain verdict.  When a juror does that, his
or her sense of pride may be aroused and he may hesitate
to recede from an announced position even if shown that
it is wrong.  Remember you are not partisans or advocates
in this matter, but judges.

Now that all the evidence is in and the
arguments are completed, you are free to talk about the
case in the jury room.  In fact, it is your duty to talk
with each other about the evidence and to make every
reasonable effort you can to reach unanimous agreement.

Talk with each other, listen carefully and
respectfully to each other's views and keep an open mind
as you listen to what your fellow jurors have to say.
Try your best to work out your differences.  Do not
hesitate to change your minds if you are convinced that
other jurors are right and that your original position
was wrong.  But do not ever change your mind just because
other jurors see things differently or just to get the
case over with.  In the end your vote must be exactly
that, your own vote.

It is important for you to reach unanimous

agreement but only if you can do so honestly and in good
conscience.  No one will be allowed to hear your
discussions in the courtroom and no record will be made
of what you say.  So you should all feel free to speak
your minds.  Listen carefully to what the other jurors
have to say and then decide for yourself if the
government has proved any defendant guilty beyond a
reasonable doubt of either charge.

If you decide that the government has proved
a defendant guilty, then it will my job to decide what
the appropriate punishment should be.  Deciding what the
punishment should be is my job, not yours.  It would
violate your oaths as jurors to even consider the
possible punishment in deciding your verdict.  Your job
is to look at the evidence and decide if the government
has proved any defendant guilty beyond a reasonable
doubt.

We have prepared a verdict form that you
will use in recording your verdict.  And it will walk you
right through what you need to decide.  Under Count One,
it says Count One of the indictment charges each
defendant with violating Title 18 United States Code
Section 241, conspiracy against rights.  With respect to
the charge in Count One of the indictment, we find the
defendant, and then it lists all six defendants and under

1   each defendant's name it has a space to mark guilty or

2   not guilty.  So you go through and decide that count as

3   to each of the six defendants.  And you make a unanimous

4   finding as to whether they're guilty or not guilty of

5   Count One.

6              Then you move on to Count Two.  And the

7   numbers of the defendants don't mean anything.  Anyway.

8   All six defendants are listed separately.

9              Count Two of the indictment charges each

10  defendant with violating Title 18 United States Code

11  Section 248(a)(1) and (2), the Freedom of Access to

12  Clinic Entrances or the FACE Act and for violating the

13  FACE Act either personally or as an aider and abettor

14  under Title 18 United States Code Section 2.

15             With respect to the charge in Count Two of

16  the indictment, we find the defendant, and then it lists

17  all six defendants and, again, a space to mark guilty or

18  not guilty as to each of the six defendants.

19             If you decide that the government has proved

20  a charge against a defendant beyond a reasonable doubt,

21  say so by having your foreperson mark the appropriate

22  place on the form.  If you decide that your foreperson --

23  if you decide that the government has not proved the

24  charge against him or her beyond a reasonable doubt, say

25  so by having your foreperson mark the appropriate place

on the form.  Your foreperson should then sign the form,
put the date on it and tell the court security officer
that you're ready to return a verdict.

Remember that the defendants are only on
trial for the particular crimes charged in the
indictment.  Your job is limited to deciding whether the
government has proved the crimes charged.

Also remember that whether anyone else
should be prosecuted and convicted for these crimes is
not a proper matter for you to consider.  The possible
guilt of others is no defense to a criminal charge.  Your
job is to decide if the government has proved these
defendants guilty.  Do not let the possible guilt of
others influence your decision in any way.

Let me finish up by saying something I said
to you earlier.  Nothing I have said or done during this
trial was meant to influence your decision in any way.
You decide for yourselves if the government has proved
any defendant guilty beyond a reasonable doubt.  Remember
that if you elected to take notes during the trial, your
notes should be used only as memory aids.  You should not
give your notes greater weight than your independent
recollection of the evidence.

You should rely upon your own independent
recollection of the evidence or lack of evidence and you

1   should not be unduly influenced by the notes of other

2   jurors. Notes are not entitled to any more weight than

3   the memory or impression of each juror. Whether you took

4   notes or not, each of you must form and express your own

5   opinion as to the facts of the case.

6              If it becomes necessary during your

7   deliberations to communicate with the Court, you may send

8   a note by the court security officer signed by your

9   foreperson or one or more members of the jury. No member

10  of the jury should even attempt to communicate with the

11  Court by any means other than a signed writing, and the

12  Court will never communicate with any member of the jury

13  on any subject touching the merits of the case otherwise

14  than in writing or orally here in open court.

15             Bear in mind also that you are never to

16  reveal to any person, not even to the Court, how you

17  stand numerically or otherwise on the questions before

18  you until after you have reached a unanimous verdict.

19             All right. Members of the jury, it's almost

20  5 o'clock. We're going to send you home at this point.

21  I want to reemphasize that you are not to talk about the

22  case with anyone or amongst yourselves. You are not to

23  do any research about anything or anyone connected to

24  this case. You are to ignore any news coverage.

25             You'll return at 9 o'clock in the morning.

1   We will bring you into court and then we will excuse you

2   to begin your deliberations, at which point you will take

3   your notes and your individual copies of the instructions

4   back to the jury room.  We will send all of the evidence

5   back, including all the evidence that's on -- what do you

6   call those sticks -- flash drives, there's a computer

7   back in the jury room, and I'm sure someone in your group

8   will know how to watch the videos.  They're in evidence,

9   you can watch them as many times as you want to.  If you

10  have trouble with any of the technology, you just let the

11  court security officer know and we'll get an IT person in

12  there to help you.

13          Now, we have four alternates.  And the

14  alternates are Christine Mason, Katherine Wolford, Lauren

15  Dean and Daniel Banks.  You will come back into court at

16  9 o'clock in the morning with the jury.  When they go to

17  begin deliberation, you will go downstairs to the jury

18  room, and you will have to wait while they deliberate

19  because if one of them has an emergency or gets sick, we

20  will have to substitute one of you.

21          And if that happens, the jury will begin its

22  deliberations all over again so that all 12 people are

23  part of the entire deliberation.  We will hope that

24  doesn't happen, but I'm afraid that you will have to

25  stick with us until we are able to make that

1  determination.  So I encourage you to bring a book or

2  whatever it is that you like to do when you're sitting

3  around.

4          So that's how we will proceed.  So at this

5  time I'm going to excuse all of you.  Go home, get a good

6  night's sleep, and you will begin deliberations in the

7  morning.  Leave all your notes and everything on your

8  chairs, okay.

9          (Whereupon, at 4:59 p.m. the jury retired

10  from open court.)

11          THE COURT:  Okay.  So sit down, please.  I

12  want everybody back in here at 9 o'clock so that we can

13  excuse them to deliberate.  And then I need to make sure

14  that Katheryn has your cell phones.  I would encourage

15  you to not get too far away.  I have no idea how long it

16  will take them to deliberate, but you never know.

17  Sometimes they come back quickly and we don't want to

18  have a whole lot of delay and keeping them longer -- any

19  longer than they need to be kept.

20          So at this point we will recess, and I'll

21  see you at 9:00 in the morning.

22          (Whereupon, at 5:00 p.m. these were all of

23  the proceedings had in the above-captioned cause on the

24  above-captioned date.)

25

1      **REPORTER'S CERTIFICATE PAGE**

2

3          I, Roxann Harkins, Official Court Reporter for

4     the United States District Court for the Middle District

5     of Tennessee, in Nashville, do hereby certify:

6          That I reported on the stenotype shorthand

7     machine the proceedings held in open court on

8     January 29, 2024, Vol 5-B, in the matter of UNITED STATES

9     OF AMERICA v. CHESTER GALLAGHER, ET AL., Case No.

10    3:22-cr-327; that said proceedings were reduced to

11    typewritten form by me; and that the foregoing transcript

12    is a true and accurate transcript of said proceedings.

13

14          This is the 12th day of March, 2024.

15

16                    s/ Roxann Harkins_____
                      ROXANN HARKINS, RPR, CRR
17                    Official Court Reporter

18

19

20

21

22

23

24

25